ACCEPTED
03-14-00735-CV
4704785
THIRD COURT OF APPEALS
AUSTIN, TEXAS
3/31/2015 9:56:35 AM
JEFFREY D. KYLE
CLERK

## NO. 03-14-00735-CV

### IN THE
### TEXAS COURT OF APPEALS
### THIRD COURT OF APPEALS DISTRICT
### AT AUSTIN

FILED IN
3rd COURT OF APPEALS
AUSTIN, TEXAS
3/31/2015 9:56:35 AM
JEFFREY D. KYLE
Clerk

ENTERGY TEXAS, INC., ET AL.,

APPELLANTS,

V.

PUBLIC UTILITY COMMISSION OF TEXAS, ET AL.,

APPELLEES

ON APPEAL FROM THE FINAL JUDGMENT
IN CAUSE NO. D-1-GN-13-000121 (CONSOLIDATED),
353RD JUDICIAL DISTRICT COURT,
TRAVIS COUNTY, TEXAS,
HONORABLE JOHN K. DIETZ, JUDGE PRESIDING

### APPELLANT'S BRIEF AND APPENDIX OF
### THE OFFICE OF PUBLIC UTILITY COUNSEL

OFFICE OF PUBLIC UTILITY COUNSEL
Tonya Baer
Public Counsel
State Bar No. 24026771

Sara J. Ferris
Senior Assistant Public Counsel
State Bar No. 50511915
P.O. Box 12397
Austin, Texas 78711-2397
512/936-7500 (Telephone)
512/936-7525 (Facsimile)
Sara.Ferris@opuc.texas.gov

**ORAL ARGUMENT REQUESTED**

March 31, 2015

# IDENTITY OF PARTIES AND COUNSEL

| <u>PARTIES</u> | <u>ATTORNEYS</u> |
|---|---|
| OFFICE OF PUBLIC UTILITY COUNSEL | Sara J. Ferris<br>Senior Assistant Public Counsel<br>Office of Public Utility Counsel<br>P.O. Box 12397<br>Austin, Texas 78711-2397<br>sara.ferris@opuc.texas.gov |
| ENTERGY TEXAS, INC. | Marnie A. McCormick<br>John F. Williams<br>Duggins, Wren, Mann & Romero, LLP<br>P.O. Box 1149<br>Austin, Texas 78767-1149<br>mmcormick@dwmrlaw.com<br>jwilliams@dwmrlaw.com |
| CITIES OF ANAHUAC, BEAUMONT, ET. AL. | Daniel J. Lawton<br>Lawton Law Firm PC<br>12600 Hill Country Boulevard, Suite R275<br>Austin, Texas 78738<br>dlawton@ecpi.com |
| STATE AGENCIES OF TEXAS | Katherine H. Farrell<br>Assistant Attorney General<br>Administrative Law Division – Energy Rates Section<br>Office of the Attorney General<br>P. O. Box 12548<br>Austin, Texas 78711-2548<br>katherine.farrell@texasattorneygeneral.gov |

i

TEXAS INDUSTRIAL
ENERGY CONSUMERS

Rex VanMiddlesworth
Benjamin Hallmark
Thompson & Knight, LLP
98 San Jacinto Blvd, Suite 1900
Austin, Texas 78701
rex.vanm@tklaw.com
benjamin.hallmark@tklaw.com


PUBLIC UTILITY
COMMISSION OF TEXAS

Elizabeth R. B. Sterling
Assistant Attorney General
Environmental Protection Division
Office of the Attorney General
P. O. Box 12548, Capitol Station
Austin, Texas 78711-2548
elizabeth.sterling@texasattorneygeneral.gov

# TABLE OF CONTENTS

IDENTITY OF PARTIES AND COUNSEL.......................................................................... i

TABLE OF CONTENTS................................................................................................... iii

INDEX OF AUTHORITIES............................................................................................... v

GLOSSARY OF ABBREVIATIONS & TECHNICAL TERMS.................................... ix

STATEMENT OF THE CASE........................................................................................... 1

STATEMENT REGARDING ORAL ARGUMENT......................................................... 2

ISSUE PRESENTED ......................................................................................................... 2

    Did the Commission err by allowing the inclusion of $13,014,379 in
    1997 ice storm restoration costs that were directly related to the
    Company's imprudence and reasonably anticipated?  Did the
    Commission act arbitrarily in allowing the inclusion of these costs
    in the Company's storm reserve balance, and violate PURA and
    the Commission's own rules? ........................................................................ 2

STATEMENT OF FACTS ................................................................................................. 3

  BACKGROUND .............................................................................................................. 3

  THE RATE CASE, DOCKET NO. 39896 .................................................................. 7

SUMMARY OF THE ARGUMENT................................................................................. 8

ARGUMENT .................................................................................................................... 13

A.    Standard of Review ................................................................................................. 13

B.    The Commission Erred as a Matter of Law in Allowing the Inclusion
    of $13,014,379 in 1997 Ice Storm Restoration Costs That Were
    Directly Related to the Company's Imprudence and Which Were
    Reasonably Anticipated.  The Commission Acted Arbitrarily in
    Allowing the Inclusion of These Costs in the Company's Storm
    Reserve Accrual and Storm Reserve Balance, and Violated PURA
    and the Commission's Own Rules. ...................................................................... 15

1. *The Commission erred in approving the recovery of imprudent costs.* ..................... 16

2. *The Commission erred by failing to hold ETI to its burden of showing that the expenses it sought to include in the storm reserve were not reasonably anticipated.* .................................................................................................... 20

3. *Prior remedies assessed for poor quality of service, including imprudent vegetation management do not address the subsequent imprudence of excessive ice damage expenses.* ...................................................................................... 22

4. *The statutory burden of proof rests upon ETI to affirmatively prove each element of its case. The Commission erred in excusing ETI from its burden of proof merely because years had passed between the incurrence of the 1997 ice storm restoration costs and Docket No. 39896.* ........................................ 25

    a. *ETI has the burden of persuasion on the entire case failed to prove each required element to meet this burden.* ............................................ 27

    b. *The Commission erred in finding that ETI had established a prima facie case sufficient to shift the burden of proof.* .................................... 28

    c. *The overall burden of proof remained on ETI to affirmatively prove each element of its case by a preponderance of the evidence. The Commission erred in failing to hold ETI to this burden.* .................................. 29

    d. *ETI's statutory responsibilities do not expire or shift due to the passage of time.* .......................................................................................... 31

    e. *The PFD adopted by the Commission improperly shifted the burden to OPUC and intervening parties.* .................................................. 32

    f. *Under Texas and Commission standards, ETI failed to meet its burden of proof required for the inclusion of the $13,014,379 in 1997 ice storm costs.* .......................................................................................... 36

5. *The Commission's decision to approve the inclusion of $13,014,379 in 1997 ice storm costs is arbitrary and capricious and constitutes an abuse of discretion.* ........................................................................................ 37

PRAYER ................................................................................................................... 40

CERTIFICATE OF COMPLIANCE .......................................................................... 41

iv

CERTIFICATE OF SERVICE ................................................................................ 41

APPENDIX

A: District Court Judgement, Cause No. D-1-GN-13-000121 (Consolidated)

B: PUC Docket No. 39896, Order on Rehearing

C: PURA, Chapter 36, Subchapters A and B, and Chapter 37, Subchapter D

D: *Entergy Gulf States, Inc. v. Public Utility Commission,*

112 S.W.3d 208 (Tex. App. – Austin 2003, pet. denied)

E: *Texas Utilities Electric Company v. Public Utility Commission,* 881 S.W.2d 387 (Tex. App. – Austin 1994) *aff'd in part, rev'd in part on other grounds,* 935 S.W.2d 109 (Tex. 1997)

F: PUC Docket No. 18249, Order on Rehearing

G: Excerpt from: PUC Docket No. 16705, Proposal for Decision

H: Excerpts from: PUC Docket No. 16705, Second Order on Rehearing

I: 16 Tex. Admin. Code § 25.231

# INDEX OF AUTHORITIES

## CASES

*Apresa v. Montfort Insurance Co.,*
　　932 S.W.2d 246 (Tex. App.—El Paso 1996, no writ) .........................................34

*Boaz v. Harris,*
　　30 S.W.2d 810 (Tex. Civ. App.—Fort Worth 1930, no writ) .....................27, 28

*Cameron Compress Co. v. Kubecka,*
　　283 S.W. 285 (Tex. Civ. App.—Austin 1926, writ ref'd) .................................27

*City of El Paso v. Public Util. Commission,*
　　883 S.W.2d 179 (Tex. 1994) .......................................................................14, 38

*Clark v. Hiles,*
　　67 Tex. 141, 2 S.W. 356 (1886).........................................................................33

*Coalition for Long Point Preservation v. Texas Commission on Environmental Quality,*
　　106 S.W.3d 363 (Tex. App – Austin 2003, pet. denied) ................................... 14

*Dodson v. Watson,*
　　110 Tex. 355, 220 S.W. 771 (1920)...................................................................28

*Entergy Gulf States, Inc. v. Public Utility Commission,*
　　112 S.W.3d 208 (Tex. App.—Austin 2003, pet. denied) .................16, 23, 27, 29

*Fritsche v. Niechoy,*
　　197 S.W. 1017 (Tex. App. – Galveston 1917, writ dism'd w.o.j.).......................28

*Hernandez v. State,*
　　161 S.W.3d 491 (Tex. Crim. App. 2005) ...........................................................28

*In re E.I. DuPont de Nemours & Co.,*
　　136 S.W.3d 218 (Tex. 2004) (orig. proceeding)................................................28

*Koppe v. Koppe*,
     57 Tex. Civ. App. 204, 122 S.W. 68 (1909)...........................................................33

*Lykes Bros.-Ripley S. S. Co. v. Pluto*,
     146 S.W.2d 414 (Tex. Civ. App.—Galveston 1940, writ dism'd
     judgm't cor.) ........................................................................................................29

*Public Utility Commission v. Gulf States Utilities*,
     809 S.W.2d 201 (Tex. 1991) .......................................................................... 12, 39

*Public Utility Commission v. Houston Lighting & Power Co.*,
     778 S.W.2d 195 (Tex. App.—Austin 1989, no writ).................................... 27, 29

*Reliant Energy, Inc. v. Public Util. Commission*,
     62 S.W.3d 833 (Tex. App. – Austin 2001, no pet.)................................................38

*Texas Parks & Wildlife Department v. Dearing*,
     240 S.W.3d 330 (Tex. App.—Austin 2007, pet. denied) ...................................28

*Texas Utilities Electric Company v. Public Utility Commission*,
     881 S.W.2d 387 (Tex. App.—Austin 1994) *aff'd in part, rev'd in part*
     *on other grounds*, 935 S.W.2d 109 (Tex. 1997) ...................................... 16, 18

*Vance v. My Apartment Steak House*,
     677 S.W.2d 480 (Tex. 1984) ........................................................................ 37

*Wyeth v. Hall*,
     118 S.W.3d 487 (Tex. App. – Beaumont 2003, no pet.)....................................28

## TEXAS STATUTES

Tex. Gov't Code § 2001.174 ....................................................................13-14, 15, 27
Public Utility Regulatory Act (PURA), Tex. Util. Code §§ 11.001-66.017 ................. 2
PURA § 15.001.......................................................................................................... 13
PURA § 31.002(19) ...................................................................................................... 3
PURA § 36.003(a) ......................................................................................................23
PURA § 36.006......................................................................................... 23, 25, 27

PURA § 36.051.................................................................................................. 23, 25

PURA § 36.062..................................................................................................23, 39

PURA § 36.064...................................................................................................20, 25

PURA § 36.064(a)..............................................................................................15, 22

PURA § 36.101 – 36.111...................................................................................... 3

PURA § 37.151...................................................................................................... 5

PURA § 38.001 ..................................................................................................... 5

PURA § 39.452(e) ............................................................................................... 3

## PUBLIC UTILITY COMMISSION OF TEXAS RULES

16 Tex. Admin. Code § 25.231.........................................................................12, 20

16 Tex. Admin. Code § 25.231(b)............................................................15, 16, 20, 25

16 Tex. Admin. Code § 25.231(b)(1)(G)....................... 12, 15-16, 20-21, 22, 25, 39

16 Tex. Admin. Code § 25.231(b)(2)(J)...........................................................12, 39

## ADMINISTRATIVE PROCEEDINGS

*Application of Entergy Texas for Approval of its Transition to Competition Plan and the
Tariffs Implementing the Plan, and for the Authority to Reconcile Fuel Costs,*
    Docket No. 16705, Proposal For Decision (Mar. 25, 1998).  ......... 30, 34-35, 36

*Application of Entergy Texas for Approval of its Transition to Competition Plan and the
Tariffs Implementing the Plan, and for the Authority to Reconcile Fuel Costs,*
    Docket No. 16705, Second Order on Rehearing (Oct. 14, 1998).  ........... 4, 9, 26

*Entergy Gulf States, Inc. Service Quality Issues (Severed from Docket No. 16705),*
    Docket No. 18249, Order on Rehearing
    (Apr. 22, 1998).  ........................................3, 4, 5, 6, 7, 8, 9, 12-13, 17, 18, 21, 22, 39

## LEARNED TREATISE

35 Tex Jur 3d, *Evidence* § 103 (Gene A. Noland, ed., 1984) ............................................ 27

# GLOSSARY OF ABBREVIATIONS & TECHNICAL TERMS

**AR** – Administrative Record

**Cities** – Anahuac, Beaumont, Bridge City, Cleveland, Conroe, Dayton, Groves, Houston, Huntsville, Montgomery, Navasota, Nederland, Oak Ridge North, Orange, Pine Forest, Rose City, Pinehurst, Port Arthur, Port Neches, Shenandoah, Silsbee, Sour Lake, Splendora, Vidor, and West Orange Texas, Plaintiffs in this appeal

**Commission or PUC**– Public Utility Commission of Texas

**Company** – Entergy Texas, Inc.

**Docket No. 16705** – The Company's last fully litigated rate case

**Docket No. 18249** – The Company's Quality of Service Issues docket

**Docket No. 39896** – The PUC docket underlying this appeal

**EGS or EGSI** – Entergy Gulf States, Inc., predecessor to ETI

**Entergy** – Entergy Corporation, ETI's parent company

**ETI** – Entergy Texas, Inc.

**Order** – The Commission's "Order on Rehearing" signed on November 1, 2012, the final and appealable order of the Commission in Docket No. 39896, from which OPUC appeals in this suit for judicial review

**OPUC** – Office of Public Utility Counsel

**PFD** – Proposal for Decision

**PURA** – *Public Utility Regulatory Act*, Tex. Util. Code §§ 11.001-66.017

**ROE** – Return on Equity

**ROW** – Right of Way

**SAIDI** – System Average Interruption Duration Index

**SAIFI** – System Average Interruption Frequency Index

**Self-Insurance Storm Reserve** – Account designed to provide for storm-related property losses exceeding $50,000 that are not covered by commercial insurance or eligible for securitization.

**SOAH** – State Office of Administrative Hearings

**Test Year** – July 1, 2010, through June 30, 2011

TO THE HONORABLE COURT OF APPEALS:

The Office of Public Utility Counsel (OPUC), Appellant, submits this brief in support of its appeal from a portion of the final judgment of the District Court on judicial review of the final Order on Rehearing (Order) of the Public Utility Commission of Texas (Commission or PUC) in Docket No. 39896.[1] Appellant respectfully presents the following:

## STATEMENT OF THE CASE

The case is an appeal from the final judgment of the 353rd Judicial District Court of Travis County, Texas, the Honorable John K. Dietz, Judge Presiding, in *Entergy Texas, Inc., et al. v. Public Utility Commission of Texas*, Cause No. D-1-GN-13-000121 (Consolidated). The case involves the judicial review of the final Order of the Commission in Docket No. 39896, styled *Application of Entergy Texas, Inc. for Authority to Change Rates, Reconcile Fuel Costs, and Obtain Deferred Accounting Treatment*, a contested rate case. The final judgment of the District Court affirmed in part, and reversed and remanded in part the final order of the Commission. OPUC appeals the part of the District Court judgment affirming the Commission's decision to

---

[1] The final judgment of the District Court and the Commission's Order on Rehearing are submitted as Appendix A and Appendix B.

include in the Company's storm reserve $13,014,379 in 1997 ice storm restoration costs that were directly related to the Company's imprudence.

## STATEMENT REGARDING ORAL ARGUMENT

The Court should permit oral argument. Like most cases involving public utility regulation, this case is complex; oral argument will assist the Court in clarifying the law and facts of the case.

## ISSUE PRESENTED

Did the Commission err by allowing the inclusion of $13,014,379 in 1997 ice storm restoration costs that were directly related to the Company's imprudence and reasonably anticipated? Did the Commission act arbitrarily in allowing the inclusion of these costs in the Company's storm reserve balance, and violate PURA and the Commission's own rules?[2]

---

[2] *Public Utility Regulatory Act*, PURA, Tex. Util. Code §§ 11.001-66.017.

STATEMENT OF FACTS

<span style="font-variant:small-caps">Background</span>

Entergy Texas, Inc. (ETI or the Company), an investor-owned electric utility with a retail service area in southeastern Texas, filed an application with the Commission on November 28, 2011 for authority to increase its rates. ETI's application was designated as Commission Docket No. 39896. *See generally*, PURA §§ 31.002(19), 36.101–36.111; Administrative Record (AR), Binder 7, Item 244, Order on Rehearing.[3] Previously, the Company had been known as Entergy Gulf States, Inc. (EGS) but on December 31, 2007, EGS jurisdictionally separated pursuant to PURA § 39.452(e).[4] ETI succeeded to EGS's certificate of convenience and necessity (CCN) for its Texas retail jurisdiction.[5] Prior to 1993 and Entergy Corporation's merger with Gulf States Utilities, Inc., the company serving this territory and holding the CCN was Gulf States Utilities.[6]

On November 27, 1996, EGS filed its transition to competition plan and rate case in PUC Docket No. 16705. In this docket, the Commission issued two preliminary orders related to EGS's service quality. The second or supplemental

---

[3] In this brief, citations to the Administrative Record will be in the following format: AR, Binder X, Item X, Item name.

[4] Docket No. 34800, *Application of Entergy Gulf States, Inc. for Authority to Change Rates and to Reconcile Fuel Costs*, Order at 1-2 n.1 (Mar. 16, 2009).

[5] *Id.*

[6] *See* Docket No. 18249, *Entergy Gulf States, Inc. Service Quality Issues (Severed from Docket No. 16705)*, Order on Rehearing at 1 (Apr. 22, 1998). This Order is submitted as Appendix F.

3

preliminary order addressed whether EGS's management policy devoted adequate resources to ensure adequate and reliable service to its ratepayers, whether there were patterns of variable service quality in the service territory, what were the cause and resolution of the variations, and what procedures should the Commission implement to monitor EGS's service quality and to respond when its service quality falls below benchmark levels.[7]  On November 4, 1997, the Commission severed the quality of service issues from Docket No. 16705 into Docket No. 18249.[8]  One of the issues which remained in Docket No. 16705 was the amount of the Company's storm reserve funding includable in rates.  The Commission considered the Company's proposal to include a post-test-year adjustment for the January 1997 ice storm expenses.  In Finding of Fact Number 147, the Commission found:

> Any reduction to the reserve fund occurring after the test year should not be considered in this case because **EGS did not prove** a reasonable post-test year level for its existing reserve fund or **that the amount expended in 1997 to reduce the fund was prudent or appropriate**.  Reserve fund levels following the test year in this case can be addressed in EGS' November 1998 rate filing when all parties will have the opportunity to **evaluate the reasonableness** of changes to the insurance reserve fund. (emphasis added)[9]

---

[7] *Id.* at 2.

[8] *Id.* at 3.

[9] *Application of Entergy Texas for Approval of its Transition to Competition Plan and the Tariffs Implementing the Plan, and for the Authority to Reconcile Fuel Costs*, Docket No. 16705, Second Order on Rehearing (Oct. 14, 1998). Excerpts from this Order are submitted with this brief as Appendix H.

In the severed Service Quality Issues proceeding (Docket No. 18249), after a hearing on the merits presided over by two Commissioners and briefing by the parties, the Commission issued its Order on Rehearing on April 22, 1998.[10] The Order on Rehearing discussed the importance of reliability and the vital role electricity plays in our lives. Under Texas law, an electric utility is required by PURA § 37.151 to provide "continuous and adequate service" in its service area, and is further obligated by PURA § 38.001 to furnish service, instrumentalities and facilities that are safe, adequate, efficient and reasonable. In Docket No. 18249, the Commission concluded that the quality of the Company's electric service to its customers in Texas had been less than adequate, specifically since Entergy Corporation acquired Gulf States Utilities, Inc., in 1993.[11] The Commission also discussed numerous deficiencies in the Company's service quality, including inadequate distribution maintenance policies, inadequate vegetation management practices, distribution poles in poor condition or in need of comprehensive vegetation clearing, and inadequate pole inspection and repair work cycles.[12] The culmination of these inadequacies led the Commission to make findings regarding

---

[10] Docket No. 18249, *Entergy Gulf States, Inc. Service Quality Issues (Severed from Docket No. 16705)*, Order on Rehearing at 4 (Apr. 22, 1998).
[11] *Id.* at 1.
[12] *Id.* at 8-19.

the state of the Company's distribution maintenance, including its vegetation management practices.[13]

The Commission also considered the damage caused in the EGS (now ETI) service territory due to a severe ice storm which occurred in January 1997. After finding that EGS should have been better prepared to deal with the January 1997 ice storm, the Commission found that up to 120,000 of the Company's approximately 318,000 customers were without power and that the restoration of service took seven days to complete.[14] The Commission then found in Finding of Fact 102 that EGS's restoration efforts would have been more effective if the Company had been more diligent in its preventative vegetation management practices and if it had a better communication and management program in place to deal with emergency situations. The Commission also stated the following:

> A major cause of the outages during the storm were broken or bowed ice-laden tree limbs overhanging the wires. Tree limbs in ROW overhanging distribution lines pose a threat to system reliability, and are largely within EGS' control. The Company's failure to clear the limbs before the storm was a major factor in the number and duration of outages experienced by customers. While Company's initial efforts to mobilize and deploy additional non-EGS personnel were slow and cause concern, vegetation management failures greatly aggravated the situation.[15]

---

[13] *Id.* at 42-49, Findings of Fact Nos. 45, 46, 67, 79-83, 91-92, 94-96, 97-99, 102, 123-124, and 127; *See Id.* at 50, Conclusions of Law Nos. 5-7.

[14] *Id.* at 46, Findings of Fact Nos. 91 and 92.

[15] *Id.* at 18-19.

The Order on Rehearing in Docket No. 18249 also contained the following findings of fact:

82. Neglect and backlog of vegetation management projects has posed unacceptable risks of increasing and recurrent service outages, especially during major ice storms.

83. The Commission finds that the Company's vegetation management efforts have not been adequate, have led to a backlog in vegetation clearing, *and have resulted in an unacceptably high risk to the system.* (emphasis added)

97. The impact of the January 1997 ice storm was greatly exacerbated by the Company's failure to maintain its ROW clear of excessive vegetation.

## THE RATE CASE, DOCKET NO. 39896

In the underlying rate case now on appeal, ETI included in the storm reserve $13,014,379 in 1997 ice storm expenses but did not provide an affirmative case supporting the prudence of the 1997 ice storm costs. Instead, the Company's testimony focused on future quality of service practices and anticipated future storm costs. The Commission's Order failed to make required findings as to the prudence of these costs or whether the costs ETI sought to include "were not reasonably anticipated" as required by PURA and the Commission's rules. OPUC appeals the Commission's consequent inclusion of the 1997 ice storm costs as legal error.

7

## SUMMARY OF THE ARGUMENT

The Commission's Order contains legal error that prejudices the rights of residential and small commercial customers. The Commission's inclusion of the 1997 ice storm restoration expenses in the Company's self-insurance storm reserve violates PURA and the Commission's own rules, was arbitrary, and capricious, and made through unlawful procedure. For these reasons, the District Court's judgment upholding the Commission's Order on this issue should be reversed and the case remanded to the Commission for further proceedings based upon the existing evidentiary record and consistent with this Court's decision.

It is a violation of PURA to include imprudent costs in rates. When there is imprudence within a utility's request for recovery, any imprudent costs must be removed either by separating them out from the prudent costs, or disallowing the entire amount of the intermingled requested costs. Despite the Commission's finding in Docket No. 18249 that the 1997 ice storm damage was greatly exacerbated by the Company's imprudence, particularly with regard to its vegetation management, ETI made no showing or even an attempt at showing that the costs of cleaning up the damage caused by its imprudent actions had been excluded from its storm balance request. Nor did the Commission hold ETI to this required showing.

ETI also bore the burden of showing that any cost it sought to include in the

8

storm reserve was "not reasonably anticipated." Both PURA and the Commission's rules require that costs included in the storm reserve be "not reasonably anticipated." Vegetation management is required in order to prevent foreseeable damage due to tree limbs or other vegetation coming into contact with conductors or power lines. The damage resulting from imprudent vegetation management is by its very nature, "reasonably anticipated." Thus, the inclusion of the $13,014,379 in 1997 ice storm restoration costs was improper and in violation of the applicable law.

The Commission committed legal error in failing to hold ETI to its burden of proving that the $13,014,379 in costs the Company was seeking to include in the storm reserve, the cost of service and ultimately reflected in rates, were not reasonably anticipated. The Commission, through the adopted PFD, erroneously relied on a 60 basis point reduction to the return on equity (ROE) from Docket No. 18249 that was imposed to compensate ratepayers for poor quality of service. The ROE reduction did not address or remedy the imprudent restoration costs that were caused by the original imprudent acts. In fact, the Commission's Order in Docket No. 16705, which was issued after the Docket No. 18249 Order, expressly contemplated that the reasonableness of including the 1997 ice storm costs in the Company's storm reserve would be addressed in the next rate case because the Company had not proven the prudence of those costs in its request to

9

include them in that docket as a post-test year adjustment. The underlying docket to this appeal, Docket No. 39896 is the first fully-litigated rate case for the Company since Docket No. 16705. The Commission erred in failing to give effect to this prior order and further erred by failing to require ETI to address the imprudence findings from Docket No. 18249 before having 1997 ice storm costs included in the storm reserve.

The Commission violated PURA by approving the recovery of the entire $13,014,379 in ice storm restoration expenses without requiring ETI to show that no costs caused by imprudent vegetation management were included in the Company's request. Under PURA, the burden of proof rests upon ETI to affirmatively prove each element of its case. The Commission erred in lifting that burden from ETI because fifteen years had passed between the incurrence of the 1997 ice storm restoration costs and Docket No. 39896. The Company's burden to prove that the requested costs were reasonable, prudent, and not reasonably anticipated under PURA does not expire.

The burden of proof in an electric rate proceeding is on the utility and it is ETI's burden to prove that each dollar included in rates was reasonable and prudent. ETI failed to provide evidence that the $13,014,379 in 1997 ice storm costs were "not reasonably anticipated." With regard to prudence, ETI only provided

evidence as to the reasonableness of how the clean-up was carried out; ETI wholly failed to address the prudence of these costs with regard to what portion was or was not related to the exacerbated damage caused by the imprudent vegetation management, or what amount would have been incurred even if no imprudent conditions had existed at the time of the storm. Further, ETI made no attempt to separate out imprudent costs from prudent costs, and the Commission erred in adopting the portion of the PFD that excused this lack of evidence due to the passage of time.

Further, the Commission erroneously shifted the burden of proof to OPUC and intervening parties and compounded this error by applying an improper standard of proof. Requiring OPUC and intervening parties to challenge specific expense items is contrary to what is required when rebutting a *prima facie* case under Texas law and Commission precedent. Under those standards, ETI failed to meet its burden of proof for the inclusion of $13,014,379 in the storm reserve, the cost of service, and ultimately reflected in rates. ETI failed to prove the existence of each element of its claim and consequently, the Commission erred in approving the inclusion of the $13,014,379 in 1997 ice storm restoration costs in the storm reserve.

Moreover, the Commission's decision approving the $13,014,379 in 1997 ice storm restoration costs was arbitrary and capricious. The Commission failed to consider factors the legislature directs it to consider, including whether the costs

11

were "not reasonably anticipated" and prudently incurred. Tellingly, there were no findings of fact or conclusions of law with regard to whether the costs were not reasonably anticipated. The Commission also considered irrelevant factors, including the passage of time between the rate case and the incurrence of the storm expenses, and the 60 basis-point reduction to the Company's ROE imposed for poor quality of service.

Additionally, the Commission acted arbitrarily and capriciously by failing to "follow the clear, unambiguous language of its own regulation."[16] The Commission failed to follow the clear, unambiguous language of Rule 25.231, which clearly states that "any expenditure found by the Commission to be unreasonable, unnecessary or not in the public interest" "shall never be a component of the cost of service." 16 Tex. Admin. Code § 25.231(b)(2)(J). The Commission also acted arbitrarily and capriciously by failing to follow its own rule which only allows storm costs to be included in the storm reserve to the extent they are reasonable and necessary, and are not reasonably anticipated. 16 Tex. Admin. Code § 25.231(b)(1)(G). In allowing the 1997 ice storm restoration costs to be included without addressing what portion was due to damage related to poor vegetation management, the Commission disregarded its prior finding from the final order of the Commission in Docket No. 18249 that storm damage was "greatly exacerbated

---

[16] *Public Util. Comm'n v. Gulf States Utilities*, 809 S.W.2d 201, 207 (Tex. 1991).

12

by the state of the Company's vegetation management."

As discussed in the sections below, the Commission committed reversible error in approving the inclusion of $13,014,379 in the storm reserve balance ultimately reflected in rates. The Commission's decision violates PURA and the Commission's own rules, is arbitrary, and capricious, affected by other error of law and made through unlawful procedure. For these reasons, the District Court's judgment upholding the Commission's Order on this issue should be reversed and the case and remanded to the Commission for further proceedings based upon the existing evidentiary record and consistent with this Court's decision.

## ARGUMENT

### A. Standard of Review

Any party to a proceeding before the Commission is entitled to judicial review under the substantial evidence rule. PURA § 15.001. The statutory standard of review is as follows:

> If the law authorizes review of a decision in a contested case under the substantial evidence rule or if the law does not define the scope of judicial review, a court may not substitute its judgment for the judgment of the state agency on the weight of the evidence on questions committed to agency discretion but:
>
> (1)    may affirm the agency decision in whole or in part; and
> (2)    shall reverse or remand the case for further proceedings if substantial rights of the appellant have been prejudiced

13

because the administrative findings, inferences, conclusions, or decisions are:

(A) in violation of a constitutional or statutory provision;
(B) in excess of the agency's statutory authority;
(C) made through unlawful procedure;
(D) affected by other error of law;
(E) not reasonably supported by substantial evidence considering the reliable and probative evidence in the record as a whole; or
(F) arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion.

Tex. Gov't Code § 2001.174.

In conducting a substantial evidence review, the court must determine whether the evidence as a whole is such that reasonable minds could have reached the same conclusion as the agency in the disputed action.[17] The court may not substitute its judgment for that of the agency and may consider only the record on which the agency based its decision.[18] The issue for the reviewing court is not whether the agency reached the correct conclusion, but rather, whether there is some reasonable basis in the record for its action.[19]

The Commission's Order prejudices the substantial rights of residential and small commercial customers by the excessive rates established in the Order, and because the Order's findings, inferences, conclusions and decisions with regard to

---

[17] *Coalition for Long Point Preservation v. Texas Commission on Environmental Quality*, 106 S.W.3d 363, 366 (Tex. App – Austin 2003, pet. denied).
[18] *Id.*
[19] *City of El Paso v. Public Util. Comm'n*, 883 S.W.2d 179, 185 (Tex. 1994).

the 1997 ice storm restoration expenses included in the Company's self-insurance storm reserve and reflected in the Company's cost of service were in violation of PURA, affected by other error of law, and were arbitrary, and capricious. Under the standard articulated in Tex. Gov't Code § 2001.174, the Commission's Order should be reversed and the case remanded for determination based upon the existing evidentiary record to determine rates consistent with the Court's decision.

**B. The Commission Erred as a Matter of Law in Allowing the Inclusion of $13,014,379 in 1997 Ice Storm Restoration Costs That Were Directly Related to the Company's Imprudence and Which Were Reasonably Anticipated. The Commission Acted Arbitrarily in Allowing the Inclusion of These Costs in the Company's Storm Reserve Accrual and Storm Reserve Balance, and Violated PURA and the Commission's Own Rules.**

The PFD adopted by the Commission erroneously found the entirety of ETI's $13,014,379 in storm expenses related to the 1997 ice storm to be reasonable and necessary and properly included in the self-insurance storm reserve.[20] By adopting the PFD on these points, the Commission erred as a matter of law by violating PURA's and PUC Substantive Rule 25.231(b)'s requirement that expenses included in rates be reasonable and necessary, and further erred by violating the requirement of both PURA § 36.064(a) and PUC Substantive Rule 25.231(b)(1)(G) that only those property and liability losses which "could not have

---

[20] AR, Binder 5, Item No. 185, PFD at 56 and 57.

15

been reasonably anticipated" may be included in a self-insurance plan.[21] The Commission's failure to either disallow the entire $13,014,379 in ice storm costs or determine what portion of those costs was incurred imprudently as a result of the Company's poor vegetation management results in the inclusion of imprudent costs in the Company's rates.

1. *The Commission erred in approving the recovery of imprudent costs.*

Imprudently incurred costs may not be recovered in the utility's base rates.[22] The utility bears the burden of proving the prudence of each cost for which recovery is sought, and if some but not all of the requested costs are imprudent, the imprudent costs must be removed either by separating them out or disallowing the intermingled requested costs. In *Texas Utilities Electric Company v. Public Utility Commission*, the Texas Third Court of Appeals found that, where a portion of the utility's $537.90 million in costs for the Comanche Peak nuclear project were imprudently incurred, the Commission acted properly in disallowing some but not all of the costs due to imprudence.[23] In the originating docket, the

---

[21] 16 Tex. Admin. Code § 25.231(b). The PUC's Cost of Service Rule, 16 Tex. Admin. Code § 25.231, is submitted as Appendix I.

[22] *See Entergy Gulf States, Inc. v. Public Utility Commission*, 112 S.W.3d 208, 214 (Tex. App.—Austin 2003, pet. denied) ("[I]n order to raise the price of its product, the utility must participate in a rate case and bear the burden of proving that each dollar of cost incurred was reasonably and prudently invested.") (Appendix D).

[23] *Texas Utilities Electric Company v. Public Utility Commission*, 881 S.W.2d 387, 405-406 (Tex. App.—

16

utility had argued that all of its Comanche Peak costs were prudently incurred, while intervening parties had argued that the costs should be disallowed entirely.[24] The Commission had then brought in a third party to evaluate the prudence of the costs. Based upon the third party recommendation, the Commission disallowed part of the costs because they were imprudent but allowed other costs.[25] The Austin court, reviewing the Commission's decision to reject an all-or-nothing approach and disallow a portion of the expenses, stated that "it is the Commission that is charged with sifting through the evidence and deciding whether imprudent conduct caused certain expenditures."[26]

The instant case is distinguishable from *Texas Utilities Electric Company* in that the decision as to whether imprudent conduct caused certain expenditures has already been made. "The impact of the January 1997 ice storm was greatly exacerbated by the Company's failure to maintain its ROW clear of excessive vegetation."[27] Finding of Fact 97 from PUC Docket No. 18249 provided the Commission with the starting point in its decision-making process, and it was the Commission's job at that point to either deny ETI's requested 1997 storm expenses

---

Austin 1994) *aff'd in part, rev'd in part on other grounds*, 935 S.W.2d 109 (Tex. 1997). *Texas Utilities Electric Company* is submitted as Appendix E.

[24] *Id.* at 404.

[25] *Id.* at 403-405.

[26] *Id.* at 404.

[27] Appendix F, *Entergy Gulf States, Inc. Service Quality Issues (Severed from Docket No. 16705)*, Docket No. 18249 at 47, FoF No. 97 (Apr. 22, 1998).

in their entirety or determine what portion was imprudently incurred and deny the portion of expenses that were caused by ETI's imprudence in managing its system. The Commission erroneously failed to take either approach, and the imprudent costs became part of the approved rates through their inclusion in the storm reserve. Additionally, the Commission's discussion of the 1997 ice storm in its Order on Rehearing in Docket No. 18249, the Company's Service Quality Issues docket, included the following statement:

> The January 1997 ice storm was certainly a severe storm that would have adversely affected even the best-maintained distribution system. **EGS' distribution system, however, is not the best-maintained. A major cause of the outages during the storm were broken or bowed ice-laden tree limbs overhanging the wires.** Tree limbs in ROW overhanging distribution lines pose a threat to system reliability, **and are largely within EGS' control. The Company's failure to clear the limbs before the storm was a major factor in the number and duration of outages experienced by customers.**[28]

Unlike in the *Texas Utilities Electric Company* case, in the absence of evidence from ETI in the underlying docket (Docket No. 39896) on what portion of the costs were attributable to the Company's imprudence, the Commission did not have a third party recommend what portion was due to imprudence. Nor did the Commission consider alternative recommendations for partial disallowance in the evidentiary record. OPUC provided evidence the Commission could have relied

---

[28] *Id.* at 18 (Emphasis added).

upon to disallow a portion of the expenses if the Commission wished to avoid making a total disallowance. In addition to recommending total disallowance of the 1997 ice storm expenses, OPUC offered a reasonable, alternative recommendation which would have disallowed a portion of the 1997 ice storm expenses to account for the Company's imprudence that heavily contributed to the expenses, but the Commission did not adopt either of OPUC's recommendations.[29]

Despite the Commission's finding in Docket No. 18249 that the ice storm damage was greatly exacerbated by the Company's failings, ETI made no showing or even an attempt at showing that the fruit of their imprudent actions has been excluded from their storm balance request. As OPUC Witness Nathan Benedict testified, "the Company has provided no analysis regarding the incremental damage caused by its imprudent vegetation management practices."[30] Despite this, the Commission failed to hold ETI to its burden of proof and ignored the fact that imprudence had already been established as the cause of at least some of the storm damage that is the subject of the restoration costs in question. The Commission committed reversible error in failing completely to take into account the expenses

---

[29] AR Binder 39, OPUC Exhibit No. 6 (Benedict Direct) at 16.
[30] AR, Binder 39, OPUC Exhibit No. 6, Benedict Direct at 13.

that resulted from the Company's imprudence established in a prior Commission final order to have, in fact, been a major cause of the ice storm damage.

2. *The Commission erred by failing to hold ETI to its burden of showing that the expenses it sought to include in the storm reserve were not reasonably anticipated.*

In addition to the burden of proving that the costs the Company incurred were reasonable and necessary or "reasonably and prudently invested" and in the public interest, ETI also bore the burden of showing that any cost it sought to include in the storm reserve was "not reasonably anticipated." The purpose of the storm reserve is set forth in PURA § 36.064. PURA Section 36.064 authorizes an electric utility to "self-insure all or part of the utility's potential liability or catastrophic property loss . . . that could not have been reasonably anticipated and included under operating and maintenance expenses."

The Commission's cost of service rule, 16 Tex. Admin. Code § 25.231, further explains what the Company must show in order to include storm damage expenses in the storm reserve. One component of the cost of service is allowable expenses. Subsection 25.231(b), entitled "allowable expenses" states that "only those expenses which are reasonable and necessary to provide service to the public shall be included in allowable expenses." Rule 25.231(b)(1) sets out the components of allowable expenses and states that "allowable expenses, to the

extent they are reasonable and necessary, and subject to this section, may include…(G) Accruals credited to reserve accounts for self-insurance under a plan requested by the Commission." Rule 25.231(b)(1)(G) also states that the reserve accounts are to be charged with "property and liability losses which occur, and which could not be reasonably anticipated and included in operating and maintenance expenses and are not paid or reimbursed by commercial insurance."

Expenses incurred due to the Company's "neglect of regular vegetation clearing"[31] are not unanticipated. The very purpose of vegetation management is to anticipate and prevent future damage. As stated in the PFD adopted by the Commission in the Company's Service Quality Issues docket, vegetation management is employed to ensure, to the greatest extent possible, that vegetation in or near the utility's right-of-way does not come into contact with the conductors and cause wire breakage or ground faults.[32] The existence of a storm reserve account, combined with the fact that expenses were incurred in the cleanup efforts related to the 1997 storm, in no way speaks to whether these past storm expenses were reasonably anticipated, prudently incurred and properly

---

[31]*Entergy Gulf States, Inc. Service Quality Issues (Severed from Docket No. 16705)*, Docket No. 18249, Order on Rehearing at 16 and 19, Finding of Fact No. 97 (April 21, 1998) (submitted with this brief as Appendix F). This cited portion of the order is also found at AR, Binder 39, OPC Exhibit No. 6, Benedict Direct at Exhibit NAB-2.

[32] *See* Appendix F, Docket No. 18249, *Entergy Gulf States, Inc. Service Quality Issues (Severed from Docket No. 16705)*, Order on Rehearing at 14 (Apr. 22, 1998).

includable in the storm damage accrual. ETI failed to demonstrate that the 1997 ice storm costs were "not reasonably anticipated."

By failing to hold ETI to this required showing, the Commission's Order results in violations of the requirements in both PURA § 36.064(a) and PUC Substantive Rule 25.231(b)(1)(G) that only those property and liability losses which "could not have been reasonably anticipated" may be included in a self-insurance plan. *See* Appendix C and Appendix I. Expenses that directly result from the Company's "neglect of regular vegetation clearing"[33] are not unanticipated. The purpose of vegetation management is to prevent damage caused by vegetation in or near the utility's right-of-way coming into contact with the conductors and causing wire breakage or ground faults.[34] The Commission's failure to disallow the inclusion of $13,014,379 in storm restoration costs or determine what portion of those costs were incurred imprudently as a result of the Company's imprudent vegetation management violates PURA and results in a storm reserve that impermissibly includes costs that were reasonably anticipated.

3. *Prior remedies assessed for poor quality of service, including imprudent vegetation management do not address the subsequent imprudence of excessive ice damage expenses.*

---

[33] Appendix F, Docket No. 18249, Order on Rehearing at 16 and 19, Finding of Fact No. 97.
[34] *See* Appendix F, Docket No. 18249, Order on Rehearing at 14.

22

The PFD adopted by the Commission states on page 57 that "the Commission's retroactive reduction of ETI's ROE in Docket No. 18249 in part compensated ratepayers for the poor service issues that exacerbated the storm damage."[35] This statement misses the point. The 60 basis point reduction to the ROE was the ratepayers' remedy for poor quality of service, including for such things as billing rate error and call center response time, and should not be presumed to inoculate the Company from facing the costs caused as a result of its poor performance with regard to vegetation management. Reducing the ROE was consistent with PURA § 36.062's requirement that the utility's quality of service and efficiency of operations be considered when establishing a return on invested capital. The PFD adopted by the Commission in Docket No. 39896 confuses one set of imprudence (poor quality of service) and its remedy (60 basis-point reduction), with a second, separate imprudence (costs associated with excessive ice damage caused by imprudence). This second imprudent condition requires a separate remedy; that is, the costs associated with the damage caused by imprudence should be disallowed. Moreover, PURA requires that imprudent costs not be included in rates.[36] The Commission's decision to allow all of the 1997 ice storm costs is an error of law.

---

[35] AR, Binder 5, Item No. 185, PFD at 57.
[36] Tex. Util. Code §§ 36.003(a), 36.006(1) and 36.051; *See Entergy Gulf States, Inc. v. Public Utility*

The PFD adopted by the Commission stated that ETI had to take appropriate action to repair the damage and restore service and that ETI had established that the expenses incurred in those efforts were reasonable and necessary. However, costs can be imprudent in two different ways. First, costs can be imprudent because of their source, the fruit of a bad act. Second, costs can be imprudent due to how they are carried out, such as the amount spent or activities performed. The evidence provided by ETI went to this second type of prudence question (i.e., the prudence of costs incurred to restore exacerbated levels of storm damage), but ETI wholly failed to show which or how much of the $13,014,379 of expenses was caused or not caused by the poor vegetation management. The Commission erred in allowing the entirety of ETI's $13,014,379 in 1997 ice storm costs and ignoring the established fact that imprudence was a major factor in the extent of damage. The Commission's failure to take into account or determine what portion of the requested 1997 ice storm costs were imprudent due to the exacerbated damage and what portion could reasonably have been anticipated violated PURA and the Commission's own rules and consequently, the District Court's Judgment and the Commission's Order should

---

*Commission,* 112 S.W.3d 208, 214 (Tex. App.—Austin 2003, pet. denied) ("[I]n order to raise the price of its product, the utility must participate in a rate case and bear the burden of proving that each dollar of cost incurred was reasonably and prudently invested.") (Appendix D).

24

be reversed and remanded to correct this error of law based upon the existing record.

4. *The statutory burden of proof rests upon ETI to affirmatively prove each element of its case. The Commission erred in excusing ETI from its burden of proof merely because years had passed between the incurrence of the 1997 ice storm restoration costs and Docket No. 39896.*

The PFD adopted by the Commission erroneously absolves ETI of its burden of proof on the 1997 ice storm restoration costs due to the passage of time and merely states that it is "not feasible to accurately determine now what portion of ice storm damage that occurred 15 years ago was caused by preventative maintenance issues."[37] This attempt at justification is in error; the Company is charged with the affirmative burden of proof under PURA § 36.006, and must show not only that its expenses included in rates are reasonable and necessary, but that expenses included in the storm reserve were not reasonably anticipated.[38] PURA § 36.006 unequivocally establishes that the utility has the burden of proof on the case. If too much time had passed to prove what portion of the storm costs was not related to the imprudence, then the Commission should have found that ETI failed to meet its burden of proof and disallowed the entire amount.

---

[37] AR, Binder 5, Item No. 185, PFD at 56.
[38] PURA §§ 36.051 and 36.064; 16 Tex. Admin. Code § 25.231(b) and (b)(1)(G).

25

More directly, the Commission failed to give effect to the Order in Docket No. 16705 with regard to the storm costs. In that docket, the Company had proposed recovery of the 1997 costs as a post-test year adjustment. The Commission rejected ETI's request and expressly found:

> 147. Any reduction to the reserve fund occurring after the test year should not be considered in this case because EGS did not prove a reasonable post-test-year level for its existing reserve fund or that the amount expended in 1997 to reduce the fund was prudent or appropriate. Reserve fund levels following the test year in this case can be addressed in EGS' November 1998 rate filing when all parties will have the opportunity to evaluate the reasonableness of changes to the insurance reserve fund.[39]

The underlying docket to this appeal, Docket No. 39896, is the first fully litigated rate case for the Company since Docket No. 16705 due to a rate freeze imposed on the Company and settlement of all subsequent rate cases for the Company after the freeze was lifted. As such, Docket No. 39896 represented the first opportunity to address the inclusion of 1997 storm costs. The parties effectively stood in the same position as if it was November 1998, and it was error for the Commission to treat the issue and the parties as if it were otherwise. Altering the burden of proof, ignoring the imprudence finding related to the cause of the storm damage and failing to require the company to show the

---

[39] Docket No. 16705, *Application of Entergy Texas for Approval of its Transition to Competition Plan and the Tariffs Implementing the Plan, and for the Authority to Reconcile Fuel Costs*, Second Order on Rehearing at 84 (Finding of Fact No. 147) (Oct. 14, 1998).

reasonableness of including these costs in the reserve fund constitutes reversible error under APA § 2001.174(2)(A),(D),(E) and (F).

### a. *ETI has the burden of persuasion on the entire case failed to prove each required element to meet this burden.*

The burden of proof for a contested electric utility rate proceeding is on the electric utility. PURA Section 36.006(1) states that the electric utility has the burden of proving that the rate change is just and reasonable, if the utility proposes the change.[40] Courts have interpreted this statutory burden of proof to mean that, "in order to raise the price of its product, the utility must participate in a rate case and bear the burden of proving that each dollar of cost incurred was reasonably and prudently invested."[41] PURA Section 36.006 serves to place the burden of persuasion on the electric utility in that if no evidence at all were offered, the electric utility would not prevail.[42] The burden of persuasion does not shift but remains with the same party for the entire case.[43]

---

[40] PURA Chapter 36, subchapters A and B and Chapter 37, subchapter D is submitted as Appendix C.

[41] *Entergy Gulf States, Inc. v. Public Utility Commission*, 112 S.W.3d 208, 214 (Tex. App.—Austin 2003, pet. denied) *citing Public Utility Commission v. Houston Lighting & Power Co.*, 778 S.W.2d 195, 198 (Tex. App.—Austin 1989, no writ)); *See Boaz v. Harris*, 30 S.W.2d 810, 811 (Tex. Civ. App.—Fort Worth 1930, no writ). *Entergy Gulf States, Inc. v. Public Utility Commission* is submitted as Appendix D.

[42] *See Cameron Compress Co. v. Kubecka*, 283 S.W. 285, 286 (Tex. Civ. App.—Austin 1926, writ ref'd) ("[T]he burden of proof rests upon the party who holds the affirmative of an issue or proposition of fact." . . . The general test in determining who has the affirmative of an issue is "which party would be successful if no evidence at all were given.").

[43] *Boaz v. Harris*, 30 S.W. 2d 810, 811; 35 Tex Jur 3d, *Evidence* § 103 at 190 (Gene A. Noland, ed.,

b. *The Commission erred in finding that ETI had established a prima facie case sufficient to shift the burden of proof.*

Another subset of the burden of proof is the burden of production. This burden may shift from party to party during the case and is the burden of producing or going forward with the evidence in order to make or meet a *prima facie* case. *Boaz v. Harris*, 30 S.W.2d 810, 811 (*quoting Fritsche v. Niechoy*, 197 S.W. 1017, 1018 (Tex. App. – Galveston 1917, writ dism'd w.o.j.) ("The burden of proof does not shift at any time in the trial of a cause, though the weight of the evidence does."))[44] The establishment of a *prima facie* case plays a role in determining which party has the burden of production. *Prima facie* evidence is evidence that suffices for proof of a particular fact until it is contradicted and overcome by other evidence.[45] The *prima facie* standard requires the production of sufficient evidence with which to support a rational inference that the allegation of fact is true.[46] A *prima facie* case must be established for each and every element of proof.[47] If a *prima facie* case is fully established, the burden of production shifts to the opponent.

---

1984).

[44] *See Texas Parks & Wildlife Department v. Dearing*, 240 S.W.3d 330, 355-56 (Tex. App.—Austin 2007, pet. denied).

[45] *Dodson v. Watson*, 110 Tex. 355, 358, 220, S.W. 771, 772 (1920).

[46] *See In re E.I. DuPont de Nemours & Co.*, 136 S.W.3d 218, 223 (Tex. 2004) (orig. proceeding).

[47] *See Hernandez v. State* 161 S.W.3d 491, 497-98 (Tex. Crim. App. 2005); *Wyeth v. Hall*, 118 S.W.3d 487, 491 (Tex. App. – Beaumont 2003, no pet.).

However, if the plaintiff fails to establish a *prima facie* case, the defendant is under no obligation or duty to produce any evidence.[48] In Docket No. 39896, ETI failed to prove that the requested $13,014,379 in 1997 ice storm costs were "not reasonably anticipated" and further failed to affirmatively prove that the costs were prudently incurred with regard to the reason why the costs had to be expended, not merely how the clean-up was carried out. The Commission erred in failing to hold ETI to its burden of proof on these elements.

c. *The overall burden of proof remained on ETI to affirmatively prove each element of its case by a preponderance of the evidence. The Commission erred in failing to hold ETI to this burden.*

In the electric rate case context, Texas courts have stated that once the utility has presented a *prima facie* case in support of its application, the burden of going forward or burden of production shifts to the intervening parties, and that in turn, once the utility's *prima facie* case is rebutted, the burden falls back onto the utility to prove its case by a preponderance of the evidence.[49] Texas courts have held that "a utility enjoys no presumption that the expenditures reflected therein have been prudently incurred by simply opening its books to inspection."[50] Past

---

[48] *Lykes Bros.-Ripley S. S. Co. v. Pluto*, 146 S.W.2d 414, 416 (Tex. Civ. App.—Galveston 1941, writ dism'd judgm't cor.).

[49] *Entergy Gulf States, Inc. v. Public Utility Commission*, 112 S.W.3d 208, 215 (Tex. App.—Austin 2003, pet. denied).

[50] *Id. citing Public Utility Commission v. Houston Lighting & Power Co.*, 778 S.W.2d 195, 198 (Tex. App.—Austin 1989, no writ).

Commission orders provide further guidance as to the burden of proof in the context of a *prima facie* case. The PFD adopted by the Commission in the Company's last litigated rate case, PUC Docket No. 16705, discussed the burden of proof in the context of a *prima facie* case, stating:

> The utility's task is not finished when it makes a prima facie case, by a preponderance of the evidence that its expenditures were in fact reasonably incurred. **That case may be challenged, and the challenger can make a reasonable challenge without introducing evidence which directly establishes imprudence.** A challenger need not establish that a particular decision proximately caused unnecessary or [avoidable] costs. **The challenging evidence need only *tend* to disprove prudence by making a prima facie case.** Once such evidence has been produced by the challenger, the burden returns to the utility to produce evidence to show, by a preponderance of the evidence, that the challenged decisions were prudent.
>
> When what is at issue is not simple facts, such as the price actually paid, but why certain things were done, … [and **when**] one party is far better able to know what the relevant facts were and how they fit together, it is manifestly reasonable to require only that a challenge be plausible, and that rebuttal be substantial. . . .
>
> **A utility which does not present all the evidence relevant to its claim to have acted prudently cannot succeed by pointing to mere evidentiary gaps in challengers' cases.** "Only upon presentation of the affirmative evidence supporting *all* of the utility's actions during the reconciliation period can interested or affected persons know exactly what actions were taken." [51]

---

[51] *Application of Entergy Texas for Approval of its Transition to Competition Plan and the Tariffs Implementing*

30

This discussion from the Company's last fully-litigated rate case details the burden-shifting process that applies in electric utility rate cases and makes clear that despite the potential shifting of the burden of production, the overall burden of proof remains on the utility to show by a preponderance of the evidence that the expenditures it seeks to recover in rates were reasonably and prudently incurred. The Commission erred in failing to hold ETI to its burden of proof in violation of PURA.

### d. *ETI's statutory responsibilities do not expire or shift due to the passage of time.*

Merely because many years have elapsed from the time the costs were incurred to the time the costs were presented as part of ETI's Docket No. 39896 rate increase request, does not mean that the Company is somehow absolved of its burden to affirmatively prove each element required for those costs to be included in the storm reserve and reflected in rates. A reasonable company, after experiencing a 60 basis-point reduction in its authorized rate of return due to quality of service inadequacies and having it expressly stated in the same Commission Order that the amount of storm damage was greatly exacerbated due to the Company's inadequate vegetation management, would make some attempt

---

*the Plan, and for Authority to Reconcile Fuel Costs, to Set Revised Fuel Factors, and to Recover a Surcharge for Under-Recovered Fuel Costs*, PUC Docket No. 16705, Proposal For Decision at 7-9 (Mar. 25, 1998) (Citations omitted) (Emphasis in bold added). An excerpt from the Docket No. 16705 PFD is submitted as Appendix G.

to quantify or carve out what portion of the storm restoration costs were due to the exacerbated damage. This could have been done by the Company in 1998, very close in time to the actual restoration effort, or anytime in the years thereafter prior to filing its rate case in Docket No. 39896. There are other ways beyond tracking expenses the Company could have attempted in order to show what ice storm costs a prudent company would have incurred, but the passage of time does not excuse the Company from carrying its burden. The distance in time is not a valid basis on which to decide not to require proof of prudence from the Company, and the Commission erred in adopting this faulty justification.

e. *The PFD adopted by the Commission improperly shifted the burden to OPUC and intervening parties.*

The PFD adopted by the Commission erroneously found that ETI had established a *prima facie* case that shifted the burden of proof to OPUC and the intervening parties. As discussed in the above sections, ETI failed to establish a *prima facie* case on each required element of proof. However, even if ETI had established a *prima facie* case sufficient to prevail if unrebutted, the standard of proof imposed on OPUC and other parties by the PFD adopted by the Commission was far beyond what is required under Texas law and established Commission precedent.

Texas law makes clear that, in order to defeat a *prima facie* case, the opponent

must meet the weight of the evidence provided and, once met, the party with the burden of proof must prove its case by a preponderance of the evidence. The Texas Court of Civil Appeals articulated the rule to be followed:

> The rule that, when the defendant seeks to defeat the prima facie case made by the plaintiff **by evidence tending to show that some fact necessary to establish such prima facie case is not true**, the burden does not rest upon him to establish the nonexistence of such fact by a preponderance of the evidence, but in such case, unless the jury find from a preponderance of all the evidence that the facts necessary to establish plaintiff's right to recover are true, they should find for the defendant, is firmly fixed by the decisions of our Supreme Court.

*Koppe v. Koppe*, 57 Tex. Civ. App. 204, 210, 122 S.W. 68, 71-72 (1909). One of the Supreme Court decisions *Koppe* referred to is *Clark v. Hiles*, 67 Tex. 141, 2 S.W. 356 (1886). *Clark* was an appeal of a boundary dispute in which the question presented to the Court dealt with the burden of proof and what shifts when a plaintiff has made out a *prima facie* case. *Id.* at 360, 148. The Court stated that the general rule is that "the burden of proof 'remains on a party affirming a fact in support of his case, and does not change in any aspect of the cause, though the weight of the evidence **may shift from side to side, according to the nature and strength of proof offered in support or denial of the main fact to be established.'"** *Id.* at 360, 148 (citations omitted) (emphasis added).

Going beyond the required standard for sufficiently rebutting a *prima facie* case, The PFD adopted by the Commission placed upon OPUC the burden to produce evidence to challenge "specific expense items included in the storm damage reserve." AR, Binder 5, Item No. 185, PFD at 56. This standard for production required OPUC to go beyond rebutting *prima facie* evidence; it required OPUC to rebut data on a level of specificity the Company did not present in evidence. Rebuttal evidence is "evidence given to disprove facts *given in evidence* by an adverse party."[52]

In the electric rate case context, the Commission in the past has articulated what is required when rebutting a *prima facie* case. In the Company's last litigated rate case, PUC Docket No. 16705, the Commission adopted the majority of the March 25, 1998 Proposal for Decision, including an analysis of the burden of proof in the context of a *prima facie* case and, citing past PUC precedent, stated:

> **The utility's task is not finished when it makes a prima facie case**, by a preponderance of the evidence that its expenditures were in fact reasonably incurred. **That case may be challenged, and the challenger can make a reasonable challenge without introducing evidence which directly establishes imprudence.** A challenger need not establish that a particular decision proximately caused unnecessary or [avoidable] costs. **The challenging evidence need only *tend* to disprove prudence by making a prima facie case.**

---

[52] *Apresa v. Montfort Ins. Co.*, 932 S.W.2d 246, 251 (Tex. App.—El Paso 1996, no writ).

Once such evidence has been produced by the challenger, the burden returns to the utility to produce evidence to show, by a preponderance of the evidence, that the challenged decisions were prudent.[53]

The PFD further stated:

**A utility which does not present all the evidence relevant to its claim to have acted prudently cannot succeed by pointing to mere evidentiary gaps in challengers' cases.** "Only upon presentation of the affirmative evidence supporting *all* of the utility's actions during the reconciliation period can interested or affected persons know exactly what actions were taken."[54]

As noted above, the standard for rebutting a *prima facie* case is not as high as that which the Commission imposed on OPUC in Docket No. 39896. The Commission's error in finding that ETI had established a *prima facie* case was compounded by shifting the burden and improperly requiring OPUC to produce evidence on specific expense items in order to rebut ETI's *prima facie* case.

---

[53] *Application of Entergy Texas for Approval of its Transition to Competition Plan and the Tariffs Implementing the Plan, and for Authority to Reconcile Fuel Costs, to Set Revised Fuel Factors, and to Recover a Surcharge for Under-Recovered Fuel Costs*, PUC Docket No. 16705, Proposal For Decision at 7-9 (Mar. 25, 1998) (citations omitted) (emphasis in bold added).
[54] *Id.* (citations omitted) (emphasis in bold added).

f. *Under Texas and Commission standards, ETI failed to meet its burden of proof required for the inclusion of the $13,014,379 in 1997 ice storm costs.*

To summarize, under the burden of proof standards articulated by the Commission, ETI failed to make a *prima facie* case.[55]  And, even assuming for the sake of argument that ETI had made a *prima facie* showing, the Commission erred in imposing an improper standard of proof for rebutting any such *prima* facie showing.  OPUC and Cities provided evidence that "tends to disprove" prudence and supports the conclusion that the expenses were in fact reasonably anticipated.[56]  The burden then returned to the Company to produce evidence that affirmatively showed by a preponderance of the evidence that either the entirety of the approx. $13 million in restoration costs were unrelated to the imprudent action, or to show what portion thereof was and was not related to the imprudent action and was not reasonably anticipated.

ETI failed to establish a *prima facie* case for each element of proof required in order to include its requested $13,014,379 of 1997 ice storm restoration costs in the storm reserve balance.  By allowing ETI to include its requested 1997 ice storm restoration costs in the storm reserve balance without actually establishing a *prima*

---

[55] *Id.*

[56] AR, Binder 39, OPUC Exhibit No. 6, Benedict Direct at 6-12, 78-87 and 88; AR Binder 8, Cities Exhibit No. 5, Pous Direct at 46-59.

*facie* case for each element of proof, the Commission violated PURA's requirement that the burden of proof be placed on the utility. For this reason, the Commission's Order should be reversed on the issue of the storm reserve balance and remanded to the Commission based upon the existing evidentiary record.

ETI's task was to show "the existence of each element of [its claim]," i.e., "to prove every fact essential to their case."[57] ETI failed to show that the expenses the Company requested to include in its storm reserve balances are reasonable and prudent *and* not reasonably anticipated. Consequently, the Commission erred as a matter of law in failing to hold ETI to its burden of proof with regard to storm damage expenses.

5. *The Commission's decision to approve the inclusion of $13,014,379 in 1997 ice storm costs is arbitrary and capricious and constitutes an abuse of discretion.*

The Commission committed legal error by abusing its discretion and acting in an arbitrary and capricious manner when approving the inclusion of the 1997 ice storm costs in ETI's storm reserve, cost of service, and rates. An administrative agency's decision is arbitrary or results from an abuse of discretion if the agency: (1) failed to consider a factor the legislature directs it to consider; (2) considers an irrelevant factor; or (3) weighs only relevant factors that the legislature directs it

---

[57] *Vance v. My Apartment Steak House*, 677 S.W.2d 480, 482 (Tex. 1984).

to consider but still reaches a completely unreasonable result.[58]  In allowing the inclusion of all $13,014,379 of ice storm expenses in ETI's cost of service, the Commission failed to consider factors the legislature directs it to consider, including whether the costs were "not reasonably anticipated" and prudently incurred.  Tellingly, there were no findings of fact or conclusions of law with regard to whether the costs were not reasonably anticipated.

The Commission also acted in an arbitrary and capricious manner by considering irrelevant factors.  The Commission, through the adopted PFD, erroneously considered the passage of time between the rate case and the incurrence of the storm expenses, and absolved the Company of its burden to prove what portion of the approximately $13 million was due to the exacerbated damages caused by the imprudent vegetation management and what portion would have been incurred even with prudent management.[59]  The Commission, through the adopted PFD, also erroneously considered the 60 basis-point reduction to the Company's ROE imposed for poor quality of service including poor call center response time.[60]

---

[58] *City of El Paso v. Public Util. Comm'n*, 883 S.W.2d 179, 184 (Tex. 1994).  *See also, Reliant Energy, Inc. v. Public Util. Comm'n*, 62 S.W.3d 833, 841 (Tex. App. – Austin 2001, no pet.).
[59] AR, Binder 5, Item No. 185, PFD at 56; *see supra* pp. 16-19, 25-26 and 31-32.
[60] *Id.; see supra* pp. 22-24.

Additionally, when an agency fails to "follow the clear, unambiguous language of its own regulation," it acts arbitrarily and capriciously.[61] The Commission failed to follow the clear, unambiguous language of its own substantive rule which states unequivocally that "any expenditure found by the Commission to be unreasonable, unnecessary or not in the public interest" "shall never be a component of the cost of service." 16 Tex. Admin. Code § 25.231(b)(2)(J).[62] The Commission also failed to follow its own substantive rule which allows storm costs to be included in the storm reserve, to the extent they are reasonable and necessary, and are not reasonably anticipated. 16 Tex. Admin. Code § 25.231(b)(1)(G). Moreover, as stated above, the Commission made no findings of fact or conclusions of law as to whether the ice storm expenses were not reasonably anticipated. Further, the Commission disregarded the prior-established finding from the final order of the Commission in Docket No. 18249 which found that storm damage was greatly exacerbated by the state of the Company's vegetation management.

For these reasons, it was arbitrary and capricious to include all of the Company's requested ice storm expenses in SPS's storm reserve and allow these costs to be reflected in SPS's cost of service and rates.

---

[61] *Public Util. Comm'n v. Gulf States Utilities*, 809 S.W.2d 201, 207 (Tex. 1991).

[62] *See also* PURA § 36.062(4).

## PRAYER

For the reasons stated in this brief, the Office of Public Utility Counsel respectfully prays that the Court reverse the district court's judgment insofar as it upholds the Commission's decision in the respects discussed above. OPUC further prays that the Court remand the case to the Commission for further proceedings, based upon the existing evidentiary Record, to determine rates consistent with the Court's decision. Finally, OPUC respectfully prays that this Court grant the OPUC such other and further relief to which it may be justly entitled.

Respectfully submitted,

Tonya Baer
Public Counsel
State Bar No. 24026771

_/s/ Sara J. Ferris_
Sara J. Ferris
Senior Assistant Public Counsel
State Bar No. 50511915

OFFICE OF PUBLIC UTILITY COUNSEL
1701 N. Congress Avenue, Suite 9-180
P.O. Box 12397, Capitol Station
Austin, Texas 78711-2397
512/936-7500 (Telephone)
512/936-7525 (Facsimile)

40

## CERTIFICATE OF COMPLIANCE

I certify that the Appellant's Brief and Appendix of the Office of Public Utility Counsel contains 8,113 words, as measured by the undersigned counsel's word-processing software, and therefore complies with the word limit found in Tex. R. App. P. 9.4(i)(2)(B).

_____/s/ *Sara J. Ferris*_____
Sara J. Ferris

## CERTIFICATE OF SERVICE

I certify that the Appellant's Brief and Appendix of the Office of Public Utility Counsel was electronically filed with the Clerk of the Court using the electronic case filing system of the Court, and that a true and correct copy of the Appellant's Brief and Appendix of the Office of Public Utility Counsel was served upon counsel for each party of record, listed below, by electronic service or 1st Class U.S. Mail, on this 31st day of March, 2015.

| | |
|---|---|
| **ENTERGY TEXAS, INC.** | **CITIES OF ANAHUAC,** |
| Marnie A. McCormick | **BEAUMONT, ET. AL** |
| John F. Williams | Daniel J. Lawton |
| Duggins, Wren, Mann & Romero, LLP | Lawton Law Firm PC |
| P.O. Box 1149 | 12600 Hill Country Blvd, Suite R275 |
| Austin, Texas 78767-1149 | Austin, Texas 78738 |
| (512) 744-9300 | (512) 322-0019 |
| mmcormick@dwmrlaw.com | dlawton@ecpi.com |
| jwilliams@dwmrlaw.com | |

41

**PUBLIC UTILITY COMMISSION OF TEXAS**
Elizabeth R. B. Sterling
Assistant Attorney General
Environmental Protection Division
Office of the Attorney General
P. O. Box 12548, Capitol Station
Austin, Texas 78711-2548
(512) 475-4152
elizabeth.sterling@texasattorneygeneral.gov

**TEXAS INDUSTRIAL ENERGY CONSUMERS**
Rex VanMiddlesworth
Benjamin Hallmark
Thompson Knight LLP
98 San Jacinto Blvd, Suite 1900
Austin, Texas 78701
(512) 320-9200
rex.vanm@tklaw.com
benjamin.hallmark@tklaw.com

**STATE AGENCIES OF TEXAS**
Katherine H. Farrell
Assistant Attorney General
Admin Law Div. – Energy Rates Section
Office of the Attorney General
P. O. Box 12548
Austin, Texas 78711-2548
(512) 475-4173
katherine.farrell@texasattorneygeneral.gov

_____/s/ *Sara J. Ferris*_____
Sara J. Ferris

# Appendix to the Appellant's Brief
# of the Office of Public Utility Counsel

A:   District Court Judgement, Cause No. D-1-GN-13-000121 (Consolidated)

B:   PUC Docket No. 39896, Order on Rehearing

C:   PURA, Chapter 36, Subchapters A and B, and Chapter 37, Subchapter D

D:   *Entergy Gulf States, Inc. v. Public Utility Commission*, 112 S.W.3d 208 (Tex. App. – Austin 2003, pet. denied)

E:   *Texas Utilities Electric Company v. Public Utility Commission*, 881 S.W.2d 387 (Tex. App. – Austin 1994) *aff'd in part, rev'd in part on other grounds*, 935 S.W.2d 109 (Tex. 1997)

F:   PUC Docket No. 18249, Order on Rehearing

G:   Excerpt from:  PUC Docket No. 16705, Proposal for Decision

H:   Excerpts from:  PUC Docket No. 16705, Second Order on Rehearing

I:   16 Tex. Admin. Code § 25.231

Appendix A

District Court Judgement,
Cause No. D-1-GN-13-000121 (Consolidated)

Filed in The District Court
of Travis County, Texas

EM OCT 1 4 2014
At ____ 11:24 A M.
Amalia Rodriguez-Mendoza, Clerk

CAUSE NO. D-1-GN-13-000121

| | | |
|---|---|---|
| ENTERGY TEXAS, INC., | § | IN THE DISTRICT COURT OF |
| **Plaintiff** | § | |
| | § | |
| | § | |
| v. | § | TRAVIS COUNTY, TEXAS |
| | § | |
| PUBLIC UTILITY COMMISSION, | § | |
| **Defendant** | § | 353RD JUDICIAL DISTRICT |

## ORDER ON ADMINISTRATIVE APPEAL

On July 22, 2014, the Court heard Plaintiff's appeal from Defendant's Order in PUC

Docket No. 39896, SOAH Docket No. 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. The administrative record was admitted

into evidence, and the Court heard oral argument. Entergy, the Cities, and OPUC each asserted

points of error challenging the Commission's order. Having considered the pleadings, the

evidence and the arguments of counsel, the Court makes the following rulings:

1. Entergy's Point of Error No. 1 addressing the use of a current line loss study rather that a prior-approved line loss study in allocating line loss costs among classes of customers establishes that the Commission erred in applying the current study in violation of Commission rules found at 16 TAC §25.236(e)(3) and 16 TAC 25.237(a) and (c)(2)(B). Accordingly, the Court FINDS that the PUC's ruling was arbitrary and capricious and constitutes an error of law. The Court REVERSES such ruling and REMANDS this matter to the Commission for further proceedings consistent with this Court's Order.
2. All other points of error are DENIED, and the Commission's Order is in all other respects AFFIRMED.

All relief not granted, herein, is DENIED.

Signed this ___14th___ day of ~~September~~ October, 2014.

_____
JUDGE PRESIDING

Appendix B

PUC Docket No. 39896, Order on Rehearing

| | | |
|---|---|---|
| APPLICATION OF ENTERGY TEXAS, | § | PUBLIC UTILITY COMMISSION |
| INC. FOR AUTHORITY TO CHANGE | § | |
| RATES, RECONCILE FUEL COSTS, | § | OF TEXAS |
| AND OBTAIN DEFERRED | § | |
| ACCOUNTING TREATMENT | § | |

## ORDER ON REHEARING

This Order addresses the application of Entergy Texas, Inc. for authority to change rates, reconcile fuel costs, and defer costs for the transition to the Midwest Independent System Operator (MISO). In its application, Entergy requested approval of an increase in annual base-rate revenues of approximately $111.8 million (later lowered to $104.8 million), proposed tariff schedules, including new riders to recover costs related to purchased-power capacity and renewable-energy credit requirements, requested final reconciliation of its fuel costs, and requested waivers to the rate-filing package requirements.

On July 6, 2012, the State Office of Administrative Hearings (SOAH) administrative law judges (ALJs) issued a proposal for decision in which they recommended an overall rate increase for Entergy of $28.3 million resulting in a total revenue requirement of approximately $781 million. The ALJs also recommended approving total fuel costs of approximately $1.3 billion. The ALJs did not recommend approving the renewable-energy credit rider and the Commission earlier removed the purchased-power capacity rider as an issue to be addressed in this docket.[1] On August 8, 2012, the ALJs filed corrections to the proposal for decision based on the exceptions and replies of the parties.[2] Except as discussed in this Order, the Commission adopts the proposal for decision, as corrected, including findings of fact and conclusions of law.

Parties filed motions for rehearing on September 25 and October 4, 2012 and filed replies to the motions for rehearing on October 15, 2012. The Commission considered the motions for

---

[1] Supplemental Preliminary Order at 2, 3 (Jan. 19, 2012).

[2] Letter from SOAH judges to PUC (Aug. 8, 2012).



rehearing at the October 25, 2012 open meeting. The Commission granted Commission Staff's motion for rehearing that requested technical corrections to reflect the rates that resulted from the Commission Staff number-running memo that was filed on August 28, 2012. The Commission modifies findings of fact 205, 206, 208, and 210 as requested by Commission Staff and attaches Commission schedules I through V to reflects its decisions. The Commission granted the Department of Energy's motion for rehearing requesting that finding of fact 198 be modified to reflect the applicable off-season for the schedulable intermittent pumping service. Finding of fact 198 is modified to reflect that the off-season is October through May. In its motion for rehearing, Entergy noted that findings of fact 17B and 17D should be modified to more accurately reflect the procedural history. The Commission modifies findings of fact 17B and 17D to state that Entergy agreed to extend time to provide the Commission sufficient time to consider the issues in this proceeding on two occasions—at the July 27 and August 30, 2012 open meetings.

## I. Discussion

### A. Prepaid Pension Asset Balance

Entergy included in rate base an approximately $56 million item named Unfunded Pension.[3] This amount represents the accumulated difference between the annual pension costs calculated in accordance with the Statement of Financial Accounting Standards (SFAS) No. 87 and the actual contributions made by Entergy to the pension fund—Entergy contributed nearly $56 million more to its pension fund than the minimum required by SFAS No. 87.[4]

In Docket No. 33309, the Commission allowed a pension prepayment asset, excluding the portion of the asset that is capitalized to construction work in progress (CWIP), less accrued deferred federal income taxes (ADFIT) to be included in rate base.[5] For the excluded portion, the Commission allowed the accrual of an allowance for funds used during construction

---

[3] Proposal for Decision at 23 (July 6, 2012) (PFD).

[4] PFD at 23-24.

[5] *Application of AEP Texas Central Company for Authority to Change Rates*, Docket No. 33309, Order on Rehearing (March 4, 2008).

(AFUDC).[6] The ALJs concluded that this approach was sound and should be followed in this case.[7] Thus, the ALJs recommended that the CWIP-related portion of Entergy's prepaid pension asset ($25,311,236) should be excluded from the asset and should accrue AFUDC.[8] However, the ALJs did not address ADFIT.

The Commission agrees that the CWIP-related portion of Entergy's pension asset should be excluded from the asset and that this excluded portion should accrue AFUDC. However, the Commission also finds that the impact of this exclusion on Entergy's ADFIT should be reflected. When items are excluded from rate base, the related ADFIT should also be excluded. The adjusted ADFIT for the prepaid pension asset remaining in Entergy's rate base should be reduced by $8,858,933, the deferred taxes related to the excluded $25 million. The Commission adds new finding of fact 28A to reflect this modification to Entergy's ADFIT.

## B. FIN 48

The Financial Accounting Standards Board's Interpretation No. 48 (FIN 48) prescribes the way in which a company must analyze, quantify, and disclose the potential consequences of tax positions that the company has taken that are legally uncertain. Entergy reported that its uncertain tax positions totaled $5,916,461. FIN 48 requires that this amount be recorded on Entergy's balance sheet as a tax liability. Entergy also reported that it made a cash deposit with the IRS in the amount of $1,294,683 associated with its FIN 48 liability.[9]

The ALJs concluded that Entergy's FIN 48 liability should be included in its ADFIT balance, but the amount of the cash deposit made by Entergy to the IRS attributable to Entergy's FIN 48 liability should not be included in Entergy's ADFIT balance. Accordingly, the ALJs recommended that $4,621,778 (Entergy's FIN 48 liability of $5,916,461 less the $1,294,683 cash deposit Entergy has already made with the IRS) be added to Entergy's ADFIT balance and thus

---

[6] *Remand of Docket No. 33309 (Application of AEP Texas Central Company for Authority to Change Rates)*, Docket No. 38772, Order on Remand (Jan. 20, 2011).

[7] PFD at 26.

[8] *Id.* at 24-26.

[9] PFD at 26-27 (citing Rebuttal Testimony of Roberts, Entergy Ex. 64 at 6), 29 (citing Rebuttal Testimony of Roberts, Entergy Ex. 64 at 8).

be used to offset Entergy's rate base.[10] The ALJs did not recommend the addition of a deferred-tax-account rider because no party expressly advocated the addition of such a rider.[11]

The Commission adopts the proposal for decision regarding the adjustment to Entergy's ADFIT for the amount attributable to Entergy's FIN 48 liability. However, the Commission also follows its precedent regarding the creation of a deferred-tax-account tracker and modifies the proposal for decision on this point. In CenterPoint's Electric Delivery Company's last rate case, Docket No. 38339,[12] the Commission found that tax schedule UTP—on which companies must describe, list, and rank each uncertain tax position—would provide the IRS auditors sufficient information to quickly determine which uncertain tax positions are of a magnitude worth investigating and that an IRS audit would be more likely to occur on some uncertain tax positions. If an IRS audit of a FIN 48 uncertain tax position results in an unfavorable outcome, the utility would not be able to earn a return on the amount paid to the IRS until the next rate case.

Accordingly, the Commission authorizes Entergy to establish a rider to track unfavorable FIN-48 rulings by the IRS. The rider will also allow Entergy to recover on a *prospective* basis an after-tax return of 8.27% on the amounts paid to the IRS that result from an unfavorable FIN-48 unfavorable-tax-position audit. The return will be applied prospectively to FIN-48 amounts disallowed by an IRS audit after such amounts are actually paid to the federal government. If Entergy subsequently prevails in an appeal of an unfavorable FIN-48 unfavorable-tax-position decision by the IRS, then any amounts collected under rider related to that overturned decision shall be credited back to ratepayers.

The Commission adds new finding of fact 40A and deletes finding of fact 41 consistent with its decision to authorize the deferred-tax-account tracker.

---

[10] PFD at 29.

[11] *Id.* at 29.

[12] *Application of CenterPoint Electric Delivery Company, LLC for Authority to Change Rates*, Docket No. 38339, Order on Rehearing at 3-4 (June 23, 2011).

## C. Capitalized Incentive Compensation

Entergy capitalized into plant-in-service accounts some of the incentive payments made to employees and sought to include those amounts in rate base. The ALJs determined that Entergy should not be able to recover its financially based incentive-compensation costs.[13] Therefore, the portion of Entergy's incentive-compensation costs capitalized during the period July 1, 2009 through June 30, 2010 that were financially based was excluded from Entergy's rate base. The ALJs also determined that the actual percentages should be used to determine the amount that is financially based.[14]

In discussing Entergy's incentive compensation as a component of operating expenses, the ALJs adopted the method advocated by Texas Industrial Energy Consumers (TIEC) for calculating the amount of the financially based incentive costs. This method uses the actual percentage reductions applicable to each of the annual incentive programs that included a component of financially-based costs.[15]

In its exceptions regarding capitalized incentive compensation, Entergy advocated for the use of TIEC's methodology to also calculate the amount of capitalized incentive compensation that is financially based. Entergy also noted that the amount of the disallowance reflected in the schedules, $1,333,352, was calculated using a disallowance factor that included incentive compensation tied to cost-control measures, which the ALJs found to be recoverable in the operating-cost incentive-compensation calculation.[16] When the TIEC methodology is applied to the capitalized incentive-compensation costs in rate base, the net result under TIEC's methodology is that only $335,752.96 should be disallowed from capital costs.[17]

The Commission agrees that capitalized incentive compensation that is financially based should be excluded from rate base and that the exclusion only applies to incentive costs that Entergy capitalized during the period from July 1, 2009 through June 30, 2010. However, the Commission finds that a consistent methodology should be used to calculate the amount to be

---

[13] PFD at 171.

[14] *Id.* at 72.

[15] *Id.* at 174; *see also* Entergy's Exceptions to the Proposal for Decision at 25-26 (July 23, 2012).

[16] Entergy's Exceptions to the Proposal for Decision at 25-26.

[17] *Id.* at 25-26.

excluded and therefore that TIEC's methodology should also be used for calculating the amount of capitalized financially based incentive-compensation costs that should be excluded from rate base. Accordingly, the total amount of capitalized incentive-compensation costs that should be disallowed from rate base is $335,752.96. Finding of fact 61 is modified to reflect this determination.

As noted by Commission Staff, this disallowance to plant-in-service alters the expense for ad valorem taxes. Accounting for this disallowance, the appropriate expense amount for ad valorem taxes is $24,921,022,[18] an adjustment of $1,222,106 to Entergy's test year amount. Finding of fact 151 is modified to reflect this adjustment to property taxes.

### D. Rate of Return and Cost of Capital

The ALJs found the proper range of an acceptable return on equity for Entergy would be from 9.3 percent to 10.0 percent.[19] The mid-point of the range is 9.65 percent. The ALJs found that the effect of unsettled economic conditions facing utilities on the appropriate return on equity should be taken into account and that the effect would be to move the ultimate return on equity towards the upper limits of the range that was determined to be reasonable.[20] The ALJs found that the reasonable adjustment would be 15 basis points, moving the reasonable return on equity to 9.80 percent.[21]

The Commission must establish a reasonable return for a utility and must consider applicable factors.[22] The Commission disagrees with the ALJs that a utility's return on equity should be determined using an adder to reflect unsettled economic conditions facing utilities. The Commission agrees with the ALJs, however, that a return on equity of 9.80 percent will allow Entergy a reasonable opportunity to earn a reasonable return on its invested capital, but finds this rate appropriate independent of the 15-point adder recommended by the ALJs. A return on equity of 9.80 percent is within the range of an acceptable return on equity found by

---

[18] Commission Number-Run Memorandum at 2 (Aug. 28, 2012).

[19] PFD at 94.

[20] *Id.*

[21] *Id.* at 94.

[22] PURA §§ 36.051, .052.

the ALJs. Accordingly, the Commission adds new finding of fact 65A to reflect the Commission's decision on this point.

## E. Purchased-Power Capacity Expense

The ALJs rejected Entergy's request to recover $31 million more in purchased-power capacity costs than its actual test-year expenses because Entergy had failed to prove that the adjustment was known and measurable,[23] and because the request violated the matching principle.[24] Consequently, the ALJs recommended that Entergy's test-year expenses of $245,432,884 be used to set rates in this docket.[25]

Entergy pointed to an additional $533,002 of purchased-power capacity expenses that were properly included in Entergy's rate-filing package, but not provided for in the proposal for decision.[26] The Commission finds that an additional $533,002 ($6,132 for test-year expenses for Southwest Power Pool fees, $654,082 for Toledo Bend hydro fixed-charges, and -$127,212 for an Entergy intra-system billing adjustment that were all recorded in FERC account 555) of purchased-power capacity costs were incurred during the test-year and should be added to the purchased-power capacity costs in Entergy's revenue requirement. The Commission modifies findings of fact 72 and 86 to reflect the inclusion of the additional $533,002 of test-year purchased-power capacity costs, increasing the total amount to $245,965,886.

## F. Labor Costs – Incentive Compensation

The ALJs found that $6,196,037, representing Entergy's financially-based incentives paid in the test-year, should be removed from Entergy's O&M expenses.[27] The ALJs agreed with Commission Staff and Cities that an additional reduction should be made to account for the FICA taxes that Entergy would have paid for those costs,[28] but did not include this reduction in a finding of fact.

---

[23] PFD at 108-09.

[24] *Id.* at 109.

[25] *Id.*

[26] Entergy's Exceptions to the Proposal for Decision at 51.

[27] PFD at 175.

[28] *Id.* at 175-76.

The Commission agrees with the ALJs, but modifies finding of fact 133 to specifically include the decision that an additional reduction should be made to account for the FICA taxes Entergy would have paid on the disallowed financially-based incentive compensation. The Commission notes that this reduction for FICA taxes is reflected in the schedules attached to this Order.[29]

## G. Affiliate Transactions

OPUC argued that Entergy's sales and marketing expenses exclusively benefit the larger commercial and industrial customers, but the majority of the sales, marketing, and customer service expenses are allocated to the operating companies based on customer counts. Therefore, the majority of these expenses are allocated to residential and small business customers. OPUC argued that it is inappropriate for residential and small business customers to pay for these expenses.[30] The ALJs did not adopt OPUC's position on this issue.

The Commission agrees with OPUC and reverses the proposal for decision regarding allocation of Entergy's sales and marketing expense and finds that $2.086 million of sales and marketing expense should be reallocated using direct assignment. The Commission has previously expressed its preference for direct assignment of affiliate expenses.[31] The Commission finds that the following amounts should be allocated based on a total-number-of-customers basis: (1) $46,490 for Project E10PCR56224 – Sales and Marketing – EGSI Texas; (2) $17,013 for Project F3PCD10049 – Regulated Retail Systems O&M; and (3) $30,167 for Project F3PPMMALI2 – Middle Market Mkt. Development. The remainder, $1,992,475, should be assigned to (1) General Service, (2) Large General Service and (3) Large Industrial Power Service.[32] The reallocation has the effect of increasing the revenue requirement allocated to the large business class customers and reduces the revenue requirement for small business and residential customers. New finding of fact 164A is added to reflect the proper allocation of these affiliate transactions.

---

[29] *See* Commission Number Run-Memorandum at 3 (Aug. 28, 2012).

[30] Direct Testimony of Carol Szerszen, OPUC Ex. 1 at 44-45.

[31] *Application of Central Power and Light Company for Authority to Change Rates*, Docket No. 14965, Second Order on Rehearing at 87, COL 29 (Oct. 16, 1997).

[32] Direct Testimony of Carol Szerszen, OPUC Ex. 1 at Schedule CAS-7.

## H. Fuel Reconciliation

Entergy proposed to allocate costs for the fuel reconciliation to customers using a line-loss study performed in 1997. Entergy conducted a line-loss study for the year ending December 31, 2010, which falls in the middle of the two year fuel reconciliation period—July 2009 through June 2011—and therefore reflects the actual line losses experienced by the customer classes during the reconciliation period. Cities argued that the allocation of fuel costs incurred over the reconciliation period should reflect the current line-loss study performed by Entergy for this case and recommended approval on a going-forward basis. Fuel factors under P.U.C. SUBST. R. 25.237(a)(3) are temporary rates subject to revision in a reconciliation proceeding described in P.U.C. SUBST. R. 25.236. P.U.C. SUBST. R. 25.236(d)(2) defines the scope of a fuel reconciliation proceeding to include any issue related to the reasonableness of a utility's fuel expenses and whether the utility has over- or under-recovered its reasonable fuel expenses.[33] Cities calculated a $3,981,271 reduction to the Texas retail fuel expenses incurred over the reconciliation period using the current line-losses. The ALJs rejected Cities' proposed adjustment finding that the P.U.C. SUBST. R. 25.237(c)(2)(B) requires the use of Commission-approved line losses that were in effect at the time fuel costs were billed to customers in a fuel reconciliation.[34]

The Commission agrees with Cities and reverses the proposal for decision regarding which line-loss factors should be used in Entergy's fuel reconciliation. Entergy used the 2010 study line-loss calculations to calculate the demand- and energy-related allocations in its cost of service analysis supporting its requested base rates. These same currently available line-loss factors should have been utilized in Entergy's fuel reconciliation. The Commission finds that Entergy's 2010 line-loss factors should be used to calculate Entergy's fuel reconciliation over-recovery. As a result, Entergy's fuel reconciliation over-recovery should be reduced by $3,981,271. Finding of fact 246A and conclusions of law 19A and 19B are added to reflect the Commission's finding that the 2010 line-loss factors be used to reconcile Entergy's fuel costs.

---

[33] Cities' Exceptions to the Proposal for Decision at 20-21 (July 23, 2012).
[34] PFD at 327-328.

## I. MISO Transition Expenses

During the Commission's consideration of the proposal for decision, the parties that contested the amount of Entergy's MISO transition expenses and how the transition expenses should be accounted for reached announced on the record that they had reached an agreement on these issues.[35] Those parties agreed that the MISO transition expenses would not be deferred and that Entergy's base rates should include $1.6 million for MISO transition expense.[36] The Commission adopts the agreement of the parties and accordingly modifies finding of fact 251 and deletes finding of fact 252.

## J. Purchased-Power Capacity Cost Baseline

The Commission modified the amount of purchased-power capacity expense in the test-year to be $245,965,886 (see section E above). Finding of fact 255 is modified to reflect the change to the proper test-year purchased-power capacity expense.

## K. Other Issues

New findings of fact 17A, 17B, 17C, 17D, and 17 E are added to reflect procedural aspects of the case after issuance of the proposal for decision.

In addition, to reflect corrections recommended by the ALJs, findings of fact 116, 123, 192, 194, and 202 are modified; and new finding of fact 182A is added.

The Commission adopts the following findings of fact and conclusions of law:

## II. Findings of Fact

***Procedural History***

1.    Entergy Texas, Inc. (ETI or the company) is an investor-owned electric utility with a retail service area located in southeastern Texas.

---

[35] Open Meeting Tr. at 138 (Aug. 17, 2012).

[36] *Id.*

2. ETI serves retail and wholesale electric customers in Texas. As of June 30, 2011, ETI served approximately 412,000 Texas retail customers. The Federal Energy Regulatory Commission (FERC) regulates ETI's wholesale electric operations.

3. On November 28, 2011, ETI filed an application requesting approval of: (1) a proposed increase in annual base rate revenues of approximately $111.8 million over adjusted test-year revenues; (2) a set of proposed tariff schedules presented in the Electric Utility Rate Filing Package for Generating Utilities (RFP) accompanying ETI's application and including new riders for recovery of costs related to purchased-power capacity and renewable energy credit requirements; (3) a request for final reconciliation of ETI's fuel and purchased-power costs for the reconciliation period from July 1, 2009 to June 30, 2011; and (4) certain waivers to the instructions in RFP Schedule V accompanying ETI's application.

4. The 12-month test-year employed in ETI's filing ended on June 30, 2011 (test-year).

5. ETI provided notice by publication for four consecutive weeks before the effective date of the proposed rate change in newspapers having general circulation in each county of ETI's Texas service territory. ETI also mailed notice of its proposed rate change to all of its customers. Additionally, ETI timely served notice of its statement of intent to change rates on all municipalities retaining original jurisdiction over its rates and services.

6. The following parties were granted intervenor status in this docket: Office of Public Utility Counsel; the cities of Anahuac, Beaumont, Bridge City, Cleveland, Conroe, Dayton, Groves, Houston, Huntsville, Montgomery, Navasota, Nederland, Oak Ridge North, Orange, Pine Forest, Rose City, Pinehurst, Port Arthur, Port Neches, Shenandoah, Silsbee, Sour Lake, Splendora, Vidor, and West Orange (Cities), the Kroger Co. (Kroger); State Agencies; Texas Industrial Energy Consumers; East Texas Electric Cooperative, Inc.; the United States Department of Energy (DOE); and Wal-Mart Stores Texas, LLC, and Sam's East, Inc. (Wal-Mart). The Staff (Staff) of the Public Utility Commission of Texas (Commission or PUC) was also a participant in this docket.

7. On November 29, 2011, the Commission referred this case to the State Office of Administrative Hearings (SOAH).

8.  On December 7, 2011, the Commission issued its order requesting briefing on threshold legal/policy issues.

9.  On December 19, 2011, the Commission issued its Preliminary Order, identifying 31 issues to be addressed in this proceeding.

10. On December 20, 2011, the Administrative Law Judges (ALJs) issued SOAH Order No. 2, which approved an agreement among the parties to establish a June 30, 2012 effective date for the company's new rates resulting from this case pursuant to certain agreed language and consolidate *Application of Entergy Texas, Inc. for Authority to Defer Expenses Related to its Proposed Transition to Membership in the Midwest Independent System Operator*, Docket No. 39741 (pending) into this proceeding. Although it did not agree, Staff did not oppose the consolidation.

11. On January 13, 2012, the ALJs issued SOAH Order No. 4 granting the motions for admission pro hac vice filed by Kurt J. Boehm and Jody M. Kyler to appear and participate as counsel for Kroger and the motion for admission *pro hac vice* filed by Rick D. Chamberlain to appear and participate as counsel for Wal-Mart.

12. On January 19, 2012, the Commission issued a supplemental preliminary order identifying two additional issues to be addressed in this case and concluding that the company's proposed purchased-power capacity rider should not be addressed in this case and that such costs should be recovered through base rates.

13. ETI timely filed with the Commission petitions for review of the rate ordinances of the municipalities exercising original jurisdiction within its service territory. All such appeals were consolidated for determination in this proceeding.

14. On April 4, 2012, the ALJs issued SOAH Order No. 13 severing rate case expense issues into *Application of Entergy Texas, Inc. for Rate Case Expenses Severed from PUC Docket No. 39896*, Docket No. 40295 (pending).

15. On April 13, 2012, ETI adjusted its request for a proposed increase in annual base rate revenues to approximately $104.8 million over adjusted test-year revenues.

16. The hearing on the merits commenced on April 24 and concluded on May 4, 2012.

17.    Initial post-hearing briefs were filed on May 18 and reply briefs were filed on May 30, 2012.

17A.    On August 7, 2012, the SOAH ALJs filed a letter with the Commission recommending changes to the PFD.

17B    At the July 27, 2012 open meeting, ETI agreed to extend time to August 31, 2012 to provide the Commission sufficient time to consider the issues in this proceeding.

17C.    The Commission considered the proposal for decision at the August 17, 2012 and August 30, 2012 open meetings.

17D.    At the August 30, 2012 open meeting, ETI agreed to extend time to September 14, 2012 to provide the Commission sufficient time to consider the issues in this proceeding.

17E.    At the August 17, 2012 open meeting, parties announced on the record a settlement of the amount of costs for the transition to MISO.

### *Rate Base*

18.    Capital additions that were closed to ETI's plant-in-service between July 1, 2009 and June 30, 2011, are used and useful in providing service to the public and were prudently incurred.

19.    ETI's proposed Hurricane Rita regulatory asset was an issue resolved by the black-box settlement in *Application of Entergy Texas, Inc. for Authority to Change Rates and Reconcile Fuel Costs*, Docket No. 37744 (Dec. 13, 2010).

20.    Accrual of carrying charges on the Hurricane Rita regulatory asset should have ceased when Docket No. 37744 concluded because the asset would have then begun earning a rate of return as part of rate base.

21.    The appropriate calculation of the Hurricane Rita regulatory asset should begin with the amount claimed by ETI in Docket No. 37744, less amortization accruals to the end of the test-year in the present case, and less the amount of additional insurance proceeds received by ETI after the conclusion of Docket No. 37744.

22.    A Test-Year-end balance of $15,175,563 for the Hurricane Rita regulatory asset should remain in rate base, applying a five-year amortization rate beginning August 15, 2010.

23. The Hurricane Rita regulatory asset should not be moved to the storm damage insurance reserve.

24. The company requested in rate base its prepaid pension assets balance of $55,973,545, which represents the accumulated difference between the Statement of Financial Accounting Standards (SFAS) No. 87 calculated pension costs each year and the actual contributions made by the company to the pension fund.

25. The prepaid pension assets balance includes $25,311,236 capitalized to construction work in progress (CWIP).

26. It is not necessary to the financial integrity of ETI to include CWIP in rate base, and there was insufficient evidence showing that major projects under construction were efficiently and prudently managed.

27. The portion of the prepaid pension assets balance that is capitalized to CWIP should not be included in ETI's rate base.

28. The remainder of the prepaid pension assets balance should be included in ETI's rate base.

28A. When items are excluded from rate base, the related ADFIT should also be excluded. The amount of ADFIT associated with the $25 million capitalized to CWIP and excluded from rate base is $8,858,933. The adjusted ADFIT for the prepaid pension asset remaining in Entergy's rate base should be reduced by $8,858,933.

29. ETI should be permitted to accrue an allowance for funds used during construction on the portion of ETI's Prepaid Pension Assets Balance capitalized to CWIP.

30. The Financial Accounting Standard Board (FASB) Financial Interpretation No. 48 (FIN 48), "Accounting for Uncertainty in Income Taxes," requires ETI to identify each of its uncertain tax positions by evaluating the tax position on its technical merits to determine whether the position, and the corresponding deduction, is more-likely-than-not to be sustained by the Internal Revenue Service (IRS) if audited.

31. FIN 48 requires ETI to remove the amount of its uncertain tax positions from its Accumulated Deferred Federal Income Tax (ADFIT) balance for financial reporting

purposes and record it as a potential liability with interest to better reflect the company's financial condition.

32.   At test-year-end, ETI had $5,916,461 in FIN 48 liabilities, meaning ETI has, thus far, avoided paying to the IRS $5,916,461 in tax dollars (the FIN 48 liability) in reliance upon tax positions that the company believes will not prevail in the event the positions are challenged, via an audit, by the IRS.

33.   ETI has deposited $1,294,683 with the IRS in connection with the FIN 48 liability.

34.   The IRS may never audit ETI as to its uncertain tax positions creating the FIN 48 liability.

35.   Even if ETI is audited, ETI might prevail on its uncertain tax positions.

36.   ETI may never have to pay the IRS the FIN 48 liability.

37.   Other than the amount of its deposit with the IRS, ETI has current use of the FIN 48 liability funds.

38.   Until actually paid to the IRS, the FIN 48 liability represents cost-free capital and should be deducted from rate base.

39.   The amount of $4,621,778 (representing ETI's full FIN 48 liability of $5,916,461 less the $1,294,683 cash deposit ETI has made with the IRS for the FIN 48 liability) should be added to ETI's ADFIT and thus be used to reduce ETI's rate base.

40.   ETI's application and proposed tariffs do not include a request for a tracking mechanism or rider to collect a return on the FIN 48 liability.

40A.  It is appropriate for ETI to create a deferred-tax-account tracker in the form of a rider to recover on a prospective basis an after–tax return of 8.27% on the amounts paid to the IRS that result from an unfavorable FIN 48 audit. The rider will track unfavorable FIN 48 rulings and the return will be applied prospectively to FIN 48 amounts disallowed by an IRS audit after such amounts are actually paid to the federal government. If ETI prevails in an appeal of a FIN 48 decision, then any amounts collected under the rider related to that decision should be credited back to ratepayers.

41. Deleted.

42. Investor-owned electric utilities may include a reasonable allowance for cash working capital in rate base as determined by a lead-lag study conducted in accordance with the Commission's rules.

43. Cash working capital represents the amount of working capital, not specifically addressed in other rate base items, that is necessary to fund the gap between the time expenditures are made and the time corresponding revenues are received.

44. The lead-lag study conducted by ETI considered the actual operations of ETI, adjusted for known and measurable changes, and is consistent with P.U.C. SUBST. R. 25.231(c)(2)(B)(iii).

45. It is reasonable to establish ETI's cash working capital requirement based on ETI's lead-lag study as updated in Jay Joyce's rebuttal testimony and on the cost of service approved for ETI in this case.

46. As a result of the black-box settlements in *Application of Entergy Gulf States, Inc. for Authority to Change Rates and to Reconcile Fuel Costs*, Docket No. 34800 (Nov. 7, 2008) and Docket No. 37744, the Commission did not approve ETI's storm damage expenses since 1996 and its storm damage reserve balance.

47. ETI established a prima facie case concerning the prudence of its storm damage expenses incurred since 1996.

48. Adjustments to the storm damage reserve balance proposed by intervenors should be denied.

49. The Hurricane Rita regulatory asset should not be moved to the storm damage insurance reserve.

50. ETI's appropriate Test-Year-end storm reserve balance was negative $59,799,744.

51. The amount of $9,846,037, representing the value of the average coal inventory maintained at ETI's coal-burning facilities, is reasonable, necessary, and should be included in rate base.

52. The Spindletop gas storage facility (Spindletop facility) is used and useful in providing reliable and flexible natural gas supplies to ETI's Sabine Station and Lewis Creek generating plants.

53. The Spindletop facility is critical to the economic, reliable operation of the Sabine Station and Lewis Creek generating plants due to their geographic location in the far western region of the Entergy system.

54. It is reasonable and appropriate to include ETI's share of the costs to operate the Spindletop facility in rate base.

55. Staff recommended updating ETI's balance amounts for short-term assets to the 13-month period ending December 2011, which was the most recent information available. Staff's proposed adjustments should be incorporated into the calculation of ETI's rate base.

56. The following short-term asset amounts should be included in rate base: prepayments at $8,134,351; materials and supplies at $29,285,421; and fuel inventory at $52,693,485.

57. The amount of $1,127,778, representing costs incurred by ETI when it acquired the Spindletop facility, represent actual costs incurred to process and close the acquisition, not mere mark-up costs.

58. ETI's $1,127,778 in capitalized acquisition costs should be included in rate base because ETI incurred these costs in conjunction with the purchase of a viable asset that benefits its retail customers.

59. In its application, ETI capitalized into plant in service accounts some of the incentive payments ETI made to its employees. ETI seeks to include those amounts in rate base.

60. A portion of those capitalized incentive accounts represent payments made by ETI for incentive compensation tied to financial goals.

61. The portion of ETI's incentive payments that are capitalized and that are financially-based should be excluded from ETI's rate base because the benefits of such payments inure most immediately and predominantly to ETI's shareholders, rather than its electric

customers. ETI's capitalized incentive compensation that is financially based is $335,752.96 and should be removed for rate base.

62. The test-year for ETI's prior ratemaking proceeding ended on June 30, 2009, and the reasonableness of ETI's capital costs (including capitalized incentive compensation) for that prior period was dealt with by the Commission in that proceeding and is not at issue in this proceeding.

63. In this proceeding, ETI's capitalized incentive compensation that is financially-based should be excluded from rate base, but only for incentive costs that ETI capitalized during the period from July 1, 2009 (the end of the prior test-year) through June 30, 2010 (the commencement of the current test-year).

## *Rate of Return and Cost of Capital*

64. A return on common equity (ROE) of 9.80 percent will allow ETI a reasonable opportunity to earn a reasonable return on its invested capital.

65. The results of the discounted cash flow model and risk premium approach support a ROE of 9.80 percent.

65A. It is not appropriate to add 15 points to the ROE due to unsettled economic conditions facing utilities.

66. A 9.80 percent ROE is consistent with ETI's business and regulatory risk.

67. ETI's proposed 6.74 percent embedded cost of debt is reasonable.

68. The appropriate capital structure for ETI is 50.08 percent long-term debt and 49.92 percent common equity.

69. A capital structure composed of 50.08 percent debt and 49.92 percent equity is reasonable in light of ETI's business and regulatory risks.

70. A capital structure composed of 50.08 percent debt and 49.92 percent equity will help ETI attract capital from investors.

71.  ETI's overall rate of return should be set as follows:

| COMPONENT | CAPITAL STRUCTURE | COST OF CAPITAL | WEIGHTED AVG COST OF CAPITAL |
|---|---|---|---|
| LONG-TERM DEBT | 50.08% | 6.74% | 3.38% |
| COMMON EQUITY | 49.92% | 9.80% | 4.89% |
| TOTAL | 100.00% | | 8.27% |

## *Operating Expenses*

72.  ETI's test-year purchased capacity expenses were $245,965,886.

73.  ETI requested an upward adjustment of $30,809,355 as a post-test-year adjustment to its purchased capacity costs. This request was based on ETI's projections of its purchased capacity expenses during a period beginning June 1, 2012 and ending May 31, 2013 (the rate-year).

74.  ETI's purchased capacity expense projections were based on estimates of rate-year expenses for: (a) reserve equalization payments under Schedule MSS-1; (b) payments under third-party capacity contracts; and (c) payments under affiliate contracts.

75.  ETI's projection of its rate-year reserve equalization payments under Schedule MSS-1 is based on numerous assumptions, including load growths for ETI and its affiliates, future capacity contracts for ETI and its affiliates, and future values of the generation assets of ETI and its affiliates.

76.  There is substantial uncertainty with regard to ETI's projection of its rate-year reserve equalization payments under Schedule MSS-1.

77.  ETI's projection of its rate-year third-party capacity contract payments includes numerous assumptions, one of which is that every single third-party supplier will perform at the maximum level under the contract, even though that assumption is inconsistent with ETI's historical experience.

78.  There is substantial uncertainty with regard to ETI's projection of its rate-year third-party capacity-contract payments.

79.  ETI's estimates of its rate-year purchases under affiliate contracts are based on a mathematical formula set out in Schedule MSS-4.

80.   The MSS-4 formula for rate-year affiliate capacity payments reflects that these payments will be based on ratios and costs that cannot be determined until the month that the payments are to be made.

81.   Over $11 million of ETI's affiliate transactions were based on a 2013 contract (the EAI WBL Contract) that was not signed until April 11, 2012.

82.   There is uncertainty about whether the EAI WBL Contract will ever go into effect.

83.   ETI projects purchasing over 300 megawatts (MW) more in purchased capacity in the rate-year than it purchased in the test-year.

84.   ETI experienced substantial load growth in the two years before the test-year, and it continues to project similar load growth in the future.

85.   ETI did not meet its burden of proof to demonstrate that a known and measurable adjustment of $30,809,355 should be made to its test-year purchased capacity expenses.

86.   ETI's purchased capacity expense in this case should be based on the test-year level of $245,965,886.

87.   ETI incurred $1,753,797 of transmission equalization expense during the test-year.

88.   ETI proposed an upward adjustment of $8,942,785 for its transmission equalization expense. This request was based on ETI's projections of its transmission equalization expenses during the rate-year.

89.   The transmission equalization expense that ETI will pay in the rate-year will depend on future costs and loads for each of the Entergy operating companies.

90.   ETI's projection of its rate-year transmission equalization expenses is uncertain and speculative because it depends on a number of variables, including future transmission investments, deferred taxes, depreciation reserves, costs of capital, tax rates, operating expenses, and loads of each of the Entergy operating companies.

91.   ETI seeks increased transmission equalization expenses for transmission projects that are not currently used and useful in providing electric service. ETI's post-test-year adjustment is based on the assumption that certain planned transmission projects will go

into service after the test-year. At the close of the hearing, none of the planned transmission projects had been fully completed and some were still in the planning phase.

92. It is not reasonable for ETI to charge its retail ratepayers for transmission equalization expenses related to projects that are not yet in-service.

93. ETI's request for a post-test-year adjustment of $8,942,785 for rate-year transmission equalization expenses should be denied because those expenses are not known and measurable. ETI's post-test-year adjustment does not with reasonable certainty reflect what ETI's transmission equalization expense will be when rates are in effect.

94. ETI's transmission equalization expense in this case should be based on the test-year level of $1,753,797.

95. P.U.C. SUBST. R. 25.231(c)(2)(ii) states that the reserve for depreciation is the accumulation of recognized allocations of original cost, representing the recovery of initial investment over the estimated useful life of the asset.

96. Except in the case of the amortization of the general plant deficiency, the use of the remaining life depreciation method to recover differences between theoretical and actual depreciation reserves is the most appropriate method and should be continued.

97. It is reasonable for ETI to calculate depreciation reserve allocations on a straight-line basis over the remaining, expected useful life of the item or facility.

98. Except as described below, the service lives and net salvage rates proposed by the company are reasonable, and these service lives and net salvage rates should be used in calculating depreciation rates for the company's production, transmission, distribution, and general plant assets.

99. A 60-year life for Sabine Units 4 and 5 is reasonable for purposes of establishing production plant depreciation rates.

100. The retirement (actuarial) rate method, rather than the interim retirement method, should be used in the development of production plant depreciation rates.

101. Production plant net salvage is reasonably based on the negative five percent net salvage in existing rates.

102.    The net salvage rate of negative 10 percent for ETI's transmission structures and improvements (FERC Account 352) is the most reasonable of those proposed and should be adopted.

103.    The net salvage rate of negative 20 percent for ETI's transmission station equipment (FERC Account 353) is the most reasonable of those proposed and should be adopted.

104.    The net salvage rate of negative five percent for ETI's transmission towers and fixtures (FERC Account 354) is the most reasonable of those proposed and should be adopted.

105.    The net salvage rate of negative 30 percent for ETI's transmission poles and fixtures (FERC Account 355) is the most reasonable of those proposed and should be adopted.

106.    The net salvage rate of negative 30 percent for ETI's transmission overhead conductors and devices (FERC Account 356) is the most reasonable of those proposed and should be adopted.

107.    A service life of 65 years and a dispersion curve of R3 for ETI's distribution structures and improvements (FERC Account 361) are the most reasonable of those proposed and should be approved.

108.    A service life of 40 years and a dispersion curve of R1 for ETI's distribution poles, towers, and fixtures (FERC Account 364) are the most reasonable of those proposed and should be approved.

109.    A service life of 39 years and a dispersion curve of R0.5 for ETI's distribution overhead conductors and devices (FERC Account 365) are the most reasonable of those proposed and should be approved.

110.    A service life of 35 years and a dispersion curve of R1.5 for ETI's distribution underground conductors and devices (FERC Account 367) are the most reasonable of those proposed and should be approved.

111.    A service life of 33 years and a dispersion curve of L0.5 for ETI's distribution line transformers (FERC Account 368) are the most reasonable of those proposed and should be approved.

112.    A service life of 26 years and a dispersion curve of L4 for ETI's distribution overhead service (FERC Account 369.1) are the most reasonable of those proposed and should be approved.

113.    The net salvage rate of negative five percent for ETI's distribution structures and improvements (FERC Account 361) is the most reasonable of those proposed and should be adopted.

114.    The net salvage rate of negative 10 percent for ETI's distribution station equipment (FERC Account 362) is the most reasonable of those proposed and should be adopted.

115.    The net salvage rate of negative seven percent for ETI's distribution overhead conductors and devices (FERC Account 365) is the most reasonable of those proposed and should be adopted.

116.    The net salvage rate of positive five percent for ETI's distribution line transformers (FERC Account 368) is the most reasonable of those proposed and should be adopted.

117.    The net salvage rate of negative 10 percent for ETI's distribution overhead services (FERC Account 369.1) is the most reasonable of those proposed and should be adopted.

118.    The net salvage rate of negative 10 percent for ETI's distribution underground services (FERC Account 369.2) is the most reasonable of those proposed and should be adopted.

119.    A service life of 45 years and a dispersion curve of R2 for ETI's general structures and improvements (FERC Account 390) are the most reasonable of those proposed and should be approved.

120.    The net salvage rate of negative 10 percent for ETI's general structures and improvements (FERC Account 390) is the most reasonable of those proposed and should be adopted.

121.    It is reasonable to convert the $21.3 million deficit that has developed over time in the reserve for general plant accounts to General Plant Amortization.

122.    A ten-year amortization of the deficit in the reserve for general plant accounts is reasonable and should be adopted.

123.    FERC pronouncement AR-15 requires amortization over the same life as recommended based on standard life analysis. A standard life analysis determined that a five-year life was appropriate for general plant computer equipment (FERC Account 391.2). Therefore, a five year amortization for this account is reasonable and should be adopted.

124.    ETI proposed adjustments to its test-year payroll costs to reflect: (a) changes to employee headcount levels at ETI and Entergy Services, Inc. (ESI); and (b) approved wage increases set to go into effect after the end of the test-year.

125.    The proposed payroll adjustments are reasonable but should be updated to reflect the most recent available information on headcount levels as proposed by Commission Staff. In addition to adjusting payroll expense levels, the more recent headcount numbers should be used to adjust the level of payroll tax expense, benefits expense, and savings plan expense.

126.    Staff has appropriately updated headcount levels to the most recent available data but errors made by Staff should be corrected. The corrections related to: (a) a double counting of three ETI and one ESI employee; (b) inadvertent use of the ETI benefits cost percentage in the calculation of ESI benefits costs; (c) an inappropriate reduction of savings plan costs when such costs were already included in the benefits percentage adjustments; and (d) corrections for full-time equivalents calculations. Staff's ETI headcount adjustment (AG-7) overstated operation and maintenance (O&M) payroll reduction by $224,217, and ESI headcount adjustment (AG-7) understated O&M payroll increase by $37,531.

127.    ETI included $14,187,744 for incentive compensation expenses in its cost of service.

128.    The compensation packages that ETI offers its employees include a base payroll amount, annual incentive programs, and long-term incentive programs. The majority of the compensation is for operational measures, but some is for financial measures.

129.    Incentive compensation that is based on financial measures is of more immediate and predominant benefit to shareholders, whereas incentive compensation based on operational measures is of more immediate and predominant benefit to ratepayers.

130. Incentives to achieve operational measures are necessary and reasonable to provide utility services but those to achieve financial measures are not.

131. The $5,376,975 that was paid for long term incentive programs was tied to financial measures and, therefore, should not be included in ETI's cost of service.

132. Of the amounts that were paid pursuant to the Executive Annual Incentive Plan, $819,062 was tied to financial measures and, therefore, should be disallowed.

133. In total, the amount of incentive compensation that should be disallowed is $6,196,037 because it was related to financial measures that are not reasonable and necessary for the provision of electric service. An additional reduction should be made to account for the FICA taxes ETI would have paid on the disallowed financially based incentive compensation.

134. The amount of incentive compensation that should be included in the cost of service is $7,991,707.

135. To attract and retain highly qualified employees, the Entergy companies provide a total package of compensation and benefits that is equivalent in scope and cost with what other comparable companies within the utility business and other industries provide for their employees.

136. When using a benchmark analysis to compare companies' levels of compensation, it is reasonable to view the market level of compensation as a range rather than a precise, single point.

137. ETI's base pay levels are at market.

138. ETI's benefits plan levels are within a reasonable range of market levels.

139. ETI's level of compensation and benefits expense is reasonable and necessary.

140. ETI provides non-qualified supplemental executive retirement plans for highly compensated individuals such as key managerial employees and executives that, because of limitations imposed under the Internal Revenue Code, would otherwise not receive retirement benefits on their annual compensation over $245,000 per year.

141. ETI's non-qualified supplemental executive retirement plans are discretionary costs designed to attract, retain, and reward highly compensated employees whose interests are more closely aligned with those of the shareholders than the customers.

142. ETI's non-qualified executive retirement benefits in the amount of $2,114,931 are not reasonable or necessary to provide utility service to the public, not in the public interest, and should not be included in ETI's cost of service.

143. For the employee market in which ETI operates, most peer companies offer moving assistance. Such assistance is expected by employees, and ETI would be placed at a competitive disadvantage if it did not offer relocation expenses.

144. ETI's relocation expenses were reasonable and necessary.

145. The company's requested operating expenses should be reduced by $40,620 to reflect the removal of certain executive prerequisites proposed by Staff.

146. Staff properly adjusted the company's requested interest expense of $68,985 by removing $25,938 from FERC account 431 (using the interest rate of 0.12 percent for calendar year 2012), leaving a recommended interest expense of $43,047.

147. During the test-year, ETI's property tax expense equaled $23,708,829.

148. ETI requested an upward *pro forma* adjustment of $2,592,420, to account for the property tax expenses ETI estimates it will pay in the rate-year.

149. ETI's requested *pro forma* adjustment is not reasonable because it is based, in part, upon the prediction that ETI's property tax rate will be increased in 2012, a change that is speculative is not known and measurable.

150. Staff's recommendation to increase ETI's test-year property tax expenses by $1,214,688 is based on the historical effective tax rate applied to the known test-year-end plant in service value, consistent with Commission precedent, and based upon known and measurable changes.

151. ETI's test-year property tax burden should be adjusted upward by $1,222,106 for a total expense of $24,921,022.

152.    Staff recommended reducing ETI's advertising, dues, and contributions expenses by $12,800. The recommendation, which no party contested, should be adopted.

153.    The final cost of service should reflect changes to cost of service that affect other components of the revenue requirement such as the calculation of the Texas state gross receipts tax, the local gross receipts tax, the PUC Assessment Tax and the Uncollectible Expenses.

154.    The company's requested Federal income tax expense is reasonable and necessary.

155.    ETI's request for $2,019,000 to be included in its cost of service to account for the company's annual decommissioning expenses associated with River Bend is not reasonable because it is not based upon "the most current information reasonably available regarding the cost of decommissioning" as required by P.U.C. SUBST. R. 25.231(b)(1)(F)(i).

156.    Based on the most current information reasonably available, the appropriate level of decommissioning costs to be included in ETI's cost of service is $1,126,000.

157.    ETI's appropriate total annual self-insurance storm damage reserve expense is $8,270,000, comprised of an annual accrual of $4,400,000 to provide for average annual expected storm losses, plus an annual accrual of $3,870,000 for 20 years to restore the reserve from its current deficit.

158.    ETI's appropriate target self-insurance storm damage reserve is $17,595,000.

159.    ETI should continue recording its annual storm damage reserve accrual until modified by a Commission order.

160.    The operating costs of the Spindletop facility are reasonable and necessary.

161.    The operating costs of the Spindletop facility paid to PB Energy Storage Services are eligible fuel expenses.

*Affiliate Transactions*

162.    ETI affiliates charged ETI $78,998,777 for services during the test-year. The majority of these O&M expenses—$69,098,041—were charged to ETI by ESI. The remaining affiliate services were charged (or credited) to ETI by: Entergy Gulf States Louisiana,

L.L.C.; Entergy Arkansas, Inc.; Entergy Louisiana, LLC; Entergy Mississippi, Inc.; Entergy Operations, Inc.; and non-regulated affiliates.

163. ESI follows a number of processes to ensure that affiliate charges are reasonable and necessary and that ETI and its affiliates are charged the same rate for similar services. These processes include: (a) the use of service agreements to define the level of service required and the cost of those services; (b) direct billing of affiliate expenses where possible; (c) reasonable allocation methodologies for costs that cannot be directly billed; (d) budgeting processes and controls to provide budgeted costs that are reasonable and necessary to ensure appropriate levels of service to its customers; and (e) oversight controls by ETI's Affiliate Accounting and Allocations Department.

164. Affiliates charged expenses to ETI through 1292 project codes during the test-year.

164A. The $2,086,145 in affiliate transactions related to sales and marketing expenses should be reallocated using direct assignment. The following amounts should be allocated to all retail classes in proportion to number of customers: (1) $46,490 for Project E10PCR56224 – Sales and Marketing – EGSI Texas; (2) $17,013 for Project F3PCD10049 – Regulated Retail Systems O&M; and (3) $30,167 for Project F3PPMMALI2 – Middle Market Mkt. Development. The remainder, $1,992,475, should be assigned to (1) General Service, (2) Large General Service and (3) Large Industrial Power Service.

165. ETI agreed to remove the following affiliate transactions from its application: (1) Project F3PPCASHCT (Contractual Alternative/Cashpo) in the amount of $2,553; (2) Project F3PCSPETEI (Entergy-Tulane Energy Institute) in the amount of $14,288; and (3) Project F5PPKATRPT (Storm Cost Processing & Review) in the amount of $929.

166. The $356,151 (which figure includes the $112,531 agreed to by ETI) of costs associated with Projects F5PCZUBENQ (Non-Qualified Post Retirement) and F5PPZNQBDU (Non Qual Pension/Benf Dom Utl) are costs that are not reasonable and necessary for the provision of electric utility service and are not in the public interest.

167. The $10,279 of costs associated with Project F3PPFXERSP (Evaluated Receipts Settlement) are not normally-recurring costs and should not be recoverable.

168. The $19,714 of costs associated with Project F3PPEASTIN (Willard Eastin et al) are related to ESI's operations, it is more immediately related to Entergy Louisiana, Inc. and Entergy New Orleans, Inc. As such, they are not recoverable from Texas ratepayers.

169. The $171,032 of costs associated with Project F3PPE9981S (Integrated Energy Management for ESI) are research and development costs related to energy efficiency programs. As such, they should be recovered through the energy efficiency cost recovery factor rather than base rates.

170. Except as noted in the above findings of fact Nos. 162-169, all remaining affiliate transactions were reasonable and necessary, were allowable, were charged to ETI at a price no higher than was charged by the supplying affiliate to other affiliates, and the rate charged is a reasonable approximation of the cost of providing service.

*Jurisdictional Cost Allocation*

171. ETI has one full or partial requirements wholesale customer – East Texas Electric Cooperative, Inc.

172. ETI proposes that 150 MW be set as the wholesale load for developing retail rates in this docket. Using 150 MW to set the wholesale load is reasonable. The 150 MW used to set the wholesale load results in a retail production demand allocation factor of 95.3838 percent.

173. The 12 Coincident Peak (12 CP) allocation method is consistent with the approach used by the FERC to allocate between jurisdictions.

174. Using 12CP methodology to allocate production costs between the wholesale and retail jurisdictions is the best method to reflect cost responsibility and is appropriate based on ETI's reliance on capacity purchases.

*Class Cost Allocation and Rate Design*

175. There is no express statutory authorization for ETI's proposed Renewable Energy Credits rider (REC rider).

176. REC rider constitutes improper piecemeal ratemaking and should be rejected.

177.  ETI's test-year expense for renewable energy credits, $623,303, is reasonable and necessary and should be included in base rates.

178.  Municipal Franchise Fees (MFF) is a rental expense paid by utilities for the right to use public rights-of-way to locate its facilities within municipal limits.

179.  ETI is an integrated utility system. ETI's facilities located within municipal limits benefit all customers, whether the customers are located inside or outside of the municipal limits.

180.  Because all customers benefit from ETI's rental of municipal right-of-way, municipal franchise fees should be charged to all customers in ETI's service area, regardless of geographic location.

181.  It is reasonable and consistent with the Public Utility Regulatory Act (PURA) § 33.008(b) that MFF be allocated to each customer class on the basis of in-city kilowatt hour (kWh) sales, without an adjustment for the MFF rate in the municipality in which a given kWh sale occurred.

182.  The same reasons for allocating and collecting MFF as set out in Finding of Fact Nos. 178-181 also apply to the allocation and collection of Miscellaneous Gross Receipts Taxes. The company's proposed allocation of these costs to all retail customer classes based on customer class revenues relative to total revenues is appropriate.

182A. ETI's proposed gross plant-based allocator is an appropriate method for allocating the Texas franchise tax.

183.  The Average and Excess (A&E) 4CP method for allocating capacity-related production costs, including reserve equalization payments, to the retail classes is a standard methodology and the most reasonable methodology.

184.  The A&E 4CP method for allocating transmission costs to the retail classes is standard and the most reasonable methodology.

185.  ETI appropriately followed the rate class revenue requirements from its cost of service study to allocate costs among customer classes. ETI's revenue allocation properly sets rates at each class's cost of service.

186. It is reasonable for ETI to eliminate the service condition for Rate Groups A and C in Schedule SHL [Street and Highway Lighting Service] that charges a $50 fee for any replacement of a functioning light with a lower-wattage bulb.

187. It is appropriate to require ETI to prepare and file, as part of its next base rate case, a study regarding the feasibility of instituting LED-based rates and, if the study shows that such rates are feasible, ETI should file proposals for LED-based lighting and traffic signal rates in its next rate case.

188. An agreement was reached by the parties and approved by the Commission in Docket No. 37744 that directed ETI to exclude, in its next rate case, the life-of-contract demand ratchet for existing customers in the Large Industrial Power Service (LIPS), Large Industrial Power Service-Time of Day, General Service, General Service-Time of Day, Large General Service, and Large General Service-Time of Day rate schedules.

189. ETI's proposed tariffs in this case did not remove the life-of-contract demand ratchet from these rate schedules consistent with the parties' agreement in Docket No. 37744.

190. A perpetual billing obligation based on a life-of-contract demand ratchet, as ETI proposed, is not reasonable.

191. ETI's proposed LIPS and LIPS Time of Day tariffs should be modified to reflect the agreement that was adopted by the Commission as just and reasonable in Docket No. 37744. Accordingly, these tariffs should be modified as set out in Findings of Fact No. 192-194.

192. ETI's Schedule LIPS and LIPS Time of Day § VI should be changed to read:

DETERMINATION OF BILLING LOAD

The kW of Billing Load will be the greatest of the following:

(A) The Customer's maximum measured 30-minute demand during any 30-minute interval of the current billing month, subject to §§ III, IV and V above; or

(B) 75% of Contract Power as defined in § VII; or

(C) 2,500 kW.

193.    ETI's Schedule LIPS and LIPS Time of Day § VII should be changed to read:

DETERMINATION OF CONTRACT POWER

Unless Company gives customer written notice to the contrary, Contract Power will be defined as below:

Contract Power - the highest load established under § VI(A) above during the 12 months ending with the current month. For the initial 12 months of Customer's service under the currently effective contract, the Contract Power shall be the kW specified in the currently effective contract unless exceeded in any month during the initial 12-month period.

194.    The Large General Service, Large General Service-Time of Day, General Service, and General Service-Time of Day schedules should be similarly revised to eliminate ETI's life-of-contract demand ratchet.

195.    In its proposed rate design for the LIPS class, the company took a conservative approach and increased the current rates by an equal percentage. This minimized customer bill impacts while maintaining cost causation principles on a rate class basis.

196.    It is a reasonable move towards cost of service to add a customer charge of $630 to the LIPS rate schedule with subsequent increases to be considered in subsequent base rate cases.

197.    It is a reasonable move towards cost of service to slightly decrease the LIPS energy charges and increase the demand charges as proposed by Staff witness William B. Abbott.

198.    DOE proposed a new Schedule LIPS rider—Schedule "Schedulable Intermittent Pumping Service" (SIPS) for load schedulable at least four weeks in advance, that occurs in the off-season (October through May), that can be cancelled at any time, and for load not lasting more than 80 hours in a year. For customers whose loads match these SIPS characteristics (for example, DOE's Strategic Petroleum Reserve), the 12-month demand ratchet provision of Schedule LIPS does not apply to demands set under the provisions of the SIPS rider. The monthly demand set under the SIPS provisions would be applicable for billing purposes only in the month in which it occurred. In short, if a customer set a

12-month ratchet demand in that month, it would be forgiven and not applicable in the succeeding 12 months.

199. DOE's proposed Schedule SIPS is not restricted solely to the DOE and should be adopted. It more closely addresses specific customer characteristics and provides for cost-based rates, as does another ETI rider applicable to Pipeline Pumping Service.

200. Standby Maintenance Service (SMS) is available to customers who have their own generation equipment and who contract for this service from ETI.

201. P.U.C. SUBST. R. 25.242(k)(1) provides that rates for sales of standby and maintenance power to qualifying facilities should recognize system wide costing principles and should not be discriminatory.

202. It is reasonable to move Schedule SMS toward cost of service by: (a) adding a customer charge equivalent to that of the LIPS rate schedule only for SMS customers not purchasing supplementary power under another applicable rate; and (b) revising the tariff as follows:

| Charge | Distribution (less than 69KV) | Transmission (69KV and greater) |
|---|---|---|
| Billing Load Charge ($/kW): | | |
| Standby | $2.46 | $0.79 |
| Maintenance | $2.27 | $0.60 |
| Non-Fuel Energy Charge (¢/kWh) | | |
| On-Peak | 4.245¢ | 4.074¢ |
| Off-Peak | 0.575¢ | 0.552¢ |

203. ETI's Additional Facilities Charge rider (Schedule AFC) prescribes the monthly rental charge paid by a customer when ETI installs facilities for that customer that would not normally be supplied, such as line extensions, transformers, or dual feeds.

204. ETI existing Schedule AFC provides two pricing options. Option A is a monthly charge. Option B, which applies when a customer elects to amortize the directly-assigned facilities over a shorter term ranging from one to ten years, has a variable monthly charge. There is also a term charge that applies after the facility has been fully depreciated.

205.  It is reasonable and cost-based to reduce the Schedule AFC Option A rate to 1.11 percent per month of the installed cost of all facilities included in the agreement for additional facilities.

206.  It is reasonable and cost-based to reduce the Schedule AFC Option B monthly rate and the Post Term Recovery Charge as follows:

| Selected Recovery Term | Recovery Term Charge | Post Recovery Term Charge |
|---|---|---|
| 1 | 9.52% | 0.28% |
| 2 | 5.14% | 0.28% |
| 3 | 3.68% | 0.28% |
| 4 | 2.95% | 0.28% |
| 5 | 2.52% | 0.28% |
| 6 | 2.23% | 0.28% |
| 7 | 2.03% | 0.28% |
| 8 | 1.88% | 0.28% |
| 9 | 1.76% | 0.28% |
| 10 | 1.67% | 0.28% |

207.  The revisions in the above findings of fact to Schedule AFC rates reasonably reflect the costs of running, operating, and maintaining the directly-assigned facilities.

208.  It is reasonable to modify the Large General Service rate schedule by increasing the demand charge from $8.56 to $11.43; decreasing the energy charge from $.00854 to $.00458; and reducing the customer charge to $260.00.

209.  Staff's proposed change to the General Service (GS) rate schedule to gradually move GS customers towards their cost of service by recommending a decrease in the customer charge from the current rate of $41.09 to $39.91, and a decrease in the energy charges is reasonable and should be adopted.

210.  ETI's Residential Service (RS) rate schedule is composed of two elements: a customer charge and a consumption-based energy charge. In the months November through April (winter), the rates are structured as a declining block, in which the price of each unit is reduced after a defined level of usage. ETI's proposed increase in the RS customer charge to $6 per month is reasonable and should be adopted. For the RS summer rate and

the first winter block rate, the 6.296¢ per kWh energy charge resulting from the increased revenue requirement for residential customers is reasonable and should be adopted.

211.  ETI's Schedule RS declining block rate structure is contrary to energy-efficiency efforts and the Legislature's goal of reducing both energy demand and energy consumption in Texas, as stated in PURA § 39.905.

212.  Schedule RS winter block rates should be modified consistent with the goal set out in PURA § 39.905, with the initial phase-in of a 20 percent reduction in the block differential proposed by ETI and subsequent reductions should be reviewed for consideration at the occurrence of each rate case filing.

213.  Other elements of Schedule RS are just and reasonable.

### *Fuel Reconciliation*

214.  ETI incurred $616,248,686 in natural-gas expenses during the reconciliation period, which is from July 2009 through June 2011.

215.  ETI purchased natural gas in the monthly and daily markets and pursuant to a long-term contract with Enbridge Inc. pipeline. ETI also transported gas on its own account and negotiated operational balancing agreements with various pipeline companies.

216.  ETI employed a diversified portfolio of gas supply and transportation agreements to meet its natural-gas requirements, and ETI prudently managed its gas-supply contracts.

217.  ETI's natural gas expenses were reasonable and necessary expenses incurred to provide reliable electric service to retail customers.

218.  ETI incurred $90,821,317 in coal expenses during the reconciliation period.

219.  ETI prudently managed its coal and coal-related contracts during the reconciliation period.

220.  ETI monitored and audited coal invoices from Louisiana Generating, LLC for coal burned at the Big Cajun II, Unit 3 facility.

221.  ETI's coal expenses were reasonable and necessary expenses incurred to provide reliable electric service to retail customers.

222.  ETI incurred $990,041,434 in purchased-energy expenses during the reconciliation period.

223.  The Entergy System's planning and procurement processes for purchased-power produced a reasonable mix of purchased resources at a reasonable price.

224.  During the reconciliation period, ETI took advantage of opportunities in the fuel and purchased-power markets to reduce costs and to mitigate against price volatility.

225.  ETI's purchased-energy expenses were reasonable and necessary expenses incurred to provide reliable electric service to retail customers.

226.  ETI provided sufficient contemporaneous documentation to support the reasonableness of its purchased-power planning and procurement processes and its actual power purchases during the reconciliation period.

227.  The Entergy system sold power off system when the revenues were expected to be more than the incremental cost of supplying generation for the sale, subject to maintaining adequate reserves.

228.  The System Agreement is the tariff approved by the FERC that provides the basis for the operation and planning of the Entergy system, including the six operating companies. The System Agreement governs the wholesale-power transactions among the operating companies by providing for joint operation and establishing the bases for equalization among the operating companies, including the costs associated with the construction, ownership, and operation of the Entergy system facilities.

229.  Under the terms of the Entergy System Agreement, ETI was allocated its share of revenues and expenses from off-system sales.

230.  During the reconciliation period, ETI recorded off-system sales revenue in the amount of $376,671,969 in FERC Account 447 and credited 100 percent of off-system sales revenues and margins from off-system sales to eligible fuel expenses.

231.  ETI properly recorded revenues from off-system sales and credited those revenues to eligible fuel costs.

232.    The Entergy system consists of six operating companies, including ETI, which are planned and operated as a single, integrated electric system under the terms of the System Agreement.

233.    Service schedule MSS-1 of the System Agreement determines how the capability and ownership costs of reserves for the Entergy system are equalized among the operating companies. These inter-system "reserve equalization" payments are the result of a formula rate related to the Entergy system's reserve capability that is applied on a monthly basis.

234.    Reserve capability under service schedule MSS-1 is capability in excess of the Entergy system's actual or planned load built or acquired to ensure the reliable, efficient operation of the electric system.

235.    By approving service schedule MSS-1, the FERC has approved the method by which the operating companies share the cost of maintaining sufficient reserves to provide reliability for the Entergy system as a whole.

236.    Service schedule MSS-3 of the System Agreement determines the pricing and exchange of energy among the operating companies. By approving service schedule MSS-3, the FERC has approved the method by which the operating companies are reimbursed for energy sold to the exchange energy pool and how that energy is purchased.

237.    Service schedule MSS-4 of the System Agreement sets forth the method for determining the payment for unit power purchases between operating companies. By approving service schedule MSS-4, the FERC has approved the methodology for pricing inter-operating company unit power purchases.

238.    The Entergy system is planned using multi-year, annual, seasonal, monthly, and next-day horizons. Once the planning process has identified the most economical resources that can be used to reliably meet the aggregate Entergy system demand, the next step is to procure the fuel necessary to operate the generating units as planned and acquire wholesale power from the market.

239.  Once resources are procured to meet forecasted load, the Entergy system is operated during the current day using all the resources available to meet the total Entergy system demand.

240.  After current-day operation, the System Agreement prescribes an accounting protocol to bill the costs of operating the system to the individual operating companies. This protocol is implemented via the intra-system bill to each operating company on a monthly basis.

241.  ETI purchased power from affiliated operating companies per the terms of service schedule MSS-3 of the System Agreement. The payments made under Schedule MSS-3 to affiliated operating companies are reasonable and necessary, and the FERC has approved the pricing formula and the obligation to purchase the energy. ETI pays the same price per megawatt hour for energy under service schedule MSS-3 as does any other operating company purchasing energy under service schedule MSS-3 during the same hour.

242.  The Spindletop facility is used primarily to ensure gas-supply reliability and guard against gas-supply curtailments that can occur as a result of extreme weather or other unusual events.

243.  The Spindletop facility provides a secondary benefit of flexibility in gas supply. ETI can back down gas-fired generation to take advantage of more economical wholesale power, or use gas from storage to supplement gas-fired generation when load increases during the day and thereby avoid more expensive intra-day gas purchases.

244.  ETI's customers received benefits from the Spindletop facility during the reconciliation period through reliable gas supplies and ETI's monthly and daily storage activity.

245.  ETI prudently managed the Spindletop facility to provide reliability and flexibility of gas supply for the benefit of customers.

246.  ETI proposed new loss factors, based on a December 2010 line-loss study, to be applied for the purpose of allocating its costs to its wholesale customers and retail customer classes.

246A. ETI's 2010 line-loss factors should be used to reconcile ETI's fuel costs. Therefore, ETI's fuel reconciliation over-recovery should be reduced by $3,981,271.

247. ETI's proposed loss factors are reasonable and shall be implemented on a prospective basis as a result of this final order.

248. ETI seeks a special-circumstances exception to recover $99,715 resulting from the FERC's reallocation of rough production equalization costs in FERC Order No. 720-A, and to treat such costs as eligible fuel expense.

249. Special circumstances exist and it is appropriate for ETI to_recover the rough production cost equalization costs reallocated to ETI as a result of the FERC's decision in Order No. 720-A.

### *Other Issues*

250. A deferred accounting of ETI's Midwest Independent Transmission System Operator (MISO) transition expenses is not necessary to carry out any requirement of PURA.

251. ETI should include $1.6 million in base rates for MISO transition expense.

252. Deleted.

253. Transmission Cost Recovery Factor baseline values should be set during the compliance phase of this docket, after the Commission makes final rulings on the various contested issues that may affect this calculation.

254. Distribution Cost Recovery Factor baseline values should be set during the compliance phase of this docket, after the Commission makes final rulings on the various contested issues that may affect this calculation.

255. The appropriate amount for ETI's purchased-power capacity expense to be included in base rates is $245,965,886.

256. The amount of ETI's purchased-power capacity expense includes third-party contracts, legacy affiliate contracts, other affiliate contracts, and reserve equalization. Whether the amounts for all contracts should be included in the baseline for a purchased-capacity rider that may be approved in Project No. 39246 is an issue that should be decided in that project.

## III. Conclusions of Law

1.  ETI is a "public utility" as that term is defined in PURA § 11.004(1) and an "electric utility" as that term is defined in PURA § 31.002(6).

2.  The Commission exercises regulatory authority over ETI and jurisdiction over the subject matter of this application pursuant to PURA §§ 14.001, 32.001, 32.101, 33.002, 33.051, 36.101–.111, and 36.203.

3.  SOAH has jurisdiction over matters related to the conduct of the hearing and the preparation of a proposal for decision in this docket, pursuant to PURA § 14.053 and TEX. GOV'T CODE ANN. § 2003.049.

4.  This docket was processed in accordance with the requirements of PURA and the Texas Administrative Procedure Act, Tex. Gov't Code Ann. Chapter 2001.

5.  ETI provided notice of its application in compliance with PURA § 36.103, P.U.C. PROC. R. 22.51(a), and P.U.C. SUBST. R. 25.235(b)(1)-(3).

6.  Pursuant to PURA § 33.001, each municipality in ETI's service area that has not ceded jurisdiction to the Commission has jurisdiction over the company's application, which seeks to change rates for distribution services within each municipality.

7.  Pursuant to PURA § 33.051, the Commission has jurisdiction over an appeal from a municipality's rate proceeding.

8.  ETI has the burden of proving that the rate change it is requesting is just and reasonable pursuant to PURA § 36.006.

9.  In compliance with PURA § 36.051, ETI's overall revenues approved in this proceeding permit ETI a reasonable opportunity to earn a reasonable return on its invested capital used and useful in providing service to the public in excess of its reasonable and necessary operating expenses.

10. Consistent with PURA § 36.053, the rates approved in this proceeding are based on original cost, less depreciation, of property used and useful to ETI in providing service.

11. The ADFIT adjustments approved in this proceeding are consistent with PURA § 36.059 and P.U.C. SUBST. R. 25.231(c)(2)(C)(i).

12. Including the cash working capital approved in this proceeding in ETI's rate base is consistent with P.U.C. SUBST. R. 25.231(c)(2)(B)(iii)(IV), which allows a reasonable allowance for cash working capital to be included in rate base.

13. The ROE and overall rate of return authorized in this proceeding are consistent with the requirements of PURA §§ 36.051 and 36.052.

14. The affiliate expenses approved in this proceeding and included in ETI's rates meet the affiliate payment standards articulated in PURA §§ 36.051, 36.058, and *Railroad Commission of Texas v. Rio Grande Valley Gas Co.*, 683 S.W.2d 783 (Tex. App.—Austin 1984, no writ).

15. The ADFIT adjustments approved in this proceeding are consistent with PURA § 36.059 and P.U.C. SUBST. R. 25.231(c)(2)(C)(i).

16. Pursuant to P.U.C. SUBST. R. 25.231(b)(1)(F), the decommissioning expense approved in this case is based on the most current information reasonably available regarding the cost of decommissioning, the balance of funds in the decommissioning trust, anticipated escalation rates, the anticipated return on the funds in the decommissioning trust, and other relevant factors.

17. ETI has demonstrated that its eligible fuel expenses during the reconciliation period were reasonable and necessary expenses incurred to provide reliable electric service to retail customers as required by P.U.C. SUBST. R. 25.236(d)(1)(A). ETI has properly accounted for the amount of fuel-related revenues collected pursuant to the fuel factor during the reconciliation period as required by P.U.C. SUBST. R. 25.236(d)(1)(C).

18. ETI prudently managed the dispatch, operations, and maintenance of its fossil plants during the reconciliation period.

19. The reconciliation period level operating and maintenance expenses for the Spindletop facility are eligible fuel expenses pursuant to P.U.C. SUBST. R. 25.236(a).

19A. Fuel factors under P.U.C. SUBST. R. 25.237(a)(3) are temporary rates subject to revision in a reconciliation proceeding.

19B. P.U.C. SUBST. R. 25.236(d)(2) defines the scope of a fuel reconciliation proceeding to include any issue related to the reasonableness of a utility's fuel expenses and whether the utility has over- or under-recovered its reasonable fuel expenses. It is proper to use the new line-loss study to calculate Entergy's fuel reconciliation and over-recovery.

20. Special circumstances are warranted pursuant to P.U.C. SUBST. R. 25.236(a)(6) to recover rough production equalization payments reallocated to ETI by the FERC.

21. ETI's rates, as approved in this proceeding, are just and reasonable in accordance with PURA § 36.003.

## IV. Ordering Paragraphs

In accordance with these findings of fact and conclusions of law, the Commission issues the following orders:

1. The proposal for decision prepared by the SOAH ALJs is adopted to the extent consistent with this Order.

2. ETI's application is granted to the extent consistent with this Order.

3. ETI shall file in Tariff Control No. 40742 *Compliance Tariff Pursuant to Final Order in Docket No. 39896 (Application of Entergy Texas, Inc. for Authority to Change Rates, Reconcile Fuel Costs, and Obtain Deferred Accounting Treatment)* tariffs consistent with this Order within 20 days of the date of this Order. No later than ten days after the date of the tariff filings, Staff shall file its comments recommending approval, modification, or rejection of the individual sheets of the tariff proposal. Responses to the Staff's recommendation shall be filed no later than 15 days after the filing of the tariff. The Commission shall by letter approve, modify, or reject each tariff sheet, effective the date of the letter.

4. The tariff sheets shall be deemed approved and shall become effective on the expiration of 20 days from the date of filing, in the absence of written notification of modification or rejection by the Commission. If any sheets are modified or rejected, ETI shall file proposed revisions of those sheets in accordance with the Commission's letter within ten

days of the date of that letter, and the review procedure set out above shall apply to the revised sheets.

5.     Copies of all tariff-related filings shall be served on all parties of record.

6.     ETI shall prepare and file as part of its next base rate case a study regarding the feasibility of instituting LED-based rates and, if the study shows that such rates are feasible, ETI should file proposals for LED-based lighting and traffic signal rates in that case. If ETI has LED lighting customers taking service, the study shall include detailed information regarding differences in the cost of serving LED and non-LED lighting customers. ETI shall provide the results of this study to Cities and interested parties as soon as practicable, but no later than the filing of its next rate case.

7.     All other motions, requests for entry of specific findings of fact and conclusions of law, and any other requests for general or specific relief, if not expressly granted, are denied.

SIGNED AT AUSTIN, TEXAS the _____ day of ~~October~~ November 2012.

PUBLIC UTILITY COMMISSION OF TEXAS

_____
DONNA L. NELSON, CHAIRMAN

_____
ROLANDO PABLOS, COMMISSIONER

I respectfully dissent regarding the utility- and executive-management-class affiliate transactions. To be consistent with Commission precedent in Docket No. 14965,[37] the indirect costs of the management of Entergy's ultimate parent should not be borne by Texas ratepayers. Therefore, I would disallow the following: $173,867 for Project No. F3PCCPM001 (Corporate Performance Management); $372,919 for Project No. F3PCC31255 (Operations-Office of the CEO); and $74,485 for Project No. F3PPCOO001 (Chief Operating Officer). I join the Commission in all other respects for this Order.

_____
KENNETH W. ANDERSON, JR., COMMISSIONER

q.\cadm\orders\final\39000\39896o on reh docx

---

[37] *Application of Central Power and Light Company for Authority to Change Rates*, Docket No. 14965, Second Order on Rehearing (Oct. 16, 1997).

SOAH DOCKET NO. 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
PUC DOCKET NO. 39896
COMPANY NAME Entergy Texas, Inc
TEST YEAR END 30-Jun-11

COMM Schedule I
Revenue Requirement

| | | Test Year Total | Company Adjustments To Test Year | Company Requested Test Year Total Electric | Commission Adjustments To Company Request | Commission Adjusted Total Electric |
|---|---|---|---|---|---|---|
| | | (a) | (b) | (c) | (d) | (e) = (c) + (d) |
| **REVENUE REQUIREMENT** | | | | | | |
| Operations & Maintenance | | $ 1,291,684,714 | $ (1,075,148,117) | $ 216,536,597 | $ (24,550,490) | $ 191,986,107 |
| Regulatory Debits and Credits | 407 00 | $ (6,784,608) | $ 12,030,533 | $ 5,245,925 | $ (324,121) | $ 4,921,804 |
| Accretion Expense | | $ 212,783 | $ (212,783) | $ - | $ - | $ - |
| Interest on Customer Deposits | | $ - | $ 68,985 | $ 68,985 | $ (25,938) | $ 43,047 |
| Decommissioning Expense | | $ - | $ - | $ - | $ - | $ - |
| Depreciation & Amortization Expense | | $ 76,072,459 | $ 22,558,698 | $ 98,631,157 | $ (6,253,316) | $ 92,377,841 |
| Taxes Other Than Income Taxes | | $ 63,023,906 | $ (2,533,159) | $ 60,490,747 | $ (2,874,506) | $ 57,616,241 |
| Federal Income Taxes | | $ (23,407,031) | $ 67,296,739 | $ 43,889,708 | $ 6,181,384 | $ 50,071,092 |
| Current State Income Taxes | | $ (127,519) | $ 89,787 | $ (37,732) | $ 37,732 | $ - |
| Deferred Federal Income Taxes | | $ 67,051,463 | $ (52,089,274) | $ 14,962,189 | $ (14,962,189) | $ - |
| Deferred State Income Taxes | | $ 812,265 | $ (727,918) | $ 84,347 | $ (84,347) | $ - |
| Investment Tax Credits | 411.00 | $ (1,611,177) | $ (46,429) | $ (1,657,606) | $ 1,657,606 | $ - |
| Consolidated Tax Savings Adjustment | | $ - | $ - | $ - | $ - | $ - |
| Return on Invested Capital | | $ - | $ 155,162,991 | $ 155,162,991 | $ (14,562,393) | $ 140,600,598 |
| **TOTAL** | | $ 1,466,927,255 | $ (873,549,947) | $ 593,377,308 | $ (55,760,578) | $ 537,616,730 |

Plus:

| | | | |
|---|---|---|---|
| Addback: Purchased Power Rider | 555.00 | $ | 244,539,884 |
| Addback: Interruptible Services | 555 00 | $ | - |
| **Total Addbacks** | | $ | 244,539,884 |
| **Total COMM Revenue Requirement** | | $ | 782,156,614 |

SOAH DOCKET NO.  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
PUC DOCKET NO.  39896
COMPANY NAME  Entergy Texas, Inc.
TEST YEAR END  30-Jun-11

COMM Schedule II
O&M Expense

| OPERATIONS AND MAINTENANCE EXPENSE | Acct. No | Test Year Total (a) | Company Adjustments To Test Year (b) | Company Requested Test Year Total Electric (c) | Commission Adjustments To Company Request (d) | Commissioin Adjusted Total Electric (e) = (c) + (d) |
|---|---|---|---|---|---|---|
| Operations & Maintenance: | | | | | | |
| Prod. Operation and Supr | 500 | 5,338,227 | 52,215 | 5,390,442 | (96,362) | 5,294,080 |
| Fuel | 501 | (255,242) | - | (255,242) | - | (255,242) |
| Fuel-Oil | 501 | 664,745 | (663,891) | 854 | - | 854 |
| Fuel-Natural Gas | 501 | 330,035,996 | (330,035,996) | - | - | - |
| Fuel-Coal | 501 | 49,170,094 | (46,618,748) | 2,551,346 | (1,466) | 2,549,880 |
| Steam Expenses | 502 | 3,900,803 | 40,940 | 3,941,743 | (61,223) | 3,880,520 |
| Electric Expenses | 505 | 2,529,473 | 9,516 | 2,538,989 | 684 | 2,539,673 |
| Misc Steam Power Expenses | 506 | 8,135,921 | 31,297 | 8,167,218 | (74,347) | 8,092,871 |
| Rents | 507 | 131,131 | - | 131,131 | - | 131,131 |
| NOX Emmissions Allowance Expense | 509 | (43,244) | 43,244 | - | - | - |
| NOX Seasonal Allowance Expense | 509 | 11,904 | (11,904) | - | - | - |
| Maintenance Supv and Eng | 510 | 1,166,596 | 21,037 | 1,187,633 | (18,303) | 1,169,330 |
| Maintenance of structures | 511 | 3,104,201 | 4,593 | 3,108,794 | (6,872) | 3,101,922 |
| Maintenance of boiler plant | 512 | 12,592,212 | 21,742 | 12,613,954 | (17,587) | 12,596,367 |
| Maintenance of electric plant | 513 | 5,491,510 | 729,791 | 6,221,301 | (27,550) | 6,193,751 |
| Maintenance of misc steam plant | 514 | 1,314,917 | (18,801) | 1,296,116 | (15,889) | 1,280,227 |
| Hydraulic Operating Supv and Eng | 535 | (841) | (27) | (868) | 9 | (859) |
| Misc Hydro Power Generation | 539 | (12) | - | (12) | - | (12) |
| Maintenance Supv and Eng | 541 | (1,359) | (32) | (1,391) | 14 | (1,377) |
| Maintenance of electric plant | 544 | 1,303 | 13 | 1,316 | (26) | 1,290 |
| Maintenance of Misc hydraulic plant | 545 | 543 | - | 543 | - | 543 |
| Operation Supv and Eng | 546 | (1,288) | (12) | (1,300) | 23 | (1,277) |
| Misc. Other Power Gen Exp | 549 | (91) | - | (91) | - | (91) |
| Purchased Power-System Companies | 555 | 111,253,452 | (111,253,452) | - | - | - |
| Purchased Power-from others | 555 | 159,034,737 | (159,034,737) | - | 533,002 Comm | 533,002 |
| Co-Generation | 555 | 148,658,981 | (148,658,981) | - | - | - |
| Rsrc Plan PurPow-Affilated | 555 | 308,866,766 | (308,866,766) | - | - | - |
| Purchased Power Entergy Affiliates | 555 | 25,558,973 | (25,558,973) | - | - | - |
| Renewable Energy Credit | 555 | - | - | - | 623,303 | 623,303 |
| System Control & Load Dispatch | 556 | 951,691 | 19,686 | 971,377 | (19,111) | 952,266 |
| System Control & Dispatch Other | 557 | 321,455 | 4,301 | 325,756 | (6,391) | 319,365 |
| Deferred Electric Fuel Cost | 557 | (52,121,822) | 52,121,822 | - | - | - |
| Deferred TX capacity rider | 557 | (12,448) | 12,448 | - | - | - |
| Transmission Ops Supr & Engr | 560 | 5,568,076 | (117,800) | 5,450,276 | (31,045) | 5,419,231 |
| Load Dispatching | 561 | 842,620 | 8,987 | 851,607 | (79,413) | 772,194 |
| Load Dispatching-reliability | 561 | 231,424 | 5,608 | 237,032 | 1,191 | 238,223 |
| Load Dispatching-transmission system | 561 | 1,422,924 | 31,890 | 1,454,814 | 6,365 | 1,461,179 |
| Load Dispatching-Trans Serv & Sch | 561 | 577,895 | 12,964 | 590,859 | 2,886 | 593,745 |
| System Planning & Standards Dev | 561 | 385,684 | 7,877 | 393,561 | 1,755 | 395,316 |
| Transmission Service Studies | 561 | 52,780 | 1,139 | 53,919 | 242 | 54,161 |
| Transmission Station Equipment | 562 | 142,626 | 925 | 143,551 | (1,813) | 141,738 |
| Trans OH Line Expense | 563 | 483,385 | 66 | 483,451 | (129) | 483,322 |
| Transmission Equalization | 565 | 1,377,103 | 9,319,479 | 10,696,582 | (8,942,785) | 1,753,797 |
| Misc. Transmission Expenses | 566 | 924,736 | (19,401) | 905,335 | (11,518) | 893,817 |
| Rents | 567 | 987,823 | - | 987,823 | - | 987,823 |
| Maint. Supv And Eng. | 568 | 3,041,227 | 313,096 | 3,354,323 | (29,859) | 3,324,464 |
| Maint. Of Structures | 569 | 106,642 | 42 | 106,684 | (6,215) | 100,469 |
| Maint Trans Computer & Telecom | 569 | 448,842 | 6,215 | 455,057 | 155 | 455,212 |
| Transmission Maint Station Equip | 570 | 1,692,713 | 7,266 | 1,699,979 | (14,177) | 1,685,802 |
| Transmission Maint OH Line Exp | 571 | 1,790,447 | 40 | 1,790,487 | (79) | 1,790,408 |
| Maint. Of Misc. Transmission | 573 | 52,814 | - | 52,814 | - | 52,814 |
| Regional Energy Mkts-Oper Supv | 575 | 18,998 | 4,034,420 | 4,053,418 | (2,452,989) Comm | 1,600,429 |
| DayAhead & Real Time Mkts WPP | 575 | 37,069 | 810 | 37,879 | (397) | 37,482 |
| Maint of Computer Software WPP | 576 | 3,168 | - | 3,168 | - | 3,168 |
| Distribution Ops Supr & Engr | 580 | 5,357,005 | 26,983 | 5,383,988 | (66,797) | 5,317,191 |
| Distribution Load Dispatching | 581 | 448,718 | 4,367 | 453,085 | (8,488) | 444,597 |
| Distribution Station Expenses | 582 | 471,978 | 2,931 | 474,909 | (5,715) | 469,194 |
| Distribution OH Line Expenses | 583 | 103,332 | 771 | 104,103 | (1,511) | 102,592 |
| Underground Line Expenses | 584 | 746,886 | 2,638 | 749,524 | (5,173) | 744,351 |
| Street Lighting & Signal Sys | 585 | 286,809 | 2,296 | 289,105 | (4,152) | 284,953 |
| Meter Expenses | 586 | 2,088,756 | 13,593 | 2,102,349 | (25,176) | 2,077,173 |
| Customer Installations | 587 | 470,236 | 3,787 | 474,023 | (7,349) | 466,674 |
| Miscellaneous Distribution Exp | 588 | 1,503,004 | 4,505 | 1,507,509 | (19,425) | 1,488,084 |
| Rents | 589 | 3,925,626 | - | 3,925,626 | - | 3,925,626 |
| Distribution Maint Supr & Engr | 590 | 1,455,611 | (4,009) | 1,451,602 | (23,447) | 1,428,155 |
| Maint. Of Structures | 591 | 180,488 | - | 180,488 | - | 180,488 |
| Distribution Maint Station Equip | 592 | 860,084 | 6,186 | 866,270 | (11,078) | 855,192 |
| Distribution Maint OH lines | 593 | 10,544,165 | 20,914 | 10,565,079 | (43,524) | 10,521,555 |
| Underground Line Expenses | 594 | 802,465 | 5,293 | 807,758 | (10,732) | 797,026 |
| Dist Maint Line Trnf, Regulators | 595 | 15,851 | 51 | 15,902 | (36) | 15,866 |
| MaintStreet Light & Signal Sys | 596 | 635,209 | 4,176 | 639,385 | (8,188) | 631,197 |
| Maintenance-Non Roadway Sec Ltg | 596 | 392,358 | 2,678 | 395,036 | (5,252) | 389,784 |
| Maintenance of Meters | 597 | 159,186 | 1,366 | 160,552 | (2,678) | 157,874 |
| Maint of Misc Distr Plant | 598 | 449,866 | 1,928 | 451,794 | (3,039) | 448,755 |
| Supervision - Customer Accts | 901 | 258,934 | 2,458 | 261,392 | (4,552) | 256,840 |
| Meter Reading Exp | 902 | 3,843,502 | 8,762 | 3,852,264 | (9,366) | 3,842,898 |
| Customer Records | 903 | 5,250,761 | 71,989 | 5,322,750 | (66,377) | 5,256,373 |
| Customer Collection | 903 | 4,745,821 | 38,181 | 4,784,002 | - | 4,784,002 |
| Customer Deposit Interest | 903.2 | - | - | - | - | - |
| Uncollectible Accounts | 904 | 2,835,831 | 2,051,289 | 4,887,120 | (459,250) | 4,427,870 |
|    Effective Rate | | 0.000000000000 | | 0.008236108685 | | 0.008236108685 |
| Uncollectible Accounts-revenue adj | | - | (307,648) | (307,648) | 307,648 | - |
| Uncollectible Accounts Elect-Write Off | 904 | (1,106,887) | - | (1,106,887) | - | (1,106,887) |
| Miscellaneous | 905 | 33,149 | 610 | 33,759 | (670) | 33,089 |
| Factoring Expense | 426.5 | - | - | - | - | - |
|    Factoring Factor | | 0.0000000000000 | | 0.0000000000000 | | 0.0000000000000 |
| Supervision | 907 | 392,505 | (2,721) | 389,784 | (5,629) | 384,155 |

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Customer Assistance | 908 | $ | 9,189,638 | $ | (7,250,909) | $ | 1,938,729 | $ | (67,298) | $ | 1,871,431 |
| Customer Assistance over/under | 908 | $ | 1,747,892 | $ | (1,747,892) | $ | - | $ | - | $ | - |
| Information & Instr Advertising | 909 | $ | 937,069 | $ | (876) | $ | 936,193 | $ | (4,056) | $ | 932,137 |
| Misc. Cust. Service and Information | 910 | $ | 1,151,988 | $ | 4,764 | $ | 1,156,752 | $ | - | $ | 1,156,752 |
| Sales Supervision | 911 | $ | 829 | $ | 7 | $ | 836 | $ | (17,467) | $ | (16,631) |
| Demonstrating & Selling Exp | 912 | $ | 730,161 | $ | 14,522 | $ | 744,683 | $ | (16,597) | $ | 728,086 |
| Advertising Expense | 913 | $ | 110,202 | $ | (2,379) | $ | 107,823 | $ | (58) | $ | 107,765 |
| Misc. Sales Expense | 916 | $ | 256,775 | $ | 1,715 | $ | 258,490 | $ | (1,390) | $ | 257,100 |
| | | $ | - | $ | - | $ | - | | | $ | - |
| TOTAL Operations & Maintenance | | $ | 1,207,264,083 | $ | (1,071,013,726) | $ | 136,250,357 | $ | (11,342,739) | $ | 124,907,618 |

SOAH DOCKET NO. 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
PUC DOCKET NO. 39896
COMPANY NAME Entergy Texas, Inc.
TEST YEAR END 30-Jun-11

| OPERATIONS AND MAINTENANCE EXPENSE | | | Test Year Total (a) | | Company Adjustments To Test Year (b) | | Company Requested Test Year Total Electric (c) | | Commission Adjustments To Company Request (d) | | Commission Adjusted Total Electric (e) = (c) + (d) |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Administrative & General: | | | | | | | | | | | |
| Admin & General Salaries | 920 | $ | 18,405,932 | $ | (1,460,140) | $ | 16,945,792 | $ | (5,773,708) | $ | 11,172,084 |
| Office Supplies & Exp | 921 | $ | 1,590,193 | $ | (459,339) | $ | 1,130,854 | $ | (5,400) | $ | 1,125,454 |
| Admin Expenses Transferred | 922 | $ | 1,059,941 | $ | 1,006 | $ | 1,060,947 | $ | 214 | $ | 1,061,161 |
| Outside Services | 923 | $ | 14,921,589 | $ | (5,431,183) | $ | 9,490,406 | $ | (89,762) | $ | 9,400,644 |
| Property Insurance | 924 | $ | 1,134,432 | $ | 1,287 | $ | 1,135,719 | $ | - | $ | 1,135,719 |
| Provision for Property Insurance | 924 | $ | 3,699,996 | $ | 5,060,004 | $ | 8,760,000 | $ | (491,172) | $ | 8,268,828 |
| Environmental Reserve Accrual | 924 | $ | 1,153,576 | $ | - | $ | 1,153,576 | $ | | $ | 1,153,576 |
| Injuries & Damages | 925 | $ | 1,859,658 | $ | 7,424 | $ | 1,867,082 | $ | (5,437) | $ | 1,861,645 |
| Employee Pensions & Benefits | 926 | $ | 27,027,557 | $ | (17,961) | $ | 27,009,596 | $ | (2,678,305) | $ | 24,331,291 |
| Regulatory Commission Exp | 928 | $ | 7,708,335 | $ | (1,984,403) | $ | 5,723,932 | $ | (4,150,717) | $ | 1,573,215 |
| General Advertising Exp | 9301 | $ | 62,040 | $ | (65) | $ | 61,975 | $ | (343) | $ | 61,632 |
| Miscellaneous | 9302 | $ | 796,138 | $ | 224,312 | $ | 1,020,450 | $ | (9,181) | $ | 1,011,269 |
| Active Development Expenses | 9302 | $ | 21 | $ | - | $ | 21 | $ | - | $ | 21 |
| Directors' Fees and Expenses | 9302 | $ | 79,476 | $ | (79,476) | $ | - | $ | - | | |
| Rents | 931 | $ | 3,264,425 | $ | 1,164 | $ | 3,265,589 | $ | - | $ | 3,265,589 |
| Maint. Of General Plant | 935 | $ | 1,657,322 | $ | 2,979 | $ | 1,660,301 | $ | (3,940) | $ | 1,656,361 |
| TOTAL Administrative & General | | | 84,420,631 | | (4,134,391) | | 80,286,240 | | (13,207,751) | | 67,078,489 |
| TOTAL O & M EXPENSE | | | 1,291,684,714 | | (1,075,148,117) | | 216,536,597 | | (24,550,490) | $ | 191,986,107 |

SOAH DOCKET NO.   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
PUC DOCKET NO.   39896
COMPANY NAME   Entergy Texas, Inc.
TEST YEAR END   30-Jun-11

| | Test Year Total (a) | Company Adjustments To Test Year (b) | Company Requested Test Year Total Electric (c) | Commission Adjustments To Company Request (d) | Commission Adjusted Total Electric (e) = (c) + (d) |
|---|---|---|---|---|---|
| **INVESTED CAPITAL** | | | | | |
| Plant in Service | $ 3,521,368,187 | $ (251,512,491) | $ 3,269,855,696 | $ (335,753) | $ 3,269,519,943 |
| Accumulated Depreciation | $ (1,417,946,172) | $ 148,061,290 | $ (1,269,884,882) | $ - | $ (1,269,884,882) |
| Net Plant in Service | $ 2,103,422,015 | $ (103,451,201) | $ 1,999,970,814 | $ (335,753) | $ 1,999,635,061 |
| Construction Work in Progress | $ - | $ - | $ - | $ - | $ - |
| Plant Held for Future Use | $ - | $ - | $ - | $ - | $ - |
| Working Cash Allowance | $ - | $ (2,013,921) | $ (2,689,275) | $ (3,697,959) | $ (6,387,234) |
| Fuel Inventories | $ 53,759,975 | $ - | $ 53,759,975 | $ (1,066,490) | $ 52,693,485 |
| Materials and Supplies | $ 29,252,574 | $ - | $ 29,252,574 | $ 32,847 | $ 29,285,421 |
| Prepayments | $ 7,366,433 | $ (148,396) | $ 7,218,037 | $ 916,313 | $ 8,134,350 |
| Property Insurance Reserve | $ - | $ 59,799,744 | $ 59,799,744 | $ - | $ 59,799,744 |
| Injuries and Damages Reserve | $ (5,569,243) | $ - | $ (5,569,243) | $ - | $ (5,569,243) |
| Coal Car Maintenance Reserve | $ 1,400,350 | $ - | $ 1,400,350 | $ - | $ 1,400,350 |
| Unfunded Pension | $ (53,715,841) | $ 109,689,386 | $ 55,973,545 | $ (25,311,236) | $ 30,662,309 |
| Allowances | $ 68,914 | $ - | $ 68,914 | $ - | $ 68,914 |
| Environmental Reserves | $ 3,412,379 | $ (4,474,569) | $ (1,062,190) | $ - | $ (1,062,190) |
| Customer Deposits | $ (35,872,476) | $ - | $ (35,872,476) | $ - | $ (35,872,476) |
| Regulatory Assets and Liabilities | $ - | $ 26,366,859 | $ 26,366,859 | $ (11,054,064) | $ 15,312,795 |
| Accumulated DFIT | $ (824,338,691) | $ 369,967,144 | $ (454,371,547) | $ 6,398,405 | $ (447,973,142) |
| Rate Case Expenses | $ - | $ 6,175,000 | $ 6,175,000 | $ (6,175,000) | $ - |
| **TOTAL INVESTED CAPITAL (RATE BASE)** | $ 1,279,186,389 | $ 461,910,046 | $ 1,740,421,081 | $ (40,292,937) | $ 1,700,128,144 |
| **RATE OF RETURN** | 5.140% | | 8.92% | | 8.2700% |
| **RETURN ON INVESTED CAPITAL** | $ - | $ 155,162,991 | $ 155,162,991 | $ (14,562,393) | $ 140,600,598 |

SOAH DOCKET NO. 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
PUC DOCKET NO. 39896
COMPANY NAME Entergy Texas, Inc.
TEST YEAR END 30-Jun-11

COMM Schedule IIIA
Electric Plant in Service

| | | Test Year Total (a) | Company Adjustments To Test Year (b) | Company Requested Test Year Total Electric (c) | Commission Adjustments To Company Request (d) | Commission Adjusted Total Electric (e) = (c) + (d) |
|---|---|---|---|---|---|---|
| **Electric Plant In Service** | | | | | | |
| Intangible Plant | | | | | | |
| Organization | 301 | 1,346,899 | 4,958,233 | 6,305,132 | - | 6,305,132 |
| Misc Intangible Plant | 303 | 96,786,717 | 4,199,689 | 100,986,406 | - | 100,986,406 |
| Total Intangible Plant | | 98,133,616 | 9,157,922 | 107,291,538 | - | 107,291,538 |
| Production Plant-Steam | | | | | | |
| Land and Land Rights | 310 | 4,512,873 | | 4,512,873 | - | 4,512,873 |
| Structures and Improve | 311 | 172,930,626 | 1,099,019 | 174,029,645 | - | 174,029,645 |
| Boiler Plant Equipment | 312 | 388,477,042 | 10,838,417 | 399,315,459 | - | 399,315,459 |
| Turbogenerators | 314 | 189,175,111 | 8,787,919 | 197,963,030 | - | 197,963,030 |
| Accessory Equipment | 315 | 96,272,189 | 10,750,419 | 107,022,608 | - | 107,022,608 |
| Misc. Power Plant Equip | 316 | 10,848,083 | 1,864,464 | 12,712,547 | - | 12,712,547 |
| Asset Retire Costs | 317 | 419,211 | (419,211) | - | - | - |
| Accessory Elec Equip | 334 | 218,538 | | 218,538 | - | 218,538 |
| Misc. Power Plant Equip | 335 | 37,269 | - | 37,269 | - | 37,269 |
| | | - | - | - | - | - |
| Total Production Plant | | 862,890,942 | 32,921,027 | 895,811,969 | - | 895,811,969 |
| Transmission Plant | | | | | | |
| Land | 350.1 | 9,579,879 | 4,247,242 | 13,827,121 | - | 13,827,121 |
| Easements | 350.2 | 33,622,888 | 356,735 | 33,979,623 | - | 33,979,623 |
| Structures and Improv | 352 | 21,909,777 | 669,852 | 22,579,629 | - | 22,579,629 |
| Station Equipment | 353 | 344,869,139 | 10,429,463 | 355,298,602 | - | 355,298,602 |
| Towers & Fixtures | 354 | 25,360,394 | 64,086 | 25,424,480 | - | 25,424,480 |
| Poles & Fixtures | 355 | 166,563,323 | 13,724,724 | 180,288,047 | - | 180,288,047 |
| Overhead Conductors &D | 356 | 166,098,991 | 12,570,240 | 178,669,231 | - | 178,669,231 |
| Underground Conduit | 357 | - | - | - | - | - |
| Underground Conductor | 358 | 321,717 | - | 321,717 | - | 321,717 |
| Roads and Trails | 359 | 202,785 | - | 202,785 | - | 202,785 |
| | | - | - | - | - | - |
| Total Transmission Plant | | 768,528,893 | 42,062,342 | 810,591,235 | - | 810,591,235 |
| Distribution Plant | | | | | | |
| Land | 360.1 | 4,178,955 | | 4,178,955 | - | 4,178,955 |
| Easements | 360.2 | 11,759,529 | | 11,759,529 | - | 11,759,529 |
| Structure and Improve | 361 | 7,857,817 | 157,089 | 8,014,906 | - | 8,014,906 |
| Station Equipment | 362 | 156,704,009 | 7,565,169 | 164,269,178 | - | 164,269,178 |
| Poles, Towers & Fixtures | 364 | 185,114,784 | 36,287,319 | 221,402,103 | - | 221,402,103 |
| OH Conductors & Devices | 365 | 170,541,014 | 44,147,418 | 214,688,432 | - | 214,688,432 |
| Underground Conduit | 366 | 22,067,426 | 1,103,870 | 23,171,296 | - | 23,171,296 |
| UG Con & Devices | 367 | 84,221,923 | 7,121,667 | 91,343,590 | - | 91,343,590 |
| Line Transformers | 368 | 285,357,209 | 73,111,167 | 358,468,376 | - | 358,468,376 |
| Services-Overhead | 369.1 | 41,093,559 | 13,092,741 | 54,186,300 | - | 54,186,300 |
| Services-Underground | 369.2 | 32,113,168 | 4,314,456 | 36,427,624 | - | 36,427,624 |
| Meters | 370 | 30,110,288 | (1,808,469) | 28,301,819 | - | 28,301,819 |
| Installations on Cus Pre | 371 | 16,132,486 | 2,318,592 | 18,451,078 | - | 18,451,078 |
| Street Lights | 373 | (226,908) | 2,378,038 | 2,151,130 | - | 2,151,130 |
| Non Roadway Lighting | 373.2 | (21,654) | (401,392) | (423,046) | - | (423,046) |
| Total Distribution Plant | | 1,047,003,605 | 189,387,665 | 1,236,391,270 | - | 1,236,391,270 |
| Computer Hardware | 382 | 60,623 | - | 60,623 | - | 60,623 |
| Computer Software | 383 | 3,366,130 | - | 3,366,130 | - | 3,366,130 |
| Total Computer | | 3,426,753 | - | 3,426,753 | - | 3,426,753 |
| General Plant | | | | | | |
| Land & Land Rights | 389 | 5,147,436 | (90,259) | 5,057,177 | - | 5,057,177 |
| Structure & Improveme | 390 | 53,909,613 | 3,034,857 | 56,944,470 | - | 56,944,470 |
| Office Furniture & Equip | 391.1 | 994,536 | (58,226) | 936,310 | - | 936,310 |
| Information System | 391.2 | 17,646,803 | 1,223,920 | 18,870,723 | - | 18,870,723 |
| Data Handling Equip | 391.3 | 917,640 | 882 | 918,522 | - | 918,522 |
| Transportation Equip | 392 | 91,988 | (81,477) | 10,511 | - | 10,511 |
| Stores Equipment | 393 | 3,226,653 | - | 3,226,653 | - | 3,226,653 |
| Tools, Shop & Garage E | 394 | 7,856,626 | 451,358 | 8,307,984 | - | 8,307,984 |
| Laboratory Equipment | 395 | 600,637 | (300,192) | 300,445 | - | 300,445 |
| Power Operated Equip | 396 | 526,899 | - | 526,899 | - | 526,899 |
| Misc Comm Equipment | 397.1 | 5,107,445 | 252,980 | 5,360,425 | - | 5,360,425 |
| Comm & Microwave Equ | 397.2 | 40,182,621 | 233,697 | 40,416,318 | - | 40,416,318 |
| Misc Equipment | 398 | 969,421 | (26,332) | 943,089 | - | 943,089 |
| | | - | - | - | - | - |
| Total General Plant | | 137,176,318 | 4,641,208 | 141,819,526 | - | 141,819,526 |
| Electric Contra AFUDC | | (8,382,452) | - | (8,382,452) | - | (8,382,452) |
| Constr Elec Cash Flow Reclass | | 248,427,857 | (248,427,858) | (1) | - | (1) |
| Intangibles Completed no Class | 303 | 64,260 | (52,768) | 11,492 | - | 11,492 |
| Completed Construction not Class | 301-349 | 23,532,587 | (20,940,477) | 2,592,110 | - | 2,592,110 |
| Completed Construction not Class | 350-359 | 37,517,589 | 14,319,209 | 51,836,798 | - | 51,836,798 |
| Completed Construction not Class | 360-373 | 152,102,936 | (129,701,876) | 22,401,060 | - | 22,401,060 |
| Completed Construction not Class | 389-399 | 5,714,246 | (777,624) | 4,936,622 | - | 4,936,622 |
| Plant Acquisition Adjustment | 311 | 1,127,778 | - | 1,127,778 | - | 1,127,778 |
| | | 460,104,801 | (385,581,394) | 74,523,407 | - | 74,523,407 |
| **Total Electric PIS** | | 3,377,266,928 | (107,411,230) | 3,269,855,698 | (335,753) | 3,269,519,945 |

SOAH DOCKET NO. 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
PUC DOCKET NO. 39896
COMPANY NAME Entergy Texas, Inc.
TEST YEAR END 30-Jun-11

COMM Schedule IIIB
Depreciation Expense

| | | Test Year Total (a) | Company Adjustments To Test Year (b) | Company Requested Test Year Total Electric (c) | Commission Adjustments To Company Request (d)= (e) - (c) | Commission Adjusted Total Electric (e) |
|---|---|---|---|---|---|---|
| **Depreciation Expense** | | | | | | |
| Structures & Improvements | 311 | $ 1,095,067 | $ 616,683 | $ 1,711,750 | $ (424,581) | $ 1,287,169 |
| Boiler Plant Equipment | 312 | 8,765,278 | 845,956 | 9,611,234 | (2,028,662) | 7,582,572 |
| TurboGenerator Units | 314 | 2,482,980 | 2,045,957 | 4,528,937 | (1,105,324) | 3,423,613 |
| Accessory Electric Equipment | 315 | 2,262,265 | 395,683 | 2,657,948 | (430,004) | 2,227,944 |
| Misc Power Plant Equip | 316 | 236,086 | 66,386 | 302,472 | (53,873) | 248,599 |
| Asset Retirement Obligation | 317 | (331,958) | 331,958 | - | | - |
| Misc Power Plant Equip | 335 | 1,188 | (943) | 245 | | 245 |
| Subtotal Production | | $ 14,510,906 | $ 4,301,680 | $ 18,812,586 | $ (4,042,444) | $ 14,770,142 |
| | | | | | | |
| Land Easements | 350.2 | 463,058 | (65,666) | 397,392 | | 397,392 |
| Structures & Improvements | 352 | 417,724 | (315) | 417,409 | | 417,409 |
| Station Equipment | 353 | 5,379,875 | 2,952,619 | 8,332,494 | | 8,332,494 |
| Towers and Fixtures | 354 | 416,765 | 46,647 | 463,412 | (107,469) | 355,943 |
| Poles and Fixtures | 355 | 4,182,575 | 779,244 | 4,961,819 | | 4,961,819 |
| OH Conductors & Devices | 356 | 2,860,208 | 1,162,693 | 4,022,901 | | 4,022,901 |
| Underground Conductors & Devices | 358 | 1,409 | 5,014 | 6,423 | | 6,423 |
| Roads and Trails | 359 | 860 | 2,224 | 3,084 | | 3,084 |
| Subtotal Transmission | | $ 13,722,474 | $ 4,882,460 | $ 18,604,934 | $ (107,469) | $ 18,497,465 |
| | | | | | | |
| Land Rights | 360.2 | 240,953 | (30,175) | 210,778 | | 210,778 |
| Structures & Improvements | 361 | 127,911 | 33,069 | 160,980 | (9,512) | 151,468 |
| Station Equipment | 362 | 3,606,715 | 363,575 | 3,970,290 | (399,946) | 3,570,344 |
| Poles, Towers & Fixtures | 364 | 6,809,464 | 1,438,154 | 8,247,618 | (1,192,611) | 7,055,007 |
| OH Conductors & Devices | 365 | 3,600,424 | 3,244,756 | 6,845,180 | | 6,845,180 |
| Underground Conduit | 366 | 436,899 | 32,544 | 469,443 | | 469,443 |
| Underground Conductors & Devices | 367 | 2,277,436 | 960,620 | 3,238,056 | | 3,238,056 |
| Line Transformers | 368 | 10,285,939 | 3,088,781 | 13,374,720 | (776,924) | 12,597,796 |
| OH Services | 369 | 2,735,306 | 1,272,163 | 4,007,469 | 280,720 | 4,288,189 |
| Meters | 370 | 1,020,813 | 394,834 | 1,415,647 | | 1,415,647 |
| Install on Customer Premises | 371 | 556,198 | 919 | 557,117 | | 557,117 |
| Street Lighting and Signal | 373 | 62,665 | (22,617) | 40,048 | | 40,048 |
| Subtotal Distribution | | $ 31,760,723 | $ 10,776,623 | $ 42,537,346 | $ (2,098,273) | $ 40,439,073 |
| | | | | | | |
| Regional Trans & Mkt Ops Hardware | 382 | 12,125 | - | 12,125 | | 12,125 |
| Regional Trans & Mkt Ops Software | 383 | 673,827 | (601) | 673,226 | | 673,226 |
| | | | | | | |
| Structures & Improvements | 390 | 1,359,296 | (272,045) | 1,087,251 | | 1,087,251 |
| Office Furniture & Equipment | 391 | 2,514,238 | 3,318,559 | 5,832,797 | | 5,832,797 |
| Transportation Equipment | 392 | 955 | 44,724 | 45,679 | | 45,679 |
| Stores Equipment | 393 | 150,556 | 176,112 | 326,668 | | 326,668 |
| Tools, Shop, & Garage Equipment | 394 | 556,547 | 66,440 | 622,987 | | 622,987 |
| Laboratory Equipment | 395 | 22,505 | 254,860 | 277,365 | | 277,365 |
| Power Operated Equipment | 396 | 30,044 | (17,172) | 12,872 | | 12,872 |
| Communication Equipment | 397 | 1,697,978 | (310,501) | 1,387,477 | | 1,387,477 |
| Misc Equipment | 398 | 47,155 | 123,991 | 171,146 | | 171,146 |
| Subtotal General Plant | | $ 6,379,274 | $ 3,384,968 | $ 9,764,242 | $ - | $ 9,764,242 |
| | | | | | | |
| ESI Depreciation Expense | 403 | 1,980,959 | (203,063) | 1,777,896 | (5,130) | 1,772,766 |
| | | | | | | |
| Organization Expense | 301 | 735,599 | 525,428 | 1,261,027 | | 1,261,027 |
| Contra AFUDC | 303 | (117,485) | 142,841 | 25,356 | | 25,356 |
| Customer Accounting | 303 | 189,797 | (17,552) | 172,245 | | 172,245 |
| Customer CCS | 303 | 233,924 | (51,305) | 182,619 | | 182,619 |
| Customer CIS | 303 | 18,386 | (1,437) | 16,949 | | 16,949 |
| Customer Service | 303 | 117,625 | 456 | 118,081 | | 118,081 |
| Distribution | 303 | 240,345 | (68,011) | 172,334 | | 172,334 |
| A&G/MISC | 303 | 2,587,529 | (835,744) | 1,751,785 | | 1,751,785 |
| A&G/MISC-Labor Related | 303 | 531,420 | (43,000) | 488,420 | | 488,420 |
| Non Nuclear Prod Fuel | 303 | 3,314 | (674) | 2,640 | | 2,640 |
| Non Nuclear Prod Non-Fuel | 303 | 704,512 | (68,483) | 636,029 | | 636,029 |
| Regional Trans & Mrkt (RTO/ICT) | 303 | 413,575 | - | 413,575 | | 413,575 |
| Transmission & Distribution | 303 | 741,809 | (173,160) | 568,649 | | 568,649 |
| Transmission | 303 | 631,821 | 7,272 | 639,093 | | 639,093 |
| Subtotal Amortization Expense | | $ 7,032,171 | $ (583,369) | $ 6,448,802 | $ - | $ 6,448,802 |
| | | | | | | |
| **Total Depreciation & Amt** | | $ 76,072,459 | $ 22,558,698 | $ 98,631,157 | $ (6,253,316) | $ 92,377,841 |

SOAH DOCKET NO. 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
PUC DOCKET NO. 39896
COMPANY NAME Entergy Texas, Inc.
TEST YEAR END 30-Jun-11

## TAXES OTHER THAN FIT

| | | Test Year Total (a) | Company Adjustments To Test Year (b) | Company Requested Test Year Total Electric (c) | Commission Adjustments To Company Request (d) | Commission Adjusted Total Electric (e) = (c) + (d) |
|---|---|---|---|---|---|---|
| **Non Revenue Related** | | | | | | |
| Ad Valorem Taxes-Texas | | $ 21,631,936 | $ 2,592,420 | $ 24,224,356 | $ (1,380,227) | $ 22,844,129 |
| Ad Valorem Taxes-Other States | | $ 2,076,893 | $ - | $ 2,076,893 | $ - | $ 2,076,893 |
| Total Property | | $ 23,708,829 | $ 2,592,420 | $ 26,301,249 | $ (1,380,227) | $ 24,921,022 |
| | | | | | | |
| **Payroll Taxes** | | | | | | |
| FICA | | $ 2,287,010 | $ (122,914) | $ 2,164,096 | $ (57,923) | $ 2,106,173 |
| FUTA | | $ 20,530 | $ - | $ 20,530 | $ (519) | $ 20,011 |
| SUTA | | $ 33,897 | $ - | $ 33,897 | $ (6,678) | $ 27,219 |
| Total Payroll | | $ 2,341,437 | $ (122,914) | $ 2,218,523 | $ (65,120) | $ 2,153,403 |
| | | | | | | |
| **Franchise Taxes** | | | | | | |
| Texas | 408.33 | $ - | $ - | $ - | $ - | $ - |
| Other States | | $ - | $ - | $ - | $ - | $ - |
| | | $ - | $ - | $ - | $ - | $ - |
| | | | | | | |
| **Other Taxes** | | | | | | |
| ESI Ad Valorem | | $ 269,306 | | $ 269,306 | | $ 269,306 |
| ESI Payroll Taxes | | $ 1,613,856 | $ 115,362 | $ 1,729,218 | $ (121,549) | $ 1,607,669 |
| ESI Franchise Taxes | | $ 40,220 | $ - | $ 40,220 | $ - | $ 40,220 |
| ESI Other | | $ 190 | $ - | $ 190 | | $ 190 |
| Entergy Arkansas Payroll Taxes | | $ 25,399 | | $ 25,399 | | $ 25,399 |
| Entergy Mississippi Payroll Taxes | | $ 466 | | $ 466 | | $ 466 |
| Entergy New Orleans Payroll Taxes | | $ 12 | | $ 12 | | $ 12 |
| Entergy Gulf States Louisiana Payroll | | $ 137,081 | | $ 137,081 | | $ 137,081 |
| Total Other | | $ 2,086,530 | $ 115,362 | $ 2,201,892 | $ (121,549) | $ 2,080,343 |
| | | | | | | |
| **Revenue Related** | | | | | | |
| State Gross Receipts - Texas | | $ 13,427,794 | $ (1,536,790) | $ 11,891,004 | $ (1,117,416) | $ 10,773,588 |
| Effective Rate | | 0 | | 0.008400949 | | 0.02003953276 |
| State Gross Receipts - Other | | $ - | $ (1,356,664) | $ (1,356,664) | $ 1,356,664 | $ - |
| Local Gross Receipts - Texas | | $ 19,932,527 | $ (2,257,405) | $ 17,675,122 | $ (1,660,958) | $ 16,014,164 |
| Effective Rate | | 0.0000000000000 | | 0.0207301912847 | | 0.02978732376 |
| Local Gross Receipts - Other | | $ - | $ (76,933) | $ (76,933) | $ 76,933 | $ - |
| State Gross Margins - Texas | | $ - | $ - | $ - | $ - | $ - |
| Effective Rate | | 0 | | 0 | | |
| | | $ 33,360,321 | $ (5,227,792) | $ 28,132,529 | $ (1,344,777) | $ 26,787,752 |
| | | | | | | |
| PUC Assessment - Texas | | $ 1,526,789 | $ 320,528 | $ 1,847,317 | $ (173,595) | $ 1,673,722 |
| PUC Assessment Effective Rate | | 0 | | 0.001667 | | 0.00311322488 |
| PUC Assessment - Other | | $ - | $ (210,763) | $ (210,763) | $ 210,763 | $ - |
| | | $ 1,526,789 | $ 109,765 | $ 1,636,554 | $ 37,168 | $ 1,673,722 |
| | | | | | | |
| **TOTAL TAXES OTHER THAN INCOME TAXES** | | $ 63,023,906 | $ (2,533,159) | $ 60,490,747 | $ (2,874,506) | $ 57,616,241 |

10/30/2012 12:39 PM

SOAH DOCKET NO.   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
PUC DOCKET NO.   39896
COMPANY NAME   Entergy Texas, Inc.
TEST YEAR END   30-Jun-11

COMM Schedule V
Federal Income Taxes

**FEDERAL INCOME TAXES - METHOD 1**

| | | Requested At Proposed Test Year Total Electric | Commission Adjustments To Company Request | Commission Adjusted Total Electric |
|---|---|---|---|---|
| | | (c) | (d) | (e) |
| Return | Total | $   - | | $  140,600,598 |
| **Less:** | | | | |
| Interest Included in Return | | $   - | | $  57,409,530 |
| Amortization of ITC | | | | $  1,642,645 |
| Amortization of DFIT (Excess) | | | | $  236,870 |
| Consolidated Tax Savings | | | | $  - |
| **Plus:** | | | | $  - |
| AFUDC | | | | $  15,544,523 |
| Other Permanent Differences | | | | $  (1,720,971) |
| Non-Normalized Timing Differences | | | | |
| EOI/ESI Taxes | | | | $  436,745 |
| Current State Income Tax | | | | $  (37,732) |
| Deferred State Income Tax | | | | $  84,347 |
| FAS 109 | | $   - | | $  - |
| Amortization of Excess DFIT-Depreciation | | $   - | | $  - |
| **TAXABLE COMPONENT OF RETURN** | | $   - | | $  95,618,465 |
| TAX FACTOR (1/1- 35)( 35) | | 0 53846150 | | 0 53846150 |
| TOTAL FIT BEFORE ADJUSTMENTS | | | 0 | 51,486,862 |
| **Adjustments:** | | | | |
| Amortization of ITC | | | | $  (1,642,645) |
| Amortization of Excess DFIT - Depreciation | | | | $  (236,870) |
| Prior Years Current FIT | | | | $  - |
| Prior Years Deferred FIT | | | | $  - |
| EOI/ESI Taxes | | | | $  463,745 |
| FAS 109 | | $   - | | $  - |
| Other - Consolidated Tax Savings | | $   - | | $  - |
| **TOTAL FEDERAL INCOME TAXES** | | $   - | | $  50,071,092 |

# Appendix C

# PURA, Chapter 36, Subchapters A and B, and Chapter 37, Subchapter D

# PUBLIC UTILITY REGULATORY ACT

Title II, Texas Utilities Code

(As Amended)

Effective as of September 1, 2013

# PUBLIC UTILITY COMMISSION
# OF TEXAS

# FOREWORD

The Public Utility Code was enacted by Acts 1997, 75th Leg., R.S., ch. 166, § 1 as a new and separate code effective September 1, 2007. Title 2 of the code is properly cited as the Public Utility Regulatory Act.

This edition of the Public Utility Regulatory Act contains amendments adopted through the 83rd Legislature, Third Called Session.

In general, the effect of amendments has been clear and the resulting text changes were straightforward and did not require any editorial discretion. Except as explained below, editorial discretion was exercised in reconciling multiple amendments to the same section. In the majority of these cases, there was no irreconcilable conflict and all of the amendments could be given effect. In some cases, an act expressly amended a provision as added or amended by another act. In the few cases where an irreconcilable conflict was found, the act with the later date of enactment was given effect, with the other provisions italicized below. In addition, a note explaining the conflict is provided following the section annotation.

The annotations following each section have two components. The first annotation shows the derivation of the section, either citing to the Public Utility Regulatory Act of 1995 (V.A.C.S. Art. 1446c-0), Acts 1997, ch. 166, or showing the section as added to the code and citing the relevant act. The second component identifies subsequent amendments, cites the amending act (and originating bill), provides a brief summary of each of the amendments, and, where appropriate, provides a reference to related provisions or material.

This publication is maintained by the Commission Advising and Docket Management Division of the Public Utility Commission of Texas. Suggestions or corrections may be submitted to that division.

# CHAPTER 36.  RATES

## SUBCHAPTER A.  GENERAL PROVISIONS

### Sec. 36.001.  AUTHORIZATION TO ESTABLISH AND REGULATE RATES.

(a)   The regulatory authority may establish and regulate rates of an electric utility and may adopt rules for determining:

(1)   the classification of customers and services; and

(2)   the applicability of rates.

(b)   A rule or order of the regulatory authority may not conflict with a ruling of a federal regulatory body.

(V.A.C.S. art. 1446c-0, Sec. 2.201.)

### Sec. 36.002.  COMPLIANCE WITH TITLE.

An electric utility may not charge or receive a rate for utility service except as provided by this title.

(V.A.C.S. art. 1446c-0, Sec. 2.153 (part).)

### Sec. 36.003.  JUST AND REASONABLE RATES.

(a)   The regulatory authority shall ensure that each rate an electric utility or two or more electric utilities jointly make, demand, or receive is just and reasonable.

(b)   A rate may not be unreasonably preferential, prejudicial, or discriminatory but must be sufficient, equitable, and consistent in application to each class of consumer.

(c)   An electric utility may not:

(1)   grant an unreasonable preference or advantage concerning rates to a person in a classification;

(2)   subject a person in a classification to an unreasonable prejudice or disadvantage concerning rates; or

(3)   establish or maintain an unreasonable difference concerning rates between localities or between classes of service.

(d)   In establishing an electric utility's rates, the commission may treat as a single class two or more municipalities that an electric utility serves if the commission considers that treatment to be appropriate.

(e)   A charge to an individual customer for retail or wholesale electric service that is less than the rate approved by the regulatory authority does not constitute an impermissible difference, preference, or advantage.

(V.A.C.S. art. 1446c-0, Secs. 2.202, 2.214 (part).)

### Sec. 36.004.  EQUALITY OF RATES AND SERVICES.

(a)   An electric utility may not directly or indirectly charge, demand, or receive from a person a greater or lesser compensation for a service provided or to be provided by the utility than the compensation prescribed by the applicable tariff filed under Section 32.101.

(b)   A person may not knowingly receive or accept a service from an electric utility for a compensation greater or less than the compensation prescribed by the tariff.

(c)   Notwithstanding Subsections (a) and (b), an electric utility may charge an individual customer for wholesale or retail electric service in accordance with Section 36.007.

(d)  This title does not prevent a cooperative corporation from returning to its members net earnings resulting from its operations in proportion to the members' purchases from or through the corporation.

(V.A.C.S. art. 1446c-0, Secs. 2.215(a), (b).)

## Sec. 36.005.  RATES FOR AREA NOT IN MUNICIPALITY.

Without the approval of the commission, an electric utility's rates for an area not in a municipality may not exceed 115 percent of the average of all rates for similar services for all municipalities served by the same utility in the same county as that area.

(V.A.C.S. art. 1446c-0, Sec. 2.213.)

## Sec. 36.006.  BURDEN OF PROOF.

In a proceeding involving a proposed rate change, the electric utility has the burden of proving that:

(1)  the rate change is just and reasonable, if the utility proposes the change; or

(2)  an existing rate is just and reasonable, if the proposal is to reduce the rate.

(V.A.C.S. art. 1446c-0, Sec. 2.204.)

## Sec. 36.007.  DISCOUNTED WHOLESALE OR RETAIL RATES.

(a)  On application by an electric utility, a regulatory authority may approve wholesale or retail tariffs or contracts containing charges that are less than rates approved by the regulatory authority but not less than the utility's marginal cost.  The charges must be in accordance with the principles of this title and may not be unreasonably preferential, prejudicial, discriminatory, predatory, or anticompetitive.

(b)  The method for computing the marginal cost of the electric utility consists of energy and capacity components.  The energy component includes variable operation and maintenance expense and marginal fuel or the energy component of purchased power.  The capacity component is based on the annual economic value of deferring, accelerating, or avoiding the next increment of needed capacity, without regard to whether the capacity is purchased or built.

(c)  The commission shall ensure that the method for determining marginal cost is consistently applied among utilities but may recognize the individual load and resource requirements of the electric utility.

(d)  Notwithstanding any other provision of this title, the commission shall ensure that the electric utility's allocable costs of serving customers paying discounted rates under this section are not borne by the utility's other customers.

(V.A.C.S. art. 1446c-0, Secs. 2.001(b), (c), (d) (part), 2.052(b), (c).)

## Sec. 36.008.  STATE TRANSMISSION SYSTEM.

In establishing rates for an electric utility, the commission may review the state's transmission system and make recommendations to the utility on the need to build new power lines, upgrade power lines, and make other necessary improvements and additions.

(V.A.C.S. art. 1446c-0, Sec. 2.051(w) (part).)  (Amended by Acts 1999, 76th Leg., R.S., ch. 405 (SB 7), § 23.)

## Sec. 36.009.  BILLING DEMAND FOR CERTAIN UTILITY CUSTOMERS.

Notwithstanding any other provision of this code, the commission by rule shall require a transmission and distribution utility to:

(1)  waive the application of demand ratchet provisions for each nonresidential secondary service customer that has a maximum load factor equal to or below a factor set by commission rule;

(2)  implement procedures to verify annually whether each nonresidential secondary service customer has a maximum load factor that qualifies the customer for the waiver described by Subdivision (1);

(3)    specify in the utility's tariff whether the utility's nonresidential secondary service customers that qualify for the waiver described by Subdivision (1) are to be billed for distribution service charges on the basis of:

(A)    kilowatts;

(B)    kilowatt-hours; or

(C)    kilovolt-amperes; and

(4)    modify the utility's tariff in the utility's next base rate case to implement the waiver described by Subdivision (1) and make the specification required by Subdivision (3).

(Added by Acts 2011, 82nd Leg., R.S., ch. 150 (HB 1064), § 1.)

# SUBCHAPTER B.  COMPUTATION OF RATES

## Sec. 36.051.  ESTABLISHING OVERALL REVENUES.

In establishing an electric utility's rates, the regulatory authority shall establish the utility's overall revenues at an amount that will permit the utility a reasonable opportunity to earn a reasonable return on the utility's invested capital used and useful in providing service to the public in excess of the utility's reasonable and necessary operating expenses.

(V.A.C.S. art. 1446c-0, Sec. 2.203(a).)

## Sec. 36.052.  ESTABLISHING REASONABLE RETURN.

In establishing a reasonable return on invested capital, the regulatory authority shall consider applicable factors, including:

(1)    the efforts and achievements of the utility in conserving resources;

(2)    the quality of the utility's services;

(3)    the efficiency of the utility's operations; and

(4)    the quality of the utility's management.

(V.A.C.S. art. 1446c-0, Sec. 2.203(b).)  (Amended by Acts 1999, 76th Leg., R.S., ch. 405 (SB 7), § 24 (repealed former subd. (1) and renumbered former subds. (2) to (5) as subds. (1) to (4)).)

## Sec. 36.053.  COMPONENTS OF INVESTED CAPITAL.

(a)    Electric utility rates shall be based on the original cost, less depreciation, of property used by and useful to the utility in providing service.

(b)    The original cost of property shall be determined at the time the property is dedicated to public use, whether by the utility that is the present owner or by a predecessor.

(c)    In this section, the term "original cost" means the actual money cost or the actual money value of consideration paid other than money.

(d)    If the commission issues a certificate of convenience and necessity or, acting under Section 39.203(e), orders an electric utility or a transmission and distribution utility to construct or enlarge transmission or transmission-related facilities to facilitate meeting the goal for generating capacity from renewable energy technologies under Section 39.904(a), the commission shall find that the facilities are used and useful to the utility in providing service for purposes of this section and are prudent and includable in the rate base, regardless of the extent of the utility's actual use of the facilities.

(V.A.C.S. art. 1446c-0, Secs. 2.206(a) (part), (c).)  (Amended by Acts 2005, 79th Leg., 1st C.S., ch. 1 (SB 20), § 1 (added subsec. (d)).)

### Sec. 36.054.  CONSTRUCTION WORK IN PROGRESS.

(a)   Construction work in progress, at cost as recorded on the electric utility's books, may be included in the utility's rate base.  The inclusion of construction work in progress is an exceptional form of rate relief that the regulatory authority may grant only if the utility demonstrates that inclusion is necessary to the utility's financial integrity.

(b)   Construction work in progress may not be included in the rate base for a major project under construction to the extent that the project has been inefficiently or imprudently planned or managed.

(V.A.C.S. art. 1446c-0, Secs. 2.206(a) (part), (b).)

### Sec. 36.055.  SEPARATIONS AND ALLOCATIONS.

Costs of facilities, revenues, expenses, taxes, and reserves shall be separated or allocated as prescribed by the regulatory authority.

(V.A.C.S. art. 1446c-0, Sec. 2.207.)

### Sec. 36.056.  DEPRECIATION, AMORTIZATION, AND DEPLETION.

(a)   The commission shall establish proper and adequate rates and methods of depreciation, amortization, or depletion for each class of property of an electric or municipally owned utility.

(b)   The rates and methods established under this section and the depreciation account required by Section 32.102 shall be used uniformly and consistently throughout rate-setting and appeal proceedings.

(V.A.C.S. art. 1446c-0, Secs. 2.151(a) (part), (d).)

### Sec. 36.057.  NET INCOME; DETERMINATION OF REVENUES AND EXPENSES.

(a)   An electric utility's net income is the total revenues of the utility less all reasonable and necessary expenses as determined by the regulatory authority.

(b)   The regulatory authority shall determine revenues and expenses in a manner consistent with this subchapter.

(c)   The regulatory authority may adopt reasonable rules with respect to whether an expense is allowed for ratemaking purposes.

(V.A.C.S. art. 1446c-0, Secs. 2.208(a), (e).)

### Sec. 36.058.  CONSIDERATION OF PAYMENT TO AFFILIATE.

(a)   Except as provided by Subsection (b), the regulatory authority may not allow as capital cost or as expense a payment to an affiliate for:

(1)   the cost of a service, property, right, or other item; or

(2)   interest expense.

(b)   The regulatory authority may allow a payment described by Subsection (a) only to the extent that the regulatory authority finds the payment is reasonable and necessary for each item or class of items as determined by the commission.

(c)   A finding under Subsection (b) must include:

(1)   a specific finding of the reasonableness and necessity of each item or class of items allowed; and

(2)   a finding that the price to the electric utility is not higher than the prices charged by the supplying affiliate for the same item or class of items to:

(A)   its other affiliates or divisions; or

(B)   a nonaffiliated person within the same market area or having the same market conditions.

(d)   In making a finding regarding an affiliate transaction,  the regulatory authority shall:

(1)   determine the extent to which the conditions and circumstances of that transaction are reasonably comparable relative to quantity, terms, date of contract, and place of delivery; and

(2)   allow for appropriate differences based on that determination.

(e)   This section does not require a finding to be made before payments made by an electric utility to an affiliate are included in the utility's charges to consumers if there is a mechanism for making the charges subject to refund pending the making of the finding.

(f)   If the regulatory authority finds that an affiliate expense for the test period is unreasonable, the regulatory authority shall:

(1)   determine the reasonable level of the expense; and

(2)   include that expense in determining the electric utility's cost of service.

(V.A.C.S. art. 1446c-0, Sec. 2.208(b).)  (Amended by Acts 1999, 76th Leg., R.S., ch. 405 (SB 7), § 25 (amended subsec. (d)); Acts 2005, 79th Leg., R.S., ch. 413 (SB 1668), § 1 (amended subd. (c)(2)).)

## Sec. 36.059.  TREATMENT OF CERTAIN TAX BENEFITS.

(a)   In determining the allocation of tax savings derived from liberalized depreciation and amortization, the investment tax credit, and the application of similar methods, the regulatory authority shall:

(1)   balance equitably the interests of present and future customers; and

(2)   apportion accordingly the benefits between consumers and the electric or municipally owned utility.

(b)   If an electric utility or a municipally owned utility retains a portion of the investment tax credit, that portion shall be deducted from the original cost of the facilities or other addition to the rate base to which the credit applied to the extent allowed by the Internal Revenue Code.

(V.A.C.S. art. 1446c-0, Secs. 2.151(c), (d).)

## Sec. 36.060.  CONSOLIDATED INCOME TAX RETURNS.

(a)   If an expense is allowed to be included in utility rates or an investment is included in the utility rate base, the related income tax benefit must be included in the computation of income tax expense to reduce the rates.  If an expense is not allowed to be included in utility rates or an investment is not included in the utility rate base, the related income tax benefit may not be included in the computation of income tax expense to reduce the rates.  The income tax expense shall be computed using the statutory income tax rates.

(b)   The amount of income tax that a consolidated group of which an electric utility is a member saves, because the consolidated return eliminates the intercompany profit on purchases by the utility from an affiliate, shall be applied to reduce the cost of the property or service purchased from the affiliate.

(c)   The investment tax credit allowed against federal income taxes, to the extent retained by the electric utility, shall be applied as a reduction in the rate-based contribution of the assets to which the credit applies, to the extent and at the rate allowed by the Internal Revenue Code.

(V.A.C.S. art. 1446c-0, Sec. 2.208(c).)  (Amended by Acts 2013, 83rd Leg., R.S., ch. 787 (SB 1364), § 1 (amended subsec. (a)).)

## Sec. 36.061.  ALLOWANCE OF CERTAIN EXPENSES.

(a)   The regulatory authority may not allow as a cost or expense for ratemaking purposes:

(1)   an expenditure for legislative advocacy; or

(2)   an expenditure described by Section 32.104 that the regulatory authority determines to be not in the public interest.

(b)   The regulatory authority may allow as a cost or expense:

(1)   reasonable charitable or civic contributions not to exceed the amount approved by the regulatory authority; and

(2)   reasonable costs of participating in a proceeding under this title not to exceed the amount approved by the regulatory authority.

(c)   An electric utility located in a portion of this state not subject to retail competition may establish a bill payment assistance program for a customer who is a military veteran who a medical doctor certifies has a significantly decreased ability to regulate the individual's body temperature because of severe burns received in combat.  A regulatory authority shall allow as a cost or expense a cost or expense of the bill payment assistance program.  The electric utility is entitled to:

(1)   fully recover all costs and expenses related to the bill payment assistance program;

(2)   defer each cost or expense related to the bill payment assistance program not explicitly included in base rates; and

(3)   apply carrying charges at the utility's weighted average cost of capital to the extent related to the bill payment assistance program.

(V.A.C.S. art. 1446c-0, Secs. 2.152(b), (c), (d), (e).)  (Amended by Acts 2013, 83rd Leg., R.S., ch. 597 (SB 981), § 1 (added subsec. (c)).)

## Sec. 36.062.  CONSIDERATION OF CERTAIN EXPENSES.

The regulatory authority may not consider for ratemaking purposes:

(1)   an expenditure for legislative advocacy, made directly or indirectly, including legislative advocacy expenses included in trade association dues;

(2)   a payment made to cover costs of an accident, equipment failure, or negligence at a utility facility owned by a person or governmental entity not selling power in this state, other than a payment made under an insurance or risk-sharing arrangement executed before the date of loss;

(3)   an expenditure for costs of processing a refund or credit under Section 36.110; or

(4)   any other expenditure, including an executive salary, advertising expense, legal expense, or civil penalty or fine, the regulatory authority finds to be unreasonable, unnecessary, or not in the public interest.

(V.A.C.S. art. 1446c-0, Sec. 2.208(d).)

## Sec. 36.063.  CONSIDERATION OF PROFIT OR LOSS FROM SALE OR LEASE OF MERCHANDISE.

In establishing an electric or municipally owned utility's rates, the regulatory authority may not consider any profit or loss that results from the sale or lease of merchandise, including appliances, fixtures, or equipment, to the extent that merchandise is not integral to providing utility service.

(V.A.C.S. art. 1446c-0, Secs. 2.151(b) (part), (d).)

## Sec. 36.064.  SELF-INSURANCE.

(a)   An electric utility may self-insure all or part of the utility's potential liability or catastrophic property loss, including windstorm, fire, and explosion losses, that could not have been reasonably anticipated and included under operating and maintenance expenses.

(b)   The commission shall approve a self-insurance plan under this section if the commission finds that:

(1)    the coverage is in the public interest;

(2)    the plan, considering all costs, is a lower cost alternative to purchasing commercial insurance; and

(3)    ratepayers will receive the benefits of the savings.

(c)   In computing an electric utility's reasonable and necessary expenses under this subchapter, the regulatory authority, to the extent the regulatory authority finds is in the public interest, shall allow as a necessary expense the money credited to a reserve account for self-insurance.  The regulatory authority shall determine reasonableness under this subsection:

(1)    from information provided at the time the self-insurance plan and reserve account are established; and

(2)    on the filing of a rate case by an electric utility that has a reserve account.

(d)   After a reserve account for self-insurance is established, the regulatory authority shall:

(1)    determine whether the reserve account has a surplus or shortage under Subsection (e); and

(2)    subtract any surplus from or add any shortage to the utility's rate base.

(e)   A surplus in the reserve account exists if the charges against the account are less than the money credited to the account.  A shortage in the reserve account exists if the charges against the account are greater than the money credited to the account.

(f)   The allowance for self-insurance under this title for ratemaking purposes is not applicable to nuclear plant investment.

(g)   The commission shall adopt rules governing self-insurance under this section.

(V.A.C.S. art. 1446c-0, Sec. 2.210.)

### Sec. 36.065.  PENSION AND OTHER POSTEMPLOYMENT BENEFITS.

(a)   The regulatory authority shall include in the rates of an electric utility expenses for pension and other postemployment benefits, as determined by actuarial or other similar studies in accordance with generally accepted accounting principles, in an amount the regulatory authority finds reasonable.  Expenses for pension and other postemployment benefits include, in an amount found reasonable by the regulatory authority, the benefits attributable to the service of employees who were employed by the predecessor integrated electric utility of an electric utility before the utility's unbundling under Chapter 39 irrespective of the business activity performed by the employee or the affiliate to which the employee was transferred on or after the unbundling.

(b)   Effective January 1, 2005, an electric utility may establish one or more reserve accounts for expenses for pension and other postemployment benefits.  An electric utility shall periodically record in the reserve account any difference between:

(1)    the annual amount of pension and other postemployment benefits approved as an operating expense in the electric utility's last general rate proceeding or, if that amount cannot be determined from the regulatory authority's order, the amount recorded for pension and other postemployment benefits under generally accepted accounting principles during the first year that rates from the electric utility's last general rate proceeding are in effect; and

(2)    the annual amount of pension and other postemployment benefits as determined by actuarial or other similar studies that are chargeable to the electric utility's operating expense.

(c)   A surplus in the reserve account exists if the amount of pension and other postemployment benefits under Subsection (b)(1) is greater than the amount determined under Subsection (b)(2).  A shortage in the reserve account exists if the amount of pension and other postemployment benefits under Subsection (b)(1) is less than the amount determined under Subsection (b)(2).

(d)  If a reserve account for pension and other postemployment benefits is established, the regulatory authority at a subsequent general rate proceeding shall:

(1)  review the amounts recorded to the reserve account to determine whether the amounts are reasonable expenses;

(2)  determine whether the reserve account has a surplus or shortage under Subsection (c); and

(3)  subtract any surplus from or add any shortage to the electric utility's rate base with the surplus or shortage amortized over a reasonable time.

(Added by Acts 2005, 79th Leg., R.S., ch. 385 (SB 1447), § 1.)

# SUBCHAPTER C.  GENERAL PROCEDURES FOR RATE CHANGES PROPOSED BY UTILITY

### Sec. 36.101.  DEFINITION.

In this subchapter, "major change" means an increase in rates that would increase the aggregate revenues of the applicant more than the greater of $100,000 or 2-1/2 percent.  The term does not include an increase in rates that the regulatory authority allows to go into effect or the electric utility makes under an order of the regulatory authority after hearings held with public notice.

(V.A.C.S. art. 1446c-0, Sec. 2.212(b) (part).)

### Sec. 36.102.  STATEMENT OF INTENT TO CHANGE RATES.

(a)  Except as provided by Section 33.024, an electric utility may not change its rates unless the utility files a statement of its intent with the regulatory authority that has original jurisdiction over those rates at least 35 days before the effective date of the proposed change.

(b)  The electric utility shall also mail or deliver a copy of the statement of intent to the appropriate officer of each affected municipality.

(c)  The statement of intent must include:

(1)  proposed revisions of tariffs; and

(2)  a detailed statement of:

(A)  each proposed change;

(B)  the effect the proposed change is expected to have on the revenues of the utility;

(C)  each class and number of utility consumers affected; and

(D)  any other information required by the regulatory authority's rules.

(V.A.C.S. art. 1446c-0, Sec. 2.212(a) (part).)

### Sec. 36.103.  NOTICE OF INTENT TO CHANGE RATES.

(a)  The electric utility shall:

(1)  publish, in conspicuous form and place, notice to the public of the proposed change once each week for four successive weeks before the effective date of the proposed change in a newspaper having general circulation in each county containing territory affected by the proposed change; and

(2)  mail notice of the proposed change to any other affected person as required by the regulatory authority's rules.

(b)  The regulatory authority may waive the publication of notice requirement prescribed by Subsection (a) in a proceeding that involves only a rate reduction for each affected ratepayer.  The applicant shall give notice of the proposed rate change by mail to each affected utility customer.

## SUBCHAPTER C.  MUNICIPALITIES

### Sec. 37.101.  SERVICE IN ANNEXED OR INCORPORATED AREA.

(a)   If an area is or will be included within a municipality as the result of annexation, incorporation, or another reason, each electric utility and each electric cooperative that holds or is entitled to hold a certificate under this title to provide service or operate a facility in the area before the inclusion has the right to continue to provide the service or operate the facility and extend service within the utility's or cooperative's certificated area in the annexed or incorporated area under the rights granted by the certificate and this title.

(b)   Notwithstanding any other law, an electric utility has the right to:

(1)   continue and extend service within the utility's certificated area; and

(2)   use roads, streets, highways, alleys, and public property to furnish retail electric utility service.

(c)   The governing body of a municipality may require an electric utility to relocate the utility's facility at the utility's expense to permit the widening or straightening of a street by:

(1)   giving the electric utility 30 days' notice; and

(2)   specifying the new location for the facility along the right-of-way of the street.

(d)   This section does not:

(1)   limit the power of a city, town, or village to incorporate or of a municipality to extend its boundaries by annexation; or

(2)   prohibit a municipality from levying a tax or other special charge for the use of the streets as authorized by Section 182.025, Tax Code.

(V.A.C.S. art. 1446c-0, Secs. 2.256(a), (b), (c).)  (Amended by Acts 1999, 76th Leg., R.S., ch. 405 (SB 7), § 33 (amended subsec. (a)).)

### Sec. 37.102.  GRANT OF CERTIFICATE FOR CERTAIN MUNICIPALITIES.

(a)   If a municipal corporation offers retail electric utility service in a municipality having a population of more than 135,000 that is located in a county having a population of more than 1,500,000, the commission shall singly certificate areas in the municipality's boundaries in which more than one electric utility provides electric utility service.

(b)   In singly certificating an area under Subsection (a), the commission shall preserve the right of an electric utility to serve the customers the electric utility was serving on June 17, 1983.  This subsection does not apply to a customer at least partially served by a nominal 69,000 volts system who gave notice of termination to the utility servicing that customer before June 17, 1983.

(V.A.C.S. art. 1446c-0, Sec. 2.256(d).)

## SUBCHAPTER D.  REGULATION OF SERVICES, AREAS, AND FACILITIES

### Sec. 37.151.  PROVISION OF SERVICE.

Except as provided by this section, Section 37.152, and Section 37.153, a certificate holder, other than one granted a certificate under Section 37.051(d), shall:

(1)   serve every consumer in the utility's certificated area; and

(2)   provide continuous and adequate service in that area.

(V.A.C.S. art. 1446c-0, Sec. 2.259(a).)  (Amended by Acts 2009, 81st Leg., R.S., ch. 1170 (HB 3309), § 4).

## Sec. 37.152. GROUNDS FOR REDUCTION OF SERVICE.

(a)   Unless the commission issues a certificate that the present and future convenience and necessity will not be adversely affected, a certificate holder may not discontinue, reduce, or impair service to any part of the holder's certificated service area except for:

(1)   nonpayment of charges;

(2)   nonuse; or

(3)   another similar reason that occurs in the usual course of business.

(b)   A discontinuance, reduction, or impairment of service must be in compliance with and subject to any condition or restriction the commission prescribes.

(V.A.C.S. art. 1446c-0, Secs. 2.259(b), (c).)

## Sec. 37.153. REQUIRED REFUSAL OF SERVICE.

A certificate holder shall refuse to serve a customer in the holder's certificated area if the holder is prohibited from providing the service under Section 212.012, 232.029, or 232.0291, Local Government Code.

(V.A.C.S. art. 1446c-0, Sec. 2.260.)  (Amended by Acts 2005, 79th Leg., R.S., ch. 708 (SB 425), § 13.)

## Sec. 37.154. TRANSFER OF CERTIFICATE.

(a)   An electric utility may sell, assign, or lease a certificate or a right obtained under a certificate if the commission determines that the purchaser, assignee, or lessee can provide adequate service.

(b)   A sale, assignment, or lease of a certificate or a right is subject to conditions the commission prescribes.

(V.A.C.S. art. 1446c-0, Sec. 2.261.)

## Sec. 37.155. APPLICATION OF CONTRACTS.

A contract approved by the commission between retail electric utilities that designates areas and customers to be served by the utilities:

(1)   is valid and enforceable; and

(2)   shall be incorporated into the appropriate areas of certification.

(V.A.C.S. art. 1446c-0, Sec. 2.257.)

## Sec. 37.156. INTERFERENCE WITH ANOTHER UTILITY.

If an electric utility constructing or extending the utility's lines, plant, or system interferes or attempts to interfere with the operation of a line, plant, or system of another utility, the commission by order may:

(1)   prohibit the construction or extension; or

(2)   prescribe terms for locating the affected lines, plants, or systems.

(V.A.C.S. art. 1446c-0, Sec. 2.262.)

## Sec. 37.157. MAPS.

An electric utility shall file with the commission one or more maps that show each utility facility and that separately illustrate each utility facility for the generation, transmission, or distribution of the utility's services on a date the commission orders.

(V.A.C.S. art. 1446c-0, Sec. 2.254(b).)

# Appendix D

*Entergy Gulf States, Inc. v. Public Utility Commission,* 112 S.W.3d 208 (Tex. App. – Austin 2003, pet. denied)


112 S.W.3d 208, Util. L. Rep. P 26,862
**(Cite as: 112 S.W.3d 208)**

**H**

Court of Appeals of Texas,
Austin.
ENTERGY GULF STATES, INC., Appellant,
v.
PUBLIC UTILITY COMMISSION OF TEXAS,
Texas Industrial Energy Consumers, City of Beaumont, City of Bridge City, City of Conroe, City of Groves, City of Nederland, and City of Port Neches, Appellees.

No. 03–02–00249–CV.
July 11, 2003.

Electric utility, cities, Office of Public Utility Counsel (OPUC), industrial energy entity, and State petitioned for judicial review of Public Utility Commission (PUC) order in utility rate case purportedly deferring issue of whether certain portion of utility's costs in constructing nuclear power plant should be included in utility's rate base. The Judicial District Court reversed. On remand, PUC ordered certain portion of costs excluded from rate base. Utility appealed. The Judicial District Court reversed. PUC, OPUC, and utility appealed. The Court of Appeals, 883 S.W.2d 739, affirmed in part, reversed in part, and rendered. Utility appealed. The Supreme Court, 947 S.W.2d 887, reversed. On remand, PUC found that any costs above the adjusted definitive cost estimate were imprudent. Utility sought review. The 353rd Judicial District Court, Travis County, Suzanne Covington, J., affirmed. Utility appealed. The Court of Appeals, Lee Yeakel, J., held that: (1) statement by Supreme Court was not law of the case as to whether utility had established a prima facie case that costs were prudently incurred; (2) PUC complied with Supreme Court's order to render a straightforward decision on remand; (3) substantial evidence supported PUC's determination that costs in excess of definitive cost estimate were not prudent; and (4) PUC decision not to accept utility's cost-reconciliation study did not improperly prevent utility from establishing the prudence of costs.

Affirmed.

West Headnotes

**[1] Electricity 145 ⚷11.3(7)**

145 Electricity
    145k11.3 Regulation of Charges
        145k11.3(7) k. Judicial Review and Enforcement. Most Cited Cases

Supreme Court's statement that there was extensive evidence supporting inclusion of all costs electric utility incurred in constructing a nuclear power plant in its rate base was not law of the case as to issue of whether utility had established a prima facie case that costs were prudently incurred, where Supreme Court did not comment on the weight of utility's evidence, remanded the case to the Public Utility Commission (PUC), and granted PUC the option of accepting additional evidence; Supreme Court's opinion focused solely on disapproving of PUC's procedure in deferring consideration of portion of costs.

**[2] Appeal and Error 30 ⚷1097(1)**

30 Appeal and Error
    30XVI Review
        30XVI(M) Subsequent Appeals
            30k1097 Former Decision as Law of the Case in General
                30k1097(1) k. In General. Most Cited Cases

112 S.W.3d 208, Util. L. Rep. P 26,862
**(Cite as: 112 S.W.3d 208)**

**Appeal and Error 30 ⚷1195(1)**

30 Appeal and Error
    30XVII Determination and Disposition of Cause
        30XVII(F) Mandate and Proceedings in Lower Court
            30k1193 Effect in Lower Court of Decision of Appellate Court
                30k1195 As Law of the Case
                    30k1195(1) k. In General. Most Cited Cases

    The law-of-the-case doctrine provides that questions of law decided on appeal to a court of last resort will govern the case throughout its subsequent stages.

**[3] Courts 106 ⚷99(1)**

106 Courts
    106II Establishment, Organization, and Procedure
        106II(G) Rules of Decision
            106k99 Previous Decisions in Same Case as Law of the Case
                106k99(1) k. In General. Most Cited Cases

    The law-of-the-case doctrine narrows the issues in successive stages of litigation and serves the policy goals of uniformity of decisions and judicial economy.

**[4] Courts 106 ⚷99(1)**

106 Courts
    106II Establishment, Organization, and Procedure
        106II(G) Rules of Decision
            106k99 Previous Decisions in Same Case as Law of the Case
                106k99(1) k. In General. Most Cited Cases

    The law-of-the-case doctrine does not necessarily apply if the issues and facts are not substantially the same in the subsequent trial.

**[5] Courts 106 ⚷99(1)**

106 Courts
    106II Establishment, Organization, and Procedure
        106II(G) Rules of Decision
            106k99 Previous Decisions in Same Case as Law of the Case
                106k99(1) k. In General. Most Cited Cases

    Use of the law of the case is flexible, left to the discretion of the court, and to be determined on a case-by-case basis.

**[6] Electricity 145 ⚷11.3(7)**

145 Electricity
    145k11.3 Regulation of Charges
        145k11.3(7) k. Judicial Review and Enforcement. Most Cited Cases

    Public Utility Commission (PUC) complied with Supreme Court's order to render a straightforward decision, on remand, as to whether costs PUC initially attempted to defer judgment on should be included in electric utility's base rate, where PUC ruled, after reviewing the entire record, that utility did not satisfy its burden of proof or establish its prima facie case as to the prudence of the additional costs. V.T.C.A., Utilities Code § 36.006.

**[7] Electricity 145 ⚷11.3(6)**

145 Electricity
    145k11.3 Regulation of Charges
        145k11.3(6) k. Proceedings Before Commissions. Most Cited Cases

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

112 S.W.3d 208, Util. L. Rep. P 26,862
**(Cite as: 112 S.W.3d 208)**

To raise the price of its product, an electric utility must participate in a rate case and bear the burden of proving that each dollar of cost incurred was reasonably and prudently invested. V.T.C.A., Utilities Code § 36.006.

**[8] Electricity 145 ⚷11.3(6)**

145 Electricity
    145k11.3 Regulation of Charges
        145k11.3(6) k. Proceedings Before Commissions. Most Cited Cases

An electric utility that seeks a rate increase enjoys no presumption that the expenditures reflected therein have been prudently incurred by simply opening its books to inspection. V.T.C.A., Utilities Code § 36.006.

**[9] Electricity 145 ⚷11.3(6)**

145 Electricity
    145k11.3 Regulation of Charges
        145k11.3(6) k. Proceedings Before Commissions. Most Cited Cases

Although the burden of production is initially on the electric utility that seeks a rate change, the utility can shift this burden upon establishing a prima facie case of prudent investment. V.T.C.A., Utilities Code § 36.006.

**[10] Electricity 145 ⚷11.3(6)**

145 Electricity
    145k11.3 Regulation of Charges
        145k11.3(6) k. Proceedings Before Commissions. Most Cited Cases

Substantial evidence supported Public Utility Commission's (PUC) determination that costs electric

utility incurred in constructing nuclear power plant which were in excess of definitive cost estimate were not prudent; pursuit of short construction schedule reduced construction productivity, and expert testimony failed to indicate whether price adjustments included allowance for funds used during construction (AFUDC). V.T.C.A., Utilities Code § 36.006.

**[11] Administrative Law and Procedure 15A ⚷791**

15A Administrative Law and Procedure
    15AV Judicial Review of Administrative Decisions
        15AV(E) Particular Questions, Review of
        15Ak784 Fact Questions
            15Ak791 k. Substantial Evidence. Most Cited Cases

To ascertain whether an agency's decision is supported by substantial evidence, a reviewing court determines whether, in considering the record upon which the decision is based, the evidence as a whole is such that reasonable minds could have reached the conclusion the agency must have reached in order to take the disputed action.

**[12] Administrative Law and Procedure 15A ⚷791**

15A Administrative Law and Procedure
    15AV Judicial Review of Administrative Decisions
        15AV(E) Particular Questions, Review of
        15Ak784 Fact Questions
            15Ak791 k. Substantial Evidence. Most Cited Cases

In determining whether an agency's decision is supported by substantial evidence, the reviewing court may not substitute its judgment for the agency's and must consider only the record upon which the decision

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

112 S.W.3d 208, Util. L. Rep. P 26,862
**(Cite as: 112 S.W.3d 208)**

is based.

**[13] Administrative Law and Procedure 15A**
**☞750**

15A Administrative Law and Procedure
    15AV Judicial Review of Administrative Decisions
        15AV(D) Scope of Review in General
           15Ak750 k. Burden of Showing Error. Most Cited Cases

The burden is on the complaining party to demonstrate an absence of substantial evidence to support an agency's decision.

**[14] Public Utilities 317A ☞194**

317A Public Utilities
    317AIII Public Service Commissions or Boards
        317AIII(C) Judicial Review or Intervention
           317Ak188 Appeal from Orders of Commission
              317Ak194 k. Review and Determination in General. Most Cited Cases

It is for the Public Utility Commission (PUC) to accept or reject witnesses' testimony, and the PUC, not the reviewing court, is the judge of the weight accorded that testimony in a rate case.

**[15] Electricity 145 ☞11.3(6)**

145 Electricity
    145k11.3 Regulation of Charges
        145k11.3(6) k. Proceedings Before Commissions. Most Cited Cases

Public Utility Commission's (PUC) decision not to accept electric utility's cost-reconciliation study did not improperly prevent utility from establishing the prudence of costs it incurred in constructing nuclear power plant, where utility was afforded ample earlier opportunities to fully develop the record, and utility supported PUC's decision not to take additional evidence.

**\*210** John F. Williams, David C. Duggins, Clark, Thomas & Winters, PC, Austin, for appellant.

Daniel J. Lawton, Lawton Law Firm, Barbara Day, Austin, for Cities.

Rex D. VanMiddlesworth, Karen P. Whitt, Andrews & Kurth, LLP, Austin, for Texas I.

James Z. Brazell, Asst. Atty. Gen., Austin, for PUC.

Before Justices KIDD, YEAKEL and PURYEAR.

*OPINION*
LEE YEAKEL, Justice.

Appellant Entergy Gulf States, Inc. ("Entergy") appeals from a district-court judgment affirming a final order of appellee the Public Utility Commission of Texas (the "Commission").[FN1] Entergy sought a rate increase to recover additional sums from its share in the construction of the River Bend Nuclear Generating Station in St. Francisville, Louisiana ("River Bend"). The Commission denied Entergy's request, finding that Entergy failed to present a *prima facie* case that the additional cost of the plant's construction above the adjusted definitive cost estimate ("DCE") was prudent. [FN2] Appellees Texas Industrial Energy Consumers and the cities of Beaumont, Bridge City, Conroe, Groves, Nederland, and Port Neches support the Commission's decision denying the rate increase. We will affirm.

> FN1. Entergy Gulf States, Inc. was known as Gulf States Utilities at the time this controversy arose in 1986 and in several of the succeeding years of this litigation. Entergy

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

112 S.W.3d 208, Util. L. Rep. P 26,862
**(Cite as: 112 S.W.3d 208)**

Gulf States came into being after Gulf States's 1993 merger with Entergy Corporation, a public utility holding company. We will refer to appellant as Entergy throughout the dispute's entire history.

FN2. DCE is the 1979 estimate of River Bend's total cost of construction. The standard of prudence, as defined by the Commission, is:

[T]he exercise of that judgment and the choosing of one of that select range of options which a reasonable utility manager would exercise or choose in the same or similar circumstances given the information or alternatives available at the point in time such judgment is exercised or option is chosen.

## STATEMENT OF THE FACTS AND PROCEDURAL HISTORY

Construction of River Bend began in 1977. After suspending construction from **\*211** October 1977 to February 1979, construction resumed and the plant achieved operational status in 1986. At that time, River Bend began serving customers in Southeast Texas and South Central Louisiana. River Bend's construction cost approximately $4.5 billion, well above the original cost estimate. As a partner in the project, Entergy was responsible for seventy percent of the construction costs. In 1986 Entergy applied to the Commission for a rate increase, seeking to include approximately $3.15 billion of its River Bend construction costs in its cost of service. Entergy also initiated a contested case to determine what portion of its total costs the utility might include in its rate base as being a "prudent" investment. The two actions were consolidated as Docket 7195.

Over a six-month period, two administrative law judges and a "hearings examiner" (the "Examiners")

conducted a hearing on the rate request and submitted to the Commission an "Examiner's Report" (the "Report") and proposed order. In the 395–page Report, the Examiners evaluated the prudence of River Bend's costs by examining the parties' evidence. Entergy and a number of other interested parties submitted their own reports, each arguing the prudence of River Bend's cost. The Examiners noted that the evidence demonstrated that every change in construction had been documented, but that the documentation was insufficient to prove that the changes were prudent. Regarding the examiners' opinion of Entergy's evidence, the Report stated:

[Entergy] did not present any credible reconciliation of plant costs with specific causes, much less with specific regulatory changes. Even if the causes for change were legitimate, it did not show that the amount of money spent to meet various goals were reasonable. It did show more generally that regulatory changes had a dramatic effect on the project's scope and cost. Yet from the evidence one cannot tell how wisely and efficiently money was spent on design development, scope changes, and meeting regulatory changes.

Ultimately, the Report concluded that: (1) $274 million, or nine percent (later adjusted to 8.3 percent), of the total plant cost should be *excluded* from Entergy's cost of service as imprudently incurred; (2) Entergy's decision to restart construction of River Bend in 1979, a decision that some parties criticized, was prudent; and (3) a reasonable DCE, based on information available in 1979, should have been $2.273 billion ("adjusted DCE"), instead of Entergy's construction manager's 1979 estimate of $1.729 billion ("original DCE").

The Commission adopted only part of the Report's recommendations. The Commission agreed with the Examiners that the decision to build River Bend was prudent and that the original DCE should be adjusted upward to $2.273 billion, as this sum was pru-

dently incurred; thus Entergy's seventy percent share of the prudently incurred cost was $1.591 billion. The Commission, however, did not adopt the Report's recommendation to disallow only 8.3 percent of the total plant cost. Instead, the Commission deferred its decision on whether Entergy prudently incurred the remaining $1.453 billion in additional costs. The Commission noted that "[t]he evidence is inadequate to support a finding of either prudence or imprudence with regard to construction costs in excess of $2.273 billion ... [and] should be excluded from plant in service at this time...." Therefore, the Commission effectively deferred a decision on the additional $1.453 billion.

Entergy and several other parties sued in district court, as authorized by the Public Utility Regulatory Act ("PURA"), seeking**212** judicial review of the Commission's final order in Docket 7195. *See* Act of May 26, 1983, 68th Leg., ch. 274, § 69, 1983 Tex. Gen. Laws 1258, 1314 (amended 1995 & 1997) (current provision at Tex. Util.Code Ann. § 15.001 (West 1998)). Concurrently, Entergy filed a new contested case with the Commission, Docket 8702, to address the $1.453 billion not adjudicated in Docket 7195.

Before direct judicial review began in Docket 7195, the Office of Public Utility Counsel ("OPUC") and twelve municipalities sued the Commission in district court, requesting a declaration that the Commission lacked the power to reconsider, in a separate contested case, the prudence of the $1.453 billion expenditure deferred in Docket 7195. Ancillary to their suit for declaratory relief, the plaintiffs requested a permanent injunction restraining the Commission from conducting any further proceedings addressing the prudence of the $1.453 billion. The district court, declaring that *res judicata* and collateral estoppel barred reconsideration of those costs by the Commission, granted the permanent injunction, enjoining the Commission from proceeding with Docket 8702. The Commission appealed. This Court reversed the dis-

trict-court judgment and dissolved the injunction, allowing Docket 8702 to proceed. *Public Util. Comm'n v. Coalition of Cities for Affordable Util. Rates,* 777 S.W.2d 814 (Tex.App.-Austin 1989), *rev'd, Coalition of Cities for Affordable Util. Rates v. Public Util. Comm'n,* 798 S.W.2d 560 (Tex.1990). The supreme court reversed this Court, holding that the doctrines of *res judicata* and collateral estoppel barred Entergy's relitigation in Docket 8702 of the issues originally reviewed in Docket 7195, and that "the PUC was powerless to defer its decision to a future proceeding." *Coalition of Cities,* 798 S.W.2d at 564–65. The appeal in Docket 7195 then went forward in the district court, which reversed the Commission's final order on an unstated ground and remanded the rate case to the Commission.

On remand, the Commission held that, because its deferral of the decision on the $1.453 billion was invalid, the remaining portions of the order in Docket 7195 "appeared to hold that [Entergy] had failed to meet its burden" and the $1.453 billion was properly excluded. Entergy appealed. The district court rejected Entergy's argument that the Commission's decision was statutorily infirm but reversed the Commission on two minor points. Entergy, the Commission, and OPUC then appealed to this Court, which reversed the district-court ruling, effectively approving the Commission's order disallowing the $1.453 billion. *Gulf States Utils. Co. v. Coalition of Cities for Affordable Util. Rates,* 883 S.W.2d 739 (Tex.App.-Austin 1994), *rev'd, Gulf States Utils. Co. v. Public Util. Comm'n,* 947 S.W.2d 887 (Tex.1997). The supreme court again reversed, holding that "one simply cannot read the record of proceedings in the PUC and the PUC's order and conclude that the Commission would have excluded the $1.453 billion from [Entergy's] rate base had it known that it could not defer ruling on the issue." *Gulf States Utils.,* 947 S.W.2d at 891. The supreme court noted that "[a]ll parties were entitled to a straightforward decision from the [Commission] the first time that the case was presented." *Id.* at 892. Finally, in remanding the case to the Commission, the

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

112 S.W.3d 208, Util. L. Rep. P 26,862
**(Cite as: 112 S.W.3d 208)**

court stated that the Commission could decide whether to entertain further evidence or resolve the case on the evidence previously presented. *Id.*

On remand, the Commission opened a new docket, Docket 17899. Entergy took the position that the Commission "could either: (1) decide the case 'on the record as originally created in Docket No. 7195,' **\*213** or (2) receive the Company's 'cost reconciliation' study in evidence should the Commission deem such a study necessary." The Commission determined to base its decision on the then existing record and requested that the parties rebrief the case; Entergy agreed with this approach. In a 2–1 decision, the Commission excluded the $1.453 billion from Entergy's cost of service.[FN3] Entergy sought judicial review in district court, which affirmed the Commission's decision. Entergy again appeals.

> FN3. Chairman Pat Wood disagreed with the majority, concluding that $103 million of the $348 million in additional regulatory expenses was not disputed by either party and, therefore, should be allowed.

## DISCUSSION

By five issues, Entergy argues that the Commission erred in: (1) disregarding the supreme court's opinion and judgment on remand; (2) determining that Entergy failed to present a *prima facie* case establishing the prudence of the plant investment; (3) disallowing all of the plant's construction costs above the adjusted DCE as not supported by substantial evidence, which is an erroneous decision as a matter of law; (4) making arbitrary, after-the-fact changes to the standards governing its prudence analysis; and (5) making certain adjustments to rates that were the product of its erroneous treatment of the plant investment. We begin by examining the supreme court's most recent decision.

### *Gulf States Utilities Co. v. Public Utility Commission*

[1] By its first issue, Entergy argues that the Commission disregarded the supreme court's opinion in *Gulf States Utilities,* 947 S.W.2d at 887, and the law-of-the-case doctrine. Specifically, Entergy contends that "[a]s a matter of law ... the Supreme Court decided that [Entergy] had presented a significant amount of evidence supporting the prudence of its entire investment, and that a total disallowance was not supported by the record." We disagree because the supreme court's opinion in *Gulf States Utilities* does not specifically comment on the weight of the evidence for either party. *See id.* at 888.

[2][3][4][5] The law-of-the-case doctrine provides that questions of law decided on appeal to a court of last resort will govern the case throughout its subsequent stages. *Hudson v. Wakefield,* 711 S.W.2d 628, 630 (Tex.1986). The doctrine narrows the issues in successive stages of litigation and serves the policy goals of uniformity of decisions and judicial economy. *Id.* The doctrine does not necessarily apply if the issues and facts are not substantially the same in the subsequent trial. *Id.* As such, use of the law of the case is flexible, left to the discretion of the court, and to be determined on a case-by-case basis. *Med Ctr. Bank v. M.D. Fleetwood,* 854 S.W.2d 278, 283 n. 6 (Tex.App.-Austin 1993, writ denied).

The sentence in the supreme court's opinion that Entergy highlights is: "There was extensive evidence supporting inclusion of all [Entergy's] costs in its rate base and extensive contrary evidence that most of these costs should be excluded." *Gulf States Util.,* 947 S.W.2d at 888. Entergy interprets this language as the supreme court's recognition that Entergy presented sufficient evidence to establish its *prima facie* case. In our opinion, this sentence comments on the quantity and not the quality of the evidence introduced. First, this sentence appears in the section in which the court delivers its recitation of the facts. There, the court recounts that Docket 7195 included the testimony of "over 100 witnesses for 132 days [and] the examiners issued a 395–page report." *Id.* **\*214** Second, the su-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

112 S.W.3d 208, Util. L. Rep. P 26,862
**(Cite as: 112 S.W.3d 208)**

preme court discussed its earlier opinion, stating that the Commission could not defer decision on disallowance of the $1.453 billion, and that "the issue remaining for judicial review was whether the [Commission] could effectively deny inclusion of those costs in [Entergy's] rate base the way it did." *Id.* at 889, 890 (citing *Coalition of Cities,* 798 S.W.2d at 564–65). Nowhere did the court discuss whether Entergy had established a *prima facie* case or met its burden of substantial evidence. Finally, the court reversed and remanded the case, granting the Commission the option of accepting additional evidence. *Id.* at 892. Again, the supreme court did not comment on the quality of the evidence presented. The court simply ordered the Commission to render a "straightforward decision." *Id.* The law-of-the-case doctrine is inapplicable because the supreme court did not comment on the weight of Entergy's evidence; rather the opinion focused solely on disapproving of the Commission's *procedure* in deferring consideration of the $1.453 billion in costs.[FN4] Therefore, we overrule Entergy's first issue.

> FN4. In *Gulf States Utilities Co. v. Public Utility Commission,* the supreme court also stated that "one simply cannot read the record of proceedings in the PUC and the PUC's order and conclude that the Commission would have excluded the $1.453 billion from [Entergy's] rate base had it known that it could not defer ruling on the issue." 947 S.W.2d 887, 891 (Tex.1997). However, we do not believe that this language comments on the weight of the evidence, but rather disapproves of the Commission's procedure in deferring its decision on whether to include the $1.453 billion in the rate base.

**The *Prima Facie* Case**

[6][7][8] By its second issue, Entergy contends that the Commission erred in ruling that Entergy had not established its *prima facie* case of prudence for inclusion of the $1.453 billion in the rate base. The

utilities code requires that "[i]n a proceeding involving a proposed rate change, the electric utility has the burden of proving that: ... the rate change is just and reasonable, if the utility proposes the change." Tex. Util.Code Ann. § 36.006 (West 1998); *Coalition of Cities,* 798 S.W.2d at 563. To raise the price of its product, the utility must participate in a rate case and bear the burden of proving that each dollar of cost incurred was reasonably and prudently invested. *Public Util. Comm'n v. Houston Lighting & Power Co.,* 778 S.W.2d 195, 198 (Tex.App.-Austin 1989, no writ). A utility enjoys no presumption that the expenditures reflected therein have been prudently incurred by simply opening its books to inspection. *Id.* A utility carries the burden of proof even when it does not initiate the proceedings. *Id.*

[9] The Commission has established that although the burden of production is initially on the utility, the utility can shift this burden upon establishing a *prima facie* case of prudence in the rate change.[FN5] In its order on remand, the Commission **\*215** described application of the burden of proof:

> FN5. The Commission's brief explains the reason behind the utility's *prima facie* case requirement:
>
> The Commission's prima facie procedure is Commission-made. It is not established by statute or prior court decision, it was specially crafted by the Commission to aid in the trial of utility prudence reviews. It is a tool to assist in conducting efficient hearings. It is crafted to accommodate the voluminous, highly technical evidence required to establish the prudence of investment in electric power plants. The Commission's prima facie procedure allows the utility to establish the prudence by introducing evidence that is comprehensive, but short of proof of the prudence of every bolt, washer, pipe hanger, cable tray,

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

112 S.W.3d 208, Util. L. Rep. P 26,862
**(Cite as: 112 S.W.3d 208)**

I-beam, or concrete pour.

(Citations omitted.)

The Commission has previously recognized the proposition that a utility's capital investments are initially presumed to be prudent once the utility has presented a *prima facie* case in support of its application. If the utility presents a *prima facie* case, the burden of going forward (burden of production) shifts to the intervenors to rebut the presumption. Once that presumption is rebutted, the burden falls on the utility to prove, by a preponderance of the evidence, that the challenged expenditures were prudent. Applying this reasoning to this case, the Commission concludes that the burden of going forward did not shift to the intervenors in this case because [Entergy] failed to put on a *prima facie* case to support full recovery of the River Bend expenditures.
Tex. Pub. Util. Comm'n, *Application of Gulf States Utils. Co. for Authority to Change Rates, Remand of Docket 7195,* Docket No. 17899, 1998 WL 971285 (Mar. 15, 1998) (order on remand) (citations omitted). Although this paragraph conveys the fact that the Commission held that Entergy had not presented the requisite level of prudence to establish a *prima facie* case, other language in its final order indicates that the Commission believed that Entergy did not meet its overall burden of proof. The Commission's final order continued, stating that "[e]ven taking into account the intervenors' *direct cases* and [Entergy's] *rebuttal,* [Entergy] failed to present a *prima facie* case because ... [Entergy] could not explain why River Bend cost so much [.]" (Emphasis added.) Moreover, the Commission opined that Entergy "simply did not meet its burden of proof to show that expenditures in excess of $2.273 billion were prudently incurred." [FN6] The Commission's Final Order indicates that it conducted a review of the entire record because numerous findings of fact discuss evidence offered by Entergy's opponents to rebut the proposed rate increase—an unnecessary review if a *prima facie* case had not been made. The Commission also observed that "[t]he record in this case is fully developed." Before enumerating the findings of fact and conclusions of law, the Commission concluded:

> FN6. In his dissenting statement, Chairman Wood wrote: "While the bulk of the additional costs [Entergy] sought were not shown by the threshold evidentiary level to be prudently incurred, some amounts were."

that [Entergy] has, by the preponderance of evidence, supported recovery of $2.273 billion as prudently incurred, but [Entergy] has not presented a *prima facie* case supporting recovery of any amounts in excess of that figure. Stated conversely, because [Entergy] failed to prove that any expenses in excess of the adjusted DCE were prudently incurred, the Commission concludes that the $1.453 billion in abeyed costs cannot be included in [Entergy's] rate base.
*Id.* Although the Commission's order on remand uses language that is less than clear concerning the burden of proof and burden of production, we believe that the Commission not only ruled that Entergy had not presented a *prima facie* case, but that the Commission reviewed the entire record and, based on this review, held that Entergy failed to satisfy its burden of proof under the utilities code. *See* Tex. Util.Code Ann. § 36.006. The Commission's repeated references to the entire record supports this view. The following findings of fact and conclusions of law included in the Commission's order indicate that the Commission held that Entergy failed to satisfy its burden of proof and **\*216** that the Commission made a "straightforward decision" based on the entire record:

[Finding of Fact] 152: The existence of identifiable imprudence and inefficiency in the construction and management of the plant as set forth in Findings of Fact Nos. 133–145 corroborates the exclusion of a

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

112 S.W.3d 208, Util. L. Rep. P 26,862
**(Cite as: 112 S.W.3d 208)**

portion of River Bend's capital costs from plant-in-service.

[Finding of Fact] 164: The preponderance of the evidence in this case establishes that $2.273 billion of River Bend capital costs were prudently and reasonably incurred. The evidence is inadequate to support a finding that construction costs in excess of $2.273 billion were prudently and reasonably incurred.

[Finding of Fact] 164A: [Entergy's] share of all River Bend capital costs in excess of $2.273 billion shall be excluded from plant in service. The amount which should be included in plant in service, given [Entergy's] 70 percent share of the plant, is $1.5911 billion.

[Conclusion of Law] 18: $1,453,520,982 of [Entergy's] share of end-of-test-year River Bend capital shall be excluded from [Entergy's] rate base as invested capital used and useful in rendering service to the public pursuant to PURA Sections 38, 39, and 41.

[Conclusion of Law] 18A: [Entergy] has not met its burden of proving that the capital costs of River Bend above a reasonable Definitive Cost Estimate of $2.273 billion were reasonably and prudently incurred.

Tex. Pub. Util. Comm'n, *Application of Gulf States Utils. Co. for Authority to Change Rates, Remand of Docket 7195,* Docket No. 17899, 1998 WL 971285 (Mar. 15, 1998). These findings and conclusions indicate that: (1) the Commission ruled not only on Entergy's failure to establish a *prima facie* case for prudence, but also that the evidence actually showed "imprudence and inefficiency," and (2) Entergy failed in its statutory burden of proof. *See id.* Moreover, the findings and conclusions clearly indicate that Entergy received a straightforward

decision.

Docket 17899's findings of fact and conclusions of law are almost identical to those found in the Commission's final order in Docket 7195, which culminated in the supreme court's *Coalition of Cities* decision. *See Coalition of Cities,* 798 S.W.2d at 562. *Coalition of Cities* is instructive. Although the supreme court held that the Commission could not defer its decision to disallow Entergy's rate increase, after listing Findings 164 and 164A and Conclusions 18 and 18A, the court noted that the Commission "found that [Entergy] had failed to prove that any expenses in excess of $2.273 billion were prudently incurred." *Id.* Later, in *Gulf States Utilities* the supreme court clarified its holding in *Coalition of Cities:* "By saying that the PUC *effectively* disallowed the $1.453 billion we did not suggest that the PUC *actually* made that decision." *Gulf States Utils.,* 947 S.W.2d at 889. We recognize that the statements may be *dicta;* however, the court's interpretation of the language used in the Commission's findings and conclusions warrants consideration. In *Coalition of Cities,* the supreme court opined that the language found in Finding 164A, "lack of sufficient evidence," "excluded from plant service," and "all capital costs in excess of $2.273 billion," demonstrated that the Commission believed that Entergy had not met its burden of proof. *Coalition of Cities,* 798 S.W.2d at 563. The supreme court then noted that "[a] party who fails to meet its burden of proof loses." *Id.* (citing *Gerst v. Goldsbury,* 434 S.W.2d 665, 667 (Tex.1968) (agency determination that applicant offered "insufficient evidence of a public **\*217** need for the proposed [savings] association" constituted "negative finding")).

In the present action, the Commission used identical language in Findings 164 and 164A and Conclusions 18 and 18A, omitting only the limiting language "at this time" in Docket 7195's Finding 164A. Use of this language indicates, as the *Coalition of Cities* opinion suggests, that the Commission intended to deny inclusion of the $1.453 billion in Entergy's rate

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

112 S.W.3d 208, Util. L. Rep. P 26,862
**(Cite as: 112 S.W.3d 208)**

increase. Additional findings and conclusions in the Commission's Final Order in Docket 17899 echo that the entire record was reviewed in its decision:

[Finding of Fact] 121: The Incremental Estimate File (IEF) was primarily a cost tracking and accounting tool and was not designed to provide justification of cost increases.[FN7]

> FN7. The IEF program reflected all changes to the original DCE and provided traceability for the reasons cited for the project changes.

[Finding of Fact] 122: The fact that [Entergy] had a legitimate process for reviewing and approving changes in project costs does not show that those costs were reasonable.

[Finding of Fact] 123: The guidelines for coding changes to the regulatory category in the IEF limited the informative value of the IEF.

[Finding of Fact] 124: The PLG [Pickard, Lowe, and Garrick] Report's analysis of the reasons for growth in the cost of River Bend was cursory and inadequate.[FN8]

> FN8. Commenting on the Pickard, Lowe and Garrick ("PLG") report, the Commission stated:
>
> The [report] summarized the results of the IEF and was the "centerpiece of [Entergy's] case on the prudence and efficiency of the construction of River Bend." On this point, the Commission does not question that [Entergy] spent $1.453 billion in excess of its share of the adjusted DCE, and that those costs are reflected through the IEF process. Cost tracking an monitoring programs, however, do not support a finding that such costs were prudently in-

curred—they simply track cost changes and indicate that someone in [Entergy] approved these changes. More is required of [Entergy] to meet its burden of proof.

[Finding of Fact] 127: The OKA [O'Brien–Kreitzberg & Assoc.] report, although more thorough than the PLG report, reached no conclusions as to imprudence during the construction of River Bend except as regards the 50–month schedule.

[Finding of Fact] 129: Regulatory requirements unforeseen in 1979 may have had an impact on the cost of River Bend, but neither [Entergy] or any other party provided adequate evidence as to any such impact.

[Finding of Fact] 163: The statistical analyses presented in this docket were inadequate to prove the reasonableness or prudence of River Bend construction costs.

[Conclusion of Law] 20: A mere showing that statistical adjustments to plant costs are unreliable or that plant costs are within the range suggested by statistical confidence intervals is inadequate to meet a utility's burden of proof under PURA Section 40.

Tex. Pub. Util. Comm'n, *Application of Gulf States Utils. Co. for Authority to Change Rates, Remand of Docket 7195,* Docket No. 17899, 1998 WL 971285 (Mar. 16, 1998). A review of the Commission's Final Order in Docket 17899 indicates that the Commission ruled, after reviewing the entire record, that Entergy had not satisfied its burden of proof or established its *prima facie* case as to the prudence of the additional costs. Therefore, regardless of the Commission's specific language, we believe that Entergy received a "straightforward**\*218** decision" that the $1.453 billion would not be included in its rate base. We overrule Entergy's second issue.

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

112 S.W.3d 208, Util. L. Rep. P 26,862
**(Cite as: 112 S.W.3d 208)**

**Substantial–Evidence Review**

[10][11][12][13] By its third issue on appeal, Entergy contends that the Commission's decision is not supported by substantial evidence. To ascertain whether an agency's decision is supported by substantial evidence, we determine whether, in considering the record upon which the decision is based, "the evidence as a whole is such that reasonable minds could have reached the conclusion the agency must have reached in order to take the disputed action." *City of El Paso v. Public Util. Comm'n,* 883 S.W.2d 179, 186 (Tex.1994); *Lone Star Salt Water Disposal Co. v. Railroad Comm'n,* 800 S.W.2d 924, 928 (Tex.App.-Austin 1990, no writ).* In making such determination, the reviewing court may not substitute its judgment for the agency's and must consider only the record upon which the decision is based. Tex. Gov't Code Ann. § 2001.174 (West 2000); *Lone Star Salt Water Disposal,* 800 S.W.2d at 928. The evidence in the agency record may actually preponderate against the agency's decision, but still constitute substantial evidence supporting it. *Lone Star Salt Water Disposal,* 800 S.W.2d at 928. The burden is on the complaining party to demonstrate an absence of substantial evidence. *Id.*

Entergy must demonstrate that the evidence conclusively established the prudence of the $1.453 billion expended. *See Texas Health Facilities Comm'n v. Charter Medical–Dallas, Inc.,* 665 S.W.2d 446, 453 (Tex.1984).* In determining whether Entergy's proposed rate increase was appropriate, the Commission examined two issues: (1) whether the decision to restart and complete construction of River Bend was prudent, and (2) what portion of actual construction costs was reasonably and prudently incurred. In its initial order, the Commission determined that Entergy's decision to restart construction was prudent. Entergy appeals the Commission's decision that no costs above the adjusted DCE were prudently incurred. However, the Commission also held that the original DCE was too low and that the evidence showed that

$2.273 billion in plant costs were reasonably and prudently incurred, resulting in the adjusted DCE. But the Commission held that the evidence did not support including any portion of the additional $1.453 billion in Entergy's rate base, as these costs were not prudently incurred.

Entergy makes several arguments regarding the lack of substantial evidence: (1) the Commission's failure to find any prudent costs associated with the schedule extension; (2) the Commission's failure to allow recovery of the full financing costs associated with the River Bend investment that it found prudent; (3) the disallowance is contrary to undisputed expert testimony and has no reasonable basis in the record as a whole; and (4) the record as a whole demonstrates concurrence of the expert witnesses in the prudence of certain costs in excess of the adjusted DCE.

Entergy argues that the Commission's failure to find any additional prudent costs associated with the 72–month construction schedule is unsupported by substantial evidence. Entergy contends that the evidence revealed that the 72–month schedule was short compared with other nuclear plants constructed at that time, and that the Commission's own findings reject the notion that River Bend experienced imprudent delays. However, the Commission's findings and conclusions are to the contrary. Findings 71 through 77 state that Entergy's pursuit of the original 50–month schedule was based on "false assumptions," "hastily conceived," and "imprudent."**219** Finding 137 states that "[p]ursuit of the 50–month schedule reduced construction productivity." Additionally, the Examiners' Report concluded that "60 months [was] a reasonable schedule for [Entergy] to have contemplated at the time of the DCE." The O'Brian–Kreitzberg report concluded that "the establishment of a 50–month schedule for the project in 1979 was unreasonable and led to the expenditure of $45,777,000 ... [and that] it is recommended that this expenditure and the associated AFUDC ['Allowance for Funds Used During Construction'] be disallowed."

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

112 S.W.3d 208, Util. L. Rep. P 26,862
**(Cite as: 112 S.W.3d 208)**

> FN9. AFUDC is a fixed percentage determined by the Federal Energy Regulatory Commission that compensates a utility for carrying the costs of construction. *Cities for Fair Util. Rates v. Public Util. Comm'n,* 924 S.W.2d 933, 935–36 (Tex.1996). Once the utility plant is operational, AFUDC is shifted to the utility's rate base, and the utility begins to earn a return on its investment. *Id.* at 936.

Regarding Entergy's expenses that the Commission should have found as prudently incurred above the original DCE, Entergy argues that the Commission did not add an amount for AFUDC. Entergy contends that twenty-three percent of $361 million should have been included as AFUDC, as this is the percentage of AFUDC allowed in the original DCE. The Commission responds that the additional sums added to the original DCE include AFUDC or that Entergy did not present evidence to support adding AFUDC. Initially, we observe that Finding 19 states the original DCE included AFUDC, while Finding 22 states that the total cost of River Bend ($4.5 billion) included AFUDC. The Commission's adjustments to the original DCE were as follows: (1) schedule increase 50 to 60 months = $183 million; (2) safety and Three Mile Island backfits [FN10] = $100 million; (3) omissions = $18 million; and (4) contingency = $243 million. The amount for the schedule increase included AFUDC, however, Entergy argues that the other adjustments did not, and this $361 million, multiplied by twenty-three percent, equals an additional $83 million that the Commission should have added to the adjusted DCE as AFUDC. Regarding the $100 million for regulatory issues and the $18 million for omissions, these costs were presented to the Commission by Entergy's experts, who did not indicate whether these costs included AFUDC. As the Commission argues, it was Entergy's burden to show whether its figures included AFUDC, and absent such testimony, the Commission was not required to account for AFUDC.

The $243 million in contingency costs was calculated by adding the Commission adjustments to the original DCE, subtracting sunken costs,[FN11] then multiplying the resulting "to go costs" by fifteen percent ($1.729 billion [original DCE] + $301 million [Commission adjustments]—$412 million [sunken costs] x 15% [Commission added contingency] = $243 million). To the extent that the equation's factors included AFUDC, the resulting $243 million also included AFUDC; however, where Entergy's expert testimony failed to indicate whether the adjustments for safety and Three Mile Island backfits ($100 million) and omissions ($18 million) included AFUDC, the Commission's added contingency of fifteen percent correctly excluded AFUDC.

> FN10. The PLG report described "Three Mile Island backfits" as required because of the 1979 accident at the Three Mile Island nuclear plant in Pennsylvania. The requirements included additional plant-monitoring instrumentation and control-room modifications.

> FN11. "Sunken costs" are "cost[s] that [have] already been incurred and that cannot be recovered." *Black's Law Dictionary* 350 (7th ed.1999).

**\*220** [14] Entergy complains that the Commission disregarded expert testimony and that the record as a whole demonstrates the prudence of costs in excess of the adjusted DCE. We disagree. It is for the agency to accept or reject witnesses' testimony, and the agency, not the reviewing court, is the judge of the weight accorded that testimony. *Southern Union Gas Co. v. Railroad Comm'n,* 692 S.W.2d 137, 141 (Tex.App.-Austin 1985, writ ref'd n.r.e.). The Commission had ample evidence before it on which to base its decision disallowing the costs in excess of $2.273 billion.

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

112 S.W.3d 208, Util. L. Rep. P 26,862
**(Cite as: 112 S.W.3d 208)**

Entergy's argument that all experts and all parties agreed that there were prudent costs above the adjusted DCE is without merit and is the same argument it presented to this Court in *Coalition of Cities,* 883 S.W.2d at 752. Entergy had the burden to prove prudence and could not shift that burden to those challenging its requested rate increase. Tex. Util.Code Ann. § 36.006 (utility bears burden to show prudence of expenditures); *see also Coalition of Cities,* 798 S.W.2d at 563 (utility enjoys no presumption that its expenditures were prudently incurred); *Houston Lighting & Power,* 778 S.W.2d at 198 (to raise rates, utility must bear burden of proving that each dollar of cost incurred was reasonably and prudently invested). The Commission determined that the $1.453 billion above the adjusted DCE was not reasonably and prudently incurred and should not be included in Entergy's rate base. If there is any evidence supporting either an affirmative or a negative finding, we must uphold the agency decision. *Charter Medical–Dallas,* 665 S.W.2d at 453.

The evidence is such that reasonable minds could have reached the same conclusion as the Commission. Because there is substantial evidence to support the Commission's decision, we overrule Entergy's third issue.

**The Cost–Reconciliation Study**

[15] By its fourth issue, Entergy argues that the Commission erred by making arbitrary, after-the-fact changes to the standards governing its prudence analysis. Specifically, Entergy argues that the Commission ruled in an earlier decision that a cost-reconciliation study was not a necessary element of a *prima facie* case; therefore, Entergy did not oppose the Commission's decision not to accept the cost-reconciliation study as evidence in Docket 17899.[FN12] The Commission's order indicates that Entergy failed to "present any credible reconciliation of plant costs with specific causes," which Entergy insists it could have offered in its cost-reconciliation study. The Commission rejoins that Entergy "knew

that the parties were demanding proof to reconcile Entergy's cost overruns to its definitive estimate ... [y]et the record shows that [Entergy] refused to provide such evidence."

> FN12. Entergy directs this Court to the Commission's decision in *Application of Texas Utilities Electric Co. for Authority to Change Rates* to support its argument that the cost-reconciliation study was not required; the Commission responds that Entergy's action is factually distinguishable. *See* Tex. Pub. Util. Comm'n, *Application of Tex. Utils. Elec. Co. for Authority to Change Rates,* Docket No. 9300, 17 Tex. P.U.C. Bull. 2057 (September 27, 1991).

The Commission's findings of fact and conclusions of law clearly indicate that Entergy did not meet its burden of proof or make a *prima facie* case as to the prudence of the $1.453 billion. Moreover, the Commission's order finds that "[t]he record ... is fully developed." Entergy, before the decision in Docket 17899, supported the Commission's decision not to take additional evidence and did not submit its cost-reconciliation study. Moreover, Entergy had been afforded earlier opportunities to submit additional evidence **\*221** to the Commission, but declined to do so. Entergy's argument that a later Commission decision rendered the cost-reconciliation study unnecessary obscures the fact that Entergy had ample opportunity to fully develop the record. The fact remains that Entergy, after a review of the entire record, did not meet the required burden of proof. We overrule Entergy's fourth issue.

**"Flow Through" Adjustments**

By its fifth issue, Entergy posits that the Commission erred by making certain rate adjustments that were the product of its erroneous treatment of the plant investment and that a decision of this Court to order the Commission to determine again the prudence of River Bend's cost would necessarily require a recal-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

112 S.W.3d 208, Util. L. Rep. P 26,862
**(Cite as: 112 S.W.3d 208)**

culation of these "flow through" costs. Specifically, Entergy argues that the erroneous rate adjustments include Entergy's payments to repurchase River Bend from its project partner, Cajun Electric Power Cooperative ("Cajun"), and that the Commission denied recovery of Entergy's payments to Cajun in proportion to the amount of River Bend investment to which it denied recovery. Additionally, Entergy argues that the level of recovery of River Bend deferred costs, a capital investment item, is limited by and tied to the amount of River Bend recovery. Because we affirm the Commission's decision that any costs above the adjusted DCE were imprudent, a recalculation of the "flow through" costs is unnecessary. We overrule Entergy's fifth issue.

### CONCLUSION

We affirm the district court's judgment affirming the Commission's decision excluding the additional $1.453 billion from Entergy's rate base.

Tex.App.–Austin,2003.
Entergy Gulf States, Inc. v. Public Utility Com'n of Texas
112 S.W.3d 208, Util. L. Rep. P 26,862

END OF DOCUMENT

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

# Appendix E

*Texas Utilities Electric Company v. Public Utility Commission*, 881 S.W.2d 387 (Tex. App. – Austin 1994) *aff'd in part, rev'd in part on other grounds*, 935 S.W.2d 109 (Tex. 1997)



881 S.W.2d 387
**(Cite as: 881 S.W.2d 387)**

Court of Appeals of Texas,
Austin.

TEXAS UTILITIES ELECTRIC COMPANY, Public
Utility Commission, Office of Public Utility Counsel, and
Cities of Arlington, et al., Appellants,
v.
PUBLIC UTILITY COMMISSION, Texas Utilities Electric Company, Office of Public Utility Counsel, and Cities
of Arlington, et al., Appellees.

No. 3–92–548–CV.
June 15, 1994.
Rehearings Overruled Aug. 31 and Oct. 12, 1994.

Final order by Public Utility Commission in electric rate case conducted under Public Utility Regulatory Act (PURA) was reversed and remanded in part when reviewed by the 250th Judicial District Court, Travis County, John K. Dietz, J. Appeals were taken. The Court of Appeals, Bea Ann Smith, J., held that: (1) commissioner's financial interest in gas industry was not prejudicial; (2) Commission lacked authority to review costs associated with reacquiring minority interests in nuclear power plant; (3) using hypothetical tax method was error; (4) Commission had authority to allow utility to implement bonded rates; (5) disallowing some revalidation expenses for nuclear power plant as imprudent was not error; and (6) setting rate of return on common equity at 13.2% was within Commission's discretion.

Reversed and remanded with instructions.

West Headnotes

**[1] Administrative Law and Procedure 15A 🗝314**

15A Administrative Law and Procedure
　15AIV Powers and Proceedings of Administrative Agencies, Officers and Agents
　　15AIV(A) In General
　　　15Ak314 k. Bias, prejudice or other disqualification to exercise powers. Most Cited Cases

Adjudicators involved in administrative proceedings are presumed to be honest and act with integrity but presumption may be overcome by demonstrating that decision maker's mind was irrevocably closed on matters at issue.

**[2] Electricity 145 🗝11.3(6)**

145 Electricity
　145k11.3 Regulation of Charges
　　145k11.3(6) k. Proceedings before commissions.
Most Cited Cases

Public Utility Commission chairperson's pecuniary interest in natural gas industry did not invalidate Commission's decision in electric rate case which decided whether costs of nuclear power plant construction should be included in utilities' rate base costs; chairperson's pecuniary interest was not shown to have deprived parties of impartial and fair hearing. V.T.C.A., Government Code § 2001.174; Vernon's Ann.Texas Civ.St. art. 1446c, § 1 et seq.

**[3] Administrative Law and Procedure 15A 🗝314**

15A Administrative Law and Procedure
　15AIV Powers and Proceedings of Administrative Agencies, Officers and Agents
　　15AIV(A) In General
　　　15Ak314 k. Bias, prejudice or other disqualification to exercise powers. Most Cited Cases

Administrative officer is not disqualified simply be-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

881 S.W.2d 387
**(Cite as: 881 S.W.2d 387)**

cause officer has previously taken position, even in public, on policy issue related to particular dispute absent showing of incapability to decide particular controversy fairly. V.T.C.A., Government Code § 2001.174.

**[4] Administrative Law and Procedure 15A ⚷305**

15A Administrative Law and Procedure
　　15AIV Powers and Proceedings of Administrative Agencies, Officers and Agents
　　　　15AIV(A) In General
　　　　　　15Ak303 Powers in General
　　　　　　　　15Ak305 k. Statutory basis and limitation. Most Cited Cases

**Administrative Law and Procedure 15A ⚷325**

15A Administrative Law and Procedure
　　15AIV Powers and Proceedings of Administrative Agencies, Officers and Agents
　　　　15AIV(A) In General
　　　　　　15Ak325 k. Implied powers. Most Cited Cases

Administrative agencies have only those powers that are expressly conferred by statute, together with those necessarily implied from authority conferred or duties imposed.

**[5] Administrative Law and Procedure 15A ⚷447.1**

15A Administrative Law and Procedure
　　15AIV Powers and Proceedings of Administrative Agencies, Officers and Agents
　　　　15AIV(D) Hearings and Adjudications
　　　　　　15Ak447 Jurisdiction
　　　　　　　　15Ak447.1 k. In general. Most Cited Cases

Jurisdiction cannot be conferred upon administrative agencies by parties before it, but rather must emanate from statute itself.

**[6] Administrative Law and Procedure 15A ⚷431**

15A Administrative Law and Procedure
　　15AIV Powers and Proceedings of Administrative Agencies, Officers and Agents
　　　　15AIV(C) Rules, Regulations, and Other Policy-making
　　　　　　15Ak428 Administrative Construction of Statutes
　　　　　　　　15Ak431 k. Deference to agency in general. Most Cited Cases
　　(Formerly 361k219(1))

Reviewing court has power and duty to consider agency's interpretation and application of statute.

**[7] Electricity 145 ⚷11.3(7)**

145 Electricity
　　145k11.3 Regulation of Charges
　　　　145k11.3(7) k. Judicial review and enforcement. Most Cited Cases

Section of Public Utility Regulatory Act (PURA) authorizing Public Utility Commission to review changes in public utility ownership did not apply to electric utility's repurchase of minority joint ownership interests in nuclear power plant given that ownership of plant did not change hands as result of repurchase; utility's decision to purchase minority interest was limited to review under prudent investment standard. Vernon's Ann.Texas Civ.St. art. 1446c, § 63.

**[8] Electricity 145 ⚷11.3(4)**

145 Electricity
　　145k11.3 Regulation of Charges
　　　　145k11.3(4) k. Operating expenses. Most Cited Cases

Public Utility Commission erred in electric rate case

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

881 S.W.2d 387
**(Cite as: 881 S.W.2d 387)**

by calculating utility's federal income tax liability using hypothetical rather than actual-tax method; utility's rates must reflect tax liability actually incurred. Vernon's Ann.Texas Civ.St. art. 1446c, § 1 et seq.

**[9] Electricity 145 ⟜11.3(4)**

145 Electricity
    145k11.3 Regulation of Charges
        145k11.3(4) k. Operating expenses. Most Cited Cases

Electric rates must be set based on utility's actual tax liability and, thus, utility's tax expense will be adjusted to reflect tax savings which would result from filing consolidated tax return, regardless of whether utility did in fact file consolidated return. Vernon's Ann.Texas Civ.St. art. 1446c, § 41(c)(2).

**[10] Electricity 145 ⟜11.3(4)**

145 Electricity
    145k11.3 Regulation of Charges
        145k11.3(4) k. Operating expenses. Most Cited Cases

The Public Utility Commission's refusal to allocate to electric utility tax savings resulting from affiliate's losses violated actual-tax doctrine, requiring that rates be based on utility's actual tax liability, even if utility did not bear risks associated with tax savings attributed to affiliates. Vernon's Ann.Texas Civ.St. art. 1446c, § 41(c)(2).

**[11] Public Utilities 317A ⟜128**

317A Public Utilities
    317AII Regulation
        317Ak119 Regulation of Charges
            317Ak128 k. Operating expenses. Most Cited Cases

If utility enjoys tax deduction based on interest expense, benefits of deduction must be passed on to ratepayers, rather than to shareholders. Vernon's Ann.Texas Civ.St. art. 1446c, § 41(c)(2).

**[12] Electricity 145 ⟜11.3(4)**

145 Electricity
    145k11.3 Regulation of Charges
        145k11.3(4) k. Operating expenses. Most Cited Cases

Allocation of tax benefits to electric utility from interest expense and deduction between present and future ratepayers is matter within Public Utility Commission's discretion. Vernon's Ann.Texas Civ.St. art. 1446c, § 41(c)(2).

**[13] Electricity 145 ⟜11.3(4)**

145 Electricity
    145k11.3 Regulation of Charges
        145k11.3(4) k. Operating expenses. Most Cited Cases

Electric utility's income tax expense must be reduced by amount of tax deductions, even if associated with disallowed capital expenses. Vernon's Ann.Texas Civ.St. art. 1446c, § 1 et seq.

**[14] Public Utilities 317A ⟜119.1**

317A Public Utilities
    317AII Regulation
        317Ak119 Regulation of Charges
            317Ak119.1 k. In general. Most Cited Cases

Utility may implement bonded rates in municipal areas when underlying rate increase is subject to appellate jurisdiction of Public Utility Commission. Vernon's Ann.Texas Civ.St. art. 1446c, § 43(e).

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

881 S.W.2d 387
**(Cite as: 881 S.W.2d 387)**

**[15] Administrative Law and Procedure 15A ⬱438(26)**

15A Administrative Law and Procedure
    15AIV Powers and Proceedings of Administrative Agencies, Officers and Agents
        15AIV(C) Rules, Regulations, and Other Policy-making
            15Ak428 Administrative Construction of Statutes
                15Ak438 Particular Statutes and Contexts
                15Ak438(26) k. Carriers and public utilities. Most Cited Cases
    (Formerly 361k219(9.1))

**Public Utilities 317A ⬱194**

317A Public Utilities
    317AIII Public Service Commissions or Boards
        317AIII(C) Judicial Review or Intervention
            317Ak188 Appeal from Orders of Commission
                317Ak194 k. Review and determination in general. Most Cited Cases
    (Formerly 361k219(9.1))

Public Utility Commission's interpretation of Public Utility Regulatory Act (PURA) is entitled to great weight, provided that interpretation is reasonable and does not contradict plain language of statute. Vernon's Ann.Texas Civ.St. art. 1446c, § 1 et seq.

**[16] Administrative Law and Procedure 15A ⬱791**

15A Administrative Law and Procedure
    15AV Judicial Review of Administrative Decisions
        15AV(E) Particular Questions, Review of
            15Ak784 Fact Questions
                15Ak791 k. Substantial evidence. Most Cited Cases

In conducting substantial evidence review, court must determine whether evidence as whole is such that reasonable minds could have reached conclusion agency must have reached in order to take disputed action.

**[17] Administrative Law and Procedure 15A ⬱793**

15A Administrative Law and Procedure
    15AV Judicial Review of Administrative Decisions
        15AV(E) Particular Questions, Review of
            15Ak784 Fact Questions
                15Ak793 k. Weight of evidence. Most Cited Cases

Reviewing court may not substitute its judgment for that of agency and must consider only record on which agency based its decision while conducting substantial evidence review.

**[18] Administrative Law and Procedure 15A ⬱750**

15A Administrative Law and Procedure
    15AV Judicial Review of Administrative Decisions
        15AV(D) Scope of Review in General
            15Ak750 k. Burden of showing error. Most Cited Cases

Party bringing appeal bears burden of showing that decision by administrative agency lacks substantial evidence.

**[19] Administrative Law and Procedure 15A ⬱791**

15A Administrative Law and Procedure
    15AV Judicial Review of Administrative Decisions
        15AV(E) Particular Questions, Review of
            15Ak784 Fact Questions
                15Ak791 k. Substantial evidence. Most Cited Cases

Agency's order must be upheld despite substantial

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

881 S.W.2d 387
**(Cite as: 881 S.W.2d 387)**

evidence challenge, if evidence would support either affirmative or negative findings.

**[20] Electricity 145** 🔑 **11.3(6)**

145 Electricity
    145k11.3 Regulation of Charges
        145k11.3(6) k. Proceedings before commissions.
Most Cited Cases

    Substantial evidence supported decision by Public Utility Commission that electric utility's imprudence caused some but not all of increased costs incurred by revalidation and reinspection program during construction of nuclear power plant; costs to respond to concerns by federal Nuclear Regulatory Commission were necessitated in part because of utility imprudence and in part because of higher safety and inspection standards. Vernon's Ann.Texas Civ.St. art. 1446c, §§ 39, 41.

**[21] Public Utilities 317A** 🔑 **124**

317A Public Utilities
    317AII Regulation
        317Ak119 Regulation of Charges
            317Ak124 k. Value of property; rate base. Most Cited Cases

**Public Utilities 317A** 🔑 **168**

317A Public Utilities
    317AIII Public Service Commissions or Boards
        317AIII(B) Proceedings Before Commissions
        317Ak168 k. Findings. Most Cited Cases

    Determination that expenditure is imprudent carries legal consequence of its exclusion from rate base and must be supported by underlying findings. V.T.C.A., Government Code § 2001.141(d).

**[22] Electricity 145** 🔑 **11.3(6)**

145 Electricity
    145k11.3 Regulation of Charges
        145k11.3(6) k. Proceedings before commissions.
Most Cited Cases

    Underlying findings supported finding of fact by Public Utility Commission that some but not all costs of complying with increased inspection standards and procedures during construction of nuclear power plant were caused by imprudence, warranting exclusion from rate base. V.T.C.A., Government Code § 2001.141(d).

**[23] Public Utilities 317A** 🔑 **194**

317A Public Utilities
    317AIII Public Service Commissions or Boards
        317AIII(C) Judicial Review or Intervention
            317Ak188 Appeal from Orders of Commission
                317Ak194 k. Review and determination in general. Most Cited Cases

    Reviewing court is bound by determinations of Public Utility Commission as to weight and credibility of evidence as long as there is substantial evidence in record supporting Commission's decision.

**[24] Electricity 145** 🔑 **11.3(6)**

145 Electricity
    145k11.3 Regulation of Charges
        145k11.3(6) k. Proceedings before commissions.
Most Cited Cases

**Public Utilities 317A** 🔑 **164**

317A Public Utilities
    317AIII Public Service Commissions or Boards
        317AIII(B) Proceedings Before Commissions
        317Ak164 k. Pleading. Most Cited Cases

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

881 S.W.2d 387
**(Cite as: 881 S.W.2d 387)**

Utility's conditional request to include construction work in progress costs (CWIP) in rate base if proposed rate increase were materially disallowed provided adequate notice of utility's intent to seek inclusion of CWIP in rate base in rate-making proceeding. Vernon's Ann.Texas Civ.St. art. 1446c, §§ 39(a), 41(a).

**[25] Electricity 145 ⊷11.3(4)**

145 Electricity
    145k11.3 Regulation of Charges
        145k11.3(4) k. Operating expenses. Most Cited Cases

Public Utility Commission may either make contract by contract determination of reasonableness of contracts for purchase of alternate energy sources or group contracts together and declare them all to be reasonable when reconciling fuel costs as part of rate case. Vernon's Ann.Texas Civ.St. art. 1446c, § 41(c)(1).

**[26] Electricity 145 ⊷11.3(4)**

145 Electricity
    145k11.3 Regulation of Charges
        145k11.3(4) k. Operating expenses. Most Cited Cases

Disallowing excessive price for natural gas as alternative fuel by electric utility, during rate case, was supported by utility's accounting records indicating that purchase was made pursuant to spot contract with unreasonably high price, despite utility's later contention that purchase was made part of separate short-term commercial contract for which purchase price would be reasonable. Vernon's Ann.Texas Civ.St. art. 1446c, § 41(c)(1).

**[27] Electricity 145 ⊷11.3(4)**

145 Electricity
    145k11.3 Regulation of Charges

145k11.3(4) k. Operating expenses. Most Cited Cases

Natural gas purchase contract which set upper limit on electric utility's right to purchase gas at contract price did not obligate utility to purchase gas under contract and, thus, supported determination by Public Utility Commission in rate case that utility violated its obligation to purchase fuel at lowest reasonable cost to ratepayers. Vernon's Ann.Texas Civ.St. art. 1446c, § 41(c)(1).

**[28] Electricity 145 ⊷11.3(4)**

145 Electricity
    145k11.3 Regulation of Charges
        145k11.3(4) k. Operating expenses. Most Cited Cases

Limiting electric utility's fuel inventory level based on utility's actual experience over several years was not arbitrary and capricious, despite utility's request in rate case for increased fuel inventory level. V.T.C.A., Government Code § 2001.174(2)(E, F).

**[29] Administrative Law and Procedure 15A ⊷753**

15A Administrative Law and Procedure
    15AV Judicial Review of Administrative Decisions
        15AV(D) Scope of Review in General
            15Ak753 k. Theory and grounds of administrative decision. Most Cited Cases

Mental processes of individual administrators are immaterial to judicial review of agency order; order is reviewed in light of record on which it purports to rest.

**[30] Electricity 145 ⊷11.3(5)**

145 Electricity
    145k11.3 Regulation of Charges
        145k11.3(5) k. Reasonableness of charges. Most

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

881 S.W.2d 387
**(Cite as: 881 S.W.2d 387)**

Cited Cases

Public Utility Commission has discretion in electric rate case to decide whether imprudence by utility's management warrants reduction in overall rate of return on common equity. Vernon's Ann.Texas Civ.St. art. 1446c, § 39(a).

**[31]** Electricity 145 ⌷⟶11.3(5)

145 Electricity
   145k11.3 Regulation of Charges
      145k11.3(5) k. Reasonableness of charges. Most Cited Cases

Setting electric utility's return on common equity at 13.2% in rate case was not abuse of discretion. Vernon's Ann.Texas Civ.St. art. 1446c, § 39(b).

**\*389** Roy Q. Minton, Minton Burton Foster & Collins, Austin, for Texas Utilities Elec. Co.

Dan Morales, Atty. Gen., Susan Bergen, Asst. Atty. Gen., Austin, for Public Utility Com'n.

Stephen Fogel, Austin, for Office of Public Utility Counsel.

**\*390** Geoffrey M. Gay, Buter Porter Gay & Day, Austin, for Cities of Arlington, et al.

David C. Duggins, Clark Thomas & Winters, Austin, for Texas Utilities Elec. Co.

Dan Morales, Atty. Gen., Steven Baron, Asst. Atty. Gen., Austin, for Public Utility Com'n.

Yolanda L. Woods, Asst. Public Counsel, Austin, for Office of Public Utility Counsel.

Steven A. Porter, Butler Porter Gay & Day, Austin, for

Cities of Arlington, et al.

David C. Duggins, Clark Thomas & Winters, Austin, for Texas Utilities Elec. Co.

Before CARROLL, C.J., and ABOUSSIE and B.A. SMITH, JJ.

BEA ANN SMITH, Justice.

Texas Utilities Electric Company, the Public Utility Commission, the Office of Public Utility Counsel, and the Cities of Arlington, et al. appeal from a district-court judgment rendered in a suit for judicial review of the Commission's final order in an electric utility rate case conducted under the Public Utility Regulatory Act (PU-RA), Tex.Rev.Civ.Stat.Ann. art. 1446c (West Supp.1994).[FN1] The district-court judgment reverses and remands certain aspects of the Commission's final order, and affirms the remainder. We will reverse the district-court judgment and remand the cause to the district court with instructions that the cause be remanded to the Commission for further proceedings consistent with our opinion. *See* Administrative Procedure Act (APA), Tex. Gov't Code Ann. § 2001.174 (West 1994).[FN2]

> FN1. Cities of Arlington, et al. includes the municipalities of Addison, Allen, Azle, Belton, Breckenridge, Bridgeport, Burkburnett, Burleson, Carrollton, Celina, Centerville, Cleburne, Colleyville, Copperas Cove, Corinth, Crowley, Dalworthington Gardens, De Leon, Denison, Euless, Farmers Branch, Forest Hill, Fort Worth, Glen Heights, Grand Prairie, Granger, Hewitt, Howe, Hurst, Irving, Keller, Lindale, Luella, McKinney, Milford, Murchison, New Chapel Hill, Ovilla, Pantego, Plano, Ranger, Richardson, Roanoke, Rockwall, Rosser, Rowlett, Sherman, Sunnyvale, The Colony, Tyler, University Park, Venus, Waco, White Settlement, and Wichita Falls. In addition to bringing individual appeals, each of the appellants is also an appellee with respect to certain parts of the district-court

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

881 S.W.2d 387
**(Cite as: 881 S.W.2d 387)**

judgment.

FN2. All citations in this opinion are to the current Administrative Procedure Act rather than the former Administrative Procedure and Texas Register Act because the recent recodification did not substantively change the law. Act of May 4, 1993, 73d Leg., R.S., ch. 268, § 47, 1993 Tex.Gen.Laws 583, 986.

### THE CONTROVERSY

Texas Utilities filed its application for a rate increase in January 1990 seeking to include in its rate base costs associated with Comanche Peak, a newly constructed nuclear power plant. The utility sought an agency adjudication regarding what portion of its costs it could include in its rate base as being a "prudent" investment, public interest findings on its reacquisition of a 12.2 percent ownership interest in the plant, final reconciliation of its fuel costs and revenues for the period April 1983 to June 1989, and a reduction of its fuel factor for the period May 1990 to April 1991. After the Commission issued its order, motions for rehearing were filed and the Commission issued a second order on rehearing. Subsequent motions for rehearing were overruled by operation of law, and five parties to the rate-making proceeding filed suit for judicial review in district court. *See* PURA § 69; APA § 2001.171. The district court affirmed the Commission order in part and reversed it in part, after which Texas Utilities, Public Utility Counsel, the Cities, and the Commission each appealed the district-court judgment.[FN3] For clarity, we will provide additional facts germane to the various points of error throughout the opinion.

FN3. With one exception, the Cities and Public Utility Counsel jointly raised their points of error.

### CONFLICT OF INTEREST

In their first point of error, the Cities and Public Utility Counsel argue that the chairman of the Commission, Paul Meek, was biased because he had a pecuniary interest in the outcome of the proceedings, and because he was prejudiced in favor of the gas industry. The allegations of impermissible bias center around Meek's ties with American **\*391** Petrofina ("Fina"). During the rate-making proceedings, Meek served as chairman of Fina's board, received retirement benefits from Fina, and held shares of its publicly traded common stock. Fina's direct sales of natural gas to Texas Utilities from 1989 to 1991 totalled $60,782; indirect revenue from sales to other Texas Utilities suppliers approximated $104 million. Because of his connections with Fina, the Cities and Public Utility Counsel claim that Meek's participation in the hearings precluded the Commission from making impartial findings. The district court found the evidence insufficient to show that Meek's service on the Commission led to unfair proceedings or prejudiced substantial rights of the parties. We agree.

PURA provides that no commissioner may, during a period of service with the Commission, "have any pecuniary interest ... in any person or corporation or other business entity a significant portion of whose business consists of furnishing goods or services to public utilities or affiliated interests...." PURA § 6(b)(1). It is grounds for removal from the Commission if a member has interests in violation of section 6(b) at the time of his or her appointment. PURA § 6A. However, "the validity of an action of the commission is not affected by the fact that it was taken when a ground for removal of a member of the commission existed." PURA § 6A(b). Meek resigned from the Commission effective April 20, 1992, after the Attorney General requested that he either sever all ties with Fina or resign from the Commission. Although Meek was not *removed* from the Commission because of a conflict of interest pursuant to PURA section 6A, he did resign in the face of a perceived conflict. Meek's conflict, however, has no effect on the Commission's order in Docket 9300. PURA § 6A(b). This Court is left, therefore, with the power to reverse and remand the Commission's order only if Meek's participation resulted in an order that prejudices substantial rights of the appellants. *See* APA § 2001.174.[FN4] We understand appellants to contend that this Court should reverse the Commission's order because Meek's interests in Fina resulted in an order that is arbitrary and

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

881 S.W.2d 387
**(Cite as: 881 S.W.2d 387)**

capricious and a violation of their constitutional right to a fair and impartial hearing.

FN4. APA section 2001.174 directs this Court to reverse and remand a cause for further proceedings only if substantial rights of the appellant have been prejudiced because the administrative findings, inferences, conclusions, or decisions are: (1) in violation of a constitutional or statutory provision, (2) in excess of the agency's statutory authority, (3) made through unlawful procedure, (4) affected by error of law, (5) not reasonably supported by substantial evidence, or (6) arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion.

[1][2] In order to prevail, appellants must overcome the presumption that agency members are persons of conscience and intellectual discipline, capable of judging a particular controversy fairly on the basis of its own circumstances. *United States v. Morgan,* 313 U.S. 409, 421, 61 S.Ct. 999, 1004, 85 L.Ed. 1429 (1941). Following the United States Supreme Court, we recognize a presumption of honesty and integrity in those serving as adjudicators. *Withrow v. Larkin,* 421 U.S. 35, 47, 95 S.Ct. 1456, 1464, 43 L.Ed.2d 712 (1975). One may overcome this presumption by demonstrating that the decisionmaker's mind is "irrevocably closed" on the matters at issue. *Federal Trade Comm'n v. Cement Inst.,* 333 U.S. 683, 701, 68 S.Ct. 793, 803–04, 92 L.Ed. 1010 (1948). During confirmation hearings conducted in May 1990, the Texas Senate fully explored the issue of Meek's conflict. At that time, aware of Meek's connections with Fina, the Senate satisfied itself that Meek could execute his duties as commissioner impartially and without prejudice in favor of the gas industry. Additionally, Meek promised to recuse himself from voting on any contested issue regarding contracts between public utilities and Fina, a promise he upheld by not reviewing contracts between Texas Utilities and Fina.FN5

FN5. Meek recused himself from voting on three issues: (1) finding of fact 172 relating to the reasonableness of Texas Utilities' fuel oil inventory, (2) finding of fact 379 relating to the reasonableness of Texas Utilities' fuel expenditures during the reconciliation period insofar as such expenditures relate to gas contracts between the utility and Fina, and (3) finding of fact 389 relating to the reasonableness of Texas Utilities' fuel oil expenditures during the reconciliation period.

**\*392** [3] It is well established that absent a showing of incapability to decide a particular controversy fairly, an administrative officer is not disqualified simply because he or she has previously taken a position, even in public, on a policy issue related to a particular dispute. *Morgan,* 313 U.S. at 421, 61 S.Ct. at 1004. In *Morgan,* the Supreme Court held that the Secretary of Agriculture's strong views on a particular issue did not make him unfit to exercise his duties in administrative proceedings relating to those matters. *Id.* Similarly, in *Cement Institute* the Court held that members of the Federal Trade Commission were not disqualified from participating in adjudicatory proceedings simply because they had previously expressed their opinions that a pricing system at issue in the proceeding was illegal. *Cement Institute,* 333 U.S. at 700–01, 68 S.Ct. at 803–04.

In this appeal, the Cities and Public Utility Counsel question Meek's impartiality because of a newspaper interview in which he expressed his disappointment with the Commission's decision to disallow $1.3 billion of Comanche Peak costs. The Supreme Court has decided, however, that public criticism "is a practice familiar in the long history of ... litigation," and that while an administrator may have an underlying philosophy in approaching a specific case, he or she may still be assumed to be a person of conscience and intellectual discipline, capable of judging a particular controversy fairly. *Morgan,* 313 U.S. at 421, 61 S.Ct. at 1004.

The Cities and Public Utility Counsel argue that this order should be invalidated, relying on *American Cyanamid Co. v. Federal Trade Commission,* 363 F.2d 757 (6th Cir.1966). In *American Cyanamid,* the court invalidated a

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

881 S.W.2d 387
**(Cite as: 881 S.W.2d 387)**

commission order because one of the commissioners had previously served as counsel for a Senate subcommittee investigating many of the same facts and issues that later came before the commission. The court found that the commissioner's dual investigative and adjudicative experiences with the issues involved in the hearing created a risk that commission decisions might be based on evidence outside the record. It was the presentation of nonrecord evidence, not the commissioner's personal viewpoints, that led the court to invalidate the order. *American Cyanamid,* 363 F.2d at 767. In this case, however, appellants base their request for invalidation of the order on assertions that Meek's personal views about the gas industry made it impossible for him to decide the issues fairly. Under the circumstances of this proceeding, we cannot agree.

We do not express any opinion regarding whether Meek should have been removed from the Commission had he not resigned. This Court is limited to the judicial review enumerated in APA section 2001.174. We conclude that Meek's involvement with Fina and his opinions about the gas industry have not been shown by the complaining parties to have resulted in a deprivation of the right to an impartial and fair hearing before the Commission, nor has it been shown that he exhibited bias such that his votes were necessarily arbitrary and capricious. The Cities and Public Utility Counsel's first point of error is overruled.

### REACQUISITION OF MINORITY INTERESTS

All appellants bring points of error related to the district court's disposition of the Commission order disallowing more than $908 million spent to repurchase 12.2 percent of Comanche Peak from minority interest owners and to settle litigation arising from the joint ownership of the project. Section 63 of PURA permits the Commission to disallow certain expenses associated with transactions involving changes in public utility ownership. The Commission's authority to make disallowances under section 63 is limited to three specific types of transactions: (1) the acquisition, sale or lease of any plant as an operating unit in the state of Texas for a total consideration in excess of $100,000; (2) a public utility's merger or consolidation with another public utility operating in the state; and (3) the

sale of fifty percent or more of a public utility's stock.[FN6] When any one of these transactions takes place, the utility **\*393** must file a report with the Commission, which then investigates the transaction to determine whether it is in the public interest. In making this determination, the Commission is to consider the reasonable value of the property, facilities or securities involved. If the Commission finds that the transaction was not in the public interest, it must "disallow the effect of such transaction if it will unreasonably affect rates or service." PURA § 63.

> FN6. Section 63 expressly provides that it shall not be construed as applying to the purchase of units of property for replacement or to additions to the public utility's facilities by construction.

In reviewing the costs associated with the construction of Comanche Peak, the Commission exercised its authority under section 63 to make a disallowance of $908,688,938. The Commission asserted that it had jurisdiction to make disallowances pursuant to section 63 because Texas Utilities' repurchase of certain minority interests in the Comanche Peak project constituted the purchase of a plant or unit as an operating system for consideration in excess of $100,000. Texas Utilities' second motion for rehearing filed with the Commission included an assignment of error stating:

> The Commission erred in concluding that PURA § 63 controls this Commission's review of [Texas Utilities'] reacquisition of minority owner interests in Comanche Peak, for the reason that, as a matter of law, PURA § 63 does not apply to the transfer between joint owners of partial, undivided interests in a plant and does not apply to a plant under construction that is not operating.

When this second motion for rehearing was overruled by operation of law, Texas Utilities sought review in the district court, and continued to maintain that the Commission had improperly applied section 63 to the repurchase of minority interests in the project. As part of its appeal to this Court, Texas Utilities contends in its second point of error

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

881 S.W.2d 387
**(Cite as: 881 S.W.2d 387)**

that the Commission's section 63 review was an error of law.

[4][5] The Cities, Public Utility Counsel, and the Commission each argue that Texas Utilities has waived its right to challenge the Commission's decision to proceed under section 63 because it was the utility that initially identified section 63 as one of the provisions giving the Commission jurisdiction over the rate-making proceeding.[FN7] Administrative agencies, however, have only those powers that are expressly conferred by statute, together with those necessarily implied from the authority conferred or the duties imposed. *State v. Jackson,* 376 S.W.2d 341, 344 (Tex.1964) (citing *Stauffer v. City of San Antonio,* 162 Tex. 13, 344 S.W.2d 158, 160 (1961)); *Sexton v. Mount Olivet Cemetery Ass'n,* 720 S.W.2d 129, 142 (Tex.App.—Austin 1986, writ ref'd n.r.e.). Jurisdiction cannot be conferred upon the agency by the parties before it, but rather must emanate from the statute itself. *See Nueces County Water Control & Improvement Dist. v. Texas Water Rights Comm'n,* 481 S.W.2d 924, 929 (Tex.Civ.App.—Austin 1972, writ ref'd n.r.e.) ("If the statutes do not grant the board the power to do a thing, then it has no such power."). If the utility's reacquisition of minority interests in Comanche Peak is not one of the specific transactions identified in section 63 of PURA, the Commission has no jurisdiction to make disallowances based on **\*394** the standards set forth in that section; such jurisdiction cannot be conferred on the Commission simply because the parties have requested or agreed to it.

FN7. The Examiners' Report notes:

In the petition and statement of intent initiating this docket, [Texas Utilities] requested that "the public interest and other findings be made favorably" with respect to its repurchases of the minority owner interests. [Texas Utilities'] pleading also cited § 63 as one of the statutory provisions granting the Commission jurisdiction over [Texas Utilities'] application. [Texas Utilities] now contends that § 63 does not apply to its reacquisition of the minority owners' in-

terests in Comanche Peak. It instead argues that the Commission should determine the prudent cost of 100 percent of Comanche Peak, rather than just 87.8 percent of the plant, in determining the extent to which the costs of the 12.2 percent repurchased plant are included in rate base.

The Report goes on to state:

The relevant precedent [for applying § 63] ... is found in the three dockets in which the Commission approved the CCN amendments reflecting the Company's reacquisition of the minority owners' interests: Docket Nos. 8015, 8236, and 8736.

In each of those dockets' final orders, the Commission envisioned a future § 63 review of [Texas Utilities'] buyback of a minority owner's interest.... [Texas Utilities] did not file a motion for rehearing in any of the final orders in the CCN dockets related to the repurchases of the minority owners' interests, even though each of the final orders envisioned a future § 63 review.

[6] This Court has the power, as well as the duty, to review the agency's interpretation and application of a statute. *See Railroad Comm'n v. Lone Star Gas Co.,* 599 S.W.2d 659, 662 (Tex.Civ.App.—Austin 1980, writ ref'd n.r.e.) (stating that an agency's duty is to carry forward the directives of statutes, and the courts review agency orders to ensure that statutes are enforced). In reviewing the Commission's order, we are therefore obliged to determine whether the repurchase of minority ownership interests is a transaction contemplated by section 63 of PURA. If it is not, the Commission had no authority to conduct a section 63 review, and we may not uphold that portion of the order. Accordingly, we first examine the repurchase at issue in this case to determine if it falls within the scope of transactions the Commission is directed to review under PURA section 63.

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

881 S.W.2d 387
**(Cite as: 881 S.W.2d 387)**

[7] In August 1973, Texas Utilities' corporate predecessors, Dallas Power & Light Company, Texas Power & Light Company, and Texas Electric Service Company, signed a memorandum of agreement to design, construct, and operate the Comanche Peak nuclear power plant.[FN8] Texas Utilities originally intended to own the entire plant, but was required to sell ownership interests in the project in order to receive construction permits from the Nuclear Regulatory Commission (NRC). In 1974, Texas Utilities agreed to allow participation in the ownership of Comanche Peak, thereby eliminating antitrust concerns associated with the issuance of the construction permits. By 1979, Texas Municipal Power Agency and Brazos Electrical Power Cooperative had acquired ownership shares of 6.2 percent and 3.8 percent respectively.[FN9] In 1982, Tex–La Electric Cooperative of Texas became another co-owner of the Comanche Peak project. Because Tex–La had raised antitrust issues with the Department of Justice and had filed a petition to intervene in the Comanche Peak antitrust review related to its application for an operating license, Texas Utilities agreed to sell Tex–La a 4.3 percent interest in the project. Before the closing, however, Tex–La reduced its purchase to 2.2 percent of the project. The joint operating agreement was amended to reflect this sale.[FN10] The Commission granted certificates of public convenience and necessity for all three sales of ownership interests in the project.[FN11]

> FN8. Texas Utilities Electric Company ("Texas Utilities") is the principal subsidiary of Texas Utilities Company (the "Holding Company"), an investor-owned holding company. Texas Utilities was created in 1984 after the merger of Dallas Power & Light Company, Texas Electric Service Company, and Texas Power & Light Company—all Holding Company subsidiaries.

> FN9. Joint ownership agreements executed with Texas Municipal Power Agency and Brazos Electrical Power Cooperative described the ownership of Comanche Peak as follows:

> 3.01 Ownership: The Parties shall have title to the Project and Fuel as *tenants in common* and shall, as co-tenants with an *undivided interest* therein, subject to the terms of this Agreement, own the Project and Fuel and have the related rights and obligations.... (emphasis added).

> The agreement also contains a provision whereby the parties to the agreement waive the right to partition their interest in the project.

> FN10. In exchange for the ownership interest, each minority interest owner agreed to advance sufficient funds to pay its ownership interest share of the project's construction and operation costs. Additionally, each minority interest owner agreed to pay its percentage share plus interest of the accumulated costs of fuel and construction paid by Texas Utilities before the applicable date of closing. The minority interest owners essentially agreed to assume financial responsibility for a percentage of the cost of building the plant in exchange for a corresponding percentage undivided interest in the completed plant. Once the plant was operating, the minority interest owner was entitled to capacity equal to its percentage share of Comanche Peak's net effective generation.

> FN11. For example, in Docket No. 3589, the Commission reviewed the transfer of a four and one-third percent ownership interest in Comanche Peak from Texas Utilities' corporate predecessors to Tex–La Electric Cooperative. Though PURA section 63 was cited as one of the statutory provisions giving the Commission jurisdiction to review the sale, the Examiners' Report states, "Because only a portion of [a] joint interest is being conveyed, it may not be necessary to comply with § 63 of the Act because it speaks to the transfer of ' ... any plant as an operating unit or

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

881 S.W.2d 387
**(Cite as: 881 S.W.2d 387)**

    system....' "

**\*395** The joint ownership agreement began to deteriorate over time. In May 1985, Brazos Electrical Power Cooperative ceased making its contractual payments to Texas Utilities. In early 1985, Tex–La Electric Cooperative made several late payments, and thereafter stopped making payments altogether. Texas Municipal Power Agency continued to make payments, but it made them under protest. Thereafter, the minority interest owners claimed that Texas Utilities had failed to meet its responsibilities under the joint ownership agreement, resulting in rising costs, schedule delays, and licensing problems. The three minority interest owners contended that they were therefore relieved of any obligation to pay their percentage costs of the construction and operation of the project.

Texas Utilities sued for breach of contract, seeking monetary damages and a declaratory judgment affirming the minority interest owners' continuing obligation to pay their share of the plant's remaining costs. The minority interest owners filed counterclaims alleging mismanagement of the project, breach of contract, and deceptive trade practices. Faced with mounting litigation costs, Texas

Utilities settled with the minority interest owners by repurchasing their undivided interests in the project.[FN12] The settlement agreements ended all litigation between Texas Utilities and the minority interest owners. The repurchases were approved by the Commission which, as previously noted, indicated its intention to review the repurchase of these minority interests under PURA section 63 in the future rate-making proceedings.

> FN12. The repurchase prices were based on the cost of building the percentage of the plant owned by each seller. Therefore, it appears that Texas Utilities reacquired the interests by reimbursing each minority interest owner the money each had contributed to the construction and operation of the plant. Additionally, Texas Utilities agreed to repurchase nuclear fuel and transmission facilities, and to reimburse the minority interest owners' litigation expenses. These payments together constitute the settlement costs paid by Texas Utilities to the minority interest owners. The Commission reviewed these settlement costs under PURA section 63 and made the following disallowances:

| | |
|---|---|
| Repurchase of 12.2% Ownership Interest | $811,342,938 |
| Reimbursement of Litigation Expenses | $ 72,684,000 |
| Repurchase of Nuclear Fuel | $ 24,662,000 |
| Total | $908,688,938 |

As part of Docket 9300, the Commission did in fact conduct the section 63 review. The Commission determined that the repurchase was in the public interest "to the extent that [Texas Utilities] paid a reasonable value for the repurchased capacity." The Commission found that the utility had reacquired the minority interests by paying $4,765 per kilowatt—the cost of building Comanche Peak. By contrast, the Commission decided that a "reasonable value" would be $1,865 per kilowatt, the cost of building a stand-alone "generic coal plant" with 12.2 percent of Comanche Peak's capacity. As a result, the Commission determined that Texas Utilities had paid $2,900 more per

kilowatt than was "reasonable."[FN13] Accordingly, the Commission disallowed the excess purchase price amounting to almost $812 million. The Commission also disallowed the utility's reimbursement of the minority interest owners' litigation costs, amounting to $72.684 million, and $24.662 million of the total consideration paid for the nuclear fuel.

> FN13. It does not appear, however, that purchasing a stand-alone coal plant was an option available to the utility in its attempts to resolve the litigation quagmire that threatened the entire project. The utility was required to obtain a li-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

881 S.W.2d 387
**(Cite as: 881 S.W.2d 387)**

cense for the Comanche Peak power plant; it could not choose to license 87.8 percent of the capacity and turn to alternative power sources for more capacity. The 12.2 percent was part of the whole project, and until the dispute with the minority interest owners was resolved, the entire plant would remain inoperative.

The district court concluded that although review under section 63 of PURA was appropriate, the Commission made disallowances that were arbitrary and capricious and not supported by substantial evidence. In two jointly raised points of error, the Cities and Public Utility Counsel assert that the district court erred in remanding some of the Commission's findings of fact and that the Commission properly carried out its section 63 review. They do not challenge the propriety of the section 63 review. The Commission **\*396** also brings two separate points of error relating to its section 63 review, contending that it properly applied section 63 and that its findings of fact were supported by substantial evidence. We do not address these points of error because our conclusion that the repurchase of the undivided minority interests in the plant are not transactions reviewable under section 63 renders moot any further controversy about what would constitute a proper disallowance under that provision.[FN14]

> FN14. The Cities and Public Utility Counsel argue that the standard applied by the Commission in its section 63 review is identical to the standard employed in the typical "prudence review" of a rate-making proceeding, and for that reason the Commission's findings should be affirmed even if this Court determines that section 63 is inapplicable to this transaction. Assuming, without deciding, that the standards are the same, we would still reverse the Commission's disallowances because they are arbitrary and capricious. In Docket 9300, the Commission adopted the following prudence standard:
>
> > The exercise of that judgment and the choosing of one of that select range of options which a

reasonable utility manager would exercise or choose in the same or similar circumstances given the information or alternatives available at the point in time such judgment is exercised or option is chosen.

If the Commission indeed applied a prudence standard when evaluating the repurchase, the resulting findings of fact are arbitrary and capricious because they reflect consideration of a factor legally irrelevant to a review of expenditures under the prudent investment standard. *See Public Util. Comm'n v. South Plains Elec. Coop., Inc.,* 635 S.W.2d 954, 957 (Tex.App.—Austin 1982, writ ref'd n.r.e.) (citing *Starr County v. Starr Indus. Servs., Inc.,* 584 S.W.2d 352 (Tex.Civ.App.—Austin 1979, writ ref'd n.r.e.),* for the proposition that an agency's consideration of a non-statutory factor amounts to arbitrary and capricious action requiring reversal); John E. Powers, *Agency Adjudications* 165 (1990). The Commission disallowed the purchase price to the extent that it exceeded the cost of building a stand-alone coal plant with capacity equivalent to 12.2 percent of Comanche Peak's. Building a stand-alone coal plant was not, however, one of the options available to the utility at the time it made the repurchase. The purpose of repurchasing the minority interests was not to obtain capacity, but to eliminate expensive and time-consuming litigation that jeopardized licensing of the entire project; building or buying a coal plant would not achieve that objective.

As previously noted, section 63 applies to three types of transactions: (1) the purchase, sale or lease of a plant or unit as an operating system for consideration in excess of $100,000; (2) sales of more than fifty percent of the stock of a public utility; and (3) a merger or consolidation of two public utilities. Texas Utilities' repurchase of the undivided ownership interests sold to Texas Municipal Power Agency, Brazos Electrical Power Cooperative, and

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

881 S.W.2d 387
**(Cite as: 881 S.W.2d 387)**

Tex–La Electric Cooperative falls into none of these categories. Rather than repurchasing a "plant or unit," Texas Utilities acquired the undivided ownership interests of three tenants-in-common. Under the joint ownership agreement, the co-tenants had waived any right to partition the interests, thereby foreclosing the possibility of identifying any part of the plant as belonging specifically to any co-tenant. The fallacy in the Commission's analysis is its assumption that the minority interests translate into a complete and independently operable portion of Comanche Peak, ownership of which changed hands when the repurchase took place.

The Cities and Public Utility Counsel argue that excluding the repurchase of the undivided interests from the scope of a section 63 review renders the provision meaningless. They contend that it is illogical to conclude that "a statute concerned with transactions of at least $100,000 would not apply to a transaction 1,000 times greater than that amount." This argument fails because the element that triggers section 63 review is not the amount of money involved in the transaction, although the legislature has set a $100,000 minimum presumably to exclude transactions so small that there is no real risk they will unreasonably affect rates or service. Rather, section 63 is concerned with certain *types* of transactions that result in changes of ownership of the utility or its operating units to ensure that the costs of transactions inconsistent with the public interest are not assessed against the ratepayers. We conclude that the Commission erred in reviewing the costs associated with the minority interests under PURA section 63.

In its final judgment, the district court reversed and remanded for reconsideration on the existing record the following specific **397** findings of fact related to the minority interest repurchases:

149. For the reasons discussed in Section VII.C.2. of this Report, [Texas Utilities] failed to prove that the consideration it paid for the repurchased 12.2 percent interest in the plant was reasonable.

150. For the reasons discussed in Section VII.C. of this Report, [Texas Utilities'] repurchases of the minority owners' interests in Comanche Peak are consistent with the public interest to the extent that [Texas Utilities] paid a reasonable value for the repurchased capacity.

151. For the reasons discussed in Section VII.C. of this Report, all amounts in excess of the reasonable value of the repurchased interests should be disallowed from invested capital as unreasonably affecting rates.

152. For the reasons discussed in Section VII.B.2.d. and Section VII.D. of this Report, a reasonable value of the repurchased interests in Comanche Peak is $1,856 per kW.

153. For the reasons discussed in Section VII.D. of this Report, the reasonable value of $1,856 per kW should apply to valuating the repurchased interests in Unit 1 and Unit 2.

153A. Consistent with an estimated fuel cost for Comanche Peak of $11 billion, the test-year-end cost of $5.938 billion should be used to value the repurchased 12.2 percent interest in Unit 1 and an estimated cost of $5.0 billion should be used to value the repurchased 12.2 percent interest in Unit 2.

153B. The plant disallowances related to the repurchased 12.2 percent interest in Unit 1 is $462,764,691; the plant disallowance related to the repurchased 12.2 percent interest in Unit 2 is $348,578,247. Taken together, the total plant disallowance related to the repurchased 12.2 percent interest in the entire plant is $811,342,938.

154. For the reasons discussed in Section VII.E. of this Report, the $72.684 million in minority owners' litigation expenses reimbursed by [Texas Utilities] as part of the settlement agreements should be disallowed.

\* \* \* \* \* \*

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

881 S.W.2d 387
**(Cite as: 881 S.W.2d 387)**

156. As modified by Findings of Fact 153A and 153B, Section VII.F. of this Report indicates the disallowances for Unit 1 and Unit 2, as calculated in Section VI. (Prudence) and Section VII. (Reacquisition of Minority Owner Interests). The total Unit 1 disallowance is $847,004,966; the total Unit 2 disallowance is $534,139,597. Taken together, the total disallowance is $1,381,144,563.

The purpose of remanding these findings was to allow the Commission to reconsider the "reasonable value" it assigned the repurchased interests, presumably to make an upward adjustment in its $1,856 per kilowatt valuation to reflect the "intangible" benefits of repurchasing the minority interests. The district court instructed the Commission to consider not only the "economic value" of the property and facilities acquired, but also benefits gained from terminating expensive and time-consuming litigation that jeopardized the entire project. We affirm the district court's rejection of these findings of fact based on our conclusion that the Commission erroneously reviewed the repurchases under PURA section 63 and failed to evaluate the repurchase price in light of the relevant statutory considerations. We reverse that portion of the district court's judgment affirming the Commission's disallowance of $24,662,000 of the cost to Texas Utilities of repurchasing nuclear fuel from the minority interest owners. This payment was part of the overall settlement cost and should be reviewed under the prudent investment standard along with all other costs related to the repurchase. The Commission has already approved the utility's decision to settle the dispute with the minority interest owners; [FN15] on remand, we **\*398** direct the Commission to consider, under the prudent investment standard, the price paid for the repurchase, including the litigation costs and repurchase of nuclear fuel at its original cost.[FN16]

FN15. Finding of fact 148 states:

For the reasons discussed in Section VII.C.1. of this Report, settling the minority owner litiga-

tion was reasonable from [Texas Utilities'] perspective.

The Report noted that "it is clear that the minority owner litigation potentially threatened the Company's licensing efforts, which in turn threatened further schedule delays and cost overruns on the project. At the time of the settlements with the minority owners, the project was incurring approximately $60 to $70 million a month in case requirements and carrying costs. Consequently, a settlement of the minority owner litigation was reasonable in order to avoid the possibility of any further project delay and unnecessary expenditures of these amounts."

FN16. We realize the Commission has already conducted an overall prudence review of the costs associated with the original construction of Comanche Peak resulting in a disallowance of approximately $537 million. Rather than hold that this figure is the appropriate disallowance, we note that the question on remand is not whether the original construction costs of the 12.2% at issue here were prudently incurred, but rather whether it was prudent for the utility to repurchase that portion of the plant at its original cost.

### FEDERAL INCOME TAX EXPENSE

In points of error seven through ten, the Cities and Public Utility Counsel complain that the district court erred in affirming the Commission's calculation of the utility's federal income tax expense. They contend that the Commission's calculation (1) improperly employed the hypothetical rather than the actual-tax method, (2) failed to account for tax savings resulting from the utility's consolidated tax return, (3) did not reflect deductions for actual interest expense, and (4) failed to reflect deductions taken for below-the-line expenses, including disallowed Comanche Peak plant costs.

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

881 S.W.2d 387
**(Cite as: 881 S.W.2d 387)**

[8] We sustain the seventh point of error complaining of the Commission's use of the hypothetical tax method. The mandate from the supreme court is clear: "The utility's rates must reflect the tax liability actually incurred." *Public Util. Comm'n v. Houston Lighting & Power Co.,* 748 S.W.2d 439, 442 (Tex.1987). This Court has repeatedly affirmed that statement by consistently requiring the Commission to employ the actual-taxes-paid doctrine. *See City of Alvin v. Public Util. Comm'n,* 876 S.W.2d 346, 359–60 (Tex.App.—Austin 1994, no writ h.); *Cities of Abilene v. Public Util. Comm'n,* 854 S.W.2d 932, 944 (Tex.App.—Austin 1993, writ requested); *Public Util. Comm'n v. GTE–SW,* 833 S.W.2d 153, 159 (Tex.App.—Austin 1992, writ granted). Furthermore, under the actual-taxes-paid test, "*any utility tax savings must benefit ratepayers.*" *Cities of Abilene,* 854 S.W.2d at 945 (emphasis added). In this case, as well, we reject the Commission's refusal to adhere to binding precedent.

[9] The Cities and Public Utility Counsel's eighth point of error asserts that the Commission erred when it failed to adjust its calculation of the utility's tax expense to reflect savings that resulted from the utility's filing a consolidated tax return. The Commission rejoins that its decision not to allocate any of the savings to the utility was consistent with PURA section 41(c)(2) and cases construing that statutory provision. Section 41(c)(2) states:

If the public utility is a member of an affiliated group that is eligible to file a consolidated income tax return, and if it is advantageous to the public utility to do so, income taxes shall be computed as though a consolidated return had been so filed and the utility had realized its fair share of the savings resulting from the consolidated return, unless it is shown to the satisfaction of the regulatory authority that it was reasonable to choose not to consolidate returns.

Texas Utilities argues that this statute only applies when the utility has *not* filed a consolidated return. We disagree. The statute provides that, regardless of whether the utility actually filed a consolidated return, the Commission must calculate the utility's income tax expense as though it had received any tax benefits a consolidated return would provide. Once the Commission determines that a consolidated filing would have been, or was, advantageous to the utility, the Commission must adjust the utility's tax expense to reflect those savings. If the Commission does not reduce the utility's tax expense to reflect the utility's tax savings, it violates the actual-tax doctrine's underlying principle **\*399** that rates must be set based on the utility's actual tax liability. *GTE–SW,* 833 S.W.2d at 166.

[10] The Commission argues that it was not required to allocate any of the tax savings from the consolidated filing to the utility because it specifically found that the consolidated filing was not advantageous to the utility. *See* Finding of Fact 331A. In *Cities of Abilene* we held that no adjustment to income tax expense is necessary under PURA section 41(c)(2) if the Commission finds either (1) that it was not advantageous to the utility to consolidate returns, or (2) that the Commission has computed taxes as though a consolidated return were filed and the utility has received its fair share of the savings from the consolidated return. *Cities of Abilene,* 854 S.W.2d at 944. In this case, the Commission relied on its own conclusion that the utility's fair share of the savings was zero to support its finding that the consolidated return was not advantageous to the utility. We will uphold the Commission's decision only if it properly found that the utility's fair share of the tax savings was zero.

Finding of fact 331D states:

The federal income tax savings resulting from the filing of a consolidated federal income tax return should accrue to the entity that provided the tax attributes that allowed for such savings, and [Texas Utilities] was not the entity that provided such tax attributes.

This Court has previously decided that even when it is the utility's affiliates that have suffered losses and provided "the tax attributes that allowed for savings," those savings must be passed on to the ratepayers. *GTE–SW,* 833 S.W.2d

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

881 S.W.2d 387
**(Cite as: 881 S.W.2d 387)**

at 167. In finding of fact 331F, the Commission asserts that it would be unfair to allocate to the utility tax savings resulting from the affiliates' losses because the utility will never be responsible for paying the affiliates' taxes when "timing differences reverse and those affiliates have taxable income." Again, this Court has rejected that argument. *GTE–SW,* 833 S.W.2d at 167 n. 16 (inequity resulting from ratepayers' benefitting from tax savings not offset by obligation to pay higher rates in the event of affiliates' gains is a matter for the legislature to remedy by amending PURA section 41(c)(2)). Similarly, finding of fact 331H, that Texas Utilities should not benefit from tax savings attributed to affiliates because it bears none of the risks associated with those entities, conflicts with existing caselaw. The Commission's finding that the consolidated tax return was not advantageous cannot rest upon its own improper refusal to allocate any savings to the utility. Having rejected several of the findings supporting the Commission's conclusion that the utility's fair share of the tax savings is zero, we are unable to uphold that conclusion. There is no indication that each finding is independently sufficient to support the conclusion. We therefore sustain the Cities and Public Utility Counsel's eighth point of error.

[11][12] The ninth point of error objects to the Commission's failure to adjust the tax expense calculation to reflect actual-interest-expense deductions. The Commission is required to allocate tax savings to ratepayers rather than to shareholders. The actual-tax doctrine requires that the ratepayers be held accountable only for "those tax expenses that are *actually* incurred by a utility." *Houston Lighting & Power,* 748 S.W.2d at 442. If the utility enjoys a tax deduction based on interest expense, the benefits of that deduction must be passed on to the ratepayers. In *City of Alvin,* however, we rejected the argument that the Commission must pass on *immediately* the entire savings related to a utility's tax deductions. *City of Alvin,* No. 3–92–459–CV, slip op. at 18 ("Section 27(e) of PURA directs the Commission to distribute [tax savings benefits] to *all* ratepayers, however, both present and future. We will not interpret *Houston Lighting* as mandating that present ratepayers receive all the benefits of accelerated deprecia-

tion."). We sustain the point of error to the extent that we continue to require the Commission to pass through to ratepayers any tax benefits from interest expense deductions. However, the Commission must allocate those savings between present and future ratepayers, and the proper allocation is within the Commission's discretion.

**\*400** [13] The Cities and Public Utility Counsel's tenth point of error contends that the Commission erroneously excluded tax benefits resulting from below-the-line expenses, including tax deductions related to expenses disallowed as imprudently incurred. This Court has already decided that PURA requires that the Commission reduce the utility's income tax expense by the amount of tax deductions, even if they are associated with disallowed capital expenses. *City of Alvin,* No. 3–92–459–CV, slip op. at 17 (citing *GTE–SW,* 833 S.W.2d at 169). We remain unpersuaded by the Commission's argument that the actual-tax doctrine conflicts with the normalization rules. *See City of Alvin,* No. 3–92–459–CV, slip op. at 18. We sustain the tenth point of error.

### BONDED RATES

In their twenty-first point of error, the Cities challenge the Commission's authority to allow Texas Utilities to implement bonded rates in both the municipal and non-municipal sections of its service area.[FN17] Disposition of this point of error requires an interpretation of PURA section 43(e). This appeal presents the first opportunity for this Court to consider the bonded-rate provision of the statute since its amendment in 1983.

> FN17. Public Utility Counsel does not join the Cities in bringing this point of error.

When an electric utility wishes to change its rates it must follow the procedures outlined in PURA section 43.[FN18] The utility initiates rate proceedings by filing a statement of intent to change rates with the regulatory authority having original jurisdiction. PURA § 43(a). [FN19] In all proceedings involving major rate changes,[FN20] the regulatory authority having original jurisdiction must hold

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

881 S.W.2d 387
**(Cite as: 881 S.W.2d 387)**

a hearing on the proposed rate schedule. PURA § 43(c). Pending the hearing, the regulatory authority may suspend implementation of the new rate schedule. If the original proceeding involves a proposed increase in the rates charged in municipal areas, the municipality holds the hearing and has ninety days in which to come to a final decision. If the municipality has made no final disposition of the rate proceeding at the expiration of ninety days, the proposed rate schedule is deemed to have been approved and the municipality loses jurisdiction over the proceeding. PURA § 43(d). If an order is issued, any party to the proceeding may seek *de novo* appellate review in the Commission. PURA § 26(a), (g).

> FN18. This discussion focuses on the more typical situation in which a utility requests a rate increase rather than a decrease.

> FN19. Original jurisdiction over rate proceedings is divided between the governing body of each municipality ("the municipality") and the Commission. Each municipality exercises exclusive original jurisdiction over electric rates and services within its corporate limits ("municipal areas"), whereas the Commission exercises exclusive original jurisdiction over rates and services in all other areas ("non-municipal areas"). PURA § 17(a), (e). In addition, the Commission has exclusive appellate jurisdiction to review each municipality's order in any rate proceeding. PURA § 17(d).

> FN20. The statute defines a "major change" as an increase in rates that will augment the aggregate revenues of the utility making the rate application by more than $100,000 or two and one-half percent, whichever is greater. PURA § 43(b).

Because most utilities provide services in both municipal and non-municipal areas, there is usually a parallel proceeding originating in the Commission to consider the same proposed rate increase as it affects non-municipal

areas. The Commission, however, has a 150–day period of original jurisdiction over its portion of the rate proceeding. In addition, the Commission is allowed two days for each day of hearings in excess of fifteen days. The practical result of allowing the Commission a longer period of original jurisdiction is that it can wait for the municipality to issue a final appealable order and then consolidate *de novo* appellate review with its own consideration of the same proposed rate increase in non-municipal areas. Therefore, the Commission typically exercises its original and appellate jurisdiction concurrently.

In these consolidated rate proceedings, the Commission has 150 days plus two days for each day of hearings in excess of fifteen days in which to make a final determination. When the Commission is faced with a particularly complex rate proceeding, protracted **\*401** hearings can mean a utility's proposed rate schedule may not take effect for a long period of time.[FN21] The term "regulatory lag" is used to describe the economic consequences of this delay.[FN22] In order to protect utilities from the financial harm engendered by prolonged regulatory lag, PURA section 43(e) provides that in cases in which the Commission has failed to render a final order within 150 days of the proposed effective date of the rate increase, the utility

> FN21. In this case, for example, there were 203 days of hearings. This means the utility might not be allowed to increase its rates for as many as 526 days.

> FN22. "Regulatory lag arises from the loss in revenue experienced by a utility whose rates are in need of upward adjustment during the period between filing an application for a rate increase and the date when relief is granted." *Railroad Comm'n v. Lone Star Gas Co.,* 656 S.W.2d 421, 423 (Tex.1983).

may put a changed rate, not to exceed the proposed rate, into effect upon the filing with the regulatory authority of a bond.... The utility concerned shall refund or credit

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

881 S.W.2d 387
**(Cite as: 881 S.W.2d 387)**

against future bills all sums collected ... in excess of the rate finally ordered plus interest at the current rate as finally determined by the regulatory authority.[FN23]

> FN23. PURA section 3(g) provides that the term "regulatory authority" means either the governing body of any municipality or the Commission, depending upon the context in which the word is used.

PURA § 43(e). This practice is known as "bonding in" rates and is used to relieve the potential financial hardship imposed on a utility while it awaits a final Commission order on its requested rate increase.

[14] In Docket 9300, Texas Utilities requested the same rate increase throughout its entire service area, encompassing both municipal and non-municipal areas. As permitted by the 1983 amendments to PURA, the Commission reviewed the proposed rate increase in municipal areas under its appellate jurisdiction at the same time it considered the increase in non-municipal areas under its original jurisdiction. When 150 days had passed without the Commission's having reached a final determination, the utility decided to implement bonded rates throughout its entire service area, and pursuant to PURA 43(e) requested that the Commission approve its bond. The Cities objected to Texas Utilities' request for bonded rates in municipal areas, maintaining that PURA prohibits bonded rates in municipal areas once the municipality has lost its original jurisdiction over the rate proceeding.[FN24] The Commission rejected this argument and determined that PURA's bonding provision does not prohibit a utility from implementing bonded rates in municipal areas when the underlying rate increase is subject to the Commission's appellate jurisdiction. We conclude that the Commission's interpretation of PURA section 43(e) is correct.

> FN24. When considered in conjunction with other provisions of PURA, the Cities' interpretation of section 43(e) leads to the result that a utility will *never* be able to implement bonded rates in mu-

nicipal areas. Section 43(e) specifically states that a utility may not put bonded rates into effect until 150 days have passed. Because the municipality loses its jurisdiction after only ninety days, a utility's right to bonded rates will always arise *after* the municipality has lost its original jurisdiction over the rate proceeding.

Section 43(e) contains no language that limits the bonding provisions to rates being considered under the Commission's *original* jurisdiction:

> If the 150–day period has been extended, ... and the commission fails to make its final determination of rates within 150 days from the date that the proposed change would have gone into effect, the utility concerned may put a changed rate, not to exceed the proposed rate, into effect upon the filing with the regulatory authority of a bond....

PURA § 43(e). In support of its contention that the utility may implement bonded rates only for those rates subject to the Commission's original jurisdiction, the Cities rely on two pre–1983 cases holding that the *former* version of section 43(e) did not permit bonded rates in areas under the Commission's appellate jurisdiction. *See Lone Star Gas,* 656 S.W.2d at 425; **\*402***Arkansas Louisiana Gas Co. (Arkla) v. Railroad Comm'n,* 586 S.W.2d 643 (Tex.Civ.App.—Austin 1979, writ ref'd n.r.e.). We conclude that the reasoning of those cases is so closely tied to the wording of PURA before the 1983 amendments that they do not support the Cities' interpretation of amended section 43(e).[FN25]

> FN25. Moreover, the supreme court expressly limited the effect of its decision in *Lone Star Gas* to cases arising before September 1, 1983, the effective date of significant amendments to PURA. *Lone Star Gas,* 656 S.W.2d at 427.

In *Lone Star Gas* the supreme court recognized the hardship created by PURA's failure to provide for bonded

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

881 S.W.2d 387
**(Cite as: 881 S.W.2d 387)**

rates during an extended period of appellate review, but commented that "any changes in the protection afforded the utility should be made by the legislature." 656 S.W.2d at 425. Perhaps responding to the court's invitation to act, in 1983 the legislature significantly amended PURA and apparently cured this particular hardship. *See GTE–SW,* 833 S.W.2d at 173 (noting that an almost identical bonded rate provision in the new Gas Utility Regulatory Act cured the problems caused by the utility's inability to implement bonded rates in municipal areas pending review *de novo* by the Commission).

Without the ability to bond in rates, a utility's only avenue for relief from regulatory lag in city rates, traditionally the lion's share of its service area, would be to request interim rates. *See* PURA § 26(g) (allowing the Commission to authorize interim rates if "necessary to effect uniform system-wide rates"). This would necessitate a bifurcated process of considering the request for interim city rates while contemporaneously implementing bonded rates outside city limits. Such an inefficient and unwieldy process undermines the amended statutory scheme designed to consolidate consideration of system-wide rates in one proceeding. Furthermore, interim rates that require a hearing do not provide relief from regulatory lag equivalent to the bonding provision which permits implementation of new rates without Commission approval, subject only to a bond adequate to ensure possible refunds. We see no suggestion in the amended version of section 43(e) that utilities should be limited to seeking interim rates to cure regulatory lag in areas servicing cities.[FN26]

> FN26. It is more sensible to view interim rates and bonded rates as separate and independent methods by which a utility may obtain rate relief in its *entire* service area, rather than alternative procedures for setting rates inside and outside city limits. A utility might first request interim rates in order to avoid posting a large bond. If the Commission did not approve the interim rates, the utility could then post a bond, which it would risk losing entirely or in part if final rates set by the Commission were lower than the bonded rates.

[15] The Commission's interpretation of section 43(e) is entitled to great weight, provided it is reasonable and does not contradict the plain language of the statute. *Tarrant Appraisal Dist. v. Moore,* 845 S.W.2d 820, 823 (Tex.1993). The Commission's construction of the bonding provision is consistent with the statutory scheme embodied in the 1983 amendments designed to facilitate contemporaneous disposition of system-wide rates in a single proceeding. It also affords the utility protection from regulatory lag through bonded rates, whether inside or outside city limits. Nothing in the statute itself or the relevant case law supports the Cities' restricted reading of section 43(e). We overrule the Cities' twenty-first point of error.

## RATE BASE ALLOWANCES

In points of error two through four, the Cities and Public Utility Counsel complain that the district court improperly upheld various aspects of the Commission's order on rehearing relating to the prudence phase of the rate-making proceeding. Specifically, they contend that the Commission's disallowance of Comanche Peak costs is contrary to substantial evidence and inconsistent with the Commission's factual determinations regarding the insufficiency of Texas Utilities' proof and with Texas law regarding the burden of proof. The Cities and Public Utility Counsel assert that reasonable minds could not reach the decision arrived at by the Commission regarding the reasonable cost of Comanche Peak, and that the Commission failed to disallow imprudent project costs as required by statute. *See* PURA §§ 39, 41.

In August 1972, Texas Utilities announced its plan to build Comanche Peak, its first **\*403** nuclear power plant. In 1977, the utility estimated that Comanche Peak Unit 1 would be commercially operable in 1981, and Unit 2 would achieve commercial operation in 1983. The total estimated cost of the project was $1.7 billion, including an allowance for funds used during construction (AFUDC). However, Unit 1 did not become commercially operable until August 1990. At the rate-making proceeding, the examiners attributed this substantial delay to Texas Utilities' inability to obtain an operating license from the NRC.

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

881 S.W.2d 387
**(Cite as: 881 S.W.2d 387)**

*See* Examiners' Report at 5.[FN27]

> FN27. In March 1984, the NRC formed a Technical Review Team to identify and resolve all regulatory issues raised by Texas Utilities' attempt to obtain an operating license. The utility, in turn, created the Comanche Peak Response Team to assess and resolve any issues raised by the Technical Review Team. In January 1985, the Technical Review Team issued a letter suggesting that Comanche Peak was deficient in the areas of quality assurance and quality control. In response, the utility formed the Design Adequacy Program and the Corrective Action Program to address the NRC's concerns and ensure that Comanche Peak received an operating license. The NRC issued a license for Comanche Peak Unit 1 in February 1990.

Docket 9300 addressed the prudence of costs incurred by the utility in responding to the NRC's concerns; the utility engaged in an unprecedented revalidation and reinspection program which caused Comanche Peak costs to nearly double. The Commission, which heard three explanations for these costs, was charged with determining which costs were prudent. Texas Utilities contended that the NRC unforeseeably and unreasonably applied stricter licensing standards to Comanche Peak, forcing the utility to implement an expensive and time-consuming revalidation and reinspection program in order to obtain an operating license. The utility took the position that all of these were regulatory costs that should be included in rate base. At the other end of the spectrum, the Cities and Public Utility Counsel argued that imprudent project management caused the NRC to lose confidence in Comanche Peak's safety, and that all post–1984 costs incurred in responding to these concerns should be disallowed as imprudent. The Commission's general counsel, supported by an evaluation conducted by the Nielsen–Wurster Group, an independent auditor, concluded that Texas Utilities' inability to obtain an operating license resulted from the NRC's significant, but unfounded, quality concerns. The general counsel maintained that certain costs should, however, be disal-

lowed based on Nielsen–Wurster's findings that the utility acted imprudently in discrete instances during the life of the project. The Commission reviewed the evidence presented by the parties and general counsel and determined that $537.90 million of Comanche Peak costs were imprudently incurred and should be disallowed.

To support the assertion that the Commission erred in the prudence phase of Docket 9300, the Cities and Public Utility Counsel make three basic points: (1) Texas Utilities did not sustain its burden of proof on the prudence of its Comanche Peak expenditures, (2) Texas Utilities did not properly quantify its imprudent Comanche Peak costs, and (3) the Nielsen–Wurster report does not constitute substantial evidence to support the Commission's determination of which Comanche Peak costs were imprudently incurred. Taken together, these points assert that the evidence presented during 203 days of hearings cannot support the Commission's final order with respect to disallowances. *See* APA § 2001.174(2)(E); *Texas Health Facilities Comm'n v. Charter Medical–Dallas, Inc.,* 665 S.W.2d 446, 452–53 (Tex.1984).

[16][17][18][19] In conducting a substantial evidence review, we must determine whether the evidence as a whole is such that reasonable minds could have reached the conclusion the agency must have reached in order to take the disputed action. *Charter Medical,* 665 S.W.2d at 453. We may not substitute our judgment for that of the agency and may consider only the record on which the agency based its decision. *Texas State Bd. of Dental Examiners v. Sizemore,* 759 S.W.2d 114, 116 (Tex.1988), *cert. denied,* 490 U.S. 1080, 109 S.Ct. 2100, 104 L.Ed.2d 662 (1989). The party bringing the appeal bears the burden of showing a lack of substantial evidence. *Charter Medical,* 665 S.W.2d at 453. If substantial evidence would support either affirmative or negative findings, we must uphold the agency's order, resolving any conflict in **\*404** favor of the agency's decision. *Auto Convoy Co. v. Railroad Comm'n,* 507 S.W.2d 718, 722 (Tex.1974).

[20] The Cities and Public Utility Counsel essentially argue that because the Commission was not persuaded by

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

881 S.W.2d 387
**(Cite as: 881 S.W.2d 387)**

the utility's argument that all Comanche Peak costs were prudent, and because the utility then failed to quantify the impact of its imprudence by identifying costs related to imprudent management, the Commission was required to disallow *all* of these expenditures.[FN28] We do not agree. The Commission determined the evidence presented by the parties did not provide an accurate foundation on which to base its disallowance decisions. It therefore turned to the report prepared by the Nielsen–Wurster Group. Nielsen–Wurster had previously performed twelve comprehensive prudence reviews of other nuclear plants, eight for commissions and four on behalf of utilities, before it was retained by the Commission to evaluate the planning and management of Comanche Peak. After an extensive investigation, Nielsen–Wurster offered its findings in ten days of testimony presented by five expert witnesses.

> FN28. The Commission rejected several of Texas Utilities' attempts to justify costs associated with Comanche Peak. For example, the Commission found: (1) the plant cost comparisons tendered by the parties were not credible for purposes of establishing a reasonable cost, (2) the cost variance analysis tendered by the utility had limited, if any, value in a prudence review of Comanche Peak, (3) the schedule variance analysis tendered by the utility did not credibly evaluate the post-March 1985 schedule extensions, and (4) the present value revenue requirements analysis and capital cost correction analysis tendered by Texas Utilities were improper methodologies for quantifying the impact of a seven-month delay. However, the Commission's final order shows that it did accept much of Texas Utilities' and the Nielsen–Wurster Group's evidence supporting the prudence of a variety of decisions related to the overall construction and management of Comanche Peak.

The Cities and Public Utility Counsel argue that the evidence presented by Nielsen–Wurster cannot serve as a proper foundation for Commission decision-making because it does not provide a sufficiently detailed breakdown of all Texas Utilities' expenditures identifying those related to utility imprudence and those that would have been necessary absent any imprudence. They assert that in order to provide evidence sufficient to support the Commission's order, either the utility or Nielsen–Wurster was required to "produce a breakdown of the Company's post-March 1985 expenditures, disaggregated between those that were 'remedial' and those that would have been incurred even absent the prolonged licensing delay." The argument urged on appeal is that once the Commission has determined the utility's evidence is insufficient to demonstrate that all expenditures were prudently incurred, the utility must then "isolate out the costs associated with its imprudent conduct" in order to avoid having the Commission disallow *all* the costs incurred.[FN29] In support of their argument, the Cities and Public Utility Counsel direct this Court to *Coalition of Cities v. Public Utility Commission,* 798 S.W.2d 560, 563–64 (Tex.1990), *cert. denied,* 499 U.S. 983, 111 S.Ct. 1641, 113 L.Ed.2d 736 (1991), in which the supreme court stated that "[a] party who fails to meet its burden of proof loses." In *Coalition of Cities,* the utility "lost" because neither the utility nor any other party satisfied the Commission that $1.453 billion in expenditures were prudently incurred. Nowhere does the supreme court state that a utility must segregate imprudent costs. When a utility fails to persuade the Commission of the wisdom of all its expenditures, that does not preclude the Commission from considering the other evidence presented in the rate-making proceeding. Indeed, it is the Commission that is charged with sifting through the evidence and deciding whether imprudent conduct caused certain expenditures. Having reviewed the utility's evidence and the Nielsen–Wurster report, **\*405** the Commission determined that $90.5 million of the Comanche Peak Response Team expenses and $79.9 million of the Corrective Action Program expenses were imprudent. The Commission made further disallowances for other imprudent conduct associated with the delay in licensing; it disallowed $54.1 million in time-driven indirect costs and $167.3 million in AFUDC.

> FN29. This Court has previously rejected similar arguments. In *City of El Paso v. Public Utility Commission* we held:

881 S.W.2d 387
**(Cite as: 881 S.W.2d 387)**

Requiring the Commission to adopt or reject witnesses' testimony in toto, especially when the testimony concerns a multi-faceted issue such as [prudence], would hobble the Commission's ability to assess each witness and render its decision based solely on the testimony it found credible.

*City of El Paso v. Public Util. Comm'n,* 839 S.W.2d 895, 906–07 (Tex.App.—Austin 1992, writ granted).

The Commission rejected Texas Utilities' claim that the costs associated with the reinspection and revalidation program were entirely due to higher regulatory standards; it similarly rejected the Cities and Public Utility Counsel's contentions that all such costs should be disallowed as imprudent. The Commission accepted the Nielsen–Wurster study as evidence that some, but not all, of the expenditures were imprudently incurred. The Commission found that the NRC's Technical Review Team findings on the plant's condition were partly unfounded, although they did identify weaknesses in the pre–1985 quality assurance program. The Commission also concluded that the growth of regulatory requirements increased the cost and extended the construction schedule beyond Texas Utilities' control. These findings are supported by testimony adduced during the rate-making proceeding and provide substantial evidence upon which the Commission could base its decision to examine all the costs in detail and make discrete disallowances associated with imprudent conduct.

The Cities and Public Utility Counsel vigorously assert that the Commission erred in not making any disallowance for the costs of executing the Corrective Action Program. However, the Commission determined that although the imprudence of the utility was partially responsible for the need to carry out the Corrective Action Program, the changed regulatory climate would have made such a program necessary even in the absence of utility imprudence. The Commission's findings are presumed to be supported by substantial evidence, and the Cities and Public Utility Counsel have failed to demonstrate that

reasonable minds could not have come to that decision based on this record. *Charter Medical,* 665 S.W.2d at 453.

The Cities and Public Utility Counsel also complain that the Commission improperly applied a "sliding" standard of prudence, assigning degrees of imprudence to utility decisions and making disallowances only when the imprudence reached a certain level or degree. After reviewing the record we believe this criticism is unfounded.[FN30] The Commission determined that the costs associated with responding to NRC concerns were necessary *in part* because of utility imprudence and *in part* because of the NRC's application of higher safety and inspection standards in the face of mounting concerns about the safety of nuclear power plants in general. The Commission's finding of fact 138 expresses this conclusion.[FN31] The Examiners' Report notes that Texas Utilities' conduct was not the sole reason for the expenditures necessary to regain the NRC's confidence. The Commission then made partial disallowances for the costs of the remedial action program, not the wholesale disallowances recommended by the intervenors. After a careful and thorough review of all the evidence presented in 203 days of hearings, the Commission made findings of fact and conclusions of law based on that review. For each finding of imprudence in the construction and management of Comanche Peak, the Commission **\*406** made a disallowance for the associated costs.[FN32] The Commission also made significant disallowances for the cost of the delay in licensing, reflecting its opinion that the utility's imprudence was partially responsible for that delay.

FN30. The Cities and Public Utility Counsel base their argument on the following statement contained in the Examiners' Report: "Although the examiners conclude that certain [Texas Utilities] management decisions were imprudent and undoubtedly contributed to the Company's licensing problems, they do not find that those practices rise to the level of imprudence which would justify a substantial disallowance of Comanche Peak costs." That the Report expresses only the view that not all costs should be disallowed because

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

881 S.W.2d 387
**(Cite as: 881 S.W.2d 387)**

they were not all occasioned by utility imprudence is clarified by the examiners' careful explanation of their position:

True, certain unreasonable conduct unquestionably contributed to the NRC staff's shift in position with respect to its expectation of proof, as reflected in the Third Technical Team letter, but other circumstances also contributed to this change in position. In other words, the imprudent conduct of [Texas Utilities] did not result

in the necessity to incur *all* of the post–1984 costs.

FN31. Finding of fact 138 states: "As discussed in Section VI.Q.2. of this Report, the evidence does not support imprudence disallowances of the magnitude proposed by the intervenors."

FN32. The Commission made the following disallowances:

| Item | Amount (Millions of Dollars) |
| --- | --- |
| Electrical Labor | 51.3 |
| Electrical Penetration Assemblies | 16.2 |
| Electrical Switchgear | 4.1 |
| Heating, Ventilation & Air Conditioning | 60.1 |
| Reactor Pressure Vessel Supports | .4 |
| Diesel Generators | 10.6 |
| DAP Root Cause Analysis | 3.2 |
| CPRT Start–Up Costs | 90.5 |
| CAP Start–Up Costs | 79.9 |
| Construction Permit Lapse | .2 |
| TOTAL | $316.5 |

The Cities and Public Utility Counsel next contend that the Commission's order is improper because it is not supported by underlying findings of fact. We understand their complaint to be that the findings of fact do not meet the requirements of the APA. *See* APA § 2001.141(d) ( "Findings of fact, if set forth in statutory language, must be accompanied by a concise and explicit statement of the underlying facts supporting the findings.") The supreme court has concluded that an agency's findings of fact need the additional support of findings of underlying facts only when the findings are stated in terms taken directly from the enabling legislation or when they "represent the criteria that the legislature has directed the agency to consider in performing its function." *Charter Medical,* 665 S.W.2d at

451. The Cities and Public Utility Counsel contend that findings of fact 138 through 152 are "ultimate" findings by which the Commission fulfills its statutory obligation to exclude from rate base all imprudently incurred post–1985 remedial costs, and as such they require underlying findings of fact. [FN33]

FN33. We limit our discussion to findings of fact 138, 139, and 140. The Cities and Public Utility Counsel waive any separate attack on findings of fact 141 and 142 in their brief, stating that they consist primarily of calculations that "fall out" of the three previous findings. We understand this to mean that if the three preceding findings are sufficient, there is no independent reason that find-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

881 S.W.2d 387
**(Cite as: 881 S.W.2d 387)**

ings of fact 141 and 142 are improper. Findings of fact 143 through 152 are addressed separately in this opinion.

[21] We first consider whether the findings of fact at issue are indeed "ultimate findings." In *City of El Paso,* this Court stated that although PURA does not expressly require the Commission to make a finding of prudence before including costs in rate base, once the Commission finds a major project to have been imprudently planned or managed, it should generally disallow project costs to the extent of the imprudence. *City of El Paso,* 839 S.W.2d at 908.[FN34] A determination that an expenditure is imprudent carries the legal consequence of its exclusion from rate base. Such a finding must be supported by underlying findings because it embodies one of the criteria the Commission must consider in deciding whether to include the particular expenditure in rate base.

FN34. This Court held:

The "statutory language" to which [APA § 2001.141(d) ] refers is the language in the statute that confers authority on the agency to take the complained-of action. In PURA, the legislature authorized the Commission to make orders setting rates. A number of PURA's sections also detail the criteria the Commission is to consider in setting rates. Therefore, only when the Commission's findings are stated in PURA's express terms, or *when they represent criteria the legislature has directed the Commission to consider,* must the Commission also make findings of underlying fact.

*City of El Paso,* 839 S.W.2d at 908 (citations omitted) (emphasis added).

[22] The following findings of fact are here at issue:

138. As discussed in Section VI.Q.2. of this Report, the evidence does not support imprudence disallowances of

the magnitude proposed by the intervenors.

**\*407** 139. As discussed in Section VI.Q.2. of this Report, the costs of executing the Comanche Peak Response Team and Corrective Action Program were prudent.

140. As calculated in Section VI.Q.2. of this Report, the total imprudent costs incurred by [Texas Utilities] through the end of the test year is $537.9 million, which allocates $382.05 million to Unit 1 and $155.85 million to Unit 2.

To meet the criteria set forth in *Charter Medical* and *City of El Paso,* these findings must be accompanied by underlying findings connecting evidence to the conclusions expressed in the Commission's ultimate findings. In support of finding of fact 138, the Examiners' Report explains that the utility should not be prohibited from including any of the costs of the remedial action program in rate base because other factors contributed to the NRC's application of stricter regulatory standards. *See* Examiners' Report at 169. Those other factors are also identified in the Report: "On balance, although the inspection standards and procedures applied by the Technical Review Team were the same as those previously used by the project's quality control inspectors, the Technical Review Team conducted its inspections and scrutinized its inspection results at Comanche Peak in a manner as never before." *See id.* at 124. These findings support the Commission's decision not to make the wholesale disallowances proposed by the intervenors. Nielsen–Wurster did not recommend disallowing any costs related to the post-effective date execution of the response team or the corrective action program. *See* Examiners' Report at 139.[FN35] Finding of fact 140 expresses the Commission's final calculation of total imprudent costs incurred by the utility through the end of the test year. These calculations are supported by extensive explanations in the Examiners' Report as well as specific findings of fact in the order on rehearing for each element of the total disallowance. We reject the Cities and Public Utility Counsel's contention that findings of fact 138, 139, and 140 are not adequately supported by underlying find-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

881 S.W.2d 387
**(Cite as: 881 S.W.2d 387)**

ings of fact.

> FN35. The Report also provides several references to the administrative record including pages 28200–28204 of the statement of facts.

Finally the Cities and Public Utility Counsel challenge the Commission's failure to impose specific disallowances flowing from its finding that the utility imprudently failed to infuse its senior management with personnel having the appropriate nuclear experience. During the rate-making proceedings the examiners determined that it was impossible to state generally the effect of this lack of nuclear experience; rather, as in the entire prudence review, the examiners proposed an examination of the utility's discrete actions and decisions throughout the project. The Commission adopted the examiners' reasoning and made disallowances for costs associated with imprudent management.[FN36] These disallowances represent the Commission's exercise of its discretion in determining rate base; the findings are not arbitrary or capricious or unsupported by substantial evidence.

> FN36. For example, the Commission found that Texas Utilities management's lack of nuclear experience caused the imprudent decision to discontinue the integrated cube schedule and implement a start-up driven schedule in May 1980. This led to reduced productivity in electrical craft labor from June 1980 to September 1981. *See* Findings of Fact 40, 41, 42. Accordingly, the Commission disallowed $51.3 million in electrical craft labor costs. The Commission also disallowed $90.5 in costs expended in developing an effective Comanche Peak Response Team program plan and $79.9 million in start-up costs associated with the Corrective Action Program, having concluded that these costs arose from management's imprudent decision to discontinue its comprehensive policy of updating original design drawings. *See* Findings of Fact 78, 79.

After careful review and consideration of all the arguments raised by the Cities and the Office of Public Utility Counsel, we overrule points of error two through four.

**COMANCHE PEAK RESPONSE TEAM DELAY**

In its first point of error, Texas Utilities complains of the Commission's disallowance of $194.4 million representing costs associated with an imprudent seven-month delay in Comanche Peak construction. Each of the utility's arguments advanced under this point of error, however, was presented to the Commission**\*408** during the rate-making proceeding and rejected with adequate accompanying findings supported by substantial evidence. We decline to substitute our judgment for that of the Commission, and will overrule the point of error.

The utility first argues that there is not substantial evidence to support the Commission's finding that Revision 2 to the Comanche Peak Response Team Program Plan was not a reasonable licensing response. To the contrary, the Commission relied on evidence that the NRC Technical Review Team letter, issued on January 8, 1985, marked a distinct departure from the NRC staff's previous position on Comanche Peak's licensability, and that the Comanche Peak Response Team did not adequately address the outstanding licensing issues raised by the Technical Review Team until the issuance of Revision 3 in January 1986. Findings of Fact 105, 109. The Commission further found that Revision 2 should have included a sampling methodology equivalent to that ultimately included in Revision 3. Finding of Fact 111. The Commission relies on the Examiners' Report to further explain its finding:

[Texas Utilities'] contention that it could not anticipate the unacceptability of the Revision 2 sampling methodology until after it filed Revision 2 is a red herring. The strongly worded third Technical Review Team letter suggested a possible programmatic quality assurance/quality control breakdown, a position never before expressed by the NRC staff.

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

881 S.W.2d 387
**(Cite as: 881 S.W.2d 387)**

Examiners' Report at 133. The utility simply failed to convince the Commission that, as it reasserts in its brief, "it had every reason to believe that the entire program under Revision 2 ... would be acceptable to the NRC." The Examiners' Report outlines many of the same arguments the utility now makes on appeal and explains its rejection of those arguments in light of conflicting evidence and proposals and recommendations made by the Commission's staff.

[23] The utility next argues that even if there was a delay in preparing an adequate response plan to NRC concerns, the delay had no impact on project duration because the project schedule was controlled by a design validation of piping and pipe supports that began in mid–1985. Again, the Commission specifically rejected this argument when it was presented at the rate-making proceeding.

[T]he examiners reject [Texas Utilities'] argument that the delay in formulating an adequate Comanche Peak Review Team Program Plan did not delay the completion of Units 1 and 2. First, the Comanche Peak Review Team—the initial vehicle by which the Company sought to assure licensability—constituted the critical path activity for both units during this period. Therefore, any imprudent delay in formulating an acceptable Comanche Peak Review Team Program Plan delayed fuel load.... [Texas Utilities] argues that the 100 percent design revalidation of large bore pipe and pipe supports, which commenced sometime in mid–1985, constituted the critical path activity with respect to Unit 1 at this time. *This argument, however, is contradicted by the direct testimony of [Texas Utilities] witness Mr. Manzi, who stated the Comanche Peak Review Team's activities paced the project's schedule through early 1987.*

Examiners' Report at 134 (emphasis added). Again, the Commission's decision is supported by record evidence. In its brief, the utility asserts: "The Commission improperly rejected the [utility's] evidence that the critical

path activity during this period was not the sampling-based CPRT activities but instead was the 100 percent design validation of piping and pipe supports...." This Court is bound by the Commission's determination as to the weight and credibility of the evidence. As long as there is substantial evidence in the record supporting the Commission's decision, we will not disturb its findings. *Suburban Util. Corp. v. Public Util. Comm'n,* 652 S.W.2d 358, 364 (Tex.1983) (holding that the agency's action will be sustained if the evidence is such that reasonable minds could have reached the conclusion that the agency must have reached in order to justify its action).

The utility next argues that the work performed pursuant to Revision 2 would have **\*409** been necessary under Revision 3, and thus failure to adopt Revision 3 until January 1986 had no effect on the project schedule. To support this argument, the utility asserts: "There is no evidence in the record that [work performed pursuant to Revision 2] was not necessary under Revision 3." They point to record evidence that work performed in accordance with Revision 2 during the seven-month period was productive, useful, and necessary under the subsequent Revision 3. The fact that work performed was productive, useful, and necessary does not, however, foreclose the possibility that activities dictated by Revision 3 could have, and should have, been carried out contemporaneously with the necessary Revision 2 activities. In other words, nothing in the record states that the Revision 3 work could not have begun until all the work done under Revision 2 was completed. The Commission specifically found that Revision 3 greatly expanded the scope of the Comanche Peak Review Team effort. This supports a finding that the failure to expand the scope sooner caused delay in completing the project.

Finally, the utility argues that even if the failure to implement Revision 3 until January 1986 caused delay in completing Comanche Peak Unit 1, it had no effect on the completion of Unit 2. Again, we need look no further than the Examiners' Report for references to evidence supporting the Commission's decision: "Unit 2 delay costs occurred in the same manner as those for Unit 1; both were

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

881 S.W.2d 387
**(Cite as: 881 S.W.2d 387)**

equally affected by the licensing quagmire in which the entire project found itself. [Texas Utilities] witness Mr. Nace agreed that the licensing issues facing Unit 1 also faced Unit 2." Examiners' Report at 134. The substantial evidence standard is well established. *Charter Medical, 665 S.W.2d at 452.* We may not reweigh the evidence in order to come to a conclusion different from the Commission's. Texas Utilities' arguments on appeal are nothing more than a restatement of arguments and evidence considered by the Commission and rejected in favor of other evidence and recommendations. We will not presume to substitute our judgment for that of the agency, but rather uphold its findings that are reasonably supported by substantial evidence. Texas Utilities' first point of error is overruled.

### INCLUSION OF CWIP IN RATE BASE

[24] As part of Docket 9300, the Commission determined that the utility should be allowed to include some "construction-work-in progress" (CWIP) costs in rate base. The term "CWIP" refers to money dedicated to facilities that are currently under construction. Because it is a state-regulated monopoly, a utility has the responsibility to provide utility service that meets public demand. In a growing market, therefore, a utility must continually expand to create greater capacity and must replace existing facilities as they wear out or become obsolete. Although these projects require huge capital outlays, PURA does not allow a utility to include these costs in rate base until the completed facility becomes "used and useful in rendering service to the public." PURA § 39(a). Before completion of a project, the utility includes these construction costs in a separate CWIP account. A utility may be permitted to include some CWIP costs in rate base as an exceptional form of rate relief upon a showing that their inclusion is necessary to the utility's financial integrity. PURA § 41(a). In its order on rehearing, the Commission allowed the utility to include $695,177,625 of CWIP in rate base. In three points of error, the Cities and Office of Public Utility Counsel challenge this decision.

In its eleventh point of error, the Cities contend that the Commission violated Rule 21.69(a) when it allowed the utility to present evidence in the rate-making proceeding to justify the inclusion of CWIP in rate base. [FN37] Rule 21.69(a) provided:

> FN37. Public Utility Counsel attempts to join the Cities in bringing this point of error. However, because its motion for rehearing filed with the Commission does not raise this claim, it has waived the right to raise it on appeal. APA § 2001.171 (requiring a party to a contested case to exhaust administrative remedies before seeking judicial review).

Any utility filing an application, petition, or statement of intent to change its rates in a major rate proceeding must file all of its evidence, including the prepared testimony of all of its witnesses and exhibits, on the **\*410** same date that such application, petition, or statement of intent to change its rates is filed with the commission.... A utility filing for a change in rates shall be prepared to go forward at a hearing on the data which have been previously submitted and sustain the burden of proof of establishing that its proposed changes are just and reasonable, and the material submitted as the filing and supporting work papers shall be of such composition, scope, and format so as to serve as the utility's completed case.

16 Tex.Admin.Code § 21.69(a) (1993) (since amended).[FN38] The Cities argue that Texas Utilities did not include CWIP as a basis for rate relief in its request for a rate increase filed on January 16, 1990. They assert that, in fact, the utility affirmatively disavowed an intention to request CWIP in the upcoming rate-making proceeding. The Cities allege that the utility's testimony regarding the amount of CWIP necessary to maintain its financial integrity in the face of proposed disallowances came as a complete surprise to the Cities and other parties to the proceeding and was tantamount to the utility changing the basis of its request for a rate increase in contravention of Rule 21.69(a).

> FN38. The Commission established this rule pursuant to PURA section 43(a) which provides:

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

881 S.W.2d 387
**(Cite as: 881 S.W.2d 387)**

> The statement of intent [to change rates] shall include proposed revisions of tariffs and schedules and a statement specifying in detail each proposed change, the effect the proposed change is expected to have on the revenues of the company, the classes and numbers of utility customers affected, and *such other information as may be required by the regulatory authority's rules and regulations.*

> PURA § 43(a) (emphasis added).

We disagree with the Cities' characterization of the utility's position on CWIP presented in its rate filing package. Schedule C–4.1, included in the rate filing package, stated, "The Company is not requesting any construction work in progress in rate base, as discussed in the testimony of Mr. H. Dan Farell." Through Mr. Farell's testimony, the utility explains:

> In this particular case ... a relatively large level of CWIP attributable to Comanche Peak Unit 1 as of June 30, 1989, is being transferred to rate base as electric plant in service. *Provided the Company's requested rate base and cost of service levels are approved, the Company will have a reasonable opportunity to reverse the negative trends and begin to restore the previously discussed financial integrity measures to acceptable levels without the inclusion of CWIP in rate base.* However, as discussed subsequently in conjunction with the overall cost of capital, any material reductions in the Company's requested rate base or cost of service will require reconsideration of the issue, and may well make inclusion of some level of CWIP in rate base necessary.

(emphasis added). We are satisfied that the utility provided adequate notice of its intent to seek inclusion of CWIP in rate base in the rate-making proceeding. The utility did not represent that it would not request CWIP at all, but rather that it would seek to include CWIP in the event the Commission materially disallowed its proposed rate increase, a very likely occurrence in any rate-making proceeding. Even though the utility's conditional request for inclusion of CWIP in rate base appears to improperly treat CWIP as a means to offset the Commission's disallowance of imprudent expenditures, it nevertheless satisfies the notice requirement of Rule 21.69(a) by announcing that the utility intended to request inclusion of CWIP in rate base if disallowances were recommended. Though the utility did not indicate what level of CWIP it would seek, it was hardly in a position to do so before the rate-making proceeding began. We reject the Cities' contention that they did not know the utility would seek inclusion of CWIP in rate base until the final stages of the proceeding. The Cities' eleventh point of error is overruled.

In their twelfth point of error, the Cities and Public Utility Counsel assert that the Commission rewarded the utility's imprudence by making CWIP allowances to offset the disallowances of imprudent expenditures. Although the utility announced its decision to seek CWIP only if its rate request was substantially disallowed, we believe the Commission applied the proper standard for including CWIP in rate base. The Commission **\*411** determined that over $2 billion of Comanche Peak Unit 2 CWIP was prudent and could be included in rate base to the extent necessary to preserve the utility's financial integrity. Finding of Fact 169. The examiners recommended that sufficient CWIP be included in rate base to allow the utility to recover up to 80 percent of its requested rate increase. In their report the examiners explained:

> Including CWIP in rate base may appear to offset any prudence disallowance and require the ratepayers to indemnify the shareholders. However, in reality, the inclusion of CWIP in rate base does not offset a prudence disallowance. Instead, it reflects a policy determination that in order to save the Company's financial integrity so that the utility may continue to provide reliable service, the ratepayers should pay now what they would soon pay anyway but in greater amounts.

Examiners' Report at 218. The Commission based its decision to allow CWIP in rate base on this reasoning

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

881 S.W.2d 387
**(Cite as: 881 S.W.2d 387)**

along with the utility's testimony regarding the need for CWIP in rate base to preserve the company's financial integrity. Conclusion of Law 59. We conclude that the Commission included CWIP in rate base to accomplish its proper purpose, consistent with the statutory requirements. *See* PURA § 41(a).[FN39] Consequently, we overrule the Cities and Public Utility Counsel's twelfth point of error.

> FN39. That CWIP allowances were not made as a direct dollar-for-dollar offset of imprudence disallowances is clear when comparing the total disallowance for Comanche Peak Units 1 and 2, $1,381,144,563, with the amount of CWIP included in rate base, $695,177,625. This is consistent with the Commission's obligation to include CWIP in rate base only to the extent necessary to ensure the utility's financial integrity.

The thirteenth point of error asserts that the Commission failed to make proper underlying findings of fact to support its decision to include $695,177,625 of CWIP in rate base. The Commission set this figure based on its conclusion that the utility required a rate increase of 10.1 percent, or $442,353,160, to maintain financial stability. We have already determined that this order must be remanded to the Commission to reconsider disallowances associated with the 12.2 percent of the project repurchased from the minority interest owners. The Commission will be required to reevaluate the utility's CWIP requirements in light of the level of disallowance on remand. In making this determination, the Commission may only consider the financial condition of the utility at the time of the hearing; it may not consider subsequent positive or negative changes in the utility's financial integrity. Therefore, though we agree that the Commission could properly consider including CWIP in rate base, we recognize that its decision as to the appropriate amount of CWIP will change, and is dependent upon the disallowances it makes on remand. We do not, therefore, review the findings related to CWIP allowances, as they will be superseded by the Commission's findings when it reexamines the utility's need for CWIP on remand. The Commission will be required to reconsider whether the 10.1 percent rate increase

it found necessary to maintain financial integrity remains the benchmark in light of this reexamination. A consequence of our remand is to moot the Commission's CWIP findings because they were calculated pursuant to erroneous disallowances. We do not, therefore, address the thirteenth point of error challenging the adequacy of the Commission's findings to support a CWIP allowance that is now immaterial. Similarly, we do not address the Cities and Public Utility Counsel's fourteenth and fifteenth points of error which attack a specific finding of fact regarding the CWIP allowance.

### GAS RECONCILIATION

[25] In their sixteenth and seventeenth points of error, the Cities and Public Utility Counsel complain of error in the Commission's determination of the proper measure of imprudent costs associated with Texas Utilities' purchases of gas from Texas Utilities Fuel Company (the "Fuel Company").

Part of Docket 9300 involved the reconciliation of fuel costs incurred by Texas Utilities during the period from April 1, 1983, to June 30, 1989. Fuel reconciliation is a term used to describe periodic adjustments to a utility's **\*412** fuel costs made to account for the difference between previously anticipated costs and actual, reasonable costs incurred. The Commission makes these adjustments on a periodic basis because of the practical difficulty of deciding a new rate case with each variation in fuel prices. In a hearing on fuel reconciliation, the utility has the burden of proving that its fuel expenses during the reconciliation period were reasonable and necessary expenses incurred to provide reliable service. *See* 16 Tex.Admin.Code 23.23(3)(B) (1994). If the fuel is purchased from or provided by an affiliate, the utility must also show that the price to the utility is no higher than prices charged by the supplying affiliate to its other affiliates or divisions for the same item or class of items, or to unaffiliated persons or corporations. PURA § 41(c)(1).

As part of the fuel reconciliation proceedings in Docket No. 9300, Texas Utilities sought to establish the reasonableness and necessity of $7,167,233,745 in natural

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

881 S.W.2d 387
**(Cite as: 881 S.W.2d 387)**

gas costs incurred during the six year reconciliation period. Upon reviewing the evidence, the Commission disallowed $29,173,090 of those costs and determined that the remainder were reasonable and necessary expenditures. There is no dispute that the gas purchase transactions reviewed by the Commission were affiliate transactions; the Fuel Company, an affiliate of Texas Utilities, supplies all the utility's gas requirements. In addition, because Texas Utilities is the Fuel Company's only customer, whether the Fuel Company charged Texas Utilities prices commensurate with those charged to other affiliates or to unaffiliated entities is not an issue. The Commission's only task was to determine the extent to which the affiliate fuel expenses were reasonable and necessary costs that could be included in Texas Utilities' rate base. At issue in the Cities and Public Utility Counsel's sixteenth and seventeenth points of error is the Commission's decision to disallow only $29,173,090 in gas costs as unreasonable expenditures.

The Commission arrived at this figure in the following way. First, it heard evidence from Texas Utilities regarding the reasonableness of the approximately 900 gas contracts subject to the reconciliation proceedings. Then it heard evidence presented by the Reed Consulting Group, which reviewed 100 of the 900 contracts representing eighty percent of the gas purchases made during the reconciliation period. In their report, the examiners reviewed sixty-four contracts, and after considering disallowances suggested by both Texas Utilities and the Reed Consulting Group, made their own recommendations for disallowances for each contract. A chart included in the Examiners' Report sets forth the disallowances recommended by Texas Utilities, the Reed Consulting Group, and the examiners with respect to thirty-seven production contracts, six long-term commercial contracts, thirteen short-term commercial contracts, and eight spot contracts. *See* Examiners' Report at 448–51. [FN40] The Examiners' Report then includes a summary section which states:

> [FN40.] There is no explanation in the Examiners'

Report as to why the Examiners did not include all 100 contracts reviewed by the Reed Consulting Group in their chart.

The examiners recommend a total disallowance for unreasonable expenditures for gas purchases by [Texas Utilities] from its affiliate, [the Fuel Company], of $78,504,776. The remainder of the Company's requested reconcilable gas costs, $7,088,728,967, are reasonable and should be approved. [FN41]

> [FN41.] We note that a chart entitled *Summary of Recommended Disallowances–Gas Contracts* appearing on page 434 of the Examiners' Report shows an additional recommended disallowance for open access transportation. The total recommended disallowance on this chart is therefore $81,504,776. Without explanation, in the summary section on page 479, the examiners dropped this $3 million disallowance leaving a recommended total disallowance of $78,504,776.

Examiners' Report at 479. The chart and summary imply that the examiners accepted Texas Utilities' evidence regarding the reasonableness of all the gas contracts not represented in the chart, and allowed all costs related to those contracts in rate base.

In its final order, the Commission made specific findings of fact for each gas contract that appeared in the examiners' chart, rejecting**\*413** the examiners' recommended disallowance in only five instances.[FN42] Like the examiners, the Commission only disallowed costs associated with the contracts that appear in the examiners' chart. The Commission allowed all costs associated with all other gas contracts.

> [FN42.] The Commission disallowed less than the examiners recommended in four instances:

| Contract No. | Examiners' Recommendation | Commission's Disallowance |
| --- | --- | --- |

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

881 S.W.2d 387
**(Cite as: 881 S.W.2d 387)**

| | | |
|---|---|---|
| 1690 (Empire) | $19,222,738 | $ 0 |
| 3205 (PG & E) | $13,453,686 | $ 0 |
| 3697 (Coronado) | $ 1,916,756 | $1,455,193 |
| 3011, 3701, 3707 (Houston Pipeline, Panhandle) | $16,721,007 | $ 0 |

The Commission disallowed more than the examiners recommended in one instance:

| Contract No. | Examiners' Recommendation | Commission's Disallowance |
|---|---|---|
| 3076 (Amalgamated) | $ 0 | $ 527,308 |

In points of error sixteen and seventeen, the Cities and Public Utility Counsel challenge the Commission's gas contract disallowances on two grounds: (1) the Commission did not review all the affiliate gas costs associated with approximately 800 contracts making up twenty percent of Texas Utilities' gas costs and as a result included unreasonable costs in rate base, and (2) the Commission did not make the specific findings required by PURA section 41(c)(1) to support the costs it did allow. Because we find both arguments to be without merit, we overrule the sixteenth and seventeenth points of error.

The Cities and Public Utility Counsel essentially argue that because the Reed Consulting Group did not review the smaller and more numerous gas contracts making up approximately twenty percent of Texas Utilities' gas costs, the Commission did not review the contracts. Simply because the Reed Consulting Group did not include these contracts in its sample does not mean that the Commission did not review those expenses or that there was no evidence that the contracts met the requirements of PURA section 41(c)(1).

Texas Utilities presented evidence as to the reasonableness of all of the approximately 900 gas contracts subject to the reconciliation proceeding. As part of its evidence of reasonableness, the utility presented testimony justifying its decisions to enter into the various gas contracts.[FN43] Opposing the reasonableness of Texas Utilities'

gas contracts, the Cities' witness, Richard S. Morey, recommended a disallowance of $452 million in gas-related expenditures. This amount represented fuel costs for the years 1985 through 1988. The examiners determined that Mr. Morey's quantification technique was seriously flawed because it relied on comparisons with utilities not comparable to Texas Utilities. The examiners recommended that the Commission reject Mr. Morey's analysis and his recommended disallowance, which the Commission did. If that had been the whole of the evidence presented to the Commission, it would have been within the Commission's discretion to allow all the costs requested by Texas Utilities if it found they were supported by substantial evidence. However, the Commission also considered the evidence presented by its own auditor and, as a result, disallowed some of the expenses associated with the larger gas contracts. While the Commission *may* consider evidence such as that presented by the Reed Consulting Group, it is not required to do so. In the absence of such evidence, it may accept or reject the evidence presented by the utility, the party bearing the burden of proof of reasonableness. With respect to the smaller **\*414** gas contracts, the Commission apparently accepted the evidence of reasonableness presented by Texas Utilities. If substantial evidence supports the Commission's findings, which we conclude it does, we must uphold the order. *See Auto Convoy,* 507 S.W.2d at 722.

FN43. Texas Utilities asserted that its three major gas contracts expired between late 1980 and 1983, at a time when its forecasts showed a con-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

881 S.W.2d 387
**(Cite as: 881 S.W.2d 387)**

tinuing increase in the cost of natural gas and when prices were still escalating. The utility entered into new contracts during a sellers' market with the result that the new contracts were less favorable to the utility than they would have been if they had entered into them at another time. Texas Utilities attributes its failure to obtain gas in an interstate market to a desire to remain free from burdensome and expensive federal regulation.

The Cities and Public Utility Counsel also maintain that the Commission did not make the findings of fact required by PURA section 41(c)(1) to support an allowance of all gas costs related to those contracts not included in the chart. The following are the portions of the Commission order relating to its determination of gas disallowances:

Finding of Fact 379: The Company's fuel expenditures during the reconciliation period of April 1983 through June 1989 should be approved to the extent of $10,488,044,993.

Conclusion of Law 82: Except to the extent of the disallowed reconciliation period gas costs (reflected in the Findings of Fact attached to the order), Texas Utilities met its burden of proof under PURA § 41(c)(1), regarding affiliate transactions.

Conclusion of Law 83: Except to the extent of the disallowed reconciliation period gas costs (reflected in the findings of fact attached to the order), the Company's fuel expenditures during the reconciliation period comply with the requirements of P.U.C.SUBST.R. 23.23(b)(2)(H).

The question for this Court is whether these findings satisfy the requirements of PURA section 41(c)(1) that "[a]ny such finding shall include specific findings of the reasonableness and necessity of each item or class of items allowed." The Cities and Public Utility Counsel assert that

this statute demands specific findings of reasonableness for each contract. We disagree. The statute allows the Commission to address its specific findings either to "each item" or "each class of items." The Commission may either make a contract-by-contract determination of reasonableness, or it may group the contracts together and declare them all to be reasonable.

The Commission made a specific finding that, with the exceptions set forth in findings of fact 383A–383AAA, Texas Utilities had established the reasonableness and necessity of its gas costs. We conclude that these findings meet the requirements of PURA section 41(c)(1).

**AMOCO CONTRACT NUMBER 1627**

[26] In its sixth point of error, Texas Utilities claims that the trial court incorrectly affirmed the Commission's decision to disallow $447,972 as imprudent gas expenditures pursuant to Amoco contract number 1627. At the Commission hearing, Texas Utilities initially offered evidence indicating that it had purchased fuel in March 1989 from Amoco pursuant to contract number 1627, a spot contract. The Commission determined that the price paid for this gas was unreasonably high given the spot price of gas at the time, and disallowed the excess purchase price from rate base. During "surrebuttal testimony," the utility's fourth opportunity to file testimony on fuel issues, it asserted that the gas purchase was not actually made pursuant to a spot contract, but rather pursuant to a separate short-term commercial contract under which the price paid would be reasonable. The utility explained that it had made an accounting error, forgetting to reform its ledger to credit the purchases to the short-term contract.[FN44] The Commission treated the gas as purchased pursuant to the spot contract and disallowed the $447,972 it believed to be in excess of a reasonable spot price for gas.

> FN44. The utility's testimony was that it had for a short time credited purchases made pursuant to a short-term commercial contract with Amoco to contract number 1627 because of delay in setting up the short-term contract for payment. Presumably, the utility only realized its failure to change

881 S.W.2d 387
**(Cite as: 881 S.W.2d 387)**

its records after the rate-making proceeding had been under way for some time.

We do not agree with Texas Utilities that its testimony of an accounting error is uncontroverted or that it necessarily established that the gas was purchased under a short-term commercial contract as a matter of law. The Commission, rather, was presented with conflicting evidence: the utility's own records showing the gas purchased pursuant to a spot contract and its contradictory testimony that in fact the gas was purchased under a short-term commercial contract. The utility **\*415** characterizes the Commission's decision to rely on the utility's records rather than the testimony provided by the utility as arbitrary and capricious. We come to the opposite conclusion. The Commission is the judge of the weight to be accorded witnesses' testimony and is free to accept part of the testimony of one witness and disregard the remainder. *Southern Union Gas Co. v. Railroad Comm'n,* 692 S.W.2d 137, 141–42 (Tex.App.—Austin 1985, writ ref'd n.r.e.). The Commission was not required to accept the utility's eleventh-hour accounting error explanation, but was free to rely on the utility's own records. It is the utility that carries the burden of proof at a rate-making proceeding; the utility that submits records to the Commission that do not accurately reflect its expenditures does so at its own peril. The point of error is overruled.

### DELHI CONTRACT NUMBER 1659

[27] In the rate proceeding, Texas Utilities asserted that Delhi gas contract number 1659 contained a take-or-pay clause which obligated the utility to purchase a certain amount of gas under the contract. The Commission considered the contract and determined that it imposed no take-or-pay obligation and that Texas Utilities had purchased gas at a price higher than necessary. The Commission concluded that Texas Utilities' gas purchases pursuant to this contract violated its obligation to purchase fuel at the lowest reasonable cost to ratepayers and disallowed $2,509,810 in fuel costs incurred under the contract. *See* PURA § 41(c)(1); 16 Tex.Admin.Code § 23.23(b)(2)(H) (1993) (since amended). In its third point of error, the Commission contends that the district court incorrectly

reversed this conclusion. Because we agree with the Commission that the contract contained no take-or-pay provision, we will sustain this point of error.

The pertinent contract provision provides:

Delhi hereby grants [the Fuel Company] the option to purchase up to fifty percent (50%) (calculated in terms of heating value) of the Schlensker–Texas Crude Gas, purchased by Delhi, at Delhi's cost of such gas plus 5 cents/MMBtu. Such option to purchase may be exercised by [the Fuel Company] at any time and from time to time during the term of Delhi's respective gas purchase agreements for such gas in blocks of ten percent (10%) of Delhi's purchases, and until [the Fuel Company] has exercised completely its option to purchase such fifty percent (50%). Each such exercise of its option to purchase by [the Fuel Company] shall be evidenced by not less than thirty (30) days prior written notice to Delhi and shall be effective on the first day of the month following that month in which the said thirty (30) day period expires.

Contrary to Texas Utilities' assertions, this contract embodies no take-or-pay obligations. It is apparent from its unambiguous terms that the contract gives Texas Utilities the option to buy, in ten percent blocks and at a fixed price, up to fifty percent of any Schlenker–Texas crude gas purchased by Delhi. We are not persuaded by Texas Utilities' argument that the phrase "and until TUFCO has exercised completely its option to purchase such fifty percent" means that once the utility has purchased at that level it must continue to do so. The contract contemplates that whenever Delhi purchases Schlenker–Texas crude gas the Fuel Company may purchase up to fifty percent of that gas at Delhi's cost plus five cents per MMBtu. The phrase "and until [the Fuel Company] has exercised completely its option to purchase such fifty percent" sets an upper, rather than a lower, limit on the utility's right to purchase this gas at the contract price; it does not operate to convert the option to purchase gas into an obligation. We sustain the Commission's third point of error.

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

881 S.W.2d 387
**(Cite as: 881 S.W.2d 387)**

#### FUEL OIL INVENTORY

[28] In its fourth point of error, Texas Utilities challenges the Commission's decision to set fuel oil inventory at 1.7 million barrels. The utility contends that this finding is arbitrary and capricious, and not supported by substantial evidence. *See* APA § 2001.174(2)(E), (F). We disagree.

Texas Utilities requested a fuel inventory level of 2,031,540 barrels, an increase of 331,540 barrels from the previously authorized level of 1.7 million barrels. *See* **\*416***Application of Texas Utilities Electric Company for a Rate Increase,* 10 P.U.C.Bull. at 954. The higher figure was based on the utility's test-year end thirteen-month average inventory of fuel oil. The Cities argued that the utility needed a fuel oil inventory of only 1,279,363 barrels, suggesting that access to nuclear-generated power from Comanche Peak Unit 1 reduced the utility's need for fuel oil. Additionally, the Cites contended that increased levels of non-oil/gas fired generation caused a decrease, rather than an increase, in the necessary fuel oil inventory level. Texas Utilities countered that it burned 1,201,008 barrels of oil in December 1983 and 1,249,952 barrels during two cold weather periods in February and March 1989. The utility hoped to demonstrate that the Cities had miscalculated its needs in the event of cold weather.

The Commission rejected both the Cities' and the utility's requests, adopting instead the examiners' recommendation that the "level of fuel oil inventory established in Docket No. 5640 of 1.7 million barrels should be left in place." This decision was not arbitrary and capricious or unsupported by substantial evidence. The examiners based their recommendation on an evaluation of the utility's actual needs since the 1.7 million barrel inventory level was established in 1984. The examiners stated, "[I]n light of the Company's experience, the examiners find that the level of fuel oil inventory established in Docket No. 5640 of 1.7 million barrels should be left in place by the Commission." The utility's actual experience over the past several years provides probative evidence from which the

agency could conclude what the utility's future needs will be. If the utility could convince the Commission of the need to increase that level, then such an increase would be in order. The burden, however, was on the utility. Texas Utilities' fourth point of error is overruled.

#### RETURN ON COMMON EQUITY [FN45]

> FN45. We understand "common equity" to mean the utility's common stock. We refer to the utility's common stock as "common equity" so as not to deviate from the terminology used by the Commission in the proceeding below. *See GTE–SW,* 833 S.W.2d at 157 n. 3.

In points of error eighteen through twenty, the Cities and Public Utility Counsel challenge the trial court's affirmance of the Commission's decision to set the utility's return on common equity at 13.2 percent. [FN46] Specifically, they contend that the Commission (1) did not identify the methodology it used to arrive at this figure; (2) failed to consider the statutory factors set out in PURA section 39(a); and (3) did not make adequate findings of fact.

> FN46. Return on equity is one element of the rate of return on a utility's invested capital. Other elements include long-term and short-term debt and preferred stock.

[29] During the rate-making proceeding, all the presentations regarding the appropriate return on common equity used some form of a discounted cash-flow methodology. Because this methodology was the only one presented, the Commission's adoption of any of the range of figures presented as the appropriate return on common equity in itself entails adoption of the discounted cash-flow methodology. The Commission's order is presumed to be based on substantial evidence and we will not require the Commission to make a separate finding simply to confirm that it has based its decision on the only method of calculating return on common equity presented during the rate-making proceeding. *See Charter Medical,* 665 S.W.2d

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

881 S.W.2d 387
**(Cite as: 881 S.W.2d 387)**

at 451; *see also GTE–SW,* 833 S.W.2d at 159 (holding that a return on equity falling within the range presented by expert testimony meets the substantial evidence test). We reject the Cities and Public Utility Counsel's attempts to look to the transcript of the Commission's final order meeting to show that the Commission based its decision regarding return on common equity on something other than record evidence. We judge the agency order on the basis on which it purports to rest, and the mental processes of individual commissioners are immaterial to judicial review. *Pedernales Elec. Coop., Inc. v. Public Util. Comm'n,* 809 S.W.2d 332, 341 (Tex.App.—Austin 1991, no writ); *see also* **\*417***City of Frisco v. Texas Water Rights Comm'n,* 579 S.W.2d 66, 72 (Tex.Civ.App.— Austin 1979, writ ref'd n.r.e.) ("The thought processes or motivations of an administrator are irrelevant in the judicial determination whether the agency order is reasonably sustained by appropriate findings and conclusions that have support in the evidence.").

The Cities and Public Utility Counsel next argue that the Commission failed to consider the necessary statutory criteria in choosing the appropriate return on common equity. The statute directs the Commission to consider, among other things, the utility's efforts to comply with the statewide energy plan, its efforts and achievements in the conservation of resources, the quality of its services, the efficiency of its operations, and the quality of its management. PURA § 39(b). Our examination of the order reveals findings of fact and conclusions of law addressing each of these criteria. The Commission addressed the utility's operational efficiency, finding that the utility generated electricity efficiently and reliably during the reconciliation period and that the energy efficiency plan satisfied the Commission's substantive rules. Findings of Fact 396, 398. Conclusion of law 58 states that Texas Utilities' generation, transmission, and distribution facilities are safe, adequate, efficient, and reasonable. Regarding the quality of management, the Commission found that, with limited exceptions, the quality of management was adequate. Finding of Fact 12. The Commission also considered the utility's efforts and achievements in conservation and compliance with the statewide energy plan. *See* Finding of

Fact 215 ("Staff's recommended 15–basis–point upward adjustment to recognize the Company's exceptional achievement in conservation and load management is reasonable."); Finding of Fact 401 ("[Texas Utilities'] demand side management achievements have been remarkable, commendable, and clearly far above those of other utilities.").

[30][31] The chief complaint appears to be the Cities and Public Utility Counsel's perception that the Commission made no downward adjustment to the return on common equity to penalize the utility for instances of imprudent management. While the statute instructs the Commission to consider the quality of the utility's management, it does not require that the Commission lower the return on common equity if it finds *any* imprudence. We understand the statute to leave to the Commission's discretion the decision whether the utility's management warrants a reduction in the overall rate of return. We also reject the assertion that the Commission's chosen rate of return is not supported by adequate findings. The utility testified to a recommended range of return from 13 to 14.25 percent. The staff's recommendation ranged from 12.36 to 13.4 percent. The Examiners' Report summarizes extensive testimony supporting the various ranges sponsored by the parties and the staff. The Commission made a specific finding that a 13.2 percent return on common equity is reasonable and appropriate for the utility. Finding of Fact 213. This Court has already decided that a finding regarding the appropriate cost of equity is not a finding set forth in statutory language, and therefore needs no underlying findings. *City of Alvin,* No. 3–92–459–CV, slip op. at 28; *see also GTE–SW,* 833 S.W.2d at 158 (approving a finding on return on equity that was "the Commission's own estimate converted into a finding" so long as the estimate was "within the range made by the testimony of the various expert witnesses"). Choosing a rate of return is a proper exercise of the Commission's discretion in setting the rate of return, and we will not require any more specific findings than its selection from a range of rates all supported by credible expert testimony. The Cities and Public Utility Counsel's points of error eighteen through twenty are overruled.

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

881 S.W.2d 387
**(Cite as: 881 S.W.2d 387)**

### CASH WORKING CAPITAL

Texas Utilities' fifth point of error complains of the district court's decision to remand the Commission's cash working capital allowance. The district court found, and the Commission agreed, that the Commission made a mathematical error in its calculation of the cash working capital. On appeal, Texas Utilities argues that there is no evidence that the Commission made a mathematical error and that in any case the district court could not address the issue because it was not raised in the motions for rehearing filed with the Commission. *See* APA § 2001.145. We do not address this point of error. On **\*418** remand the Commission will have an opportunity to recalculate the cash working capital and correct its mathematical error or make other changes to cash working capital in light of its decisions on remand.

### CONCLUSION

For the reasons stated in this opinion, we reverse the district-court judgment and remand the cause to the district court with instructions that it be remanded to the Commission for further proceedings consistent with this opinion.

Tex.App.–Austin,1994.
Texas Utilities Elec. Co. v. Public Utility Com'n
881 S.W.2d 387

END OF DOCUMENT

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

935 S.W.2d 109, 39 Tex. Sup. Ct. J. 267, 40 Tex. Sup. Ct. J. 238
**(Cite as: 935 S.W.2d 109)**



Supreme Court of Texas.
PUBLIC UTILITY COMMISSION OF TEXAS et al.,
Petitioners,
v.
TEXAS UTILITIES ELECTRIC COMPANY et al.,
Respondents.

No. 94–1071.
Feb. 9, 1996.
Rehearing Overruled Jan. 10, 1997.

Judicial review was sought of Public Utility Commission (PUC) order in electric utility rate case. The 250th Judicial District Court, Travis County, John K. Dietz, J., reversed and remanded in part. Appeals were taken. The Austin Court of Appeals, Bea Ann Smith, J., 881 S.W.2d 387, reversed and remanded with instructions. Utility applied for writ of error. The Supreme Court held that, in setting electric utility rates, PUC is not required to recognize utility's available tax deductions for disallowed capital costs.

Reversed in part and affirmed in part.

West Headnotes

**Electricity 145 11.3(4)**

145 Electricity
    145k11.3 Regulation of Charges
        145k11.3(4) k. Operating Expenses. Most Cited Cases

In setting electric utility rates, Public Utility Commission (PUC) is not required to recognize utility's available tax deductions for disallowed capital costs. Vernon's Ann.Texas Civ.St. art. 1446c (Re-

pealed).

**\*109** Appealed From Austin Court of Appeals, Third Judicial District; Bea Ann Smith, Judge.Geoffrey M. Gay, Steven A. Porter, Dan Morales, Steven Baron, Susan Bergen Schultz, Elizabeth R.B. Sterling, Austin, for Petitioners.

Stephen Gardner, Ellen Greer, Stefan H. Krieger, Brad Sutera, Patrick Gattari, Dallas, Alan Holman, James W. Checkley, Jr., Mark W. Smith, Austin, Peggy Wells Dobbins, Coral Gables, FL, Dick Terrell Brown, Walter Washington, Stephen Fogel, Marion Taylor–Drew, Jack W. Smith, Mark R. Davis, Austin, William H. Burchette, A. Hewitt Rose, Washington, DC, Jonathan Day, Houston, Michael G. Shirley, Rupaco T. Gonzalez, David C. Duggins, Fernando Rodriguez, Roy Q. Minton, John L. Foster, Austin, J. Dan Bohannan, Dallas, Walter Demond, Austin, Robert M. Fillmore, Howard V. Fisher, Robert A. Wooldridge, Dallas, for Respondents.

PER CURIAM.

This is an appeal from a final order of the Public Utility Commission in a ratemaking proceeding initiated by Texas Utilities. The district court reversed the Commission's order in certain respects and remanded the case for further proceedings. The court of appeals reversed the district court's judgment but also remanded the case to the Commission. 881 S.W.2d 387. We find but one error in the court of appeals' opinion warranting our review.

The Commission refused to reduce Texas Utility's income tax expenses by potential savings from consolidated tax returns with the Texas Utilities' affiliates, by savings from available deductions for disallowed capital and operating expenses, and by savings from available deductions for interest expense. The court of appeals held that the Commission should have used an

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

935 S.W.2d 109, 39 Tex. Sup. Ct. J. 267, 40 Tex. Sup. Ct. J. 238
**(Cite as: 935 S.W.2d 109)**

"actual taxes paid" and not a "hypothetical tax" standard in applying Section 41(c)(2) of the Public Utility Regulatory Act, Act of June 2, 1975, 64th Leg., R.S., ch. 721, § 41(c)(2), 1975 Tex.Gen.Laws (formerly TEX.REV.CIV.STAT.ANN. art. 1446c, § 41(c)(2), recodified without change as Section 41(c)(2) of the Public Utility Regulatory Act of 1995, *id.* art. 1446c–0, § 2.208(c)). From this the court of appeals concluded that the Commission should have reduced Texas Utility's estimated income tax expense by: (1) the utility's "fair share" of savings from consolidated tax returns with the utility's affiliates; (2) the utility's available deductions for disallowed capital and noncapital expenses; and (3) available deductions for interest expense "to the extent that we continue to require the Commission to pass through to ratepayers any tax benefits from interest expense deductions", but not necessarily immediately. The latter saving, **\*110** the court explained, must be allocated between present and future ratepayers, in the Commission's discretion. 881 S.W.2d at 398–400.

The appeals court's opinion preceded and conflicts with our decision in *Public Utility Commission v. GTE–Southwest, Inc.,* 901 S.W.2d 401 (Tex.1995). There we held that neither PURA § 41(c)(2) nor the reference to taxes "actually incurred" in *Public Utility Commission v. Houston Lighting & Power Co.,* 748 S.W.2d 439, 442 (Tex.1987), required the Commission to apply an "actual-taxes-paid" methodology to estimate a utility's income tax expense. We held that the Commission "has neither the power nor the discretion to consider expenses disallowed under section 43(c)(3)." 901 S.W.2d at 411. Although we did not directly address whether the Commission is required to recognize available deductions for disallowed capital costs, as opposed to noncapital costs, *id.* at 411–12, our reasoning applies equally to both.

Regarding deductions for interest expenses, Texas Utilities argues that the court of appeals erred "to the extent" it required that tax deductions related to assets not included in rate base be passed on to rate-payers. If Texas Utilities refers to assets that are not *currently* included in the rate base but will be in the future, its argument may be that related interest deductions should be allotted to future ratepayers. All such matters are within the Commission's discretion, which was properly exercised in this case. If Texas Utilities refers to assets that will *never* be included in the rate base because they have been disallowed, then its argument may be that related interest deductions should be treated consistently with other deductions for disallowed capital expenses. We agree.

Because the opinion of the court of appeals conflicts with our decision in *GTE–Southwest,* we grant Texas Utilities' application for writ of error, and without hearing oral argument, reverse the judgment of the court of appeals to the extent that it conflicts with this opinion. TEX.R.APP.P. 170. Texas Utilities' application does not complain of any other error in the court of appeals' opinion that requires reversal. We deny the applications of the Public Utility Commission, the Office of Public Utility Counsel, and the Cities of Arlington, et al. *Id.* Rule 133. Thus, the judgment of the court of appeals is, in all other respects, affirmed.

Tex.,1996.
Public Utility Com'n of Texas v. Texas Utilities Elec. Co.
935 S.W.2d 109, 39 Tex. Sup. Ct. J. 267, 40 Tex. Sup. Ct. J. 238

END OF DOCUMENT

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

# Appendix F

# PUC Docket No. 18249, Order on Rehearing

ENTERGY GULF STATES, INC.              §      PUBLIC UTILITY COMMISSION
SERVICE QUALITY ISSUES                 §
(SEVERED FROM DOCKET NO. 16705)        §              OF TEXAS

## ORDER ON REHEARING

This Order addresses electric service quality issues relating to Entergy Gulf States, Inc. (EGS or the Company). The Commission concludes that the quality of EGS' electric service to its customers in Texas has been less than adequate, specifically since Entergy Corporation acquired Gulf States Utilities, Inc., in 1993. The record evidence reveals a lack of effective and prudent maintenance policies, uneven spending in the area of operations and maintenance (O&M), cuts in experienced personnel, and consequent deterioration in the quality of service. The management of EGS is structured in a way that fails to link resource availability with appropriate performance accountability.

The Commission further concludes that the difficulties EGS has experienced with its quality of service are not simply "customer perception" problems, as claimed by the Company.[1] The problems are real and must be addressed by the Company in a timely and serious manner. To motivate the Company to revise its current approach and promote long-term commitment toward service quality and reliability, the Commission orders a two-part solution designed both to deal with past problems and implement remedies for the future. First, the Company's authorized return on equity (ROE) that otherwise would be adopted in Docket No. 16705[2] will be reduced by 60-basis points and initially refunded to distribution-level customers. Second, going forward, the Company

---

[1] EGS Initial Brief (IB) at 4 (Dec. 2, 1997); *see also*, Tr. at 231.

[2] *Application of Entergy Texas for Approval of Its Transition to Competition Plan and the Tariffs Implementing the Plan, and for the Authority to Reconcile Fuel Costs, to Set Revised Fuel Costs, to Set Revised Fuel Factors, and to Recover a Surcharge for Underrecovered Fuel Costs*, Docket No. 16705 (pending).

109

will have an opportunity to earn back a portion of the ROE reduction, depending on whether its service quality meets specified benchmarks. These benchmarks will establish service reliability standards (outage frequency and duration) and customer service standards (billing errors, call-center performance, service installation, line extension, and street light replacement). The margin achieved above the benchmarks will reflect the level of improvement (or, if below, a lack thereof) and will be used to determine whether the Company is entitled to recoup a portion of the ROE reduction.


I.       Procedural History


EGS filed its transition/rate case in Docket No. 16705 on November 27, 1996. The Commission referred the case to the State Office of Administrative Hearings (SOAH) on December 5, 1996. On January 24, 1997, the Commission issued a preliminary order in Docket No. 16705 directing parties, among other things, to "address specific service quality standards that will apply after the transition [proposed by EGS]."[3]


On March 7, 1997, the Commission issued a supplemental preliminary order in Docket No. 16705 that dealt specifically with service quality issues. This order required that Docket No. 16705 address, in addition to others, the following issues: (1) Does EGS have an effective and prudent management policy in place that devotes sufficient resources to ensure adequate and reliable service to its ratepayers? (2) Are there patterns of variable service quality in EGS' service territory, and if so, what is the cause and potential resolution of these variations? and (3) What procedures can and should the Commission implement to monitor service quality on EGS' system, and to respond to situations in which EGS' service quality falls below the service quality benchmark levels?

---

[3] Preliminary Order at 12 (January 24, 1997).

Proceeding with EGS' rate case, SOAH established a four-phased hearing schedule to address the numerous transition and rate issues in Docket No. 16705. The service quality issues were to be dealt with in the "Competitive Issues" phase, scheduled to begin in early November 1997.

After EGS and interested parties had filed written testimony and exhibits,[4] but before the Competitive Issues phase commenced at SOAH, the Commission determined that it would itself hear and resolve the service quality issues. Accordingly, on November 4, 1997, the Commission issued an order severing the pending service quality issues from Docket No. 16705, establishing Docket No. 18249 to deal with those issues, and establishing procedures by which the Commission would hear and rule on the case.

The Commission convened a hearing on the merits of EGS' service quality on November 20 and 21, 1997. Chairman Pat Wood and Commissioner Judy Walsh presided over the hearing. The participating parties included the Company, the Cities, the High Load Factor Commercial Customer Group (HLFCCG), and the General Counsel, all of whom presented their direct cases and conducted cross-examinations. Chairman Wood and Commissioner Walsh also directed questions to the witnesses. Observers from the Office of Public Utility Counsel (OPUC) and the Attorney General's Office attended the hearing. The active parties filed initial and reply briefs on December 2 and 9, 1997, respectively. OPUC filed a statement on December 2, 1997, supporting the briefs of the Cities and HLFCCG, and the Attorney General's Office filed a statement on December 9, 1997, in support of the same briefs.

The Commission issued the final order in this docket on February 13, 1998. On March 5, 1998, EGS and General Counsel filed motions for rehearing. The replies to the motions were due on March 16, 1998, but based on parties' request, the Commission

---

[4] Some of the testimony, particularly from the Company's witnesses, was originally pre-filed for the Revenue Requirement phase.

granted an extension for filing of replies until March 25, 1998. On March 19, 1998, the Commission ratified the extension of deadline to file replies and also extended until May 14, 1998, the time to rule on the motions for rehearing pursuant to GOV'T CODE 2001.146(e).

On March 25, 1998, the parties filed a joint reply to motions for rehearing and motion for entry of order consistent with the parties' stipulation and agreement (the Stipulation). General Counsel, EGS, OPUC, and HLFCCG signed the Stipulation. At the April 1, 1998 open meeting, the Commission granted rehearing and approved the Stipulation. The provisions of the Stipulation are reflected in this Order.

## II.   Background

Entergy Gulf States, Inc., is a public utility subject to the jurisdiction of this Commission in accordance with Public Utility Regulatory Act (PURA) §§ 14.001, 31.001, 32.001, 33.122, and 36.001 through 36.156.[5] EGS is a wholly-owned subsidiary of Entergy Corporation (Entergy), a holding company incorporated in Delaware and registered with the federal Securities and Exchange Commission in accordance with the Public Utility Holding Company Act. Entergy acquired Gulf States Utilities, Inc., to create EGS, effective on December 31, 1993.[6]

EGS operates in Louisiana and Texas, and is affiliated through its holding company with investor-owned electric utilities located in Louisiana, Mississippi, and

---

[5] Public Utility Regulatory Act, TEX. UTIL. CODE ANN. 11.001-63.063 (Vernon 1998).

[6] *Application of Entergy Corporation and Gulf States Utilities Company for Sale, Transfer, or Merger*, Docket No. 11292 (Mar. 25, 1994).

Arkansas.[7] The EGS service territory in Texas is located in the southeastern part of the state, and contains industrialized areas in the vicinity of Beaumont and Port Arthur, as well as a coastal zone. The differing geographic and climatic characteristics of the Company's service territory have led to the creation of three distinct sectors: Western I (suburban with dense trees), Western II (rural with fewer trees), and Gulf (both rural and urban).

Entergy's headquarters is in New Orleans; EGS' principal office in Texas is located in Beaumont. In Texas, the Company serves approximately 318,279 customers[8] and has 11,472 miles of distribution lines. There are 394,865 poles[9] in its system, with 431 feeders.[10] The transmission system--built as early as 1924, with approximately half of the lines added in the 1950's and 1960's and only 12 percent of lines built or rehabilitated after 1977--has shown generally good performance.[11] This Order is concerned predominantly with the state of the Company's distribution system.

## III.   Discussion and Analysis of Issues

### A. General Concept of Reliability

Electricity plays a vital role in our lives. Most, if not all, aspects of our society, including industrial production, commerce, and individual lifestyles, are built around a reliable and adequate supply of electrical energy. People have come to depend on

---

[7] Entergy Arkansas (including the Arklahoma Corporation), Inc., Entergy Louisiana, Inc., Entergy Mississippi, Inc., and Entergy New Orleans, Inc. These companies, together with EGS, form the "Operating Companies."

[8] *Ice Storm '97 Field Investigations*, Project No. 16301, at V-25 (June 24, 1997).

[9] General Counsel Ex. 5, Burrows Direct Testimony at 33, Attachment JDB-2.

[10] General Counsel Ex. 24.

[11] General Counsel Ex. 1, Ethridge Direct Testimony at 6.

electricity being available when they need it. In fact, for most customers, delivery of electrical power and reliability of its delivery have become two inseparable expectations. Electric utilities generally recognize and accept this dependence and have responded to it by constructing and operating generation and delivery systems of superior reliability.[12] State law formalizes the utilities' obligation to provide reliable service in PURA § 37.151. Reliability, however, is not a static concept. As customer bases grow and systems age, utilities face new challenges that must be acknowledged and resolved to maintain reliable service.

In addition to sufficient generating capacity, transmission and distribution facilities are built so that a specified degree of reliability is achieved. The goal is to provide required amounts of energy with no, or few, interruptions, while maintaining a reasonable cost of the overall system. Smooth and continuous interaction of the various elements of the electrical system results in reliable performance of the overall system. For consumers, this reliability is reflected in uninterrupted power supply, the degree of which may be measured by the frequency, duration, and magnitude of adverse effects on consumer service.

### B. Legal Standards

PURA imposes various obligations on utilities and the Commission regarding the provision of electric service to Texas consumers. Specifically, PURA § 37.151 requires that a regulated utility provide continuous and adequate service in its certificated service territory. PURA § 38.001 directs utilities to furnish service, instrumentalities, and facilities that are safe, adequate, efficient, and reasonable. Parallel responsibilities rest with the Commission. In accordance with PURA § 36.052(3), the Commission must consider the quality of a utility's services in establishing a reasonable return on invested

---

[12] NORTH AMERICAN ELECTRIC RELIABILITY COUNCIL, RELIABILITY CONCEPTS 1-2 (Feb. 1985).

capital.[13]  This same section of PURA directs the Commission to consider the quality of the utility's management and the efficiency of its operations when establishing a reasonable return.   Moreover, PURA § 38.071 authorizes the Commission to order an electric utility to provide "specified" improvements in its service.

## C. Analysis of Issues

The Commission's analysis of the issues in this case is divided into five general topics:  (1) physical facilities, maintenance, and monitoring;  (2) vegetation management; (3) emergency preparedness, response, outage restoration, and treatment of storm data; (4) personnel levels, management practices, and spending levels; and (5) pockets of unreliable service and overall customer service.   The following narrative lays out essential points of the relevant issues; with additional, specific information contained in the Findings of Fact in Section IV.

## 1. Physical Facilities, Maintenance, and Monitoring

### a. Condition of Poles

As stated above, EGS' transmission system does not pose serious concerns since it has performed adequately over the last few years, during which only a minimal number of transmission-related outages or circuit-breaker operations occurred.  EGS' inspection and treatment programs relating to its transmission system seem to be working

---

[13] There are several precedent cases in which the Commission reduced ROE to address inadequate quality of service.  *See, e.g., Application of General Telephone Company of the Southwest for Authority to Increase Rates,* Docket No. 3094, Final Order, 6 P.U.C. BULL. 92, 123 (Aug. 8, 1980) (imposing penalty on company for inadequate service quality); *Application of General Telephone Company of the Southwest for Authority to Increase Rates,* Docket No. 3690, Final Order, 7 P.U.C. BULL. 11, 39 (June 18, 1981) (sustaining penalty due to persistence of poor service); *Application of General Telephone Company of the Southwest for Authority to Increase Rates,* Docket No. 4132, Final Order, 7 P.U.C. BULL. 646, 648 (Jan. 14, 1982) (lifting penalty after service was shown to improve for a sufficient period of time); *Application of Houston Lighting and Power Company,* Docket No. 4540, Final Order, 8 P.U.C. BULL 75 (Dec. 6, 1982) (reducing company's ROE because of service quality and reliability concerns).

satisfactorily, with transmission line rights-of-way (ROW) appearing generally clear.[14] For these reasons, the Commission concludes that the physical state of the Company's transmission system is adequate. The remainder of this Order will address the Company's distribution system and related services.

Primary evidence for the condition of EGS' distribution system, including wires, poles, pole appurtenances, and transformers, comes from the Osmose Wood Preserving Company (Osmose) inspections conducted in 1995 and 1996, a report filed by Drash Consulting Engineering, Inc. (Drash), and limited Staff surveys.[15] In general, most of the poles in the Texas portion of the Company's distribution system are in good condition. There are, however, numerous poles with physical deficiencies or in need of extensive and comprehensive vegetation clearing.[16]

The Osmose inspectors, contracted by EGS in 1995 and 1996, examined approximately 37,000, or 10 percent, of the poles and crossarms and found that on average 17.9 percent of poles in eight different areas showed structural decay.[17] The actual percentages, however, varied greatly, with one area having more than 37 percent of the poles with some decay, a condition clearly impermissible for any transmission and distribution (T&D) system.[18] While the Osmose inspections were not random, and in fact, as the Company asserts, focused on particularly troubled spots, the results show that there are many poles in unsatisfactory condition.

---

[14] General Counsel Ex. 1, Ethridge Direct Testimony at 6-8, 41-43.

[15] General Counsel Ex. 1, Ethridge Direct Testimony at 15; General Counsel Ex. 4; General Counsel Ex. 5, Burrows Direct Testimony, Attachment JDB-3.

[16] *Id.* at 5.

[17] General Counsel Ex. 5, Burrows Direct Testimony at 17.

[18] *Id.,* Appendix Workpapers at 2.

The purpose of the Drash report, contracted for by the Commission, was to collect data regarding the condition of EGS' overhead distribution system.  The survey was based on a sample of 33 uniformly distributed substations from the Texas portion of EGS distribution system.[19]  The Drash inspectors examined 582 poles on various feeders originating at these substations.[20]  The Drash survey found 59 poles with structural deficiencies and 72 poles with ROW encroachments.[21]  During the hearing, EGS raised questions about the accuracy and statistical reliability of the Drash report.  The Commission concludes that the Drash study lacked specific evaluation criteria and necessary randomness to draw conclusions about the entire EGS Texas system.  The Commission, however, does not reject the Drash report, as requested by the Company;[22] rather, the Commission relies on the report to the extent that its findings have been confirmed by the Osmose inspections and Staff surveys.  Considered together, the collected data persuasively indicate that numerous poles show decay, are in need of repair or replacement, and that vegetation growth poses a serious problem on some ROW.

### b. Pole Inspection Program

The Company conceded that it does not have a traditional pole inspection program in place.[23]  Since the Osmose inspections in 1996, there have been no pole or crossarm inspections on Texas territory.[24]  Post-merger, EGS reduced the number of inspections; for example, in 1995, 29,294 poles and 43,941 crossarms were inspected, but in 1996, only 7,939 poles and 11,908 crossarms underwent inspections.[25]  The Company

---

[19]  *Id.* at 19.

[20]  *Id.* at 20.

[21]  *Id.* at 21-22.

[22]  Tr. at 552-60, 606-15.

[23]  Tr. at 176, 751-52.

[24]  Tr. at 170, 177-78.

[25]  General Counsel Ex. 19 at Bates Stamp 0194741.

is now planning to hire Osmose to carry out a ten-year inspection program that will cover the entire system (35,000 poles inspected annually).[26] Evidence presented in the case makes it clear that EGS' pole inspection and repair work cycles have not been sufficiently rigorous, continuous, or frequent to maintain all of its facilities in the condition required to meet its reliability and service obligations under PURA.

### c. Maintenance Practices

A review of maintenance records shows that line maintenance and vegetation control are reactive in nature;[27] there is a lack of written, specific, and preventive maintenance policies;[28] and priority is given to capital additions to the detriment of adequate maintenance practices.[29] For example, total line-miles actively maintained by the Company's employees dropped 30 percent from 1994 to 1996.[30] The Company's internal risk assessment study points to an absence of a strategic plan, and consequent inadequacies in resource sharing and work planning.[31] Based on the evidence, the Commission concludes that EGS has failed to establish and carry out distribution maintenance policies in a manner sufficient to ensure adequate and reliable delivery of electric service.

### d. Data Collection

The Company presented a variety of data to support its claim of good performance; however, the accuracy of its data collection practices came under a great deal of scrutiny during the hearing, bringing into question the ability of the Company to

---

[26] Tr. at 751-52.

[27] General Counsel Ex. 4, Gonzalez Direst Testimony at 6-8, Drash Report at 45-46.

[28] Tr. at 59; HLFCCG Ex. 1, Patton Direct Testimony, Entergy Internal Audit and Risk Assessment.

[29] General Counsel Ex. 1, Ethridge Direct Testimony at 19-20; General Counsel Ex. 8; General Counsel Ex. 19.

[30] Tr. at 737.

[31] General Counsel Ex. 30 at 2.

monitor its performance fairly.  The parties debated at length the merits and mechanics of various system monitoring tools and reporting standards.  These include: (1) System Average Interruption Frequency Index (SAIFI), a measure of the number of interruptions per year for the average customer;[32] (2) System Average Interruption Duration Index (SAIDI), a measure of the total interruption time experienced by the average customer;[33] (3) Customer Average Interruption Duration Index (CAIDI),  defined as the ratio of SAIDI/SAIFI;[34] (4)  Distribution Interruption System (DIS), a database to capture reliability performance and indices for individual feeders;[35] (5) Average System Availability Index (ASAI),[36] a measure of the total time of service availability to the average customer; and (6) TACTICS, which captures data on every device down to the transformer level to measure each device's operational performance and impact on customers.[37]  In addition, the Company utilizes a System Control and Data Acquisition device (SCADA) to measure data for large interruptions such as feeder breaker outages,[38] and the new Automatic Mapping and Facilities Management System (AM/FM), developed in order to determine where an outage occurred and what device caused it, which will be completed by the year 2000.[39]

General Counsel, Cities, and HLFCCG argued that the number of customers affected by outages and the duration of such outages are difficult to determine because

---

[32] HLFCCG Ex. 1, Patton Direct Testimony at 9-12.

[33] *Id.* at 10.

[34] *Id.*

[35] *Id.* at 11.

[36] General Counsel Ex. 3, Eckhoff Direct Testimony at 20.

[37] Tr. at 448-450.

[38] Tr. at 238, 443.

[39] Tr. at 429-30.

EGS excluded relevant information between 1994 and 1996.[40]  For example, for the first six months of 1996, the Company reported 35 to 40 percent fewer outages than were reported on average during the first six months of the years 1991-94.[41]  In trying to explain the discrepancies in the data, Company officials described changing data collection standards applied to the various outage-causing events.  At different times, the Company excluded outages caused by equipment failures; outages affecting feeders with fewer than 500 customers; storms, generation or transmission outages; or trees falling into the ROW ("non-preventable" trees).[42]  The Company data is generally confusing and comparisons over a period of several years are difficult to make because of changing standards;[43] in addition, the inaccuracies are further compounded because, for example, outages on feeders with fewer than 500 customers can nevertheless result in very long outage durations, especially when those feeders are energized last.[44]

The evidence shows that Company linemen sometimes made subjective determinations as to the cause, duration, or effect of an outage, thus causing the Company's SAIFI and SAIDI numbers to be unreliable.[45]  The evidence also revealed that most historically deficient feeders serve rural customers.[46]  This observation is supported by EGS' testimony that it prioritizes restoration of feeders serving the greatest numbers of customers, thus leaving those in lower-density areas (most likely rural) to experience recurring and longer service reliability problems.[47]

---

[40] *See* HLFCCG Ex. 2, Entergy Southwest Reliability Report 1994-1996; Tr. at 41-43.

[41] HLFCCG Ex. 3 at slide 9.

[42] Tr. at 41-44, 54, 62-66.

[43] *Id.*; HLFCCG Ex. 2 at Bates Stamp 0232514.

[44] Tr. at 67.

[45] Tr. at 47-48.

[46] Tr. at 707, 821

[47] The Rebuttal (redacted) Testimony of Dereck Hasbrouck on behalf of the Company contains this quote: "One important fact to keep in mind when considering a customer or group of customers who consistently

General Counsel, Cities, and HLFCCG asserted that the Company has manipulated information to show better performance.[48] A significant problem with the Company's use of performance and reliability indices is that they reflect outage frequency and duration on a system-wide rather than feeder-by-feeder basis which can mask poor performance of individual feeders.[49] For example, EGS reported a system-wide SAIDI of 133 minutes for 1996,[50] but this measure failed to reveal that 83 feeders or primary circuits experienced outage times in excess of 200 minutes.[51] The average customer on these circuits experienced an outage duration of 3.3 hours.[52] More notably, customers on feeder Tamina encountered 41.3 hours of outage time in one year.[53] It is apparent that system-wide averages used by the Company cannot be relied on to disclose many of the localized service difficulties.

The historic data presented by the Company is not accurate and consistent as the Company itself admitted to not collecting all relevant data,[54] changing the standards for data collection, and submitting inconsistent data for ASAI and SAIFI.[55] Even the

---

receive less reliable service than the average customer is that there are geographic and environmental conditions beyond the utility's control. These conditions, in combination with the construction cost considerations may effectively limit the realistic reliability expectations for customers in certain areas. In EGS Texas' service territory, the Bolivar Peninsula and Sabine Pass may be examples where these constraints come into play ." EGS Ex. 11, Hasbrouck Rebuttal Testimony at 39.

[48] Tr. at 278-79, General Counsel Ex. 3, Eckhoff Direct Testimony at 54.

[49] General Counsel Ex. 3, Eckhoff Direct Testimony at 18, Appendix H and I; Tr. at 41-67; HLFCCG Ex. 1, Patton Direct Testimony at 12-14.

[50] General Counsel says SAIDI in 1996 was 157 minutes. General Counsel Ex. 22; HLFCCG Ex. 1, Patton Direct Testimony at 13.

[51] HLFCCG Ex. 1, Patton Direct Testimony at Exhibit ADP-3.

[52] *Id.*

[53] General Counsel Ex. 3, Eckhoff Direct Testimony, Appendix H..

[54] Tr. at 706.

[55] General Counsel Ex. 3, Eckhoff Direct Testimony at 54.

Company's internal audit revealed that reporting of outages has not been consistent.[56] EGS cannot correctly measure how many individual customers lose service because of an outage affecting parts of a feeder.[57]

The Commission concludes that the types of information monitoring and reporting tools relied on by the Company are useful, but they must be employed uniformly and consistently to be meaningful measures of service quality. The Commission finds that the level of EGS' service quality and reliability, as documented through the Company data, is unreliable because the data fail to record and report all events accurately and consistently. Pockets of inadequate service are ignored by system-wide measures, and such measures do not identify recurring individual-feeder problems.

## 2. Vegetation Management

Vegetation management is the catch-all description for programs involving the removal of trees, bushes, or vines that overhang, grow into, or toward conductors strung along the Company's ROW. The purpose of vegetation management is to ensure, to the greatest extent possible, that vegetation in, or near, the ROW does not come into contact with the conductors and thereby cause wire breakage or ground faults.[58] During the hearing, Company witnesses referred to scheduled tree trimming, carried out on a three-year cycle in urban areas and a six-year cycle in rural areas. The evidence presented, however, was not clear on whether EGS actually followed the stated cycles.[59] Nonetheless, the Company argued that its vegetation management has been adequate and

---

[56] Cities Ex. 1, Lawton Direct Testimony at 12.

[57] Tr. at 445-46.

[58] Tr. at 176-178.

[59] Tr. at 602, 728.

consistent with industry practice.[60]  In fact, EGS asserted that it had improved vegetation management and introduced efficiencies when compared to the pre-merger period.[61]

General Counsel, Cities, and HLFCCG presented extensive evidence to document serious neglect of vegetation management and consequent heightened risk to the distribution system.  The majority of incidents included in the evidence involve three types of vegetation-related damage: wires expanding down into vegetation due to increased load or lack of under-clearance; overhanging limbs breaking or growing into wires in non-inclement weather; and limbs or trees bending or breaking onto wires due to wind, ice build-up, or other adverse weather conditions.  These parties also argued that the ROW surveyed were in need of extensive clearing and that vegetation encroachments posed unacceptable risks.[62]  Cities claimed that neglected vegetation management multiplied the severity of the ice storm in January 1997.[63]  The number and duration of vegetation-caused service interruptions almost doubled in the last four years,[64] and vegetation-related SAIDI and SAIFI have worsened since the merger.[65]

The author of a vegetation management study, commissioned by the Company, observed that there were areas where maintenance clearing had been deferred until brush reached the conductors.[66]  The study proposed specific and comprehensive ways for

---

[60]  EGS Ex. 10, Ervin Rebuttal Testimony at 55, 59.  EGS states that more than 80 percent of the Company's vegetation management expenditures are allocated to trimming, which is above the industry norm.

[61]  EGS Ex. 8, Ervin Supplemental Direct at 22.

[62]  General Counsel Ex. 4, Gonzalez Direct Testimony at 6-8; General Counsel Ex. 1, Ethridge Direct Testimony at 8-11.

[63]  Tr. at 305-08.

[64]  HLFCCG Ex. 1, Patton Direct Testimony, Exhibits ADP-10, ADP-13 (illustrating values for system-wide SAIDI for Texas increased from 21.17 in 1994 to 40.36 in 1997, and SAIFI doubled, from .31 in 1994 to .63 in 1997).

[65]  General Counsel Ex. 37.

ROW maintenance, but the Company presented no evidence that the study's findings had been implemented. An e-mail sent in August of 1997 by an EGS network manager in Beaumont identified trees touching conductors as one of the preventable root causes of several recent outages.[67]

The Commission concludes that the level of the Company's vegetation management is unacceptable and has significantly affected the reliability of the distribution system in recent years. While such a deficiency may not in itself impact a typical system severely, this deficiency is magnified when the inadequacy of the infrastructure and the nature of the weather in the Company's service area are taken into account.[68] The lack of preventive vegetation control efforts by the Company and neglect of regular vegetation clearing have led to the creation of unnecessary risks. The Commission does not suggest that "ground-to-sky" tree trimming is necessary, but the Company clearly has significant room for improvement. The recent hiring of 30 new vegetation clearance crews, while welcome, confirms the existence of an unacceptable backlog in vegetation control.[69] As will be discussed below, the Commission is also concerned that managers in Texas have no clear line of authority or resources necessary to implement effective vegetation management policies.

---

[66] General Counsel Ex. 27, Environmental Consultants, Inc., Report on Distribution Line Clearance Program (Jul. 1994) at I-2-3.

[67] HLFCCG Ex. 6.

[68] Tr. at 308.

[69] Tr. at 730-31, 787.

## 3. Emergency Preparedness, Response, Outage Restoration, and Treatment of Storm Data

### a. January 1997 Ice Storm

In mid-January 1997, many parts of Texas experienced a severe ice storm; disruptions of electric service were sustained by most utilities in the state.[70] The impact on EGS' territory was particularly hard. At one time, up to 120,000 of EGS' customers were without power and it took seven days to complete the restoration process.[71] Utilizing help from other utilities and contract workers, EGS had more than 2,700 personnel working to restore service.[72] In assessing the Company's performance, EGS officials compared it to that of other utilities and concluded that its efforts were not only adequate, but even "very good."[73] They blamed most of the damage on excessive ice.[74]

This view was not shared by the other parties.[75] HLFCCG played excerpts from taped conversations conducted by the Company's dispatchers during the storm, which highlighted insufficient numbers of personnel and initially inadequate efforts to repair the damage.[76] The Cities asserted that they had to use their own employees for repairs, including the handling of live wires,[77] and that in some instances they were unable to reach Company employees at all.[78] One of the Cities' exhibits was a letter, dated August

---

[70] General Counsel Ex. 2B, Hughes Workpapers, Ice Storm '97 Field Investigations Project 16301 at II-1.

[71] EGS Ex. 8, Ervin Supplemental Direct Testimony at 53.

[72] *Id.*

[73] *Id.* at 74.

[74] *Id.* at 74-75.

[75] Tr. at 379; Cities Ex. 1, Lawton Direct Testimony at 12.

[76] Tr. at 87-92.

[77] Tr. at 376.

[78] Cities Ex. 2, Kimler Direct Testimony at 2.

17, 1995, from several fire chiefs in EGS' service territory to the Company describing various problems with emergency procedures, such as not being able to reach the Company's 1-800 telephone number, and, apparently, this problem persisted.[79]  Some other cities' representatives testified, however, that the Company's restoration efforts were good.[80]  The significant disparities in the Company's response to the damage caused by the ice storm suggest a need for greater and clearer communication between the Company and all cities, including development of contacts before an emergency occurs.

The Company has an emergency plan on file with the Commission; the plan contains no obvious deficiencies.[81]  As is industry practice, EGS also has agreements with other utilities for emergency cooperation; those agreements, however, are not in writing.[82]

The January 1997 ice storm was certainly a severe storm that would have adversely affected even the best-maintained distribution system.  EGS' distribution system, however, is not the best-maintained.  A major cause of the outages during the storm were broken or bowed ice-laden tree limbs overhanging the wires.  Tree limbs in ROW overhanging distribution lines pose a threat to system reliability, and are largely within EGS' control.  The Company's failure to clear the limbs before the storm was a major factor in the number and duration of outages experienced by customers.[83]  While Company's initial efforts to mobilize and deploy additional non-EGS personnel were slow and cause concern,[84] vegetation management failures greatly aggravated the

---

[79]  Cities Ex. 2, Kimler Direct Testimony at 7.

[80]  Tr. at 377, 381, 391.

[81]  General Counsel Ex. 2, Hughes Direct Testimony at 21.

[82]  Tr. at 676-77.

[83]  General Counsel Ex. 2, Hughes Direct Testimony at 17.

[84]  Tr. at 379.

situation. The Company has experienced major storms in 1994, 1995, and 1997.[85] The weather, however, cannot be an excuse for poor service. While the Commission does not expect 100 percent reliability, the system must be built and maintained taking the local geographic and weather conditions into account.

### b. Treatment of Storm Data

The Commission has required utilities to report the causes of interruptions, including the extreme storms. EGS, however, excludes outage duration and frequency data from its SAIDI and SAIFI reports if the data are attributable to a "major storm."[86] As defined currently by the Commission, major storms include situations in which there is a loss of power to 10 percent or more of customers in a region over a 24-hour period and full restoration is not achieved within 24 hours.[87] EGS' definition of a major storm counts any event in which 10 percent or more of a region's customers are interrupted for 24 hours or more, and is similar to the Commission's definition.[88]

HLFCCG argued that interruptions associated with major storms should be included in the computation of reliability indices. HLFCCG maintains that the design and maintenance of lines, and therefore their condition under the stress of severe weather, is within the control of the utility.[89] Exclusion of major-storm interruptions from reliability indices could encourage reduced preventive maintenance, including vegetation management, and reductions in force needed for restoration efforts.[90]

---

[85] Tr. at 214, 377.

[86] Tr. at 54.

[87] EGS Ex. 10, Ervin Rebuttal Testimony at 30.

[88] *Id.*

[89] HLFCCG Ex. 1, Patton Direct Testimony at 14.

[90] *Id.* at 15.

The Commission is reluctant to allow the Company to exclude major-storm data from its overall reports because such reports may be incorrectly perceived as an indication that overall service quality is better than it actually is. Also, leaving major-storm data out may obscure the fact that poor management and maintenance, and not just the severity of the weather, contribute to or cause a weather event to become serious enough to be classified as a "major storm." Despite a great deal of controverting testimony by customer groups, the Company continues to assert that the acknowledged problems during the 1997 ice storm were a "storm-of-the-century" aberration.[91] Allowing the Company to carve out major storms from its outage-reporting data would mask the seriousness of service quality problems that occur on its system under all conditions.

The Commission understands that if a truly major storm affects the system, the Company cannot be expected to restore power and respond to increased customer calls as fast as it would in a more "normal" or day-to-day situations. Therefore, the Commission will allow the segregation of major from non-major storm data in outage frequency and duration reports. The major storms, defined by the severity of the weather conditions, rather than by the outage duration, will be reported and evaluated separately, as discussed in the "Remedies" section below.

## 4. Personnel Levels and Management Practices; Spending Levels

### a. Personnel Levels

All parties agreed that post-merger personnel cuts were executed, ostensibly, in order to save costs. The Company asserted that cuts were possible because of increased efficiencies and that the permanent employees were simply replaced with contract workers.[92] The other parties maintained that cuts were not only too extensive, but

---

[91] Tr. at 225; EGS Ex. 10, Ervin Rebuttal Testimony at 32-35.

[92] Tr. at 160, 236; EGS Ex. 8, Ervin Supplemental Direct at 19; EGS Ex. 10, Ervin Rebuttal Testimony at 51.

resulted in a loss of many years of worker experience that could not be compensated for by contract workers who may lack knowledge of the system or loyalty to the Company. For example, General Counsel witness Ethridge cited the forced departure of 66 employees with an average of 18 years of experience each.[93]  A precise number of lost employees was not conclusively proven: the Company maintained that total net loss was only 23,[94] but HLFCCG, for instance, asserted that in the space of three years, the jobs of 67 linemen were eliminated.[95]

A related issue concerned the Company's ability to evaluate contract workers' performance: while the Company felt confident about increased efficiency of its hiring practices, it did admit to not having performance measures for contract workers.[96] General Counsel presented Company documents showing that controls over contract worker management were not effective.[97]  An internal risk assessment audit, conducted by the Company, also concluded that no formal and consistent process existed to monitor contractor performance, that management employees did not generate necessary reports to allow proper monitoring, and that distribution contracts were not competitively bid.[98] An additional concern presented by Cities dealt with the decrease in the number of operational staff while regulatory staff increased; this led Cities to conclude that the Company had insufficient focus on system maintenance matters.[99]

---

[93] General Counsel Ex. 1, Ethridge Direct Testimony at 37.

[94] Tr. at 236; EGS Ex. 10, Ervin Rebuttal Testimony at 52.

[95] HLFCCG IB at 6 (referring to General Counsel Ex. 16 at 2, and Ex. 17 at 2).

[96] Tr. at 249-50.

[97] General Counsel IB at 14 (referring to HLFCCG Ex. 13, Entergy Internal Audit and Risk Assessment).

[98] HLFCCG Ex. 1, Patton Direct Testimony, Risk Assessment Attachment at 3-4, 6.

[99] Cities Ex. 1, Lawton Direct Testimony at 12; Tr. at 164.

The Commission concludes that, post-merger, EGS cut many experienced employees, some of whom were consequently replaced by contract workers. The Commission, however, will not prescribe what personnel levels the Company should maintain. It is up to EGS to make sure it has enough workers to carry out proper maintenance and necessary emergency responses, along with having well-defined performance measures for both regular and contract employees.

### b. Management Practices

Because the various operational entities under the holding company are split both along functional and geographic lines, tracing management structure poses some difficulties. According to Company witness Johnny Ervin, a network manager is located in Beaumont, along with a reliability supervisor.[100] There are two levels of customer service managers located in Beaumont; the vice president of customer service is located in Jackson, Mississippi. During the hearing, however, the Company presented its director of performance measurement, located in Little Rock, Arkansas, to speak on customer service issues. The network manager and reliability supervisor report to a franchise director (in Beaumont) and reliability director (in New Orleans, Louisiana), respectively. Both of these directors report to a senior vice president of distribution operations, who is located in New Orleans and is actually employed by Entergy Services, Inc. The senior vice president answers to a utility group president, who has above him the chief operating officer and, finally, the chief executive officer of Entergy. According to Mr. Ervin, this reflects a new and "flatter" organizational structure, designed to promote better communication.[101] None of the managers in Beaumont reports to the EGS president, who has offices in Beaumont and Austin, Texas.

---

[100] Tr. at 789-794; the entire description of the management structure is taken from these pages of the transcript.

[101] *Id.*

The Commission has concerns regarding the Company's management structure. It is not clear from the evidence that managers actually have the authority and matching resources to supervise their specific areas.[102] Those responsible for system reliability have little control over the vegetation management area, even though vegetation management has a major impact on how well the T&D system functions. The Company's internal audit concluded that there was no overall strategic plan in place to set performance strategies, and that hindered management in accomplishing business objectives and goals.[103] While EGS' representatives explained that recent changes in management structure were aimed at increasing communication, they also revealed that there was no structured way for the management to track and resolve problems reported by the employees.[104] In addition, managers' bonuses are tied in part to cost-cutting which may conflict with efforts to improve system performance.[105]

The Commission concludes that those who are responsible for the reliable performance of the Company's distribution system in Texas must also have the necessary authority and resources at their full disposal to maintain the system. The managers in the Texas territory must have clearly delineated powers and should be accountable to a unified higher management. The current, bifurcated management structure, under which local Texas supervisors report to multiple supervisors, is an obstacle to effective and reliable operation of EGS' Texas system.

### c. Spending Levels

An issue addressed at length in this docket involved the Company's record of investment in the T&D system, particularly in maintenance. While there is hardly a

---

[102] Tr. at 791-92.

[103] HLFCCG Ex. 1, Patton Direct Testimony, Internal Audit and Risk Assessment at 4.

[104] Tr. at 204-05.

[105] Tr. at 475, 847. General Counsel Ex. 20. Also, EGS internal risk assessment studies for vegetation management and distribution maintenance list cost-cutting as a major business goal.

substitute for sufficient O&M expenditures, the Commission will not prescribe a specific level of spending that may guarantee adequate service quality, and, at present, is not keenly interested in past expenditure levels. The Commission is primarily interested in results. As noted in the March 7, 1997 Supplemental Preliminary Order in Docket No. 16705, the Commission recognizes "that there may be a point of diminishing returns above which the dollars or resources allocated to service quality become unreasonable and fail to be cost effective."[106] That crossover point is not set in this docket, and it is not intended to be set. EGS is responsible for determining sufficient spending levels and for the appropriate allocation of resources to O&M, distribution capital additions, and other categories in order to meet its obligation to provide adequate service quality.

In the hearing, EGS witnesses maintained that the Company had increased T&D spending since the 1993 merger; that inspection and measurement standards had improved; and that its spending on service quality programs equaled or even exceeded that of other utilities.[107] It is not certain, however, that EGS actually increased spending because expenses were not categorized clearly. Increased spending, if any, shows just that--increased spending; it does not measure how the quality of service has improved, or whether the service is adequate in accordance with PURA. Nonetheless, EGS is required to provide *continuous and adequate* service in accordance with traditional reasonable and necessary cost standards.[108]

In a memo dated October 31, 1995, a Company official discusses vegetation maintenance spending in the Southern Region and points to a recently implemented 20 percent reduction in allocations which, he expresses, cannot be sustained by any region

---

[106] Supplemental Preliminary Order at 2, Docket No. 16705 (Mar. 7, 1997).

[107] Tr. at 760; EGS IB at 7-10.

[108] The Commission would expect some increases in spending since the 1993 merger because GSU, facing bankruptcy, would have presumably reduced even the necessary expenses.

without an adverse effect on customer service.[109]  The parties generally agreed that spending on O&M decreased, while distribution capital additions slightly increased.[110] The Internal Audit department of the Company in its distribution risk assessment study identified the budget process which allocated dollars to the regions based on past history rather than system needs as one of the problems that needed to be resolved.[111]

After evaluating the record evidence, the Commission concludes that expenditure levels for O&M are confusing and unclear, and pose a problem regarding tracking and accountability.  While the Commission declines to state specific amounts to be spent, proper tracking and accounting of expenditures, both by type and jurisdiction, are essential.  For example, the Company was unable to explain a 50 percent increase in the miscellaneous Federal Energy Regulatory Commission (FERC) Account 588.[112]  It is virtually impossible to ascertain how much of the O&M budget is actually spent in the Texas jurisdiction or for distribution capital additions as compared to system maintenance.

The Commission concludes that expenditures for O&M must be readily available and verifiable.  The same applies to the oft-mentioned, but never specified or quantified, "increased efficiencies" used to justify cutting costs.[113]  For such claims to have any weight, the Company must have a ready and reasonable explanation together with supporting documentation.

---

[109]  General Counsel Ex. 28 at 2.

[110]  Tr. at 134, 248; 353-54; General Counsel Ex. 1, Ethridge Direct Testimony at 20, 27; Cities Ex. 1, Lawton Direct Testimony at 8.

[111]  General Counsel Ex. 30 at 7.

[112]  *Id.* at 9; Tr. at 153-54.

[113]  EGS Ex. 8, Ervin Supplemental Direct at 16, 19-20.

## 5. Pockets of Unreliability; Customer Service

### a. Pockets of Unreliability

One of the issues identified in the Supplemental Preliminary Order in Docket No. 16705 involves pockets of particularly unreliable service,[114] such as the feeder Tamina, which had 41.3 hours of outage time in one year.[115] Rural customers are more likely to experience outages and wait longer for restoration. The Company admits to areas of lower reliability[116] and agrees that "outliers" must be improved.[117] The Company's practice--seemingly logical--of first restoring and clearing areas with most customers has led to the same customers experiencing repeated lower-quality service. In addition, the Company maintains a list of "politically sensitive" accounts, which suggests that some customers may receive preferential treatment.[118]

The Commission concludes that there should be a high standard of service for all customers, including a set minimum standard below which no customer would fall, and that the Company needs to bring all of its worst performing poles and feeders into compliance with that minimum standard.

### b. Customer Service

The Company has maintained, from the outset of this case, that its service is not deficient, but that it simply faces a "customer perception" problem. The Company knows that it has a large number of customers who are not satisfied with their electric service.[119]

---

[114] Supplemental Preliminary Order at 3, Docket No. 16705 (March 7, 1997); *see also,* General Counsel Ex. 7 at 36.

[115] General Counsel Ex. 3, Eckhoff Direct Testimony, Appendix H.

[116] Tr. at 122, 223, 652.

[117] Tr. at 223-24.

[118] Tr. at 396-97.

[119] Tr. at 219. The Company's internal customer survey showed declining satisfaction levels from 1995 to 1996, Tr. at 198-200.

Based on the record, the Commission concludes that EGS customers' perceptions are justified. The same concerns were reflected in the testimony of city officials charged with protecting the health and safety of their citizens. Of particular note was the evidence that a municipality was compelled to call upon its volunteer firefighters to disconnect live electric wires because the Company's personnel were not available to perform this highly dangerous task.[120]

The Company's inadequate service quality is not necessarily an outgrowth of a lack of "money" or "expenditures." The Company has available funds that should be sufficient to provide higher-quality service, as may be gathered from the fact that the entire O&M budget was not spent.[121] It should be noted that the internal risk assessment study on distribution line construction and service restoration lists as the first priority improvement in customer perception of energy delivery and improvement in reliability only as a second priority.[122]

EGS' customers and the Commission believe that the Company has an obligation to provide continuous and adequate service, and that significant improvements in EGS' performance are needed. Section D, below, outlines the outcomes EGS must attain for the Commission to be satisfied that those improvements have been made. An improvement in EGS performance will eventually lead to more favorable perceptions and evaluations by the Company's customers.

---

[120] Tr. at 376.

[121] Tr. at 468-70.

[122] General Counsel Ex. 30 at 1.

*D. Remedies*

Based on the foregoing analysis, the Commission concludes that the Company's service quality must be improved. The following incentive plan lays out remedies to help EGS achieve such improvements. The five essential components of the plan are as follows:

1. A reduction in the return on equity divided into two parts: an adjustment component that recognizes EGS' current service quality is not adequate, with amounts to be refunded to customers, and an incentive-pool component to encourage future improvements in service quality;

2. Adoption of minimum and target levels for SAIDI and SAIFI as recommended in General Counsel's testimony, including improvement in the worst- feeder performance; establishment of standards for major-storm data; and reporting requirements;

3. Partial adoption of customer service performance benchmarks as recommended in General Counsel's testimony;

4. Establishment of a quality assurance requirement to ensure improved performance through the hiring of an independent consultant consistent with the amended, non-unanimous stipulation; and, to guarantee the accuracy of all data, hiring by the Company of an independent auditor to review all reports.[123]

5. A customer information and notification requirement.

## 1. Reduction in the Return on Equity and Incentive Pool

Drawing from the recommendation in the testimony of Cities' witness Lawton, the Company will be assessed a 60-basis point reduction in its ROE adopted in Phase II of Docket No. 16705. This reduction shall be implemented in recognition of the historically inadequate performance of EGS' distribution system. The Company will be required to refund current overcollections, including all appropriate taxes, for the period

---

[123] EGS had filed an amended, non-unanimous stipulation regarding the hiring of an independent consultant to assess Company's distribution system, including a review of the service quality processes. The Commission approved the stipulation with modifications on January 15, 1998.

starting with June 1, 1996, the effective date of any rate reductions ordered in Docket No. 16705, up to the effective date of this order.[124]

Going forward, the Company will collect the amount equal to one-half of the 60-basis point reduction, plus appropriate taxes, and deposit that amount in an interest-bearing escrow account to create an incentive pool. The Company may earn this escrowed amount back by achieving specific performance targets. The other one-half of the 60-basis point reduction, plus appropriate taxes, will be retained by the ratepayers. The performance evaluation year will be a 12-month period, commencing on November 1, and ending on October 31. For SAIDI and SAIFI minimum level compliance, SAIDI and SAIFI target level compliance, and compliance with the billing-error rate and call center performance targets, the initial evaluation period shall commence on November 1, 1997, and end on October 31, 1998. For service installation, line extension, and light replacement customer service performance measures, the initial evaluation period shall commence on May 1, 1998, and end on October 31, 1998. Thus, EGS' performance during the initial measurement year for these three performance measures shall be based on only six months of customer service performance. During subsequent years, EGS' performance shall be based on twelve months of customer service performance. At the end of each performance evaluation period, if the Company fails to achieve stated performance benchmarks in any of the three areas (SAIDI and SAIFI minimum levels, SAIDI and SAIFI target levels, and customer service), a corresponding portion of the incentive pool will be refunded to distribution-level customers, divided on a pro-rata basis within each customer class, except as noted below. If the Company successfully reaches all of the benchmarks, the full amount of the incentive pool will revert back to EGS.

---

[124] The effective date of this Order for the purposes of the requirements set forth herein is the date on which this Order is no longer subject to rehearing.

The performance evaluation year is intended to coincide with the filing requirements of the Commission's Electric System Service Quality Report (ESSQR) forms. If the Commission were to change the ESSQR form time periods to a calendar-year basis, the performance evaluation periods discussed above for EGS shall change to be consistent with the Report form periods.

Performance will be evaluated, and the incentive pool will be divided, according to three measures: (1) improvement in the minimum performance levels for SAIDI and SAIFI for worst feeders; (2) improvement in the target performance levels for SAIDI and SAIFI for average feeders; and (3) improvement in customer service performance, which has five components: (a) billing-error rate, (b) connection rate at the call center, (c) timeliness in completing service and meter installations, (d) timeliness in completing line extensions, and (e) timeliness in replacing and/or repairing service and street lights.

For the purposes of determining what amount, if any, the Company will earn back, the portions of the incentive pool will be represented by the following benchmarks: SAIDI and SAIFI minimum value improvements for the "worst" feeders (described below) will count as one-third of the pool; SAIDI and SAIFI target value improvements will count as one-third of the pool; and customer service improvements will count as one-third. Failure to achieve a measure will result in refunds to the affected customers based on the requirements for that specific measure. SAIDI and SAIFI will be calculated on a feeder-specific basis.

The Company has stated it does not have the ability to measure customer-specific feeder performance, and thus cannot calculate customer-specific refunds. For the first measure, however, refunds shall be provided to all customers taking service from a feeder that fails to meet the SAIDI and SAIFI minimum acceptable levels as recorded over a one-year period. These refunds are more customer-specific than currently contemplated by the Company, but because only a small number of feeders is expected to fall into this

category, the refund calculations should not pose an insurmountable problem.[125]  For the second measure, if the Company fails to achieve the specified SAIDI and SAIFI target level improvements, refunds shall be made to all Texas, distribution-level customers.  For the third measure, failure to meet the standard for any of the customer service components will result in pro-rata refunds to each of the distribution-level customers. Distribution-level customers are meant to be those Texas, retail residential and small commercial ratepayers whose contract demands are less than or equal to 100 kW.

Feeder-specific refunds shall be distributed in a single billing period in proportion to and limited by each customer's total annual electric usage (i.e., no customer shall receive a refund greater than the total amount paid by that customer for the service in that year).  If any money remains in the pool, the amount shall be refunded to all distribution-level customers on a pro-rata basis.  All refunds shall be labeled "Service Quality Refund" on the customer's bill and shall be directed to the current customer receiving service at a given premise.

## 2. Minimum and Target Performance Levels

### a. Frequency and Duration of Interruptions

The performance benchmarks are drawn from General Counsel's testimony with some adjustments.  General Counsel proposed that the Company measure the duration of interruptions using the Average System Availability Index (ASAI).  The ASAI index and the SAIDI index are closely related.  Since the Company is required to report SAIDI under the Commission's service quality rules, that index will be used as the duration measure. General Counsel, HLFCCG, and Cities agree that performance should be measured feeder-by-feeder rather than through a system average.  EGS has accepted a feeder-by-feeder approach for outage frequency.[126]  General Counsel's proposal for

---

[125] The Company states that it does not have the ability to tie specific feeders to specific customers; it is expected, however, that the number of feeders involved is such that manual calculations will be possible or the Company can use its TACTICS program.  Tr. at 445-46.

[126] Tr. at 228.

feeder-by-feeder SAIFI and SAIDI targets is presented in Table 1, where the SAIDI targets are converted from the ASAI values recommended by General Counsel.[127] The Commission adopts the following performance targets for use by EGS as its reliability performance standards.

Table 1:  General Counsel's Proposal for Interruption Performance Measures

| Index Value | Minimum Acceptable Value (annual) | Target Value (annual) |
|---|---|---|
| SAIFI | 3.8 interruptions | 2.6 interruptions |
| SAIDI | 315 minutes (5.25 hours) | 158 minutes (2.63 hours) |

Source:  Eckhoff Direct Testimony at 7.

General Counsel's testimony indicates that distribution feeders serving approximately 90 percent of EGS' Texas customer meters met the minimum acceptable values for SAIDI and SAIFI in 1996.[128] Distribution feeders serving approximately 75 percent of EGS' Texas customer meters met the target values in 1996.[129]

### b. Minimum Performance Benchmark

General Counsel presented testimony to show that a certain percentage of EGS' feeders fall below the minimum acceptable values for SAIDI and SAIFI.  As part of the remedial plan, the Company must achieve 95 percent compliance with the minimum acceptable values in 1998, so that no more than 5 percent of distribution feeders serving EGS' Texas customer fail to meet the minimum acceptable values for SAIDI and SAIFI.

---

[127] General Counsel Ex. 3, Eckhoff Direct Testimony at 7.  HLFCCG recommends an annual feeder-by-feeder standard for SAIFI of 3 interruptions and for SAIDI of 200 minutes.  HLFCCG Ex. 1, Patton Direct Testimony at 29.

[128] General Counsel reported that feeders serving 89.97 percent of EGS' Texas customer meters met the SAIFI minimum value, and 90.84 percent met the ASAI minimum value.  General Counsel Ex. 3, Eckhoff Direct Testimony at 33-34.

[129] General Counsel reported that feeders serving 75.6 percent of EGS' Texas customers met the SAIFI target value, and 76.86 percent met the ASAI target value. *Id.*

For the following year, the compliance level will be raised to 98.5 percent. In addition, in year 2 and thereafter, EGS must also meet the following conditions: (1) two or more feeders served by the same substation may not fail to attain any minimum acceptable value; (2) no feeder may fail to attain the minimum acceptable value for two or more consecutive years; and (3) 98.5 percent of all meters must receive service at a level meeting or exceeding both minimum acceptable values. Feeders with 5 or fewer meters shall not be considered in determining whether EGS has met these compliance standards. The Company will maintain or exceed the 98.5 percent compliance with these standards in the subsequent years.

To document and track this improvement, the Company shall identify the worst-performing feeders as discussed herein. EGS shall file SAIDI and SAIFI performance data for all feeders in the following way: (1) exclusive of storm effects and using the SAIDI and SAIFI definitions of major events as contained in the Commission's Electric System Service Quality Report filing (PUC Project No. 15013), and (2) inclusive of all such storm effects and defining major weather events as an ice accumulation of at least one inch of ice within the period of 24 hours, or winds greater than 80 miles-per-hour. Further, EGS shall rank all of its 431 Texas distribution feeders from best to worst according to SAIFI numbers calculated as described above. A list of the worst 10 percent shall be submitted as a part of the June 15, 1998 ESSQR filing. Because the report asks for data on the worst 5 percent of the feeders, the Company shall supplement its filing for the purposes of this docket. If the Company fails to meet the minimum acceptable value benchmark or the major-storm restoration measure for that year, as described below, one-third of the incentive pool amount, plus appropriate taxes, will be refunded to customers served by all non-complying feeders.

### c. Target Performance Benchmark

In 1998, for all feeders, the Company must achieve 85 percent compliance with General Counsel's recommended target levels for SAIDI and SAIFI to retain the corresponding portion of the incentive pool (i.e., the Company must improve up to the

target levels an additional 10 percent of its feeders, from 75 to 85 percent).   In the following year, SAIDI and SAIFI compliance with the target levels will be raised to 90 percent of feeders, and this level will be maintained or exceeded in the future.   If the Company fails to meet the target performance benchmark, one-third of the incentive pool, plus appropriate taxes, will be refunded to all Texas distribution-level customers.

### d. Treatment of Major-Storm Data

The record shows that extreme weather events can cause major outages.   For the purposes of record-keeping and performance evaluation, it is necessary to define extreme events according to actual weather conditions rather than the effect weather has on the T&D system.   For the purposes of its supplemental filing, EGS shall define extreme weather as an ice accumulation of at least one inch of ice within the period of 24 hours, or winds greater than 80 miles-per-hour.   The Company shall keep its records in a way that includes all weather events, and a separate set that includes only the major-weather events.   The determination of the Company's performance regarding SAIDI and SAIFI benchmarks shall be calculated based on the all-inclusive data.   In addition, the Commission adopts as the performance measure for major-weather events the complete restoration of all customers' electric service no later than 120 hours after the initiation of such an event (i.e., when an accumulation of one inch of ice or 80 mph wind have been recorded).   Failure to achieve this measure will preclude the Company's recovery of the one-third of the incentive pool, plus appropriate taxes, associated with the SAIDI and SAIFI minimum acceptable level compliance for that year.

If an extreme-weather event occurs on the system, and the Company believes it has a detrimental effect on the overall performance for that year, the Company may submit a good cause exception filing for the Commission's consideration on whether to include such an event in the annual evaluation of compliance with set benchmarks.

### e. Reporting Requirements

As discussed above, the Company shall file collected data regarding performance measures on a semi-annual basis, which filings shall coincide with the filing dates of the Commission's ESSQR form.   In addition to that filing, on March 1 of each year beginning in 1999, the Company shall file a proposed reconciliation statement showing the level of achievement with the established benchmarks to qualify for any part of the incentive pool.  The filing shall be audited by an independent auditor prior to filing, and the auditor's report shall be filed with the proposed reconciliation statement.  If and when the Commission approves the filing, the Company shall retain the appropriate portion of the pool or refund the corresponding portion, plus appropriate taxes, to its Texas distribution-level customers, as directed by the Commission.   SAIDI and SAIFI performance data shall be reported according to the following schedule: May through October data due on December 15; November through April data due on June 15 of each year.

## 3. Customer Service Performance Benchmarks

The performance measures listed below in Table 2 are drawn from General Counsel's recommendations, with the exception of security and street light replacement, which is based on a recommendation made by the Company.[130]  In its reply brief, EGS adopted many of the components of General Counsel's recommended performance measures for customer service.[131]  For the purposes of this remedial plan, each customer service measure will be computed for the time interval noted in Table 2, and reported to the Commission every six months, consistent with the filing dates for the service quality reports, as a separate Customer Service Report.  If all five targets are achieved by EGS in one given year, the customer service portion of the incentive pool will be retained by the

---

[130]   General Counsel Ex. 7, Goodman Direct Testimony; General Counsel Ex. 5, Burrows Direct Testimony, Attachment JBG-8.

[131]   EGS Reply Brief at 17-21.

Company for that year; otherwise, that portion of the incentive pool, plus appropriate taxes, will be refunded to distribution-level customers on a pro-rata basis.

Table 2:  Performance Targets for Customer Service Measures

| Customer Service Measure | Performance Target |
| --- | --- |
| Billing-error rate | The Texas system average monthly rate of actual customer over-billing errors per 1000 customers shall not exceed five. |
| Call center performance | Seven days a week, 24 hours per day, on a monthly basis, in every EGS call center, 85 percent of the time, calls shall be answered within 30 seconds. |
| Service installation | In any distribution substation service area, 90 percent of applications for new electric service and meters not involving line extensions or new facilities shall be filled within five working days, excluding those orders in which a later date is specifically requested by the customer.  Service installation compliance will be measured on a quarterly basis. |
| Line extensions | In any distribution substation service area, 85 percent of requests for line extensions or new facilities shall be completed within 60 working days, excluding those orders in which a later date is specifically requested by the customer.  This standard includes orders for new service and other services, installations, moves, or changes, but not complex services.  Line installation compliance will be measured on a quarterly basis. |
| Light replacements | In any distribution substation service area, 90 percent of all customer reports of security and streetlight outages shall be corrected within 48 hours.  Light replacement compliance will be measured on a quarterly basis. |

Note:  Definitions of specific terms are adopted from J.B. Goodman Direct Testimony, Attachment JBG-8.

After EGS files its first annual customer service report on December 15, 1998, the Commission Staff will work cooperatively with any party who requests it to review performance data collected by EGS relevant to the performance targets, established in Table 2 for new service installations, line extensions, and street lights, in order to determine whether the targets should be adjusted and, if so, in what manner.  No earlier than April 1, 1999, any party may petition the Commission to revise these three customer service measures and targets.  In its December filing each year, EGS shall, for the purposes of this docket, provide an annual, audited summary of customer service performance data.

**4. Quality Assurance Proposal; Independent Consultant; and Independent Auditor**

According to the terms of the amended, non-unanimous stipulation, the Company shall hire an independent consultant to assess the distribution system, develop strategies for improvement, revise data collection practices, and set up evaluation criteria procedures spelled out in the order approving that stipulation as modified.[132] Testimony in this docket exposed inconsistencies in EGS' collection, recording, and reporting of service quality indices, including SAIDI and SAIFI. The Company shall develop a quality assurance program that guarantees accurate and consistent reporting of all collected data. The Company shall file its quality assurance proposal no later than August 16, 1998.[133] The deadline shall be extended one day for every day the consultant's report addressing the EGS distribution system is filed beyond July 16, 1998. This proposal shall be developed with the input and in conjunction with the work done by the independent consultant hired under the terms of the amended, non-unanimous stipulation. To guarantee that all data and reports collected by EGS and filed with the Commission are accurate and consistent, the Company shall hire annually an independent auditor to review such data and reports.

**5. Customer Information/Notification**

The final component of the incentive plan is the information and notification requirement. Following its annual reconciliation statement filed with the Commission, the Company shall include an insert in bills to its customers that explains the service quality requirements, the Company's performance during the preceding annual period, and the amount of the refund to distribution-level customers. The insert shall contain

---

[132] On December 17, 1997, EGS, OPUC, HLFCCG, Cities, and General Counsel, jointly filed a supplementary motion for entry of an order consistent with proposed amendments to a previously filed non-unanimous stipulation.

[133] The quality assurance requirement appears consistent with the amended non-unanimous stipulation related to hiring a service quality consultant filed by EGS and other signing parties, on December 17, 1997.

instructions to customers on who to contact to report broken or malfunctioning street lights. The proposal for the scope and content of the bill inserts shall be included in the Company's annual reconciliation filing.


## IV.    Findings of Fact and Conclusions of Law

The preceding discussion explains the Commission's factual and legal conclusions with regard to the issues presented in this docket. In accordance with TEX. GOV'T CODE ANN. § 2001.141, the Commission separately states the following findings of fact and conclusions of law.


### A. Findings of Fact

Procedural History

1.    On November 27, 1996, EGS filed with the Commission its transition/rate case in Docket No. 16705.

2.    The Commission referred the case to SOAH on December 5, 1996. The preliminary order issued by the Commission on January 24, 1997, in Docket No. 16705 directed that the docket "address specific service quality standards that will apply after the transition [proposed by EGS]."

3.    On March 7, 1997, the Commission issued a supplemental preliminary order in Docket No. 16705 that focused specifically on service quality issues. That order delineated three questions which must be addressed: (1) Whether EGS has an effective and prudent management policy in place that devotes sufficient resources to ensure adequate and reliable service to its ratepayers; (2) Whether there appear patterns of variable service quality in EGS' service territory, and if so, what is the cause and potential resolution of these variations; (3) Whether the Commission should implement procedures, and if so, what procedures can it implement, to monitor service quality on EGS' system, and to respond to situations in which EGS' service quality falls below the benchmark levels.

4.    SOAH segmented the hearings in Docket No. 16705 (SOAH Docket No. 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) into four phases to address numerous transition and rate issues separately. The service quality issues were scheduled for hearing in early November 1997, in the "Competitive Issues" phase of the case.

5.      At the November 4, 1997 Open Meeting, Chairman Pat Wood, III, and Commissioner Judy Walsh voted to sever the service quality issues from Docket No. 16705 and determined that the Commission itself would hear and resolve these issues.

6.      An order issued on November 4, 1997, established Docket No. 18249 to address the service quality issues.  The order also established procedures by which the Commission would hear and rule on the service quality issues directly.

7.      Chairman Wood and Commissioner Walsh convened and presided over a public hearing on the merits on November 20 and 21, 1997, to address EGS' service quality issues.  EGS, Cities, HLFCCG, and General Counsel submitted their testimony and exhibits into evidence and conducted cross-examination.  The Chairman and Commissioner Walsh also directed questions to the witnesses.

8.      EGS, Cities, HLFCCG, and General Counsel filed post-hearing briefs in this docket on December 2, 1997.  Reply briefs were filed by these same parties on December 9, 1997.  The Office of Public Utility Counsel and the Attorney General's Office filed statements on December 2 and 9, 1997, respectively, supporting the briefs of the Cities and HLFCCG.

9.      The Commission issued its Final Order in this docket on February 13, 1998.

10.     On March 5, 1998, General Counsel and EGS filed motions for rehearing.

11.     At the March 19, 1998 open meeting, the Commission granted extensions to rule on the motions for rehearing until May 14, 1998, and to file replies until March 25, 1998.

12.     On March 25, 1998, a joint reply to motions for rehearing and motion for entry of order consistent with the parties' stipulation and agreement (the Stipulation) was filed and signed by General Counsel, EGS, HLFCCG, and OPUC.

13.     The Commission granted rehearing at the April 1, 1998 open meeting and also approved the Stipulation.

Notice

14.     Hearings held on November 20 and 21, 1997, were properly noticed in accordance with TEX. GOV'T CODE ANN. §§ 551.041, 551.043, 2001.051, and 2001.052.

15.     This matter was scheduled for discussion in open meetings convened on December 17, 1997, January 14, 1998, and April 1, 1998, for which notice was given pursuant to TEX. GOV'T CODE ANN. §§ 551.041 and 551.043.

EGS

16.    EGS is a public utility subject to the jurisdiction of this Commission in accordance with PURA §§ 14.001, 31.001, 32.001, 33.122, and 36.001 through 36.156.

17.    EGS is a wholly-owned subsidiary of Entergy, a holding company incorporated in Delaware and registered with the federal Securities and Exchange Commission in accordance with the Public Utility Holding Company Act.

18.    Entergy acquired Gulf States Utilities, Inc., to create EGS, effective as of December 31, 1993.

19.    EGS operates in Louisiana and Texas, and through its parent holding company is affiliated with investor-owned electric utilities located in Louisiana, Mississippi, and Arkansas. Entergy's headquarters is located in New Orleans, Louisiana.

20.    EGS' Texas service territory covers the southeastern part of the state. EGS' principal office in Texas is located in Beaumont.

Management Structure

21.    In Beaumont, EGS employs, among others, a network manager and a reliability supervisor. These managers report to a franchise director, also located in Beaumont.

22.    The network manager's and reliability supervisor's responsibilities include managing and dealing with system reliability, outages, restoration, and vegetation management.

23.    The network managers report to the franchise director located in Beaumont, who reports to the senior vice president of distribution operations, employed by Entergy Services, Inc., and located in New Orleans.

24.    In New Orleans, the vice president of distribution operations answers to a utility group president, who reports to a chief operating officer, and ultimately the chief operating officer of Entergy.

25.    The network manager, reliability supervisor, and franchise director do not report to the EGS president, who has offices both in Austin and Beaumont.

26.    The Company management structure is ill-suited to assure best supervision of the T&D system in the Texas territory. The supervisors in Texas answer to multiple directors in Louisiana, do not have all the necessary resources at their disposal, and their bonus incentives are tied in part to successful cost-cutting.

Transmission System

27.    The construction of EGS' transmission system started in 1924.   Half of the transmission lines currently in service were added in the 1950's and 1960's.  Since 1977, 12 percent of the lines have been newly built or rehabilitated.

28.    The Commission finds that the physical state of EGS' transmission system is adequate; few transmission-related outages or circuit breaker operations occurred.

29.    Transmission line ROW appear to be clear.

30.    The EGS transmission system appears to provide adequate, continuous, and reliable service.

Physical Condition of Distribution System and Pole Inspection Program

31.    EGS serves approximately 318,279 customers in Texas.  The distribution system in the state is comprised of 11,472 miles of electric lines; 394,865 poles; and approximately 431 feeders.

32.    EGS contracted with Osmose Wood Preserving Company to perform inspections of EGS poles and crossarms in Texas for the years 1995 and 1996.

33.    In 1995 and 1996, Osmose field inspectors inspected a total of 37,233 wood poles in eight different areas.  The poles reviewed account for 9.4 percent of the total number of poles in EGS' Texas system.

34.    Although the Osmose inspections focused on particularly troubled spots of the distribution system in Texas, certain areas revealed a number of deficient poles that was excessive by any measure.

35.    Osmose survey results show wide fluctuations in percentages of poles with decay, from 8 to 37 percent, with the average percentage being 17.9 percent.

36.    EGS proposes to implement a new pole inspection program, through which approximately 35,000 poles will be inspected annually, so that all poles in the Texas jurisdiction will be inspected by the end of the 10th year.

37.    General Counsel selected Drash Consulting Engineering Inc. to survey 33 uniformly distributed substations from the Texas portion of the EGS distribution system.

38.    General Counsel recommended that Drash inspect a representative sample of 591 poles on feeders originating from these 33 substations, of which Drash visually surveyed 582, or 98.42 percent, of poles.

39.     The Drash report picked for inspection approximately every 5th, 10th, or 15th pole from the substation. The age of the poles was determined by visual inspection.

40.     Drash filed its report on August 11, 1997, in which it identified 59 of 582 poles with structural deficiencies, such as rot, decay, or leaning, and 72 poles with encroachments by tree limbs and vegetation build-up.

41.     The Drash survey did not use specific criteria by which to evaluate the condition of the poles, but relied on the inspectors' experience.

42.     Beginning on May 12, 1997, the Commission Staff performed limited, random inspections of EGS' poles in the Vidor, Orange, Bridge City, Port Arthur, and Port Neches areas. The Staff inspections also encompassed the northern portion of the system to the western limits of EGS' service area.

43.     By August 1997, the Commission Staff surveyed 60 poles, and found that 6.7 percent had equipment deficiencies and 63 percent had ROW problems.

44.     In general, the distribution system is in adequate condition; however, there are numerous poles with decay, in need of repair or replacement, and many lines and poles that need vegetation clearing.

45.     The inspection program carried out by the Company has not been sufficiently extensive or adequate to fulfill its purpose of securing reliable service.

46.     The Company's distribution system maintenance practices have failed to assure continuous and adequate service to EGS' customers.

Reliability Indices and Performance Standards

47.     EGS uses the following standards and systems to collect and record performance measures:   System Average Interruption Frequency Index (SAIFI); System Average Interruption Duration Index (SAIDI); Distribution Interruption System (DIS); TACTICS; and a System Control and Data Acquisition devise (SCADA). General Counsel also used the Average System Availability Index (ASAI) as an outage measure.

48.     EGS begins to record a specific outage only after a customer calls in to the Company to complain. Timing of the outage duration starts after the customer alerts the Company.

49.     System-wide, the average customer in EGS' Texas territory experienced outages totaling 133 minutes (as recorded in SAIDI) in 1996. The system-wide SAIFI in Texas for 1996 was 2.648 interruptions.

50.     Fifty of 431 feeders (11.6 percent) in the EGS' Texas system were below the minimum ASAI standard recommended by General Counsel (99.94 percent or 157 minutes), while 37 (8.58 percent) feeders missed the minimum SAIFI standard of 3.8 interruptions per year.

51.     Eighty-three feeders or primary circuits experienced outage times in excess of 200 minutes during 1996.

52.     Eighteen feeders, serving 9,457 meters, are "historically deficient"[134] for SAIFI, and seventeen feeders, serving 10,835 meters, are "historically deficient" for ASAI.

53.     Nine percent of the meters did not meet minimum ASAI standards.  Similarly, 10 percent of the meters fell below minimum SAIFI benchmarks.

54.     Customers on several feeders suffered significantly more interruptions than the average customer, and with lengthier outages:  feeders Tamina and China recorded SAIDI scores of 2,477 minutes and 934 minutes, respectively, while feeder Dobbin reached a SAIDI value of 699 minutes.  Feeder Pleasure scored 10.2 interruptions, feeder Crystal had a SAIFI of 8 interruptions, and Cordrey scored 7.56 interruptions.

55.     Sixty-five feeders with approximately 58,000 customers have a SAIFI rating less than the 10-year Company average.

56.     EGS testified that it restores first those feeders with the highest numbers of customers.  Likewise, it clears vegetation first on the feeders with the most customers.

57.     EGS excluded certain data in calculating its reliability indices.  In 1994, the Company ceased counting outages in areas with less than 500 customers.  For the first six months of 1996, the Company reported 35 to 40 percent fewer outages than were reported on average during the first six months of the 1991-94 time-frame.

58.     The average outage duration during the first three years after the merger went up to 2.4105 hours, from the average of 1.8220 hours during the seven years preceding the merger.

59.     By September 1996, the number of outages reported increased by 80 percent from 1995, due to a greater number of small outages recorded.

60.     EGS prepared a Reliability Report for the Southwest Region, issued in May 1994, that summarized reliability performance for the year, compared actual performance with Company goals, identified problem areas, and reported corrective actions.

---

[134] Historically deficient feeders are those with consistently poor performance over a period of several years.

61.   Equipment failures were excluded from the May 1994 Reliability Index, as were outages attributed to public damage, non-preventable trees, load curtailment, transmission line outages, instantaneous outages, and planned outages.  EGS began reporting these types of outages again in September 1995.

62.   EGS excluded from its performance measures and reliability indices data collected during episodes of extreme weather conditions in February 1994 and January 1997.

63.   The measure of outage duration does not take into account either the number of customers who fail to alert the Company to an outage, or the length of time a customer has suffered an outage prior to notifying the Company.

64.   Linemen working for or on behalf of EGS make subjective determinations as to the cause, duration, or effect of an outage, which may hinder true and accurate reporting of the outage causes.

65.   EGS records and reports its reliability and performance data based on system-wide measures.  This method of reporting overlooks recurring individual feeder problems and pockets of disproportionately low service quality.

66.   EGS is not technically equipped at the present time to measure SAIDI and SAIFI performances at the individual customer level.  The Company, however is able to calculate performance indices on a feeder-by-feeder basis.

67.   The Company's data and compiled indices are unreliable because of changing data collection standards, failure to report all relevant information, and manipulation of the data.

Vegetation Management

68.   The purpose of vegetation management is to ensure to the extent possible that vegetation in or near ROW does not come into contact with the conductors and either break the wires or cause ground faults.

69.   Many of the outages in EGS' service territory result from trees or tree limbs falling into EGS' ROWs or distribution lines.

70.   EGS stated that it has a six-year, rural tree-trimming cycle; it calls for a 20-foot clearance.  Trees in urban areas, according to the Company, are trimmed on a three-year cycle.  The Company did not offer persuasive evidence that these cycles were actually followed.

71.   The Company stated that 80 percent of EGS' vegetation management expenditures are allocated to cyclical tree trimming.

72.    Texas vegetation management expenses in the post-merger period were $4.99 million in 1994, $5.09 million in 1995, and $4.735 million in 1996. The decrease in spending between 1995 and 1996 is attributed by the Company to unexplained efficiency gains.

73.    The total line-miles actively maintained by the Company dropped approximately 30 percent in 1996 from the 1994-1995 levels; EGS witnesses did not explain this decrease.

74.    Vegetation management spending increased by 34 percent in 1997, a significant part of which went towards the January 1997 ice storm cleanup costs.

75.    Vegetation-related SAIDI and SAIFI values have worsened since the merger. System-wide SAIDI values for Texas have increased from 21.17 in 1994 to 40.36 in 1997. SAIFI values have also increased from 0.31 in 1994 to 0.63 in 1997. As of September 1997, the SAIDI level for 1997 exceeded the SAIDI value for the entire year in 1996.

76.    Network managers in EGS' Texas territory have the responsibility to ensure adequate service reliability. Network managers, however, do not directly supervise or fully control the vegetation management program.

77.    A 1994 study by Environmental Consultants, Inc., (ECI) proposed specific recommendations for EGS' vegetation management to include herbicide and tree trimming based on plant species, equipment scheduling in the planning process, aggressive pursuit of tree removals, and performance measures for contractors. EGS has not implemented the recommendations proposed by ECI.

78.    Entergy's Internal Audit department conducted a comprehensive risk assessment study of the vegetation management program in 1996, and concluded that sufficient strategic planning had not occurred to ensure that Entergy met its objectives. The study also found that the Alliance Agreement between Entergy and vegetation management contractors was not being consistently applied in the various regions, and did not meet business objectives.

79.    Power lines cannot be shielded 100 percent from all contact with vegetation; however, the Company's inability to develop and carry out prudent vegetation management policies has resulted in major service disruptions.

80.    EGS' management structure does not provide those responsible for ensuring service reliability with direct authority to address or prevent vegetation-related outages.

81.    The Company does not have a strategic plan to guide vegetation management efforts.

82.     Neglect and backlog of vegetation management projects has posed unacceptable risks of increasing and recurrent service outages, especially during major storms.

83.     The Commission finds that the Company's vegetation management efforts have not been adequate, have led to a backlog in vegetation clearing, and have resulted in an unacceptably high risk to the system.

Emergency Preparedness, Response, and Outage Restoration

84.     In June 1996, EGS conducted a drill simulating an emergency situation in order to test its emergency response and restoration plans.

85.     EGS' emergency plan and procedures are on file with the Commission, and were reviewed by the Commission Staff after the ice storm in January 1997.

86.     In Docket No. 16301, *Ice Storm '97 Field Investigations Project*, the Commission Staff concluded that EGS had a good emergency plan in place before the ice storm of January 1997.

87.     The Commission defines "major storm" as a weather-related event in which there is a loss of power to 10 percent or more of the customers in a region over a 24 hour period and with all customers not restored within 24 hours.

88.     EGS defines major storm as any event in which 10 percent or more of a region's customers are interrupted for 24 hours or more.

89.     Many parts of Texas experienced an ice storm of significant magnitude that began early on January 12, 1997, and lasted through the afternoon of January 13, 1997.

90.     Most utilities in Texas experienced disruptions in service during the January 1997 ice storm.

91.     EGS should have been better prepared to deal with the January 1997 ice storm, given that it had experienced major weather events in 1994 and 1995, and that it had successfully conducted emergency drills in 1996.

92.     During the ice storm in January 1997, up to 120,000 of EGS' Texas customers were without power.   Restoration took seven days to complete, with temporary emergency crews mobilized from Louisiana, Mississippi, and Arkansas.

93.     By January 16, 1997, EGS had more than 2,700 personnel deployed to restore service on various parts of its Texas system.

94.     At the public hearing on November 20, 1997, city officials from the towns of Port Neches, Orange, and Nederland described numerous episodes in which the numbers of

EGS workers, equipment, and materials were insufficient to deal adequately with emergency situations.  Other officials from Cleveland, Dayton, and Port Arthur gave favorable reports of EGS' performance during the January 1997 ice storm.

95.     Mr. Dick Nugent, representing the city of Nederland, testified that after several attempts to reach EGS personnel, city officials had to retrieve an EGS supervisor from his house in Nederland to help them with power restoration efforts.

96.     Mr. A.R. Kimler, from the city of Port Neches, testified that local firefighters were deployed to cut down live power lines because EGS stated there were not enough employees to respond at the time.

97.     The impact of the January 1997 ice storm was greatly exacerbated by the Company's failure to maintain its ROW clear of excessive vegetation.

98.     While the Company has emergency plans in place, not all personnel are familiar with the plans, a fact that may have accounted for the Company's uneven and delayed restoration efforts during the January 1997 ice storm.

99.     It may be uneconomic for EGS to build, operate, or maintain a 100 percent storm-proof system.  The January 1997 ice storm, however, revealed that EGS must implement a better preventive maintenance program and faster customer response initiatives.

100.    Segregation of major-storm data from non-major storm data in outage duration and frequency reports provides a more accurate method to evaluate EGS' performance on a day-to-day basis, as well as during crisis events.

101.    The standard for classifying major storms is to be defined in terms of the severity of the weather-related event, rather than in terms of the impact on the T&D system. Feeders subject to major storms can be defined as those experiencing an accumulation of one inch of ice or more within a 24-hour period, or those exposed to winds of at least 80 mph.

102.    EGS' outage restoration efforts during the January 1997 ice storm would have been more effective if: (1) EGS had been more diligent in its preventive vegetation management practices; and (2) it had a better communication and management program in place to deal with emergency situations.

103.    The effect and incidence of lightning strikes did not materially affect the quality of service offered by the Company.

Spending Levels

104.    System-wide transmission spending followed a generally increasing trend since 1992.  No data was presented for transmission O&M expenditures on the Texas portion

of the system.

105.    Between 1994 and 1996, distribution maintenance spending decreased by $4 million each year.  Half of these cuts ($2 million each year) came from the overhead line maintenance spending.

106.    Miscellaneous distribution expenses recorded in Federal Energy Regulatory Commission (FERC) Account 588 increased from just under $3 million in 1991-1993, to $10.3 million in 1995, and $12.4 million in 1996, an increase EGS could not explain.

107.    FERC has designated Account 588 for mapping, records, communications, and other miscellaneous expenses such as clerical, stenographic, and janitorial work at buildings.

108.    EGS decreased its level of spending for pole and appurtenance replacements by 50 percent during the years 1995 and 1996.

109.    EGS' O&M spending has been uneven, lacks clear accounting, and proportionately more is spent on distribution capital additions than on distribution system maintenance.

110.    In 1995, most of the spending for distribution capital additions was in the Louisiana area.

111.    Efficiency savings have not been identified nor proven in areas where spending levels had been reduced.

112.    The Company witness could not explain whether any of the savings from the unspent T&D budget were credited according to the Entergy/GSU merger agreement (PUC Docket No. 11292).

Personnel Levels

113.    The Company has carried out substantial cuts in the number of employees assigned to T&D operations:  95 distribution employees in 1995-1996 and 26 in 1997. EGS has increased its use of contract workers during the same periods for a total net decrease of 42 permanent linemen and servicemen since the merger.

114.    Since the merger, most the terminated T&D employees were replaced with contract workers.  Sixty-six of the terminated T&D employees had on average of 18 years experience with the Company.

115.    The Company has no performance measures to evaluate contract-worker efficiency.

116.   The ratio of contract employees to permanent linemen and servicemen is now 2:1. The Commission does not oppose the use of contract employees. The present ratio of contract employees to permanent staff, however, is high, particularly in light of the extensive experience lost when many of the permanent employees were laid-off.

117.   EGS is expected to structure its line maintenance and vegetation management programs in such a way that adequate numbers of properly trained and supervised employees are promptly available.

118.   EGS hired 30 additional contract crews in October 1997, specifically to remedy a backlog of vegetation management projects.

119.   The Company lacks a clearly stated strategic plan for vegetation management, and priorities are driven primarily by budget considerations.

Customer Service

120.   An EGS customer survey reveals that satisfaction results decreased among all classes of ratepayers and for all components of service from 1995 to 1996, as more customers classified EGS service as "fair" or "bad" than "very good" or "helpful."

121.   EGS did not track customer complaints prior to 1995, nor did it track customer service performance standards. EGS began a complaint management system in January 1997 to document every complaint called in to the Company.

122.   The Company's automated voice response unit, substituted for live employees, has not led to increased customer satisfaction.

123.   EGS has failed to implement sufficient customer service procedures and has a high number of dissatisfied customers.

124.   The Company also has, by its own admission, pockets of particularly inadequate service.

125.   In a letter dated September 19, 1997, State Representative Mark Stiles wrote to the Commission expressing concern over an increase in the number of EGS customers who contacted him to complain of poor service by EGS.

126.   EGS acknowledges that it has a large number of customers who remain unsatisfied with their customer service.

127.   EGS' customer service quality is clearly deficient based on the numerous complaints to the Commission and Texas Legislature, and as indicated in the Company's own survey data.

Stipulation

128.   In the Stipulation, filed by parties on March 25, 1998, and approved by the Commission at the April 1, 1998 open meeting, the parties, among other provisions, agreed to: (1) lower the compliance level for SAIDI and SAIFI minimum acceptable level to 98.5 percent; (2) make the reporting and evaluation periods consistent with the Electric System Service Quality Report form; (3) provide for a possible review of customer service targets; (4) change the selection process of the auditor; and (5) change the due date of the quality assurance proposal to August 16, 1998.

129.   The Stipulation addressed only some of the issues raised by the parties in the motions for rehearing.   However, at the April 1, 1998 open meeting, the EGS representative indicated that if the Commission adopted the Stipulation as drafted, the parties would not appeal the Order.

### B. Conclusions of Law

1.   Entergy Gulf States, Inc., (EGS) is a public utility as defined in PURA § 31.002(1).

2.   The Commission has jurisdiction over issues addressed in this Order in accordance with PURA §§ 14.001, 31.001, 32.001, 33.122, 36.001-36.151, and 38.071.

3.   The Commission has jurisdiction over all matters relating to the conduct of a hearing in this case, in accordance with PURA § 14.051.

4.   This Order is issued in accordance with TEX. GOV'T CODE ANN. § 2001.141.

5.   PURA § 37.151(2) requires that EGS provide continuous and adequate service in its certificated service territory.

6.   EGS is obligated, pursuant to PURA § 38.001, to furnish service, instrumentalities, and facilities that are safe, adequate, efficient, and reasonable.

7.   EGS has failed to provide continuous and adequate service to many of its customers, as required by PURA §§ 37.151(2) and 38.001.

8.   In establishing a reasonable return on invested capital, the Commission is required, among other things, to consider the quality of the utility's service. PURA § 36.052(3).

9.   The Commission, after notice and hearing, may order an electric utility to provide specified improvements in its service and in a specified area if (a) service in the area is

inadequate or substantially inferior to service in a comparable area; and (b) requiring the company to provide the improved service is reasonable.  PURA § 38.071.

10.    The remedies proposed in the Stipulation are tailored to achieve the desired result as contemplated in the Final Order; implementation of such remedies is in the public interest.

## V.    Ordering Paragraphs

1.  Upon issuance of a final order in EGS' pending rate case in Docket No. 16705, the Company shall calculate the revenues equal to 60-basis points, and appropriate taxes, of the ROE established in Docket No. 16705.

2.  Within 30 days after issuance of the final order in Docket No. 16705, the Company shall submit to the Commission its calculation of the revenues equal to 60-basis points, and appropriate taxes, for Commission review and approval.

3.  If a rate reduction is ordered in Docket No. 16705, the Company shall refund to its customers an amount equal to 60-basis points of its ROE authorized in Docket No. 16705, plus appropriate taxes, for the period from June 1, 1996, through the effective date of this Order.[135]

4.  As of the effective date of this Order, the Company shall reduce collections from customers by an amount equal to 30-basis points, and appropriate taxes, of the ROE authorized in Docket No. 16705.

5.  As of the effective date of this Order, the Company shall establish an interest-bearing escrow account into which it shall deposit, on an on-going basis, the amount equal to 30-basis points, and appropriate taxes, of its ROE authorized in Docket No. 16705.

6.  The Company shall hire an independent consultant, according to the conditions set out in the amended, non-unanimous stipulation regarding the hiring of consultants, as approved with modifications by the Commission in this docket.  The consultant shall assess the distribution system, develop strategies for improvement, revise data-collection practices, establish evaluation criteria, and perform any additional work as set out in the amended, non-unanimous stipulation.

---

[135]  If the final order in Docket No. 16705 does not mandate any refunds to customers, there will not be a refund of 60-basis points to customers based on this Order for the period from June 1, 1996, up to the effective date of this Order.

7. The Company shall file a quality assurance proposal governing the collection, recording, and reporting of SAIDI and SAIFI, and any other relevant service quality measures by August 16, 1998. This filing deadline shall be extended one day for every day the consultant's report addressing the EGS distribution system is filed beyond July 16, 1998.

8. Twice annually, and starting on June 15, 1998, the Company shall file the Electric System Service Quality Report, including its supplemental filing, to document SAIDI and SAIFI feeder-by-feeder data for each six-month period, calculated in the manner discussed in this Order. The Company shall also submit a listing of the worst performing 10 percent of the Company's feeders, twice annually along with their performance data. Beginning on December 15, 1998, and twice annually thereafter, at the same time as the Electric System Service Quality Reports, the Company shall file its Customer Service Reports, relating to service installations, line extensions, and light replacements. Initial Customer Service Reports related to the remaining customer service measures (billing-error rate and call center performance) shall be due on June 15, 1998. In its December filing each year, the Company shall provide an annual, audited summary of customer performance data.

9. Beginning in 1999, and no later than March 1 of that and each subsequent year, the Company shall file with the Commission its reconciliation proposal for the funds held in escrow according to this Order for the prior calendar year. The Company's annual filing shall be audited by an independent auditor, and the audit shall be filed with the reconciliation proposal.

10. If the Commission determines that the Company has achieved the performance standards set out in this Order for a minimum acceptable level of improvement for SAIDI and SAIFI for the 10 percent of worst feeders and, if applicable, major-storm restoration process, the Company may retain one-third of the amount in escrow for that year; otherwise, the Company shall refund that amount, plus appropriate taxes, to its Texas distribution-level customers taking service from the non-complying feeders, as explained in section D(1) and D(2)(b) of this Order. If the Commission determines that the Company has achieved the performance standards set out in this Order for the target level improvement for SAIDI and SAIFI, the Company may retain one-third of the amount in escrow for that year, otherwise, the Company shall refund that amount, plus appropriate taxes, to all its Texas distribution-level customers, divided on a pro-rata basis within each customer class. If the Commission determines that the Company has achieved the performance standards set out in this Order for customer service, the Company may retain one-third of the amount in escrow for that year; otherwise, the Company shall refund that amount, plus appropriate

taxes, to its Texas distribution-level customers divided on a pro-rata basis within each customer class.

11. In conjunction with its annual reconciliation filing, the Company shall submit a proposal for customer notification. At a minimum, the proposal shall include the content and format for a billing insert that explains the service quality requirements, the Company's performance for the preceding year, street light reporting instructions and telephone number, and the amount of the escrow pool retained by the Company and/or refunded to customers.

12. The Company shall develop and implement, within the six months of the effective date of this Order, a media campaign to inform and educate customers in its Texas service territory about the importance and proper procedure for reporting to the Company malfunctioning or broken street lights.

13. The provisions of the Stipulation are approved as reflected in this Order.

14. The entry of an order consistent with the Stipulation of the parties does not indicate the Commission's endorsement of approval of any principle or methodology that may underlie the Stipulation of the parties. Neither should entry of an Order consistent with the full settlement of the parties be regarded as a binding holding or precedent as to the appropriateness of any principle or methodology underlying the Stipulation of the parties.

15. All other motions, requests for entry of specific findings of fact and conclusions of law, and any other requests for general or specific relief, if not expressly granted herein, are hereby denied for want of merit.

This Order reflects the opinion of Chairman Wood and Commissioner Walsh. Commissioner Curran was not present at the adjudicatory hearing conducted in this docket, and did not participate in the final order and order on rehearing deliberations.

SIGNED AT AUSTIN, TEXAS, the _21st_ day of April 1998.

PUBLIC UTILITY COMMISSION OF TEXAS

_____

**PAT WOOD, III, CHAIRMAN**

_____

**JUDY WALSH, COMMISSIONER**

q/share/final/18249rhr.doc

Appendix G

Excerpt from:  PUC Docket No. 16705,
Proposal for Decision

| | | |
|---|---|---|
| APPLICATION OF ENTERGY TEXAS | § | BEFORE THE STATE OFFICE |
| FOR APPROVAL OF ITS TRANSITION | § | |
| TO COMPETITION PLAN AND THE | § | |
| TARIFFS IMPLEMENTING THE PLAN, | § | |
| AND FOR AUTHORITY TO | § | OF |
| RECONCILE FUEL COSTS, TO SET | § | |
| REVISED FUEL FACTORS, AND TO | § | |
| RECOVER A SURCHARGE FOR | § | |
| UNDERRECOVERED FUEL COSTS | § | ADMINISTRATIVE HEARINGS |

## PROPOSAL FOR DECISION

## I. Introduction

Entergy Gulf States, Inc. (EGS) is an electric utility serving southeastern Texas and south central Louisiana. On November 27, 1996, EGS filed a request for (1) approval of a transition to competition plan, (2) a revision to its fixed fuel factors, (3) a general rate case, and for reconciliation of fuel expenses. The test year for the fuel reconciliation and the revenue requirement is July 1, 1995 to June 30, 1996.

## A. EGS and Entergy: A Brief Description

Entergy Gulf States, Inc. (EGS--formerly Gulf States Utilities Company) is one of Entergy Corporation's (Entergy's) five wholly-owned operating companies. Entergy is an investor-owned public utility holding company headquartered in New Orleans, Louisiana. It operates in four states with five operating companies under seven regulatory authorities. In addition to EGS, Entergy has four other wholly-owned operating companies: Entergy Arkansas, Inc. (formerly Arkansas Power & Light Co.), Entergy Louisiana, Inc. (formerly Louisiana Power & Light Co.), Entergy Mississippi, Inc. (formerly Mississippi Power & Light Co.), and Entergy New Orleans, Inc. (formerly New Orleans Public Service, Inc.), which cumulatively provide electric service to approximately 2.4 million retail customers. Entergy is regulated by five state utility commissions, various Texas

cities, the City of New Orleans, and the Federal Energy Regulatory Commission. EGS Ex. 86, Johnson Direct at 5.

Entergy Texas provides electric service to approximately 317,000 customers from the Louisiana border and Texas Gulf Coast to approximately 50 miles east of Austin, Texas. Entergy provides services to 64 incorporated cities and towns in Texas and is certificated for areas within 21 counties in Southeastern Texas. EGS sells both gas and steam in Louisiana, and it serves retail as well as wholesale customers in both Texas and Louisiana. EGS's service territory is driven in large part through the economics of the petrochemical and refining industries. EGS Ex. 86, Johnson Direct at 6.

Within Entergy, there are several functional organizations that provide services to each of the five operating companies:

- Entergy Services, Inc. provides the general executive, administrative, financial, legal, accounting, engineering and other technical services on a centralized basis for each of the various system companies.

- Entergy Operations, Inc. provides the operation and management for each of the system's five nuclear generating units.

- Retail Services manages all aspects of customer service, including marketing, customer service, and product development.

- Operations includes the operation, construction and maintenance of the transmission distribution systems, and the non-nuclear generating stations in Entergy System; energy management is also a part of this function.

EGS remains the regulated entity in Texas but many of its services are provided through other functional subsidiaries. EGS Ex. 86, Johnson Direct at 6 - 7.

## B. The EGS and Entergy Generating System: A Brief Description

EGS owns four fossil fuel power generating plants, including two in Texas and two in Louisiana. About 44 percent (2,410 megawatts (MW)) of its fossil fuel generating capacity is provided by its Texas power plants, which are located near Bridge City in Orange County (Sabine Station) and near Willis in Montgomery County (Lewis Creek Station). The Louisiana fossil fuel plants, which are located near St. Gabriel in Iberville Parish (Willow Glen Station) and Westlake in Calcasieu Parish (Nelson Station) provide the remaining 56 percent (3,076 MW) of fossil fuel generating capacity. All of these plants, with the exception of Nelson Station, Unit 6, normally use natural gas as fuel.[1]

Nelson Unit 6 is a 550 MW coal-fired unit and has no natural gas fuel burning capability. EGS owns 70 percent (385 MW) of this unit. The remaining 30 percent (165 MW) is owned by the Sam Rayburn Municipal Power Agency (SRMPA) (20 percent or 110 MW), and Sam Rayburn G&T, Inc., (SRG&T) (10 percent or 55 MW). EGS also owns 42 percent (227 MW) of a coal-fired unit known as Big Cajun II, Unit 3 and operated by Cajun Electric Power Cooperative, Inc., (Cajun), located near New Roads in Pointe Coupee Parish, Louisiana.[2]

EGS also has available, subject to the water level of Toledo Bend Lake, one-half (46 MW) of the generating capacity of two hydropower units (total of 92 MW) located on the Sabine River. The hydropower units are owned by the Sabine River Authorities of Texas and Louisiana and are operated and maintained under contract by EGS.[3]

---

[1] EGS Ex. 4 (Bakewell Direct Test.) at 3.

[2] *Id.*

[3] *Id.*

EGS operates Units 1 and 2 of the Nelson Industrial Steam Company (NISCO), a 196 MW joint venture cogeneration project.[4]

EGS owns 70 percent (655 MW) of River Bend Nuclear Station Unit 1 (936 MW). Cajun owns the remaining 30 percent (281 MW). Entergy Operations, Inc. (EOI) operates River Bend on behalf of EGS.[5]

## II. Jurisdiction, Notice, and Procedural History

### A. Jurisdiction

EGS is an electric utility as defined by PURA[6] § 31.002 and is therefore subject to the jurisdiction of the Public Utility Commission of Texas (PUC or Commission) under PURA § 32.001. The Commission has jurisdiction over this proceeding pursuant to PURA § 36.203. The State Office of Administrative Hearings (SOAH) has jurisdiction over all matters relating to the conduct of a hearing in this proceeding, including the preparation of a Proposal For Decision (PFD) with findings of fact and conclusions of law, pursuant to PURA § 14.053 and TEX. GOV'T CODE ANN. § 2003.049 (Vernon 1998).

### B. Notice

On February 28, 1997, as proof of notice, EGS filed publishers' affidavits showing that it had provided notice by publication in newspapers having general circulation in each county of the utility's service area. No party objected to the sufficiency of EGS's notice. The Commission and

---

[4] EGS Ex. 30 (Rainer Direct Test.) at 5.

[5] *Id.* at 4.

[6] Public Utility Regulatory Act (PURA), TEX. UTIL. CODE ANN. §§ 11.001-63.063 (Vernon 1998).

SOAH provided ten day's notice of the initial prehearing conference by submission of notice (filed Dec. 5, 1996) to the Texas Register and publication therein (21 Tex. Reg. 11975 (Dec. 13, 1996)).

## C. Procedural History

Five attachments appended to this (PFD) provide procedural and other information:

- Attachment A outlines the procedural history of this docket.

- Attachment B is a list of the parties and their representatives.

- Attachment C lists the intervenor-municipalities that have exercised local regulatory authority over EGS's application.

- Attachment D lists the Administrative Law Judges (ALJs) presiding in this docket.

- Attachment E lists the Preliminary Order Issues with citation to the page number of the PFD on which discussion of the issue begins.

## III. Fuel Factor Revision

In interim Order No. 148, the ALJs denied EGS's request for an interim (Phase I) fuel factor. That denial was based on (1) the inadvisability of issuing an interim fuel factor PFD when this (main) PFD was imminent, and (2) EGS's failure to satisfy the burden of proof, as shown by (a) the relative incomprehensibility of EGS's application from a big picture or bottom-line perspective, and (b) a gap in the evidence due to EGS's failure to supplement certain schedules to include purchased power and off-system sales figures for the forecast year to which the parties had ultimately agreed.

In Order No. 150, the ALJs denied EGS's motion for reconsideration of Order No. 148. The findings and conclusions supporting this denial of EGS's request for interim fuel factor will be included in a supplemental PFD to be issued as soon as possible. That supplemental PFD will also address the ALJs' recommendation on EGS's request for a final (Phase IV) fuel factor.

## IV. Fuel Reconciliation

### A. Introduction to Fuel Reconciliation

In this proceeding, EGS has requested reconciliation of about $594.1 million in eligible fuel expenses on a Texas basis.[7]

### B. Preliminary Order Issues and Fuel Rule Provisions Applicable to Fuel Reconciliation, Burden of Proof, and Prudence Standard

#### 1. Preliminary Order Issues Applicable to Fuel Reconciliation

In its preliminary order in this case, the Commission declined to specify any issues relating to the fuel reconciliation and instead directed the parties to address those issues generally addressed in fuel reconciliation proceedings.[8] The supplemental preliminary order, issued March 7, 1997, did not add any fuel reconciliation issues.

#### 2. Fuel Rule Provisions Applicable to Fuel Reconciliation

PURA § 36.203(e) requires the Commission to provide by rule for the reconciliation of fuel costs on a timely basis. The Commission's fuel rule, P.U.C. SUBST. R. 23.23(b), includes such

---

[7] EGS Ex. 23B (Monroe Supp. Direct Test.) at 3.

[8] Preliminary Order at 25 (Jan. 24, 1997).

procedures. In particular, subsection 3 of the fuel rule (*i.e.*, P.U.C. SUBST. R. 23.23(b)(3)) supplies

substantive and procedural[9] standards for a fuel reconciliation proceeding, as follows:

- (A) prescribes the information required to be included in fuel reconciliation filings;
- (B) determines the burden of proof in, and the scope of, a fuel reconciliation proceeding;
- (C) sets out the method for calculating any refund or surcharge resulting from a reconciliation;
- (D) provides guidelines for setting a procedural schedule for a fuel reconciliation proceeding.

Particularly noteworthy are subsections 3(A) (contents of filing) and 3(B)(i) (burden of proof) and

(ii) (scope of proceeding). Under P.U.C. SUBST. R. 23.23(b)(3)(A), a utility's application and

supporting testimony must include certain information in the format specified by the Commission's

filing package.[10] Under P.U.C. SUBST. R. 23.23(b)(3)(B)(i), a utility has the burden of proving that:

(1) fuel expenses were reasonable and necessary; (2) affiliate fuel expenses were reasonable and

necessary and no higher than prices charged by the supplying affiliate to other affiliates or

unaffiliated persons or corporations; and (3) fuel revenues were properly accounted for. Under

P.U.C. SUBST. R. 23.23(b)(3)(B)(ii), the scope of a fuel reconciliation proceeding includes any issue

related to determining the reasonableness of the utility's fuel expenses and whether the utility has

over- or under-recovered its reasonable fuel expenses.

## 3.     Burden of Proof

As stated above, under P.U.C. SUBST. R. 23.23(b)(3)(B)(i), a utility has the burden of proving

that: (1) fuel expenses were reasonable and necessary; (2) affiliate fuel expenses were reasonable

and necessary and no higher than prices charged by the supplying affiliate to other affiliates or

unaffiliated persons or corporations; and (3) fuel revenues were properly accounted for.

---

[9] Subsection 4 of the fuel rule governs notice, which is addressed on p. 4 *supra*.

[10] EGS filed the schedules required by the Commission's general rate case rate filing package (Official Notice Ex. 1) rather than those set out in the fuel reconciliation filing package. The ALJs found that this was not a material deficiency. Order No. 20 at 2 (Jan. 21, 1997).

Two fuel reconciliation burden-of-proof subjects are worthy of discussion: (1) the placement of the burden of proof on EGS, and (2) the value of contemporaneous documentation in satisfying the burden of proof.

### a.    Placement of the Burden of Proof

Regarding EGS's burden to establish its prudence, the ALJs concur in General Counsel's well stated expression of what EGS seems to have forgotten:[11]

> ... A utility's fuel expenses are not presumed to be reasonable.[12] There is no presumption in the [fuel] rule, in Commission precedent, or in PURA. A utility can carry its burden, even when there is no opposition, only by making a prima facie case, that is, one which standing unchallenged would compel adoption of the utility's position.[13] Simple assertions and summaries, unsupported by contemporaneous documents, have a difficult time making up a prima facie case.
>
> The utility's task is not finished when it makes a prima facie case, by a preponderance of the evidence that its expenditures were in fact reasonably incurred. That case may be challenged, and the challenger can make a reasonable challenge without introducing evidence which directly establishes imprudence. A challenger need not establish that a particular decision proximately caused unnecessary or [avoidable] costs.[14] The challenging evidence need only *tend* to disprove prudence by making a prima facie case.[15] Once such evidence has been produced by the

---

[11] GC Reply Brief at 6-7 (emphasis in original) (footnotes slightly changed from original).

[12] *Petition of General Counsel for a Fuel Reconciliation for Southwestern Public Service Company*, Docket No. 9030, 17 P.U.C. BULL. 395, 411-413 (June 3, 1991) (hereinafter Docket No. 9030).

[13] *Application of Texas-New Mexico Power Company for Authority to Change Rates*, Docket No. 10200, 19 P.U.C. BULL. 89, 146 (Mar. 18, 1993).

[14] *Application of Texas-New Mexico Power Company for Authority to Change Rates*, Docket No. 9491, 16 P.U.C. BULL. 2825, 2858-2859 (Feb. 7, 1991) (hereinafter Docket No. 9491).

[15] *Inquiry of the Public Utility Commission of Texas into the Prudence and Efficiency of the Planning and Management of the Construction of the South Texas Nuclear Project*, Docket No. 6668, 16 P.U.C. BULL. 183, Conclusion of Law No. 14 at 483 (June 20, 1990) (hereinafter Docket No. 6668).

challenger, the burden returns to the utility to produce evidence to show, by a preponderance of the evidence, that the challenged decisions were prudent.[16]

When what is at issue is not simple facts, such as the price actually paid, but why certain things were done, ... [and when] one party is far better able to know what the relevant facts were and how they fit together, it is manifestly reasonable to require only that a challenge be plausible, and that rebuttal be substantial. In particular, if a party has peculiar knowledge of the facts which must be proven, it will have the burden of proof regarding those facts.[17] ...

A utility which does not present all the evidence relevant to its claim to have acted prudently cannot succeed by pointing to mere evidentiary gaps in challengers' cases. "Only upon presentation of the affirmative evidence supporting *all* of the utility's actions during the reconciliation period can interested or affected persons know exactly what actions were taken."[18]

In reviewing EGS's fuel reconciliation application, the ALJs have adopted the General Counsel's reasoning (strongly supported by Commission precedent) regarding the placement of the burden of proof.

**b.    <u>Contemporaneous Documentation</u>[19]**

Cities, NSST, OPC, and General Counsel sang a chorus of dismay in this proceeding at EGS's lack of contemporaneous documentation to support its claims of prudence. EGS rejected

---

[16] Docket No. 6668, 16 P.U.C. BULL. 183, Conclusion Of Law No. 15 at 484; Docket No. 9491, 16 P.U.C. BULL. 2825, Conclusion of Law No. 16 at 3216. ("Once the prudence of the utility's actions are challenged, the burden is on the utility to prove, by a preponderance of the evidence, that the expenditures were, in fact, prudently incurred.")

[17] This is consistent with Texas civil procedure. *Complaint of the Sunmeadow Community Improvement Ass'n of Friendswood, Texas, Against Southwestern Bell Telephone Company*, Docket No. 11253, Order No. 12, 18 P.U.C. BULL. 1495, 1497 (Feb. 23, 1993).

[18] Docket No. 9030, 17 P.U.C. BULL. 395, 413.

[19] The argument on this issue can be found at: EGS Initial Brief at 64; Cities Initial Brief at 6-8; NSST Initial Brief at 8; OPC Initial Brief at 4-6; EGS Reply Brief at 15-17; Cities Reply Brief at 2-3; GC Reply Brief at 4-7.

these calls for contemporaneous documentation as a misplaced mantra.[20] This utility has certainly heard that mantra before.

###        i.          EGS's Past Contemporaneous Documentation Cases

####        (a)        Docket No. 6525

In Docket No. 6525, the Commission found that EGS's predecessor GSU imprudently contracted for capacity with the Southern Company.[21] GSU had resorted to independent retrospective analyses to demonstrate the prudence of its Southern capacity purchase, but the Commission found that those post hoc justifications failed to show that GSU had considered or analyzed alternative load forecasts or power suppliers, or the possibility that the purchase could have been avoided at lesser cost by generation capacity construction, cogeneration, or load management.[22]

> Upon the appeal of the Commission's decision, the appeals court found as follows:
>
> The utility without contemporaneous evidence to support its decision-making process faces a heavy burden. The Commission will subject its after-the-fact justifications to rigorous review. The lack of documentation impedes the Commission's ability to

---

[20] EGS Initial Brief at 64.

[21] *Application of Gulf States Utilities Company for Authority to Change Rates*, Docket No. 6525, 12 P.U.C. BULL. 1043, Conclusion of Law No. 28 (pp. 1256, 1283) (Oct. 15, 1986). This decision was also the culmination of *Inquiry of the Public Utility Commission of Texas concerning the Fixed Fuel Factor of Gulf States Utilities Company*, Docket No. 6477, *Appeals of Gulf States Utilities Company from Rate Proceedings of the Cities of Port Neches, et al.*, Docket No. 6660, *Appeals of Gulf States Utilities Company from the Rate Proceedings of the City of Orange, et al.*, Docket No. 6748, and *Appeals of Gulf States Utilities Company from the Ratemaking Proceedings of the City of Lumberton*, Docket No. 6842.

[22] *Id.* at Finding of Fact Nos. 50-57, 60-69 (pp. 1250-52, 1279-82).

determine whether the utility conducted a reasoned investigation of all relevant factors and alternatives before reaching its decision.[23]

The court also noted that an attempt to show prudence by a retrospective analysis is "inherently defensive and hence more suspect." The court went on to quote from ALJ Drews's Examiner's Report as follows:

> First, after-the-fact analyses are not created for the purpose of helping corporate management reach the best decision, which would have tended to encourage frankness about problems with different courses of conduct. Rather, they are produced for the purpose of defending conduct already engaged in, which might have the opposite effect. Second, such analyses might describe events, available information, alternatives, and decisions less accurately and completely than contemporaneous documents, due to such problems as imperfect recollection, changes in personnel or corporate philosophies and the influence of hindsight. For these reasons, utilities are well advised to keep appropriate documentation.[24]

EGS attempted to distinguish the present case from the above decisions by urging that, in this case, EGS has presented, not later-hired independent consultants, but company witnesses with decision making authority and with personal knowledge of the evaluations conducted and the alternatives considered. As to one particular dispute in this case, EGS also alleged that it in fact provided contemporaneous documentation in the form of a reconstruction from computer records and the recollections of company personnel with personal knowledge of the transactions in dispute.[25] The ALJs will address this last statement in the supplemental PFD regarding EGS's February 1996 gas expenses. The ALJs observe, however, that EGS has also wholly failed to produce anything

---

[23] *Gulf States Utilities Company v. Public Utility Commission of Texas*, 841 S.W.2d 459, 476 (Tex. Civ. App.--Austin 1992, writ denied).

[24] *Ibid.*

[25] *See* Tr. (Harrington) at 3904-13.

even resembling contemporaneous documentation with respect to other matters, such as the two long-term gas contracts which it entered into this reconciliation period.[26]

### (b)    Docket No. 10894

In this utility's last published litigated fuel reconciliation case (Docket No. 10894), a dispute arose regarding GSU's failure to maintain any copies of its critical progress and status reports from a River Bend refueling outage. No related findings, conclusions, or ordering paragraphs were found during a brief review of the final Order in that case, but the ALJ there did observe, "It seems foolhardy ... for GSU not to maintain at least one copy of such documentation until it obtains a Commission order reconciling its fuel costs for that period. The responsibility to maintain sufficient documentation falls on the utility."[27]

### ii.    Testimony and Briefing on Contemporaneous Documentation

Some of the more interesting testimony on contemporaneous documentation came from EGS witness Mr. Langdon, who said, among other things, that a prudence determination should be based on the circumstances at the time of an event, not on a post hoc justification. He also stated his belief that undocumented or anecdotal evidence "should be dealt with very, very carefully and not given

---

[26] *See id.* at 3929.

[27] *Application of Gulf States Utilities Company to Reconcile Fuel Costs, Establish New Fixed Fuel Factors, and Recover Its Under-Recovered Fuel Expense*, Docket No. 10894, Examiner's Report, 19 P.U.C. BULL. 1401, 1501 (Aug. 19, 1993).

the same weight" as contemporaneous documentation.[28] Furthermore, he concurred with Cities'

attorney that a decision involving millions of dollars should be documented.[29]

One of the more enlightening brief arguments was EGS's claim that its mission is to keep

the lights on, and when business is busy, there may not be time for documentation.[30] Though the

ALJs agree that keeping the lights on is of paramount importance, the ALJs disagree with EGS's

claim that this is an either/or proposition.

### iii.    ALJs' General Conclusions regarding Contemporaneous Documentation

In this case, when it came to EGS's early February 1996 gas purchases (to be addressed in

a supplemental PFD), the two natural gas contracts EGS signed during the reconciliation period,

EGS's bidweek gas purchases throughout the reconciliation period, and the sale of 500,00 pounds

of uranium in 1977 by GSU, EGS either simply failed to conduct any analyses, or if it did conduct

analyses, it did not reduce them to paper (or silicon), or if it did memorialize the analyses in

documents, it did not retain and maintain them. EGS suggested that credible testimony by witnesses

with personal knowledge can satisfy the burden of proof despite  a complete lack of

contemporaneous documentation.[31] The ALJs believe that, in the abstract, this is likely a correct

view of the burden of proof, though EGS appears to underestimate the steep uphill nature of that

evidentiary path.  However, as will be seen below, the failure to maintain contemporaneous

---

[28] Tr. (Langdon) at 4387-88. EGS's Initial Brief also cited to this general area of the transcript in an attempt to support a claim that Mr. Langdon testified that "while documents are necessary, they are not a requirement ... ." EGS Initial Brief at 65. This non sequitur suggests that EGS, like the ALJ, found it hard to reconcile its position with Mr. Langdon's testimony.

[29] *Id.* at 4433.

[30] EGS Initial Brief at 64.

[31] EGS Reply Brief at 16-17.

documentation may result in a comparison to the most appropriate benchmark available in the evidentiary record, else in a determination that the burden of proof has not been satisfied.

## 4.      Prudence Standard

### a.      Analysis of Process vs. Comparison to Benchmark

The ALJs conclude that use of a benchmark is appropriate when the record contains insufficient contemporaneous documentation or insufficient credible, EGS-specific evidence that is quantifiable or confirmable.[32]

### b.      Prudence and Competition[33]

Early in the proceeding it became clear that EGS and the other parties disagreed not only about the placement of the burden of proof, but also about the nature of the prudence standard. In particular, the dispute centered on whether the Commission's recent discussion of the prudence standard and competitive proxy principles in EGS's last fuel reconciliation case heralded a new and different standard, or whether it simply placed the traditional prudence wine in a new bottle with the word "competition" added on the label.[34] In the Docket No. 15102[35] Order and Order on Rehearing,

---

[32] *See* GC Reply Brief at 8-11.

[33] The argument on this issue can be found at: EGS Initial Brief at 28-29; Cities Initial Brief at 5-6; General Counsel Initial Brief at 5-7; EGS Reply Brief at 14-15.

[34] This dispute first arose when EGS objected to the testimony of Cities witnesses Mr. Schneider and Mr. Hubbard. Much the same arguments were made then as have been made more recently in post-hearing briefs. In Order No. 91, the ALJ was unable to determine whether the Docket No. 15102 order was simply reiterating the prudence standard or announcing a new standard. Order No. 91 at 4 (June 11, 1997). The ALJ therefore allowed the testimony to remain, in the hope that cross-examination and briefing would yield additional insight. They have.

[35] *Application of Gulf States Utilities, Inc. to Reconcile Fuel Costs,* Docket No. 15102, ___ P.U.C. BULL.___, (June 24, 1997) (not yet published) (hereinafter Docket No. 15102).

the Commission included language that could suggest either result. Two sentences arguably suggest that the competitive proxy principles[36] constitute a new standard:

(1) Because the Commission did not indicate by rule, case precedent, or preliminary order that a standard different from [the traditional Docket No. 6668 standard] would apply in this proceeding, the PFD properly cited the traditional prudence standard as the measure by which EGS's actions are judged in this docket.[37]

(2) While the traditional application of the prudence standard is appropriate in this case, circumstances may dictate otherwise in the future, as long as the utility is given proper notice of what standard the Commission will employ.[38]

On the other hand, one sentence suggests that nothing has really changed:

(1) These concepts are nothing new.[39]

As additional evidence that the principles are not new, Cities and General Counsel pointed to the Commission's reference to a longstanding statutory provision regarding the Commission's role

---

[36] Those competitive proxy principles are as follows: "(1) the regulation of utilities is a substitute for the forces of competition and, therefore, (2) utility actions and decisions should be analyzed relative to the actions and decisions that would be made under the same or similar circumstances in a competitive environment." *Id.* at 3.

[37] Docket No. 15102, Order on Rehearing at 2, citing *Inquiry of the Public Utility Commission of Texas into the Prudence and Efficiency of the Planning and Management of the Construction of the South Texas Nuclear Project,* Docket No. 6668, 16 P.U.C. BULL. 183, 483 (June 20, 1990).

[38] *Id.* at 4. It could also be argued that this sentence, which is contained within a discussion of cost-of-service regulation and performance-based regulation, merely means that the Commission may not impose an unannounced performance criterion (such as an industry median nuclear fuel expense cap) during a fuel reconciliation, so long as a utility has met the burden of proof and satisfied the prudence standard under a traditional "reasonable and necessary" review.

[39] *Id.* at 3.

as a proxy for the normal forces of competition.[40]   In other words, they argued that the Docket No. 15102 Order on Rehearing simply provided a reminder of that statutory provision element's existence; *i.e.*, the Commission did not even rebottle the prudence wine, but instead simply dusted off the label to reveal one of the ingredients that may have been forgotten by some. General Counsel also suggested that this time of transition-to-competition requires an application of the following two principles: "(1) prudent utilities know, or should have known for some time now, that they will be operating in a substantially more competitive world in the foreseeable future and, therefore, (2) they should be raising their own standards for prudent management of their resources and responsibilities in order to prepare for that future."[41]

EGS, on the other hand, argued that it had no notice of a new prudence standard, and that it could not be bound in this case by a standard articulated on April 1, 1997(when the first final order in Docket No. 15102 was issued), long after the end of this reconciliation period (July 1, 1995 to June 30, 1996).[42]

The ALJs do not propose to recommend a definitive resolution for this argument. For the purpose of this case, the ALJs conclude that the recommended disallowances would be the same under either statement of the standard. Thus, the ALJs effectively conclude that, for this case, the competitive proxy principles do not constitute a change to the prudence standard for fuel reconciliations.

---

[40]  TEX. UTIL. CODE ANN. § 11.002(b) (Vernon 1998) (formerly PURA § 2.001(a)).

[41]  General Counsel Initial Brief at 6-7.

[42]  *See Kittman v. State Board of Pharmacy*, 607 S.W.2d 26, 28 (Tex. Civ. App.--Tyler 1980, no writ); P.U.C. SUBST. R. 23.23(b)(6).

# Appendix H

# Excerpts from:  PUC Docket No. 16705,
## Second Order on Rehearing

RECEIVED

98 OCT 14 AM 9: 02

PUBLIC UTILITY COMMISSION
FILING CLERK

APPLICATION OF ENTERGY TEXAS §
FOR APPROVAL OF ITS TRANSITION §
TO COMPETITION PLAN AND THE § PUBLIC UTILITY COMMISSION
TARIFFS IMPLEMENTING THE PLAN, §
AND FOR THE AUTHORITY TO § OF TEXAS
RECONCILE FUEL COSTS, TO SET §
REVISED FUEL FACTORS, AND TO §
RECOVER A SURCHARGE FOR §
UNDER-RECOVERED FUEL COSTS §

## SECOND ORDER ON REHEARING

This Second Order on Rehearing (Order) addresses the application filed by Entergy Gulf States, Inc. (EGS or the Company) on November 27, 1996, in accordance with Paragraph 9b of the Stipulation and Agreement approved by the Commission in Docket No. 11292.[1] Through this Order, the Commission adopts in part and modifies in part the Proposal for Decision (PFD) as corrected and the Supplemental Proposal for Decision (SPFD) issued by the State Office of Administrative Hearings (SOAH) Administrative Law Judges (ALJs) in late March 1998.[2]

## I. Introduction

The SOAH ALJs conducted separate evidentiary hearings on the four component parts of this docket: fuel, revenue requirement, cost allocation/rate design, and competitive issues. After completion of the hearings and review of the record evidence, the ALJs recommended that the Commission order EGS to reduce its current Texas retail base rates by $137 million, which

---

[1] *Application of Entergy Corporation and Gulf States Utilities Company for Sale, Transfer or Merger,* Docket No. 11292, 19 P.U.C. BULL. 2040, 2041 (Ordering Paragraph 5) (Dec. 29, 1993).

[2] The ALJs issued the PFD on March 25, 1998, as revised by clarifications, revised text, and revised schedules filed on June 4, 12, and 16, 1998. The ALJs issued the SPFD, which addresses supplemental fuel-related issues, on March 27, 1998. The Commission considered the matters addressed in this Order at its open meetings convened on June 30, July 8 through 10, July 13, July 16, and July 22, 1998. The Commission issued its "final" order in this docket on July 22, 1998. The Commission considered motions for rehearing at its open meetings convened on August 26, and October 8, 1998. A more detailed procedural history of this case is contained in Attachment A to the PFD and the Findings of Fact (FoF) and Conclusions of Law (CoL), as modified, contained in this Order.

5006

represents a 29% reduction from current base rates. The rationale for this recommended reduction is set forth in detail in the PFD and SPFD which, together, total over 800 pages.

In this Order, the Commission directs EGS to reduce its Texas retail base rates in conformance with the attached schedules (approximately $111 million, or $26 million less than the reduction recommended by the ALJs). This base rate reduction, and the Commission's rationale for modifying portions of the PFD and SPFD, are explained in detail in the Discussion section of this Order. In this Introduction, the Commission focuses primarily on the three most contentious issues in this docket: (1) treatment of EGS' claimed affiliate expenses; (2) the treatment of EGS' "excess costs over market" (referred to either as "ECOM" or "potentially stranded investment"); and (3) interruptible service.

## A.    Affiliate Expenses

The ALJs concluded in the PFD that EGS failed to meet its statutory burden of proof to justify recovery of approximately $86 million in Texas retail affiliate expenses. The ALJs therefore recommended that the Commission disallow all of these claimed costs.[3] This $86 million in recommended disallowed expenses is comprised of $49 million billed to EGS by its corporate service affiliate, Entergy Services, Inc. (ESI), or allocated to EGS by its nuclear service affiliate, Entergy Operations, Inc. (EOI), plus an additional $37 million direct-billed to EGS by EOI.[4] In the alternative to a full disallowance, the ALJs recommended that the Commission could potentially justify allowing EGS to recover the direct-billed EOI affiliate expenses ($37 million), but that the record clearly required disallowance of the $49 million in ESI and EOI allocated expenses. (To avoid confusion, this Order refers to the ESI billed and EOI *allocated* expenses as the $49 million in disallowed "ESI" expenses; the $37 million in EOI *direct billed* expenses are referred to as the "EOI" expenses.) In this Order, the Commission adopts the ALJs'

---

[3] For convenience, this Introduction refers only to the Texas retail affiliate expenses claimed by EGS. The Company's application and the PFD actually refer primarily to "system-wide" affiliate expenses in the range of $200 million. The system-wide expenses include affiliate expenses allocable to EGS' services in Louisiana, services in the Texas wholesale market, and services in the Texas retail market.

[4] The complexity of the affiliate transactions affecting EGS (previously Gulf States Utilities, Inc. (GSU)) significantly increased when Entergy Corporation purchased GSU in 1993, thereby creating EGS.

are now declining. By allowing the Company to surcharge the AOD expense over a three-year period, the Commission moves closer to intergenerational equity than would occur if future customers are required to pay the AOD over the remaining life of River Bend. Thus, the Commission's treatment both mitigates EGS' ECOM and better matches the recovery period for the AOD to the time period in which the AOD would normally have been expensed.

## C.    Interruptible Service

The Commission concludes that the current demand charge credits provided to the interruptible service (IS) customers will not be subject to partial imputation as recommended by the ALJs. The current IS demand and energy charges also will not be reduced in tandem with the base rate reductions applicable to firm customers. Instead, the demand and energy charges to IS customers, under the IS rider, will be frozen at current levels. This treatment results in the IS customers continuing to receive interruptible service at rates below firm service, but narrows the demand charge credit as base rates for firm customers are reduced. Also, by freezing the energy charges billed to IS customers under the IS rider, the Commission is ensuring that IS customers are allocated their fair share of transmission costs and, where applicable, distribution costs.

## D.    Overall Effect of this Order

The Commission affirms the majority of the PFD, but concludes that the record evidence requires modification to a number of findings and conclusions reached by the ALJs. In addition to the modification summarized above, the Commission modifies the ALJs' recommendations to conclude that (1) EGS' wheeling expenses and revenues should be subject to base rate treatment, rather than fuel reconciliation and fuel surcharges; (2) in recognition of the remedies established in EGS service quality case,[25] the Company's rate of return on equity (ROE) will be set at 11.1% for the period June 1, 1996 through May 12, 1998, and at 11.4% from May 13, 1998 through the remainder of the effective period of the rates in this docket;[26] and (3) the Company is also

---

[25] *Entergy Gulf States, Inc. Service Quality Issues (Severed From Docket No. 16705)*, Docket No. 18249, Order on Rehearing (April 22, 1998) (*EGS Service Quality*).

[26] The remedies established in *EGS Service Quality* will remain in place for some period beyond the rate period subject to this docket. Thus, the ROE reduction remedy will also apply in at least some portion of EGS' next effective rate period.

entitled to recover approximately $10 million more in fuel expense than recommended by the ALJs.

The following discussion addresses each of the Commission's modifications to the PFD and SPFD. The discussion does not track the sequence of the SOAH recommendations, but begins with the larger transition items arising in the competitive issues and revenue requirement phases. Discussion of the cost allocation/rate design and fuel issues follows in that sequence. This Order also includes a separate section addressing how refunds will be treated in this docket, including refunds resulting from a companion order on rehearing issued on September 2, 1998 in *Gulf States Utilities Company Remand of Actual Taxes Paid Issues,* Docket No. 18290.

Also attached to this Order are schedules detailing (1) the Company-wide Revenue Requirement and Invested Capital (Commission Schedules I through VI); (2) the Revenue Requirement and Revenue Deficiency (Commission Schedule KS-J1); (3) the Texas Retail Class Revenue Requirement Assignment, the Texas Retail Class Revenue Requirement Allocation, and the Texas Retail Class Rate Base Allocation (Commission Schedules KS-TX/1 through KS-TX/3, respectively); and (4) the Calculation of the Fixed Fuel Factor and the Allocation of Fuel Over/Under Recovery by Rate Class (Commission Schedules KP-Fuel/1 and KP-Fuel/2, respectively).

To the extent *not* addressed below, the Commission affirms the ALJs' discussions and proposed findings of fact (FoFs) and conclusions of law (CoLs) without substantive modification.

the ALJs in effect are recommending an improper double disallowance because, in the SPFD, the ALJs recommend disallowance of certain natural gas expenses related to fuel burns in February of 1996. As stated by General Counsel, "[t]he Commission therefore should not disallow imprudent fuel costs related to EGS's failure to burn fuel oil, on the one hand, and refuse to include the fuel oil in inventory, on the other."[60]

The Commission agrees with General Counsel and EGS; if the February 1996 natural gas expenses are to be disallowed as imprudent (which they are, as discussed below), the Company should be permitted to recover the costs of the No. 6 fuel oil that it should have burned in lieu of the disallowed high cost natural gas. Accordingly, to reflect the preponderance of evidence in the record, FoF 117 is modified and FoF 117A is added to find that the fuel oil working capital in rate base is $5,110,085, rather than $2,085,630.

## 5.     Return on Equity

The Commission affirms the ALJs' recommendation to set the Company's ROE at 11.7% in this docket with the following modifications. First, the Commission acknowledges that an appropriate range for EGS' ROE is 9.65% to 13.94%. This range is based on both the constant growth and the multi-stage non-constant growth discounted cash flow (DCF) analyses. As the ALJs recognized, using both of these models more closely resembles the balance employed by the Commission in Docket No. 14965. Accordingly, FoFs 128 and 129 are modified, New FoF 128A is added, and FoFs 130-132 are deleted. Additionally, the Commission modifies FoF 134 to reflect that, although adjustments to EGS' ROE were not modified in this case for poor demand-side management and affiliate transactions, the Commission retains full discretion to make such adjustments in a future case.

Second, a new FoF 128B is added to reduce the 11.7% ROE by 60 basis points to 11.1% for the period June 1, 1996 through May 12, 1998, and by 30 basis points to 11.4% from May 13, 1998 through the remainder of the period in which the rates subject to this docket are in effect. This bifurcated ROE reduction is required by the Commission's determinations in the related

---

[60] *See* General Counsel's Brief on Exceptions at 18.

*EGS Service Quality* proceeding (Docket No. 18249), which concluded that the ROE ultimately authorized in this docket (Docket No. 16705) would be reduced permanently by 60 basis points from the date refunds become effective in this docket "through the effective date of [the final order in Docket No. 18249]."[61] After the effective date of the final order in Docket No. 18249 (that is, May 12, 1998), the authorized ROE in Docket No. 16705 is increased by 30 basis points to 11.4%, but the Company must escrow that 30 basis points of ROE. As provided in *EGS Service Quality,* the Company will be permitted to retain up to the full amount of the escrowed 30 basis points if it meets certain service quality benchmarks established in that proceeding.[62] If it does not meet those benchmarks, some portion or all of the escrowed amount will be refunded to customers, thus effectively resulting in a minimum ROE of 11.1%. These ROE reductions are not predicated on a finding that the ALJs erred in recommending the 11.7% ROE. Rather, they are based on the Commission's rulings in *EGS Service Quality.* Accordingly, new FoF 128B is not a modification to the ALJs' ROE recommendation subject to APA § 2003.049(g), but rather is made to conform the ROE in this docket to the rulings in Docket No. 18249.

Third, the reduction to the Company's authorized ROE also results in a reduction to the ALJs' recommended return on invested capital.[63] This authorized overall return dollar amount is therefore reduced as reflected on the attached Commission Schedules I and IV. In addition, FoFs 134 and 135 are modified respectively to clarify that only the direct-billed EOI expenses are approved in this docket, and to reflect the adjustment to the overall cost of capital as a result of the Commission's decisions in *EGS Service Quality.*

### 6.    Amortization Expense

The amortization expense reflected on Schedule I must be decreased to reflect the removal of $9 million in annual amortization expenses related to the AOD discussed in the

---

[61] *EGS Service Quality* Order on Rehearing at 51 (Ordering Paragraph 3).

[62] *Id.* at Ordering Paragraph 5.

[63] This figure is the corrected amount reflected in Schedules I and IV of the ALJs' June 12, 1998 clarification. The original PFD recommends a slightly higher figure. PFD at 317.

before the next fuel reconciliation. Therefore, EGS is not required to file a fuel reconciliation with the November 1998 rate case, and a good cause exception to the rate case filing requirement is granted accordingly. The SOAH ALJs assigned to the next case will address the procedural issues raised by EGS. Otherwise, EGS should be prepared to address any other revenue requirement and major rate design issues in the November 1998 rate case. Accordingly, FoFs 96R through 96U are added to clarify this issue.

Finally, EGS has not proposed to recover its rate case expenses or the Cities' rate case expenses in this docket. The question remained whether the Company might attempt to recover these expenses in a future docket. At the Commission's open meeting on July 10, 1998, representatives of EGS committed orally on the record that the Company will not seek to recover Cities' or its own rate case expenses in this proceeding or any future proceeding. Accordingly, a FoF 164 is modified and a new FoF 164A is added to reflect this commitment.

## IV.     Findings of Fact and Conclusions of Law

The section consolidates the FoFs and CoLs contained in both the PFD and SPFD, as modified in accordance with the foregoing discussion. The numbering sequence contained in the PFD is retained; the SPFD FoFs and CoLs are integrated into this sequence by placing them in the proper location and changing the SPFD number to a corresponding numbered *and* lettered designation. The designation "SFoF" refers to the findings in the Supplemental PFD. The references to "Revised PFD" refer to the corrected pages to the PFD filed by the ALJs on June 4, 1998.

### A. Findings of Fact

1.     Entergy Gulf States, Inc. (EGS) is an electric utility serving southeast Texas and south central Louisiana and is one of five wholly-owned operating companies of the Entergy Corporation, an investor-owned public utility holding company headquartered in New Orleans, Louisiana.

**Property Insurance Reserve Balance**

120. The reasonable and necessary reserve balance in rate base for property insurance should be ($15,572,000).

**Other Adjustments to Invested Capital**

121. Based on an amortization period ending January 31, 2000, the test year amortization expense for deferred financing costs would increase by $5,903,700, and amortization expense for property cancellation loss for River Bend 2 would decrease by $1,365,396, for a net increase in test year amortization of $4,538,304.

122. No expenditures necessary to produce cost savings related to the merger between EGS and Entergy Corporation should be reflected in rate base consistent with the decision to disallow all such costs.

123. From April 1994 through the end of the test year, June 30, 1996, EGS collected $36,205,679 on a total Company basis for post-retirement expenses other than pensions (OPEBs). This amount should not be reduced by EGS' OPEB trust funds, as EGS has not had access to the funds with which to fund rate base.

124. The following are appropriate adjustments to EGS' requested level of invested capital:

| Account | 13 Mo. Avg. | Adjustment | Total Level |
|---|---|---|---|
| Injuries and Damages | ($5,543,000) | $643,000 | ($4,899,000) |
| Coal Car Maint. Reserve | ($4,071,000) | ($91,000) | ($4,162,000) |
| Customer Deposits | ($21,510,000) | ($860,000) | ($22,370,000) |
| Contractor Retainage | ($455,000) | 11,000 | ($444,000) |

**Cost of Capital**

125. EGS' cost of capital should be based on a capital structure consisting of 48.06% long-term debt, 2.16% QUIPS, 6.52% preferred stock, and 43.26% common equity.

**Employee Pensions and Benefits**

142.  Total electric pension expense should reflect a 3.5% assumed salary escalation factor, an eight percent discount rate, and an adjustment to reflect the declining employee levels through January 1997.

143.  EGS' reasonable and necessary pension expense through January 1997 is ($3,161,011). (*See* Revised PFD.)

144.  Post-retirement benefits other than pension should be $8,800,267 for total electric. This includes a medical cost trend rate of 7.9%, an eight percent discount rate, and employee levels through January 1997. It is not reasonable to permit a utility to recover estimated costs that exceed by any large degree the actual costs experienced in the test year. The $8.8 million level of expense reasonably approximates EGS' test year OPEB expense.

**Production Operation and Maintenance Expense**

145.  EGS included $136,327,381 in production O&M expense, of which $51,491,665 relates to fossil plants. Production O&M expense for its Big Cajun II Unit 3 plant should be $6,428,935, which amounts to a $5,921,024 reduction from EGS' requested O&M expense for this plant. Using EGS' revised figures based on the FERC Form 1 methodology achieves a reasonable total fossil plant O&M expense of $45,570,641.

**Insurance Expense**

146.  EGS' reasonable insurance expense is $1,651,321 per year for current losses. With regard to current losses, EGS should accrue only enough each year to cover typical storm damage. (*See* Revised PFD.)

147.   Any reduction to the reserve fund occurring after the test year should not be considered in this case because EGS did not prove a reasonable post-test-year level for its existing reserve fund or that the amount expended in 1997 to reduce the fund was prudent or appropriate. Reserve fund levels following the test year in this case can be addressed in EGS' November 1998 rate filing when all parties will have the opportunity to evaluate the reasonableness of changes to the insurance reserve fund.

**Affiliate Expenses**

148.   Under PURA § 11.003(2), a utility's affiliates include any entity owning five percent or more of a utility and any entity in which the holding company has a five percent ownership interest. Accordingly, Entergy Service, Inc. (ESI) and Entergy Operations, Inc. (EOI), subsidiaries of Entergy Corporation, are EGS' affiliates. Entergy Services, Inc. provides numerous services ranging from administrative functions to providing fuel supplies to Entergy's various affiliates. Entergy Operations, Inc. is responsible for the management, operation, and support of the five nuclear generating units owned by the Entergy operating companies.

149.   EGS provided evidence of ESI expenses based on the total of all expenses charged. Neither proof by an aggregate finding as to total expenses nor total expenses for that affiliate is viable in this docket--because so many services are provided by ESI, the quantity and diversity of these costs is enormous and involve thousands of items billed during the test-year period. For this reason, EGS must provide evidence of the reasonableness and necessity of its affiliate expense in strict compliance with Section 36.058 of PURA. That is, it must provide evidence supporting the reasonableness and necessity of these expenses by class of costs. It failed to do this.

Appendix I

16 Tex. Admin. Code § 25.231





Texas Administrative Code Currentness
  Title 16. Economic Regulation
    Part 2. Public Utility Commission of Texas
      Chapter 25. Substantive Rules Applicable to
      Electric Service Providers
        Subchapter J. Costs, Rates and Tariffs
          Division 1. Retail Rates
            ➡➡ **§ 25.231. Cost of Service**

(a) Components of cost of service. Except as provided for in subsection (c)(2) of this section, relating to invested capital; rate base, and § 23.23(b) of this title, (relating to Rate Design), rates are to be based upon an electric utility's cost of rendering service to the public during a historical test year, adjusted for known and measurable changes. The two components of cost of service are allowable expenses and return on invested capital.

(b) Allowable expenses. Only those expenses which are reasonable and necessary to provide service to the public shall be included in allowable expenses. In computing an electric utility's allowable expenses, only the electric utility's historical test year expenses as adjusted for known and measurable changes will be considered, except as provided for in any section of these rules dealing with fuel expenses.

  (1) Components of allowable expenses. Allowable expenses, to the extent they are reasonable and necessary, and subject to this section, may include, but are not limited to the following general categories:

    (A) Operations and maintenance expense incurred in furnishing normal electric utility service and in maintaining electric utility

plant used by and useful to the electric utility in providing such service to the public. Payments to affiliated interests for costs of service, or any property, right or thing, or for interest expense shall not be allowed as an expense for cost of service except as provided in the Public Utility Regulatory Act § 36.058.

    (B) Depreciation expense based on original cost and computed on a straight line basis as approved by the commission. Other methods of depreciation may be used when it is determined that such depreciation methodology is a more equitable means of recovering the cost of the plant.

    (C) Assessments and taxes other than income taxes.

    (D) Federal income taxes on a normalized basis. Federal income taxes shall be computed according to the provisions of the Public Utility Regulatory Act § 36.060.

    (E) Advertising, contributions and donations. The actual expenditures for ordinary advertising, contributions, and donations may be allowed as a cost of service provided that the total sum of all such items allowed in the cost of service shall not exceed three-tenths of 1.0% (0.3%) of the gross receipts of the electric utility for services rendered to the public. The following expenses shall be included in the calculation of the three-tenths of 1.0% (0.3%) maximum:

      (i) funds expended advertising methods of conserving energy;

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Tex. Admin. Code tit. 16, § 25.231

(ii) funds expended advertising methods by which the consumer can effect a savings in total electric utility bills;

(iii) funds expended advertising methods to shift usage off of system peak; and

(iv) funds expended promoting renewable energy.

(F) Nuclear decommissioning expense. The following restrictions shall apply to the inclusion of nuclear decommissioning costs that are placed in an electric utility's cost of service.

(i) An electric utility owning or leasing an interest in a nuclear-fueled generating unit shall include its cost of nuclear decommissioning in its cost of service. Funds collected from ratepayers for decommissioning shall be deposited monthly in irrevocable trusts external to the electric utility, in accordance with § 25.301 of this title (relating to Nuclear Decommissioning Trusts). All funds held in short-term investments must bear interest. The level of the annual cost of decommissioning for ratemaking purposes will be determined in each rate case based on an allowance for contingencies of 10% of the cost of decommissioning, the most current information reasonably available regarding the cost of decommissioning, the balance of funds in the decommissioning trust, anticipated escalation rates, the anticipated return on the funds in the decommissioning trust, and other relevant factors. The annual amount for the cost of decommissioning determined pursuant to

the preceding sentence shall be expressly included in the cost of service established by the commission's order.

(ii) In the event that an electric utility implements an interim rate increase, including an increase filed under bond, an incremental change in decommissioning funding shall be included in the increase.

(iii) An electric utility's decommissioning fund and trust balances will be reviewed in general rate cases. In the event that an electric utility does not have a rate case within a five-year period, the commission, on its own motion or on the motion of the commission's Office of Regulatory Affairs, the Office of Public Utility Counsel, or any affected person, may initiate a proceeding to review the electric utility's decommissioning cost study and plan, and the balance of the trust.

(iv) An electric utility shall perform, or cause to be performed, a study of the decommissioning costs of each nuclear generating unit that it owns or in which it leases an interest. A study or a redetermination of the previous study shall be performed at least every five years. The study or redetermination should consider the most current information reasonably available on the cost of decommissioning. A copy of the study or redetermination shall be filed with the commission and copies provided to the commission's Office of Regulatory Affairs and the Office of Public Utility Counsel. An electric utility's most recent decommissioning study or redeterminations shall be filed with the commission within 30 days of the effective date of this subsec-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Tex. Admin. Code tit. 16, § 25.231

tion. The five year requirement for a new study or redetermination shall begin from the date of the last study or redetermination.

(G) Accruals credited to reserve accounts for self-insurance under a plan requested by an electric utility and approved by the commission. The commission shall consider approval of a self insurance plan in a rate case in which expenses or rate base treatment are requested for a such a plan. For the purposes of this section, a self insurance plan is a plan providing for accruals to be credited to reserve accounts. The reserve accounts are to be charged with property and liability losses which occur, and which could not have been reasonably anticipated and included in operating and maintenance expenses, and are not paid or reimbursed by commercial insurance. The commission will approve a self insurance plan to the extent it finds it to be in the public interest. In order to establish that the plan is in the public interest, the electric utility must present a cost benefit analysis performed by a qualified independent insurance consultant who demonstrates that, with consideration of all costs, self-insurance is a lower-cost alternative than commercial insurance and the ratepayers will receive the benefits of the self insurance plan. The cost benefit analysis shall present a detailed analysis of the appropriate limits of self insurance, an analysis of the appropriate annual accruals to build a reserve account for self insurance, and the level at which further accruals should be decreased or terminated.

(H) Postretirement benefits other than pensions (known in the electric utility industry as "OPEB"). For ratemaking purposes, expense associated postretirement benefits other than pensions (OPEB) shall be treated as follows:

(i) OPEB expense shall be included in an electric utility's cost of service for ratemaking purposes based on actual payments made.

(ii) An electric utility may request a one-time conversion to inclusion of current OPEB expense in cost of service for ratemaking purposes on an accrual basis in accordance with generally accepted accounting principles (GAAP). Rate recognition of OPEB expense on an accrual basis shall be made only in the context of a full rate case.

(iii) An electric utility shall not be allowed to recover current OPEB expense on an accrual basis until GAAP requires that electric utility to report OPEB expense on an accrual basis.

(iv) For ratemaking purposes, the transition obligation shall be amortized over 20 years.

(v) OPEB amounts included in rates shall be placed in an irrevocable external trust fund dedicated to the payment of OPEB expenses. The trust shall be established no later than six months after the order establishing the OPEB expense amount included in rates. The electric utility shall make deposits to the fund at least once per year. Deposits on the fund shall include, in addition to the amount included in rates, an amount equal to fund earnings that would have accrued if deposits had been made monthly. The funding requirement can be met with deposits made in advance of the recognition of the expense for ratemaking

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

purposes. The electric utility shall, to the extent permitted by the Internal Revenue Code, establish a postretirement benefit plan that allows for current federal income tax deductions for contributions and allows earnings on the trust funds to accumulate tax free.

(vi) When an electric utility terminates an OPEB trust fund established pursuant to clause (v) of this subparagraph, it shall notify the commission in writing. If excess assets remain after the OPEB trust fund is terminated and all trust related liabilities are satisfied, the electric utility shall file, for commission approval, a proposed plan for the distribution of the excess assets. The electric utility shall not distribute any excess assets until the commission approves the disbursement plan.

(2) Expenses not allowed. The following expenses shall never be allowed as a component of cost of service:

(A) legislative advocacy expenses, whether made directly or indirectly, including, but not limited to, legislative advocacy expenses included in professional or trade association dues;

(B) funds expended in support of political candidates;

(C) funds expended in support of any political movement;

(D) funds expended promoting political or religious causes;

(E) funds expended in support of or membership in social, recreational, fraternal, or religious clubs or organizations;

(F) funds promoting increased consumption of electricity;

(G) additional funds expended to mail any parcel or letter containing any of the items mentioned in subparagraphs (A)-(F) of this paragraph;

(H) payments, except those made under an insurance or risk-sharing arrangement executed before the date of the loss, made to cover costs of an accident, equipment failure, or negligence at an electric utility facility owned by a person or governmental body not selling power within the State of Texas;

(I) costs, including, but not limited to, interest expense, of processing a refund or credit of sums collected in excess of the rate finally ordered by the commission in a case where the electric utility has put bonded rates into effect, or when the electric utility has otherwise been ordered to make refunds;

(J) any expenditure found by the commission to be unreasonable, unnecessary, or not in the public interest, including but not limited to executive salaries, advertising expenses, legal expenses, penalties and interest on overdue taxes, criminal penalties or fines, and civil penalties or fines.

(c) Return on invested capital. The return on invested capital is the rate of return times invested capital.

(1) Rate of return. The commission shall allow each electric utility a reasonable opportunity to earn a reasonable rate of return, which is expressed as a percentage of invested capital, and

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Tex. Admin. Code tit. 16, § 25.231

shall fix the rate of return in accordance with the following principles.

(A) The return should be reasonably sufficient to assure confidence in the financial soundness of the electric utility and should be adequate, under efficient and economical management, to maintain and support its credit and enable it to raise the money necessary for the proper discharge of its public duties. A rate of return may be reasonable at one time and become too high or too low because of changes affecting opportunities for investment, the money market, and business conditions generally.

(B) The commission shall consider efforts by the electric utility to comply with the statewide integrated resource plan, the efforts and achievements of the electric utility in the conservation of resources, the quality of the electric utility's services, the efficiency of the electric utility's operations, and the quality of the electric utility's management, along with other applicable conditions and practices.

(C) The commission may, in addition, consider inflation, deflation, the growth rate of the service area, and the need for the electric utility to attract new capital. The rate of return must be high enough to attract necessary capital but need not go beyond that. In each case, the commission shall consider the electric utility's cost of capital, which is the weighted average of the costs of the various classes of capital used by the electric utility.

(i) Debt capital. The cost of debt capital is the actual cost of debt at the time of issuance, plus adjustments for premiums, discounts, and refunding and issuance costs.

(ii) Equity capital. For companies with ownership expressed in terms of shares of stock, equity capital commonly consists of the following classes of stock.

(I) Common stock capital. The cost of common stock capital shall be based upon a fair return on its market value.

(II) Preferred stock capital. The cost of preferred stock capital is the actual cost of preferred stock at the time of issuance, plus an adjustment for premiums, discounts, and refunding and issuance costs.

(2) Invested capital; rate base. The rate of return is applied to the rate base. The rate base, sometimes referred to as invested capital, includes as a major component the original cost of plant, property, and equipment, less accumulated depreciation, used and useful in rendering service to the public. Components to be included in determining the overall rate base are as set out in subparagraphs (A)--(F) of this paragraph.

(A) Original cost, less accumulated depreciation, of electric utility plant used by and useful to the electric utility in providing service.

(i) Original cost shall be the actual money cost, or the actual money value of any consideration paid other than money, of the property at the time it shall have been dedicated to public use, whether by the electric utility which is the present owner or by a predecessor.

(ii) Reserve for depreciation is the ac-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Tex. Admin. Code tit. 16, § 25.231

cumulation of recognized allocations of original cost, representing recovery of initial investment, over the estimated useful life of the asset. Depreciation shall be computed on a straight line basis or by such other method approved under subsection (b)(1)(B) of this section over the expected useful life of the item or facility.

(iii) Payments to affiliated interests shall not be allowed as a capital cost except as provided in the Public Utility Regulatory Act § 36.058.

(B) Working capital allowance to be composed of, but not limited to the following:

(i) Reasonable inventories of materials, supplies, and fuel held specifically for purposes of permitting efficient operation of the electric utility in providing normal electric utility service. This amount excludes appliance inventories and inventories found by the commission to be unreasonable, excessive, or not in the public interest.

(ii) Reasonable prepayments for operating expenses. Prepayments to affiliated interests shall be subject to the standards set forth in the Public Utility Regulatory § 36.058.

(iii) A reasonable allowance for cash working capital. The following shall apply in determining the amount to be included in invested capital for cash working capital:

(I) Cash working capital for electric utilities shall in no event be greater than one-eighth of total annual operations and maintenance expense, excluding amounts charged to operations and maintenance expense for materials, supplies, fuel, and prepayments.

(II) For electric cooperatives, river authorities, and investor-owned electric utilities that purchase 100% of their power requirements, one-eighth of operations and maintenance expense excluding amounts charged to operations and maintenance expense for materials, supplies, fuel, and prepayments will be considered a reasonable allowance for cash working capital.

(III) Operations and maintenance expense does not include depreciation, other taxes, or federal income taxes, for purposes of subclauses (I), (II), and (V) of this clause.

(IV) For all investor-owned electric utilities a reasonable allowance for cash working capital, including a request of zero, will be determined by the use of a lead-lag study. A lead-lag study will be performed in accordance with the following criteria:

(-a-) The lead-lag study will use the cash method; all non-cash items, including but not limited to depreciation, amortization, deferred taxes, prepaid items, and return (including interest on long-term debt and dividends on preferred stock), will not be considered.

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

(-b-) Any reasonable sampling method that is shown to be unbiased may be used in performing the lead-lag study.

(-c-) The check clear date, or the invoice due date, whichever is later, will be used in calculating the lead-lag days used in the study. In those cases where multiple due dates and payment terms are offered by vendors, the invoice due date is the date corresponding to the terms accepted by the electric utility.

(-d-) All funds received by the electric utility except electronic transfers shall be considered available for use no later than the business day following the receipt of the funds in any repository of the electric utility (e.g., lockbox, post office box, branch office). All funds received by electronic transfer will be considered available the day of receipt.

(-e-) For electric utilities the balance of cash and working funds included in the working cash allowance calculation shall consist of the average daily bank balance of all non-interest bearing demand deposits and working cash funds.

(-f-) The lead on federal income tax expense shall be calculated by measurement of the interval between the mid-point of the annual service period and the actual payment date of the electric utility.

(-g-) If the cash working capital calculation results in a negative amount, the negative amount shall be included in rate base.

(V) If cash working capital is required to be determined by the use of a lead-lag study under the previous subclause and either the electric utility does not file a lead lag study or the electric utility's lead-lag study is determined to be so flawed as to be unreliable, in the absence of persuasive evidence that suggests a different amount of cash working capital, an amount of cash working capital equal to negative one-eighth of operations and maintenance expense including fuel and purchased power will be presumed to be the reasonable level of cash working capital.

(C) Deduction of certain items which include, but are not limited to, the following:

(i) accumulated reserve for deferred federal income taxes;

(ii) unamortized investment tax credit to the extent allowed by the Internal Revenue Code;

(iii) contingency and/or property insurance reserves;

(iv) contributions in aid of construction;

(v) customer deposits and other sources of cost-free capital;

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Tex. Admin. Code tit. 16, § 25.231

(D) Construction work in progress (CWIP). The inclusion of construction work in progress is an exceptional form of rate relief. Under ordinary circumstances the rate base shall consist only of those items which are used and useful in providing service to the public. Under exceptional circumstances, the commission will include construction work in progress in rate base to the extent that:

(i) the electric utility has proven that:

(I) the inclusion is necessary to the financial integrity of the electric utility; and

(II) major projects under construction have been efficiently and prudently planned and managed. However, construction work in progress shall not be allowed for any portion of a major project which the electric utility has failed to prove was efficiently and prudently planned and managed; or

(ii) for a project ordered by the commission under § 25.199 of this title (relating to Transmission Planning, Licensing and Cost-recovery for Utilities within the Electric Reliability Council of Texas), if the commission determines that conditions warrant the inclusion of CWIP in rate base, the project is being efficiently and prudently planned and managed, and there will be a significant delay between initial investment and the initial cost recovery for a transmission project.

(E) Self-insurance reserve accounts. If a self insurance plan is approved by the commission, any shortages to the reserve account will be an increase to the rate base and any surpluses will be a decrease to the rate base. The electric utility shall maintain appropriate books and records to permit the commission to properly review all charges to the reserve account and determine whether the charges being booked to the reserve account are reasonable and correct.

(F) Requirements for post test year adjustments.

(i) Post test year adjustments for known and measurable rate base additions (increases) to historical test year data will be considered only as set out in subclauses (I)-(IV) of this clause.

(I) Where the addition represents plant which would appropriately be recorded:

(-a-) for investor-owned electric utilities in FERC account 101 or 102;

(-b-) for electric cooperatives, the equivalent of FERC accounts 101 or 102.

(II) Where each addition comprises at least 10% of the electric utility's requested rate base, exclusive of post test year adjustments and CWIP.

(III) Where the plant addition is deemed by this commission to be in-service before the rate year begins.

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Tex. Admin. Code tit. 16, § 25.231

(IV) Where the attendant impacts on all aspects of a utility's operations (including but not limited to, revenue, expenses and invested capital) can with reasonable certainty be identified, quantified and matched. Attendant impacts are those that reasonably follow as a consequence of the post test year adjustment being proposed.

(ii) Each post test year plant adjustment will be included in rate base at:

(I) the reasonable test year-end CWIP balance, if the addition is constructed by the electric utility; or,

(II) the reasonable price, if the addition represents a purchase, subject to original cost requirements, as specified in Public Utility Regulatory Act § 36.053.

(iii) Post test year adjustments for known and measurable rate base decreases to historical test year data will be allowed only when clause (i)(IV) of this subparagraph and the criteria described in subclauses (I) and (II) of this clause are satisfied.

(I) The decrease represents:

(-a-) plant which was appropriately recorded in the accounts set forth in clause (i)(I) of this subparagraph;

(-b-) plant held for future use;

(-c-) CWIP (mirror CWIP is not considered CWIP); or

(-d-) an attendant impact of another post test year adjustment.

(II) Plant that has been removed from service, mothballed, sold, or removed from the electric utility's books prior to the rate year.

**Source:** The provisions of this § 25.231 adopted to be effective March 1, 1999, 24 TexReg 1377; amended to be effective April 13, 2005, 30 TexReg 2055.

16 TAC § 25.231, 16 TX ADC § 25.231

Current through 40 Tex.Reg. No. 866, dated February 20, 2015, as effective on or before February 27, 2015

Copr. (C) 2015. All rights reserved.

END OF DOCUMENT

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.